IN THE CIRCUIT COURT OF THE FIRST JUDICIAL DISTRICT OF
HINDS COUNTY, MISSISSIPPI

CITY OF JACKSON,

     Plaintiff,

V.                                       CAUSE NO. 19-375

SIEMENS INDUSTRY, INC., SIEMENS
CORPORATION, SIEMENS AG, CHRIS
MCNEIL, U.S. CONSOLIDATED, INC.,
U.S. CONSOLIDATED GROUP LLC,
M.A.C. & ASSOCIATES, LLC, IVISION IT
CONSULTANTS LLC, GARRETT
ENTERPRISES CONSOLIDATED, INC.,
MUELLER SYSTEMS LLC, and JOHN
DOES 1 – 10

     Defendants.

---

## PLAINTIFF'S FIRST AMENDED COMPLAINT
## (JURY TRIAL DEMANDED)

---

Plaintiff, the City of Jackson, Mississippi (the "City" or "Plaintiff"), files this First Amended Complaint against Defendants, Siemens Industry, Inc., Siemens Corporation (collectively, "Siemens"), Chris McNeil ("McNeil"), U.S. Consolidated, Inc., U.S. Consolidated Group LLC (collectively, "U.S. Consolidated"), M.A.C. & Associates, LLC ("M.A.C."), Ivision IT Consultants LLC ("Ivision"), Garrett Enterprises Consolidated, Inc. ("Garrett"), Mueller Systems LLC  ("Mueller"), and John Does 1 – 10 (collectively, the "Defendants"), and hereby pleads as follows:

### I. PARTIES

1.     Plaintiff, the City of Jackson, is a municipal corporation organized and existing under the laws of the State of Mississippi.  The City of Jackson is a mid-sized city with a



population of approximately 165,000 residents. The Jackson Area Water and Wastewater system serves residents and citizens within Hinds County, Mississippi. The City is governed by the Mayor and City Council. The Mayor is elected by the at-large vote of the residents and citizens of the City. There are seven members of the City Council, each elected to represent the citizens and residents of one of the City's seven Wards. This lawsuit is filed by authority of the Mayor of the City of Jackson and with approval of the City Council as the elected representatives of the citizens and residents of the City.

2.      Siemens Industry, Inc. is a Delaware corporation doing business in the State of Mississippi. Siemens Industry, Inc. has been served and has appeared in the lawsuit.

3.      Siemens Corporation is a Delaware corporation doing business in the State of Mississippi. Siemens Corporation has been served and has appeared in the lawsuit.

4.      Mueller Systems LLC is a Delaware limited liability doing business in the State of Mississippi. Mueller Systems LLC may be served through its registered agent, CT Corporation System, at 645 Lakeland East Dr., Suite 101, Flowood, Mississippi 39232.

5.      Chris McNeil is an individual who, on information and belief, resides and works in Mississippi. McNeil is a former employee of Siemens and is being sued in his individual capacity and in his capacity as an agent of Siemens. McNeil has been served and has appeared in this lawsuit.

6.      U.S. Consolidated, Inc. is a Mississippi corporation with its principal office located at 4785 I-55 North, Suite 102, Jackson, Mississippi 39206. U.S. Consolidated, Inc. has been served and has appeared in this lawsuit.

7.      U.S. Consolidated Group LLC is a Mississippi limited liability company doing business in the State of Mississippi.  U.S. Consolidated Group LLC has been served and has appeared in this lawsuit.

8.      M.A.C. & Associates, LLC is a Mississippi limited liability company doing business in the State of Mississippi, with its principal office located at 125 S. Congress St., Suite 1300, Jackson, Mississippi 39201.  M.A.C. & Associates, LLC has been served.

9.      Ivision IT Consultants LLC is a Mississippi limited liability company doing business in the State of Mississippi.  Ivision IT Consultants LLC has been served and has appeared in this lawsuit.

10.     Garrett Enterprises Consolidated, Inc. is a Mississippi corporation with its principal office located at 2659 Livingston Road, Jackson, Mississippi 39213.  Garrett Enterprises Consolidated, Inc. has been served and has appeared in this lawsuit.

11.     Defendants John Does 1 – 10 are persons or entities who may be liable for all or part of the claims or damages set forth in this Complaint, but whose involvement or identity is unknown at this time.  These defendants include, without limitation, individuals or entities who received improper payments or benefits in connection with the project at issue in this lawsuit.

## II.  JURISDICTION AND VENUE

12.     This Court has subject matter and personal jurisdiction over the Defendants under Mississippi Code § 9-7-81.  The Defendants reside in Mississippi and/or committed the acts, omissions, and torts described in this Complaint in the State of Mississippi.  Defendants also have systematic and continuous contacts with the State of Mississippi.

13.    Under Mississippi Code § 11-11-3, venue is proper in the Circuit Court of Hinds County, Mississippi because the events that caused the injuries at issue occurred in Hinds County, Mississippi.

### III.  CONDITIONS PRECEDENT

14.    All conditions precedent necessary to maintain this action have been performed or have occurred.

### IV.  CASE OVERVIEW

15.    This case involves a massive fraud orchestrated by Siemens under the guise of an energy performance contract promising $120 million in guaranteed savings for the City. Siemens was paid $90 million to install a new automated water meter and billing system and to make repairs to the City's water treatment plants and sewer lines.  Siemens committed fraud with respect to who was performing the work on the project, what the system would do, and what savings the system would generate, among other things.  Far from delivering on its promise of $120 million in guaranteed savings, Siemens provided illusory guarantees and a defective system that caused more than $450 million in losses to the City.

16.    To induce the City to hire Siemens for the $90 million project, Siemens guaranteed that increased revenue and savings from the water meter upgrades would pay for the cost of the project, including the financing costs that ultimately resulted in the project costing more than $200 million.  Siemens assured the City that the new system would be so accurate in measuring the water consumed by the City's customers that the system would pay for itself through increased revenue collections and a decrease in the number of City employees needed to manage the automated system.  In its pitch to the City, Siemens repeatedly invoked the

guaranteed structure of an energy performance contract. But in the end, the energy performance contract promised by Siemens was not an energy performance contract at all.

17.    Siemens failed the citizens of Jackson in its promises to perform and in its obligations of honesty and fair dealing. When it came time to execute an agreement, Siemens effectuated a "bait-and-switch" that fell short of a true performance contract. Despite promising to structure an agreement to comply with the requirements of an energy performance contract regulated by the State of Mississippi, Siemens created a deal structure with illusory savings and no real performance assurances at all. The substantial majority of the purported "savings" under the contract are phony, assumed amounts that are not measured against actual savings or revenue realized by the City. Siemens represented that it would structure the agreement to comply with energy performance contracting requirements, but it intentionally omitted any true performance guarantees or energy savings in the contract itself. The City thus took on all of the risk of the project while Siemens was paid $90 million regardless of its delivery of actual savings and revenue.

18.    Siemens's "bait-and-switch" scheme is not only fraudulent, but it also invalidates the contract, which lacks the statutory protections promised by Siemens and to which the City and its citizens are entitled. Siemens sold the automated water meter and billing system as an energy performance contract to avoid an open public bidding process. But the process used by Siemens was a sham. Siemens manipulated the Mississippi Development Authority ("MDA") oversight process in violation of Mississippi law to obtain approval by the MDA as an "energy performance contract," even though the contract is devoid of the guarantees and protections required by Mississippi law. Because of Siemens's manipulations, the project was not publicly bid and the MDA was unable to provide meaningful oversight. By promising but failing to

provide an actual energy performance contract with guaranteed revenue and savings, Siemens violated the strict bidding requirements of Mississippi's public bidding statute and created an invalid contract that undermines the very purpose of guaranteed energy performance contracts.

19.    As a further inducement for the City to enter into a contract with Siemens, Siemens also misrepresented its commitment to hire qualified, minority-owned subcontractors under an Equal Business Opportunity (EBO) plan.  In an effort to provide opportunities for historically-underutilized businesses, the City encourages contractors like Siemens to consider qualified minority-owned businesses when selecting subcontractors to perform work on public works projects.  As part of its pitch to secure a contract with the City, Siemens represented that it would utilize minority-owned businesses to carry out 58% (more than $52 million) of the $90 million project cost.  However, Siemens never intended to hire qualified EBO subcontractors to actually perform the work.  Instead, Siemens conspired with its co-defendants and used a pass-through scheme in which it hired sham subcontractors and middlemen to inflate its EBO numbers and deceive the City's residents.  Focused only on generating a multi-million dollar project for itself, Siemens drove up the cost of the project by using unqualified pass-through entities selected on the basis of their political connections and influence rather than their qualifications, thereby depriving qualified and competent EBO contractors the opportunity to perform the work in accordance with the law and the representations made by Siemens.  Siemens and its co-defendants manipulated the EBO plan requirements and made millions of dollars to the detriment of the citizens of Jackson.

20.    Siemens not only defrauded the City and its residents through the contracting process, but Siemens also failed to provide a water meter system that works.  The $90 million project was plagued by technical problems from the start.  The hardware for the system was

shockingly overpriced and rarely installed properly. More than 20,000 water meters were installed incorrectly or were unable to transmit meter readings to the system, causing delays in the project and chronic, ongoing problems with accurately measuring and billing for water usage by the City's customers. The meters as installed could not communicate with the billing system, and the billing system was not set up appropriately to address the thousands of faulty meter readings, which resulted in accounts becoming "stranded" in the system.

21.     To this day, the City continues to discover serious flaws and implementation problems that were concealed by Siemens, including inherent defects in the Siemens system. First, the City has become aware of information indicating that the Mueller water meters and associated equipment installed by Siemens have ***manufacturing and/or design defects***, resulting in meter reading failures at a rate far in excess of the industry standard. Second, the City eventually learned through trial and error that, as designed and implemented by Siemens, the Mueller automated water meter system was incompatible with the Oracle Customer Care and Billing System, revealing a ***fatal design defect*** that destroyed the functionality of the system. Even more alarming, Siemens knew that the water meter and billing system suffered from inherent defects while the project was ongoing. Siemens concealed this vital information from the City while the City worked diligently to figure out the problems with the system. In fact, Siemens sent fraudulent notices to the City representing that the project was complete and the system was functional, despite knowing that the system was plagued by problems that would continue to interfere with the City's revenue collection efforts after the system was handed over by Siemens.

22.     Despite the City's efforts to remedy defects in the system, the Siemens water system continues to be a disaster for the City of Jackson and its citizens. At the time Siemens

handed over a system that it claimed to be functional, more than 20,000 of the 60,000 meters installed by Siemens were not functioning correctly. To this day, it is estimated that more than 10,000 meters still are not working, and the billing system has repeatedly generated grossly inaccurate bills and, in some instances, failed to generate bills at all. This has resulted in the City's inability to collect revenue from water use, while the City's residents and businesses have lost all confidence in the defective system installed by Siemens.

23.    Siemens sold the water meter project as a risk-free energy performance contract backed by Siemens's full financial guarantee. Siemens claimed that the automated meter system would pay for itself and make money for the City. And Siemens pledged to write a check to the City for the difference if the system did not deliver guaranteed revenue and savings to cover the entire cost of the project. In reality, Siemens installed a defective automated water meter system that is inferior in every respect to the City's old manual system and that delivers none of the guarantees promised by Siemens. Siemens ultimately guaranteed nothing other than financial ruin for the City.

24.    The City thus has been forced to bring this lawsuit to hold Siemens and its co-defendants accountable for their promises to the citizens of Jackson and the financial disaster they have caused. The City seeks to recover approximately $209 million for the cost of the system and its implementation, which includes the $90 million paid to Siemens and the City's debt service costs for financing the project. The City also seeks to recover more than $175 million for lost revenue from the defective system and more than $75 million for system stabilization, repairs, and ongoing maintenance and operations costs funded by the City.

25.    In addition to these damages of more than $450 million, the City has incurred other substantial losses due to the Siemens project destroying the City's credit rating and ability

to borrow necessary funds. This has resulted in the City's inability to complete other public works projects, including work required by a preexisting consent decree in an enforcement action by the United States Environmental Protection Agency. In total, the City will likely suffer **_more than $700 million in losses_** caused by the supposedly "guaranteed" and "risk-free" water meter project promised by Siemens.

## V.  FACTUAL BACKGROUND

### A.    Siemens Makes False Promises to Induce the City to Approve the Project.

26.    The City's path to the ill-fated project with Siemens started several years ago. In 2010, Chris McNeil of Siemens began his pitch to persuade the City to hire Siemens for what McNeil referred to as a "guaranteed water project" to update the City's water meter infrastructure. On September 7, 2010, McNeil sent an email to Dan Gaillet, the City's Public Works Director at the time, "to guide you through the process of the water project," informing Gaillet that "[t]o get the process started all you need is to send an email to the MDA (Terrence Spears) with an intent to advertise" and ensuring the City that "[w]e [*i.e.*, Siemens] have already received approval for these projects so there should be no objection." McNeil represented to Gaillet that Siemens performed "the first guaranteed project done in MS" for the City of McComb, Mississippi, and that "through a Guaranteed Performance-based Solution," McComb's "revenue enhancements were accomplished through a comprehensive water meter project with the installation of fixed base AMR technology." Unknown to the City of Jackson at the time, the City of McComb would later sue Siemens for its defective water meter system and empty guarantees.

27.    McNeil continued his pitch to the City throughout the Fall of 2010, promising to deliver a guaranteed water meter project backed by the risk-free structure of an energy performance contract. In an October 21, 2010 email to Gaillet, McNeil stated that

"[p]erformance contracting is a great thing and is one of the greatest economic development tools you guys [*i.e.*, the City] have."  In touting Siemens's experience, McNeil claimed that "[w]e [*i.e.*, Siemens] are the largest ESCO [*i.e.*, energy services company] in the world and have performed more PC [*i.e.*, performance contract] projects in MS than all other ESCO's combined."  McNeil claimed that "[w]e have performed every guaranteed project in MS" and "[w]e have NEVER missed a guarantee in MS."

28.    On December 7, 2010, McNeil again contacted Gaillet and informed him that Siemens effectively wrote the legislation governing energy performance contracts, and the City needed to use that statute in updating its water meter system because, according to McNeil, the City was losing thousands of dollars each day through the use of its manual water meter system. McNeil told Gaillet that "[r]ight now the city truly needs this project b/c you are losing thousands of dollars each day the project is not implemented."  In referring to Mississippi's statute governing energy performance contracts, McNeil represented that "Siemens pushed this legislation through to make these jobs possible, did the first guarantee job at the City of McComb, and set the standard for contract language required with the MDA," and Siemens "got [language] added to the legislation to allow these projects."

29.    In pushing the guaranteed structure of the project, McNeil assured Gaillet that "the [Mississippi Attorney General] and MDA have both approved these projects," and [o]nce you select someone there is specific language that has to be put in the contact, specific ways the [technical energy analysis] has to be submitted, specific calculations on savings."  Once again touting Siemens's allegedly singular experience, McNeil claimed that "we [*i.e.*, Siemens] have been selected on every job that has been advertised" and "this is truly a situation that we are the only vendor that knows b/c we are the ONLY ones that have done it."  McNeil assured Gaillet

that "we [*i.e.*, Siemens] know this stuff backwards and forwards and can help you fight any erroneous information that is provided." At the time, the City did not know that Siemens, the supposed expert on these types of projects, would be the one providing false information to the City.

30. Siemens, through McNeil, continued to urge the City to initiate the "risk-free" water meter project throughout 2010 and early 2011. On January 30, 2011, McNeil contacted Gaillet to provide information to address "questions from my team members that city personnel have been asking … about the differences between 1 ESCO vs. multiple award, how the guarantees work, etc." McNeil stated that "[w]ith any performance contract there are several different things that can be guaranteed: utility savings, operations savings, capital cost planning, and revenue production," and "for any improvements we propose the guarantees listed above on an annual basis must pay for the improvements over the term." McNeil made clear that "[t]he goal is for the ESCO [*i.e.*, Siemens] to take all the risk." In discussing whether the project could be awarded to two prime contractors by "split[ting] everything down the middle including water meters," McNeil represented that "[i]n MS this is not possible b/c the state requires the ESCO [*i.e.*, Siemens] to guarantee actual $$$ on revenue not just accuracy [of water meters]. You can't have two companies guaranteeing $$$." McNeil claimed that "MS is the only state I know of that has this requirement so the other companies responding to this project will not know this. Since we are the only company to have performed these projects in MS we would be the only one to know this."

31. With McNeil continually assuring the City that the project would pay for itself, the City eventually began the process of advertising for an energy performance contract to update the City's water meter infrastructure. In August 2011, the City, through the

administration of former Mayor Harvey Johnson, issued a Request for Qualifications for an Energy Performance Contract. Siemens issued a response to the City's Request for Qualifications in or around October 2011. In its response and ongoing communications with the City, Siemens assured the City that the project would receive the full financial and technical support of the entire Siemens organization, with Siemens representing itself as an $80 billion company with world-wide experience in successfully completing energy performance contracts.

32.     After receiving Siemens's response, the City and Siemens continued to engage in discussions regarding the City's water meter system and the possibility of improvements to the system under an energy performance contract. During those discussions in January, February, and March 2012, Siemens representative McNeil continued to represent that the City would generate additional revenue from water usage and would realize operational savings if it upgraded its water meter system. McNeil assured the City that if Siemens was selected as the contractor, the additional revenue and savings realized by the City would pay for the cost of the project and would result in incremental revenue for water usage not captured by the City's current meters. In a presentation to the City on or around March 26, 2012, McNeil represented that the City would be able to collect additional revenue and reduce operating costs, which would pay for the cost of the project and provide additional cash flow to the City. Siemens emphasized that the "[f]irst payment isn't due until revenues are realized," and the "[i]ncreased revenue and reduced operating costs provide supplemental capital improvement funds," which the City can use to fund other necessary projects. In its presentation, Siemens and McNeil once again assured the City that the project would be paid for by "*GUARANTEED SAVINGS! – ESCO* [*i.e.*, Siemens] *PAYS FOR ANY SHORTFALLS.*"

33.    Relying on Siemens's representations of a guaranteed energy performance contract in which Siemens would pay for any shortfalls in increased revenue and savings to cover the cost of the project, the City selected Siemens to go forward with a technical energy analysis, which is required by Mississippi's energy performance contracting statute.  In May 2012, Siemens conducted a technical energy audit of the City's water meter system.  The analysis claimed that the City's meters were only 86% to 94% accurate, and the meter accuracy would decrease to 79% to 87% over a fifteen-year period.  Siemens, through representatives that included Chris McNeil, represented that new water meters installed by Siemens, by comparison, would have a 98.5% accuracy rate.  Siemens representative McNeil represented that its more accurate meters would result in increased revenue for the City without the need to raise rates charged to the citizens of Jackson.  Siemens and McNeil further represented that the City would benefit from operational and maintenance savings associated with updated meters that could be read remotely, which would eliminate the need for City personnel to read individual meters and perform repairs to the old system.  In a May 25, 2012 email to Gaillet, McNeil emphasized that "[t]he project must be self funded. This project will require NO RATE INCREASES or TAX INCREASES."  McNeil also confirmed that "the project … will be funded by the guaranteed savings/revenues."

34.    Siemens guaranteed that the City would realize more than $120 million in increased revenue and savings as a result of the water meter upgrades.  Siemens representatives, including McNeil, again represented that the guaranteed savings from the water meter upgrades would pay for the cost of the project and the City's cost of financing the work.  To make sure that the City would approve the project and be able to obtain financing, McNeil even provided information to the City that he intended for the City to pass on to rating agencies.  In a July 31,

2012 email to Gaillet, McNeil provided "the answers you need for the rating agency."  Among other "answers" provided by Siemens, McNeil represented that "[t]he performance contract is a construction job that is paid from additional revenues and operational savings that are achieved by the project."  He also represented that "[t]he project will generate about 4.5M per year in revenues and another 3.5M per year in reductions to the current operating budget," and "[t]hese savings will be used over a 15 year period of time to fund the 85M in debt service required to pay for the project and the savings will be GUARANTEED by Siemens," assuring the City that "[i]f there is a shortfall in the revenues Siemens must write a check back to the city for the difference."

35.    McNeil once again invoked the protections of Mississippi's energy performance contract statute in trying to persuade the City to approve the project.  In his July 31, 2012 email, McNeil stated that "[t]he contract will be reviewed by the Mississippi Development Authority and ultimately approved based on its cash neutral approach. This agency ensures that the revenues/savings in the contract are viable and that the city is signing a contract that fully covers them financially."  McNeil continued to emphasize that "[a]s part of the state law and MDA requirements, the project must be fully funded from the guaranteed savings/revenues."  And McNeil again emphasized the risk-free nature of an energy performance contract in an August 2, 2012 email to the City, representing that "[p]er MS Law 31-7-14 these revenues/savings must cover the debt service each year. If there is a shortfall, Siemens will have to reimburse the city for the difference to pay for the debt service."  According to McNeil, "[t]hat is where the guarantee comes into play. This guarantee will stay in place as long as the city has debt service on the project up to a maximum of 15 years."  Unknown to the City at the time, Siemens had no

intention of providing the required guarantee that McNeil was pitching as an essential element of a supposedly "risk-free" and "cash neutral" project.

36.     In addition to false representations regarding Siemens's financial guarantees and the risk-free structure of an energy performance contract, Siemens misrepresented critical information regarding the technical components and implementation of the system.  Siemens represented to the City that "the Mueller system will be a great long term solution for Jackson which is evident in our guarantee of revenues associated with the system."  Despite that representation, Siemens did not disclose that it had never installed a Mueller water meter system for use in conjunction with an Oracle Customer Care & Billing System.  Siemens essentially used the City of Jackson as a $90 million test case for an unproven system, failing to disclose to the City that Siemens had never successfully paired the two systems before.  Siemens also failed to disclose that installing a new automated water meter system at the same time as a new electronic billing system is unprecedented and is contrary to industry standards.  The City relied on Siemens, the supposed expert on these types of projects, yet Siemens failed to disclose material information regarding the project's components and implementation.

37.     To induce the City to enter into a contract with Siemens, Siemens representative McNeil also represented to the City that more than 50% of the total project cost would comply with the City's EBO plan by utilizing minority-owned businesses in performing aspects of the project.  In September 2012, Siemens submitted an application to the City's EBO Office representing that 58% of the project cost would be subcontracted to minority-owned businesses. Siemens acknowledged that the minority-owned businesses involved in the project would, per the requirements of the City's EBO plan, perform a "commercially useful function" by being responsible for a distinct element of the work and by actually performing, managing, and

supervising the work involved.  Siemens also represented to the City that Siemens would mentor and train the minority-owned businesses involved in the project.

38.    In October 2012, relying on Siemens's and McNeil's promises of increased revenue and savings and involvement of minority-owned businesses, the City Council approved entering into a contract with Siemens to upgrade the City's water system.  In doing so, the City relied on Siemens's representations (as detailed above) that increased revenue and savings would pay for the cost of the project, and that Siemens would pay the City for any shortfall in the guaranteed revenue and savings.  The City later discovered, however, that Siemens manipulated the contracting process and provided illusory guarantees to the City in order to secure the contract.

**B.    Siemens Imposes a Contract Structure Burdened by $90 Million in Upfront Costs and Illusory Guarantees.**

39.     Siemens and McNeil pitched the Siemens project to the City as an energy performance contract.   Energy performance contracts are subject to public contracting requirements and are regulated by the State of Mississippi through the Mississippi Development Authority ("MDA").  Despite presenting its project as an energy performance contract, however, Siemens created a contract structure that fails to deliver the guaranteed energy performance and savings promised by Siemens and required by law for such regulated contracts.

40.    The City and Siemens entered into what was called the Performance Contracting Agreement (the "Agreement"), dated January 30, 2013, but signed by former Mayor Harvey Johnson on December 28, 2012.  The Agreement was amended four times to address specific issues.  A copy of the Agreement, with Amendments 1, 2, 3, and 4, is attached as Exhibit A to this Complaint.

41.    The Agreement required Siemens to "install an Automatic Metering System to provide hourly reads." *See* Amendment No. 4 at § 1.2.1.  The required components of the automatic metering system included 60,000 water meters with remote transmitters, 4,700 backup water meters for inventory, 60 data hub collectors, and 900 network repeaters.  *See id*.  In addition, the Agreement called for Siemens to implement a new billing and payment system, referred to as the Oracle Customer Care & Billing (CC&B) System, as part of the meter upgrades.  Siemens was obligated to develop and install the new billing software module and server, transfer billing account data from the existing billing system to the CC&B System, and provide training and technical support for the new automatic metering and billing system.  *See id*.  Among other specific obligations, Siemens agreed to "provide training and administrative support prior to Substantial Completion of the Project to ***ensure a functional system***."  *See id*. (emphasis added).

42.    Despite its repeated representations regarding a performance contract with guaranteed revenue and savings, Siemens created a deal structure that required the City to pay $90 million in upfront installation costs and another $4.5 million for Siemens to measure what were essentially illusory performance guarantees.  The "Performance Guarantee" from Siemens states that "the increase in billable usage over the Baseline … , through more accurate measurement, will be equal to or exceed the total Project Cost" of $90 million.  *See* Agreement at Exhibit C, § 1.3.  Table 1.2 of the Agreement identifies $122 million in guaranteed savings, broken down by billable usage increase, operational savings, and deferred maintenance savings:

| Table 1.2 – Total Guaranteed Savings (Cost) | | | | | |
|---|---|---|---|---|---|
| Performance Period | Small Meter Billable Usage Increase $ | Large Meter Billable Usage Increase $ | Operational Savings $ | Deferred Maintenance Savings $ | Total Savings $ |
| Annual Period 0 | $2,309,957 | $501,802 | $503,750 | - | $3,315,509 |
| Annual Period 1 | $2,529,702 | $1,003,604 | $2,015,200 | $1,654,389 | $7,202,895 |
| Annual Period 2 | $2,657,333 | $1,003,604 | $2,075,656 | $1,654,389 | $7,390,983 |
| Annual Period 3 | $2,784,965 | $1,003,604 | $2,137,926 | $1,654,389 | $7,580,884 |
| Annual Period 4 | $2,784,965 | $1,003,604 | $2,202,063 | $1,654,389 | $7,645,021 |
| Annual Period 5 | $2,784,965 | $1,003,604 | $2,268,125 | $1,654,389 | $7,711,083 |
| Annual Period 6 | $2,784,965 | $1,003,604 | $2,336,169 | $1,654,389 | $7,779,127 |
| Annual Period 7 | $2,784,965 | $1,003,604 | $2,406,254 | $1,654,389 | $7,849,212 |
| Annual Period 8 | $2,784,965 | $1,003,604 | $2,478,442 | $1,654,389 | $7,921,400 |
| Annual Period 9 | $2,784,965 | $1,003,604 | $2,552,795 | $1,654,389 | $7,995,753 |
| Annual Period 10 | $2,784,965 | $1,003,604 | $2,629,379 | $1,654,389 | $8,072,337 |
| Annual Period 11 | $2,784,965 | $1,003,604 | $2,708,260 | $1,654,389 | $8,151,218 |
| Annual Period 12 | $2,784,965 | $1,003,604 | $2,789,508 | $1,654,389 | $8,232,466 |
| Annual Period 13 | $2,784,965 | $1,003,604 | $2,873,193 | $1,654,389 | $8,316,151 |
| Annual Period 14 | $2,784,965 | $1,003,604 | $2,959,389 | $1,654,389 | $8,402,347 |
| Annual Period 15 | $2,784,965 | $1,003,604 | $3,048,171 | $1,654,389 | $8,491,129 |
| TOTALS | $43,701,532 | $15,555,862 | $37,984,280 | $24,815,841 | $122,057,515 |

43.    This performance guarantee structure imposed by Siemens contains purported "savings" that are illusory and not based on reality. The alleged savings from large meter usage increases, operational reductions, and deferred maintenance are not based on actual savings or revenue, but rather on amounts that are assumed to occur over the 15-year period covered by the contract. As a result, only the small meter revenue increase is subject to an actual measurement of performance for each annual period. And even under that component, Siemens measures its own performance and does not compare the alleged usage increases to actual revenue collected by the City. Siemens thus created a performance contract structure with no real performance guarantees, and with 65% (around $80 million) of the $122 million in purported savings based on amounts that will never be measured to determine if the savings actually occurred.

44.    Compounding the illusory nature of Siemens's performance guarantees, Siemens is charging the City another $4.5 million to measure its own yearly performance. If the City fails

to pay for the ongoing Performance Assurance Program, Siemens will not guarantee the purported savings promised under the Agreement. Siemens thus is charging the City $4.5 million for a self-evaluation of performance metrics that do not reflect the City's actual collected revenue and realized savings. Knowing the City lacked the technical expertise to evaluate fully Siemens's proposal, Siemens was able to effectuate a "bait-and-switch" that fell short of a true energy performance contract with guaranteed savings and revenue that would pay for the cost of the project.

**C.    Siemens Manipulates EBO Plan Requirements by Using a Fraudulent Pass-Through Scheme.**

45.    On top of Siemens's misrepresentations and illusory guarantees in violation of energy performance contracting requirements, Siemens's "bait-and-switch" scheme was facilitated by its manipulation of EBO plan requirements. To induce the City to enter into the Agreement, Siemens representatives, including McNeil, represented that minority-owned businesses would be utilized for 58% of the $90 million project cost. Yet Siemens and McNeil never intended to live up to that promise. Instead, Siemens and McNeil conspired with the other Defendants and concocted an EBO pass-through scheme in which Siemens utilized sham subcontractors to obtain approval of the Agreement.

46.    Siemens submitted a plan to use several minority-owned businesses as subcontractors for the project to satisfy its 58% commitment. As part of the EBO plan, Siemens purported to engage U.S. Consolidated, Inc. and/or U.S. Consolidated Group LLC ("U.S. Consolidated"), a company owned and managed by former Mississippi state politician and lobbyist Tom Wallace, as a subcontractor responsible for supplying the water meters for the project. Siemens representatives, including McNeil, represented to the City that Siemens would pay U.S. Consolidated approximately $19 million for water meter supply and logistics. At the

conclusion of the project, Siemens claimed that it ended up paying U.S. Consolidated approximately $19.5 million for its work on the water project.

47.     However, in reality, Siemens and McNeil brought in U.S. Consolidated as a pass-through entity involved in the supply of water meters on paper only.  Siemens carried out its scheme by having U.S. Consolidated buy the water meters from the manufacturer, Mueller Systems, and then sell the meters to Siemens at a marked-up price for installation by yet another subcontractor.  Siemens thus conspired with U.S. Consolidated, a minority-owned business, to use U.S. Consolidated as the water meter middleman to funnel the meters to Siemens as part of a fraudulent EBO scheme, all at an increased cost to the City.  Siemens simply used Tom Wallace's company as a pass-through entity to inflate the EBO participation percentage for the project.  For its part, U.S. Consolidated received nearly $20 million for doing nothing more than serving as a middleman for water meters that were manufactured and installed by other companies.

48.     Siemens and McNeil used other sham contractors in the EBO pass-through scheme.  Siemens and McNeil represented to the City that M.A.C. & Associates, LLC ("M.A.C."), a minority-owned business owned and managed by Marcus Wallace, would be paid approximately $19 million as a subcontractor responsible for water plant and sewer line repairs and installation of the new water meters.  In reality, Hemphill Construction, Inc. performed most of the water plant and sewer line repairs, either through a separate subcontract with Siemens or through a second-tier subcontract with M.A.C.  At the direction of Siemens, Pedal Valve, Inc. also performed a substantial portion of the water meter installation work through a subcontract with Siemens or a second-tier subcontract with M.A.C.  Because M.A.C. was not qualified to perform the work assigned to it on paper as part of Siemens's EBO scheme, Hemphill and Pedal

Valve actually performed the work, which increased the costs to the City. Siemens and McNeil falsely claimed that M.A.C. was providing a commercially useful function as a qualified EBO contractor even though other contractors actually performed the work. M.A.C. conspired with Siemens and agreed to serve as a pass-through entity in return for receiving $19 million.

49. Similarly, Siemens and McNeil represented that Ivision IT Consultants LLC ("Ivision"), a minority-owned business owned and managed by James Covington, was paid approximately $11 million as a subcontractor responsible for implementing the new CC&B billing system. However, another company ended up performing most of that work, and it is unclear what role, if any, Covington's company actually played in performing or managing the implementation of the billing system. Ivision was paid $11 million for simply serving as a pass-through entity for Siemens's EBO scheme.

50. Finally, Siemens and McNeil represented to the City that Garrett Enterprises Consolidated, Inc. ("Garrett"), a minority-owned business owned and operated by Socrates Garrett, was paid $4.6 million to perform construction management and quality control services. However, it is unclear what services, if any, Garrett actually performed and how those services provided any commercially useful function for the project and benefit to the citizens of Jackson. Like the other sham subcontractors, Garrett received millions of dollars to serve as a pass-through entity under Siemens's fraudulent EBO plan.

51. The City approved the Siemens project based on Siemens's and McNeil's fraudulent representations regarding Siemens's EBO plan commitments. Instead of abiding by its promise to hire minority-owned businesses to perform 58% of the $90 million contract, Siemens used unqualified, sham subcontractors based on their political connections and influence to carry out a pass-through scheme that ultimately cost the City millions of dollars in

inflated costs for an already overpriced water system. Siemens's selection of unqualified EBO subcontractors resulted in shoddy work that contributed to problems with the current water system and deprived other qualified EBO businesses the opportunity to perform the work.

**D.    Siemens Continues to Make False Representations and Conceal Material Information After the Agreement is Signed.**

52.    Even after the Agreement was executed, Siemens continued its pattern of deceptive conduct and misrepresentations to obtain approval of the Agreement by the MDA, to convince the City to issue a notice to proceed with the work, and to induce the City to continue to make payments to Siemens during the course of the project. Siemens effectively ghost-wrote the City's responses to questions from the MDA and directed the project through the MDA approval process. In doing so, the City relied on information provided by Siemens in responding to questions from the MDA. Among other issues, in response to the MDA's questions concerning large water meters and how the meters would be measured and verified, Siemens representative McNeil told the City and the MDA in March 2013 that the accuracy of the large meters will not degrade over time, and the large meters will always have an accuracy rate of at least 99.6%. As a result, according to Siemens and McNeil, there is no need to measure and verify the accuracy of the large meters. Unknown to the City at the time, inaccurate readings from the large meters would be a consistent problem after the system was implemented.

53.    In addition, to convince the City to issue a notice to proceed with the project, Siemens representative McNeil assured the City Council in July 2013 that the City would immediately begin to realize savings and increased revenue as soon as the Siemens project began, which would allow the City to pay for its debt service during the construction period and over the course of the City's loan repayment. Specifically, at a City Council meeting on July 22, 2013, McNeil was asked whether the City will start to realize savings as soon as construction

begins, and how long it will take to start realizing savings.  In response, McNeil informed the City Council: "Right when we get started, it's immediate. … You're relying upon savings created by us starting work right now."   When again asked whether the City will begin to realize savings as soon as Siemens starts work on the project, so that the City can begin using the savings to cover its debt payments, McNeil responded, "Yes, without a doubt."  The City relied on Siemens's and McNeil's promises of immediate, guaranteed savings in authorizing commencement of the project.

54.    To induce the City to continue to make payments to Siemens during the course of the project, Siemens also misrepresented the status of the project and concealed serious defects in the system.  First, the City has become aware of information indicating that the Mueller water meters and associated equipment installed by Siemens have manufacturing and/or design defects, resulting in meter reading failures at a rate far in excess of the industry standard.  Mueller's shareholders have filed a federal securities class action lawsuit against Mueller alleging that Mueller misrepresented the nature and scope of serious defects in its water meters and automated meter system, exposing Mueller to claims by various counties and municipalities that installed the defective Mueller equipment.  According to filings by Mueller's shareholders, Mueller was aware of crippling defects in its water meters and increasing failure rates associated with its meters beginning in January 2016, at the latest.  In April 2016, Mueller representatives even informed the San Diego public utility department about a defect in the gears of the Mueller water meter's register that could prevent a dial from turning properly, preventing the meter from relaying water use remotely.  Other jurisdictions, including Missouri water districts, discovered that Mueller water meters installed between 2012 and 2015 had either a defective magnetic design or problems with other meter components, resulting in premature failure rates associated

with nearly 100,000 Mueller meters.  Mueller executives acknowledged these defects in 2016 and 2017, noting that meters produced between 2011 and 2014 were failing at a higher than expected rate, particularly meters installed in warm, humid environments.  Although Mueller claimed to have later error-proofed the manufacturing process to prevent this defect from continuing to occur, the defective Mueller meters were already installed in the City of Jackson, and neither Siemens nor Mueller disclosed these defects to the City.  The defects acknowledged by Mueller apply to Mueller-Hersey meters manufactured between 2011 and 2014, which covers the meters installed by Siemens for the City.

55.    Second, the City eventually learned through trial and error that, as designed and implemented by Siemens, the Mueller automated water meter system was incompatible with the Oracle Customer Care and Billing System, revealing a fatal design defect that destroyed the functionality of the system.  Communication between the Mueller meters and the CC&B billing system has never worked properly due to faulty meters and an improperly-configured master meter file.  As designed and implemented by Siemens, the master meter file hosted by the Mueller MIHost system did not work.  Even if meters were providing readings (and thousands were not doing so), those readings were not reaching the billing system because of coding/software configuration errors.

56.    These problems with system should have been corrected by Siemens and its subcontractors before the system was handed over to the City.  Even more alarming, Siemens knew that the water meter and billing system suffered from inherent defects while the project was ongoing, yet it worked to conceal these problems from the City and misrepresented that the system was working properly.  Throughout 2016, 2017, and 2018, Siemens concealed this vital information from the City while the City worked diligently to figure out the problems with the

system.  In 2016 and 2017, Siemens representative Frank Gagliardi repeatedly represented that the billing system was working and was communicating correctly with the Mueller meters, including Gagliardi's representations to the City Council in May 2016.  Siemens even sent notices to the City representing that the project was complete and the system was functional— including a notice of substantial completion in 2018—despite Siemens knowing that the system was plagued by problems that would continue to interfere with the City's revenue collection efforts.  In short, Siemens told the City that the project's implementation was a success and that the system was working despite knowing that the meter equipment suffered from crippling defects and the system was not functional.

**E.    Siemens Provides a Flawed Metering and Billing System that Fails to Deliver Increased Revenue and Savings.**

57.    In addition to the Agreement being tainted by Siemens's fraud and failure to disclose material defects in the system, the Siemens project was plagued by technical problems from the start.  At the time Siemens handed over a system that it claimed to be functional, more than 20,000 of the 60,000 meters installed by Siemens were not functioning correctly or did not satisfy the required specifications, causing delays in the project and problems with accurately measuring and billing for water usage by the City's customers.  The entire project was delayed in early 2015 when the City discovered that Siemens had installed meters that read in gallons instead of the appropriate cubic-feet reading.  Absent the City catching Siemens's mistake, the incorrect meters would have resulted in drastically-higher and inaccurate bills to the City's customers.

58.    Shortly after the new billing system went live in 2015, the City began to accumulate a backlog of thousands of "stranded bills," which continues to grow even as the City works to clear those bills.  The billing system has caused many customers to receive inexplicably

high bills that do not reflect their actual water usage.  In other instances, customers may receive no bill at all for significant periods of time, only to eventually receive an unusually high bill based on months of purported water usage.  These issues have caused customers to contest bills or lack the ability to pay them, while other customers fail to receive bills at all.

59.    Billing and measurement problems continue to this day.  The City estimates that at least 10,000 of the 60,000 new meters are not functioning correctly, resulting in numerous unpaid accounts and water usage that is not accurately captured.  Meters are either installed incorrectly, not transmitting readings, or not communicating with the Mueller network and/or billing system.  Thousands of bills continue to become "stranded" in the system, which has been a pattern since the billing system went live in 2015.  Siemens never fixed the system problems during "stranded bill relief efforts" in 2016 and 2018, which were supposed to remedy meter and billing problems affecting more than 20,000 accounts.  Instead, system problems persist, often requiring manual overrides of what were designed to be "automated" processes.  On top of the inherent defects and implementation problems with the Siemens system, the City's operations and maintenance costs for the water meter system have actually increased, contrary to Siemens's promises that the automated system would decrease costs.  The City has to add skilled workers to run the system, and the system needs additional maintenance and support not required by the City's old manual system.  In short, the Siemens system has been an abject failure, and the citizens of Jackson  have lost faith in the water billing system as a result.

60.    The technical problems with the Siemens project were exacerbated by Siemens's hiring of—and failure to supervise appropriately—unqualified contractors.  For example, neither U.S. Consolidated, nor M.A.C., nor Ivision was qualified to perform the work that Siemens purportedly hired the companies to perform.  Siemens's use of unqualified subcontractors not

only resulted in performance issues, but also inflated the costs of the project.  With regard to the materials and work furnished by or through U.S. Consolidated, M.A.C., Ivision, and Garrett—under Siemens's negligent management and supervision—the work and materials were defective and contributed to the numerous technical problems with the Siemens water system that continue to this day.

61.    The Siemens project has devastated the City's finances.  The City has fallen well short of its budgeted revenue target for water and sewer services since Siemens installed the new water system.  In addition to being saddled with paying more than $200 million for the defective system, the City has lost revenue of more than $175 million due to the defective system.  On top of those losses, the City has funded more than $75 million for system stabilization, repairs, and ongoing maintenance and operations costs.  All told, preliminary calculations place the City's losses at more than $450 million.

## VI.  CAUSES OF ACTION

### Count One – Fraud and Fraud in the Inducement

62.    Plaintiff incorporates all prior paragraphs into this section, to the extent not inconsistent, as if fully set forth herein.

63.    During discussions before execution of the Agreement and in meetings and presentations seeking to obtain the City's approval of the water and sewer system project, Siemens and McNeil misrepresented to the City that:  (a) guaranteed savings and revenue from upgrading the City's water meter and billing system will pay for the cost of the $90 million water improvement project and the City's cost of financing the project; (b) due to the guaranteed savings and revenue from upgrading the City's water system there is no financial downside or financial risk for the City in hiring Siemens to install the new water meter and billing system; (c)

Siemens will utilize and pay minority-owned businesses to perform 58% of the total $90 million contract price for the water system improvement project and such minority-owned businesses will perform a "commercially useful function," pursuant to the City's EBO plan, by being responsible for a distinct element of the work and actually performing, managing, and supervising the work involved; and (d) Siemens will mentor, train, and manage the minority-owned businesses involved in the project.

64.    Among other specific misrepresentations, Siemens representative McNeil falsely promised and represented in oral and written statements to the City throughout 2011, 2012, and 2013—including in January 2011, October 2011, January 2012, February 2012, March 2012, July 2012, October 2012, and July 2013—that guaranteed increases in revenue and decreases in operating expenses would pay for the cost of the Siemens water meter and billing project; that the project would greatly reduce the City's operating costs and minimize the amount of personnel needed to operate the water meter and billing system; that Siemens would take all of the risk on the project; that Siemens would guarantee the City's collection of actual monetary revenue, not just the accuracy of water meters installed by Siemens; that the large water meters are so accurate that they do not need be measured and would maintain an accuracy rate of at least 99.6%; that Siemens would pay the City for any shortfalls in increased revenue to cover the cost of the project, such that if there is a shortfall in increased revenue from the project, Siemens would write a check back to the City for the difference; and that the savings realized by the City would start immediately after construction began, allowing the City to pay its debt service payments from the savings.    Siemens and McNeil made these statements to various representatives of the City, including City Council members and City employees Dan Gaillet and David Willis.

65.     Siemens and its subcontractor, Mueller, also misrepresented and failed to disclose the condition of the water meters and associated equipment and the status of implementation of the system.   On information and belief, the Mueller water meters and associated equipment installed by Siemens have manufacturing and/or design defects, resulting in meter reading failures at a rate far in excess of the industry standard.   On information and belief, the Mueller automated water meter system also was incompatible with the Oracle Customer Care and Billing System, revealing a fatal design defect that destroyed the functionality of the system.   Neither Siemens nor its subcontractor, Mueller, disclosed this material information to the City and instead concealed the inherent defects in the system while blaming the City for any problems with the system's implementation and functionality.   In 2018, Siemens sent notices to the City misrepresenting that the project was complete and the system was functional, despite knowing that the system was plagued by crippling defects and implementation problems.   Specifically, Siemens representatives Frank Gagliardi and Cory Carter misrepresented the status of the project and the functionality of the system.   On information and belief, Siemens knew that the meter to billing interface did not work when Siemens sent completion notices to the City and asked the City to sign off on the project in 2018.

66.     Siemens also misrepresented and failed to disclose material facts regarding the system's design and the project implementation.   Siemens represented to the City that the Mueller automated meter system would be the best long-term solution for the City, yet Siemens failed to disclose that it had never installed a Mueller water meter system to be used in conjunction with an Oracle Customer Care & Billing System, and Siemens had never paired the two systems before and ensured that the systems would communicate correctly.   Siemens also

failed to disclose that installing a new automated water meter system at the same time as a new electronic billing system is unprecedented and is contrary to industry standards.

67.    The above referenced statements, misrepresentations, deceptive conduct, and nondisclosures were made by Siemens, McNeil, and Mueller with actual knowledge that they were false.    Alternatively, the above referenced statements, misrepresentations, deceptive conduct, and nondisclosures were made recklessly, as a positive assertion, and without knowledge of their truth.

68.    The above referenced statements, misrepresentations, deceptive conduct, and nondisclosures were material to the City's decision to enter into the Agreement, to authorize Siemens to make improvements to the City's water and sewer system, and to continue to pay Siemens for its work on the project.    Siemens, McNeil, and Mueller made the above referenced statements, misrepresentations, deceptive conduct, and nondisclosures with the intention that the City act upon them and enter into the Agreement, and the City relied on the above referenced statements and misrepresentations in entering into the Agreement, in authorizing Siemens to make improvements to the City's water and sewer system, and in continuing to pay Siemens over the course of the project.

69.    As a result of Siemens's, McNeil's, and Mueller's false representations, nondisclosures, and deceptive conduct, the City has incurred damages for which it now sues. The City requests that Siemens, McNeil, and Mueller be held jointly and severally liable and be ordered to disgorge all revenue and funds received from the City and pay all actual and consequential damages resulting from their wrongful conduct, including but not limited to the $90 million paid to Siemens in connection with the Agreement, and the City's lost revenue, debt service costs, loss of credit, damage to credit rating and reputation, investigation and remediation

costs, and repair costs. The City also seeks punitive damages due to Siemens's, McNeil's, and Mueller's fraud.

### Count Two – Negligent Misrepresentation

70.    Pleading affirmatively and in the alternative, Plaintiff incorporates all prior paragraphs into this section, to the extent not inconsistent, as if fully set forth herein.

71.    Siemens and McNeil misrepresented to the City that upgrading the City's water meter and billing system will result in guaranteed savings and revenue that will cover the costs of the $90 million water improvement project and the City's cost of financing the project, and that due to Siemens's guarantee of savings and revenue there is no financial downside or risk for the City in hiring Siemens to install the new water meter and billing system.

72.    Among other specific misrepresentations, Siemens representative McNeil falsely represented in oral and written statements throughout 2011, 2012, and 2013—including in January 2011, October 2011, January 2012, February 2012, March 2012, July 2012, October 2012, and July 2013—that guaranteed increases in revenue and decreases in operating expenses would pay for the cost of the Siemens water meter and billing project; that the project would greatly reduce the City's operating costs and minimize the amount of personnel needed to operate the water meter and billing system; that Siemens would take all of the risk on the project; that Siemens would guarantee the City's collection of actual monetary revenue, not just the accuracy of water meters installed by Siemens; that the large water meters are so accurate that they do not need be measured and would maintain an accuracy rate of at least 99.6%; that Siemens would pay the City for any shortfalls in increased revenue to cover the cost of the project, such that if there is a shortfall in increased revenue from the project, Siemens would write a check back to the City for the difference; and that the savings realized by the City would

start immediately after construction began, allowing the City to pay its debt service payments from the savings. Siemens and McNeil made these statements to various representatives of the City, including City Council members and City employees Dan Gaillet and David Willis.

73.    Siemens and its subcontractor, Mueller, also misrepresented and failed to disclose the condition of the water meters and associated equipment and the status of implementation of the system. On information and belief, the Mueller water meters and associated equipment installed by Siemens have manufacturing and/or design defects, resulting in meter reading failures at a rate far in excess of the industry standard. On information and belief, the Mueller automated water meter system also was incompatible with the Oracle Customer Care and Billing System, revealing a fatal design defect that destroyed the functionality of the system. Neither Siemens nor its subcontractor, Mueller, disclosed this material information to the City and instead concealed the inherent defects in the system while blaming the City for any problems with the system's implementation and functionality. In 2018, Siemens sent notices to the City misrepresenting that the project was complete and the system was functional, despite knowing that the system was plagued by crippling defects and implementation problems. Specifically, Siemens representatives Frank Gagliardi and Cory Carter misrepresented the status of the project and the functionality of the system. On information and belief, Siemens knew that the meter to billing interface did not work when Siemens sent completion notices to the City and asked the City to sign off on the project in 2018.

74.    Siemens also misrepresented and failed to disclose material facts regarding the system's design and the project implementation. Siemens represented to the City that the Mueller automated meter system would be the best long-term solution for the City, yet Siemens failed to disclose that it had never installed a Mueller water meter system to be used in

conjunction with an Oracle Customer Care & Billing System, and Siemens had never paired the two systems before and ensured that the systems would communicate correctly. Siemens also failed to disclose that installing a new automated water meter system at the same time as a new electronic billing system is unprecedented and is contrary to industry standards.

75.    Siemens and McNeil failed to exercise reasonable care in making the above referenced statements and misrepresentations.

76.    The above referenced statements and misrepresentations were material to the City's decision to enter into the Agreement, to authorize Siemens to install the water meter and billing system, and to continue to pay Siemens for its work on the project. The City relied on the above referenced statements and misrepresentations in entering into the Agreement, in authorizing Siemens to proceed with installing the water meter and billing system, and in continuing to pay Siemens for its work on the project.

77.    As a result of Siemens's and McNeil's misrepresentations, the City has incurred damages for which it now sues. The City requests that Siemens and McNeil be held jointly and severally liable and be ordered to pay all actual and consequential damages resulting from their wrongful conduct, including but not limited to the City's lost revenue, debt service costs, loss of credit, damage to credit rating and reputation, investigation and remediation costs, and repair costs. The City also seeks punitive damages as Siemens's and McNeil's misrepresentations constitute gross negligence.

**Count Three – Civil Conspiracy**

78.    Pleading affirmatively and in the alternative, Plaintiff incorporates all prior paragraphs into this section, to the extent not inconsistent, as if fully set forth herein.

79.     Siemens and McNeil conspired with Mueller, U.S. Consolidated, M.A.C., Ivision, and Garrett to accomplish unlawful purposes, including but not limited to the acts, omissions, and torts described in this Complaint, and to accomplish lawful purposes by unlawful means, including but not limited to the acts, omissions, and torts described in this Complaint. The Defendants' conspiracy includes, but is not limited to, the fraudulent EBO pass-through scheme described in this Complaint.

80.     The Defendants had a meeting of the minds on the object or course of action, and at least one member of each conspiracy committed at least one unlawful, overt act to further the object or course of action.

81.     The City suffered injury as a proximate result of the Defendants' wrongful acts, including the fraud and other torts described in this Complaint.

82.     The City requests that the Defendants be held jointly and severally liable and be ordered to disgorge all revenue and funds received from the City and pay all actual and consequential damages resulting from their wrongful conduct, including but not limited to the $90 million paid to Siemens in connection with the Agreement, and the City's lost revenue, debt service costs, loss of credit, damage to credit rating and reputation, investigation and remediation costs, and repair costs. The City also seeks punitive damages due to the Defendants' fraud, malice, and gross negligence.

**Count Four – Negligence**

83.     Pleading affirmatively and in the alternative, Plaintiff incorporates all prior paragraphs into this section, to the extent not inconsistent, as if fully set forth herein.

84.     Siemens owed legal duties to the City in connection with the design and installation of the water meter and billing system. Siemens breached its duties and obligations to

the City by failing to provide adequate design, services, management, and oversight, and by failing to furnish and install a water meter and billing system that was free of defects in design, work, and materials and that worked correctly with regard to both the physical equipment and software.

85.    Siemens breached its duties owed to the City by, among other reasons:  (a) failing to adequately design the water meter and billing system to ensure the proper installation of equipment and the correct functioning of the equipment and software; (b) failing to adequately design the water meter and billing system to ensure that the system was appropriate for the City's resources and infrastructure and could be managed and operated by the City's personnel; (c) failing to responsibly and properly represent the City during installation of the water meter and billing system by using Siemens's professional skill and supervision; (d) failing to guard against defects and deficiencies in the work in a manner consistent with Siemens's standard of care; (e) failing to determine in general if the work, when fully completed, would be in accordance with applicable codes, regulations, and industry standards; (f) failing to use ordinary care, skill, and judgment in the installation of the water meters and billing system; (g) failing to use ordinary care, skill, and judgment in the selection of tradesman and subcontractors for installation of the water meters and billing system; and (h) failing to use ordinary care, skill, and judgment in inspecting the products and work for the water meter and billing project.

86.    Mueller, U.S. Consolidated, M.A.C., Ivision, and Garrett owed legal duties to the City in connection with the materials and services they provided for the water meter and sewer system improvement project for the City, including the sale and installation of the new water meters, the implementation of the new water billing system, and the repairs to the City's sewer lines and water treatment plants.  Mueller, U.S. Consolidated, M.A.C., Ivision, and Garrett

breached their duties and obligations to the City by failing to provide adequate services and materials and by failing to furnish and install a water meter and billing system that was free of defects in design, work, and materials and that worked correctly with regard to both the physical equipment and software.

87.    The Defendants' breaches of their duties and standards of care proximately caused injury to the City, resulting in damages to the City, including but not limited to investigation and remediation costs, repair costs, loss of use, lost revenue, lost efficiency, loss of credit, damage to credit rating and reputation, and other actual and consequential damages.  The City also seeks punitive damages as the Defendants' conduct rises to the level of gross negligence.

**Count Five – Breach of Implied Warranty of Good Workmanship**

88.    Pleading affirmatively and in the alternative, Plaintiff incorporates all prior paragraphs into this section, to the extent not inconsistent, as if fully set forth herein.

89.    Siemens impliedly warranted that it was a careful and competent manager and contractor, and that it would provide construction services and project management in a good and workmanlike manner.  Siemens did not provide such services in a good and workmanlike manner because the water meter and billing system installed by Siemens is inaccurate, flawed, and deficient.

90.    The City relied on Siemens's implied warranties.  Siemens's breach of implied warranties directly and proximately caused injury to the City, resulting in damages to the City, including investigation and remediation costs, repair costs, loss of use, lost revenue, lost efficiency, and other actual and consequential damages.

### Count Six – Unjust Enrichment

91.    Pleading affirmatively and in the alternative, Plaintiff incorporates all prior paragraphs into this section, to the extent not inconsistent, as if fully set forth herein.

92.    The Defendants have unjustly enriched themselves, to the City's detriment, by the acts, omissions, and torts described in this Complaint.

93.    The City paid Siemens more than $90 million for the installation of an automatic water meter system and online billing and payment system that is inaccurate, flawed, defective, and otherwise deficient as described in this Complaint, and the project was awarded to Siemens based on the Defendants' fraudulent misrepresentations.  In addition, on information and belief, the other Defendants received millions of dollars for their participation in a fraudulent conspiracy with Siemens and for serving as pass-through, sham subcontractors on the Siemens project, which resulted in a water meter and billing system that is inaccurate, flawed, and otherwise defective as described in this Complaint.  Specifically, Garrett received more than $4.6 million, Ivision received more than $11 million, MAC received more than $18.8 million, U.S. Consolidated received more than $19.5 million, and Mueller received more than $1 million (with substantially more received by Mueller from the sale of its defective meters and associated equipment).

94.    The Defendants' retention of the City's funds is unconscionable, and such funds belong to the City in equity and good conscience.  The City requests that the Defendants be ordered to provide full restitution, disgorge all revenue and wrongfully-obtained funds, and pay all actual and consequential damages resulting from their wrongful conduct and retention of funds which in good conscience and equity belong to the City.

### Count Seven – Declaratory Judgment

95.    Pleading in the alternative, Plaintiff incorporates all prior paragraphs into this section, to the extent not inconsistent, as if fully set forth herein.

96.    To the extent that the Agreement is enforced despite Siemens's fraud, the City seeks a declaration to clarify its rights and obligations and determine the validity and enforceability of certain aspects of the Agreement.

97.    Specifically, the City seeks a declaration from the Court that the provisions of the Agreement related to the Performance Assurance and Guaranteed Savings (as those terms are defined in the Agreement) are invalid and unenforceable as written because the provisions fail to comply with Mississippi Code § 31-7-14 and because the provisions violate Article 4, § 100 of the Mississippi Constitution by purporting to require the City to waive or diminish its statutory rights related to energy performance contracts.  To constitute a valid energy performance contract under Mississippi Code § 31-7-14, the Agreement must provide actual guaranteed monetary savings to the City, and Siemens's illusory guarantees regarding savings in the Agreement render those provisions invalid and unenforceable.  The City seeks a declaration from the Court that Siemens thus is liable, as required by Mississippi law and public policy, to reimburse the City for the City's loss of actual revenue and savings over the 15-year period since the system was installed.

98.    The City also seeks a declaration that the following provisions of the Agreement are invalid and cannot be enforced against the City under Article 4, § 100 of the Mississippi Constitution:  (a) section 12.6 of the Agreement and the provision in the introductory section of the Agreement stating that the Agreement "supersedes all prior and contemporaneous negotiations, statements, representations, agreements, letters of intent, awards, or proposals,

either written or oral relative to the same," to the extent such provisions purport to waive, limit, or diminish the City's ability to assert claims for damages based on Siemens's false representations and non-disclosures as described in this Complaint; (b) section 4.7 of the Agreement, to the extent it purports to limit Siemens's liability or waive or diminish the City's claims for damages; (c) section 4.8 of the Agreement, to the extent it purports to limit Siemens's liability, cap the City's damages, or waive or diminish any of the City's claims or damages; (d) sections 5.7 and 5.8 of the Agreement, to the extent those sections purport to waive, limit, or diminish any warranties or the City's claims and damages related to any warranties; and (e) section 9.1(e) of the Agreement, which purports to waive, limit, and diminish the City's claims related to completion of the project.

**Count Eight – Breach of Contract**

99.    Pleading in the alternative, Plaintiff incorporates all prior paragraphs into this section, to the extent not inconsistent, as if fully set forth herein.

100.    To the extent that the Agreement is enforced as written despite Siemens's fraud and failure to comply with applicable Mississippi law governing energy performance contracts as described in this Complaint, the City asserts in the alternative that the Agreement constitutes a valid, binding, and enforceable contract between Siemens and the City, and the City has performed its obligations under the Agreement.

101.    Siemens breached the Agreement by, among other reasons, failing to:  (a) provide a fully-functioning and accurate Automatic Metering System and billing system; (b) provide the requisite training and administrative support to ensure a functional water metering and billing system; (c) properly install certain water meters and associated equipment; (d) install meters and associated equipment that are of good quality and free from defects, including manufacturing

and/or design defects; (e) ensure that, as designed and installed by Siemens, the Mueller automated water meter system was compatible with the Oracle Customer Care and Billing System and that the systems were able to communicate information correctly and consistently; (f) ensure that customer billing account data was properly transferred and set up in the new billing system; (g) properly upload new meter change information into the existing Customer Information System prior to implementation of the new customer care and billing software module and server; (h) properly develop and install a new customer care and billing software module and server; (i) provide full commissioning and verification of the system; and (j) conduct all work in a workmanlike manner.

102.    As a result of Siemens's breach of its contractual duties, the City has incurred money damages for which it now sues.

### Count Nine – Breach of Covenant of Good Faith and Fair Dealing

103.    Pleading in the alternative, Plaintiff incorporates all prior paragraphs into this section, to the extent not inconsistent, as if fully set forth herein.

104.    To the extent the Agreement is enforced as written despite Siemens's fraud and failure to comply with applicable Mississippi law governing energy performance contracts as described in this Complaint, Siemens owed and continues to owe the City a duty of good faith and fair dealing in connection with the Agreement, which is implied in all contracts.  As described in this Complaint, Siemens breached such duty by failing to act consistently with the justified expectations of the City and by failing to act with decency, fairness, and reasonableness in its dealings with the City, including by charging the City more than $90 million for a water system upgrade that is deficient and for which Siemens cannot provide tangible performance guarantees, increased revenue, and cost savings to the City.

105.     As a result of Siemens's breach of its duty of good faith and fair dealing, the City has incurred money damages for which it now sues.  The City requests that Siemens be ordered to disgorge all profits and wrongfully-obtained funds, and pay all actual and consequential damages, resulting from Siemens's breach of its duty of good faith and fair dealing.  The City also requests punitive damages.

## VII.  AGENCY AND ALTER EGO LIABILITY

106.     Siemens Corporation and Siemens Industry, Inc. are wholly owned subsidiaries of Siemens AG.  Siemens Corporation is the direct parent of Siemens Industry, Inc.

107.     On information and belief, Siemens Corporation and Siemens Industry, Inc. are controlled by Siemens AG, with Siemens Corporation directly controlling Siemens Industry, Inc.  On information and belief, Siemens Corporation is the sole beneficiary and recipient of the revenue and profits generated by Siemens Industry, Inc., while Siemens AG is the sole beneficiary and recipient of the revenue and profits generated by Siemens Corporation.

108.     Siemens Corporation executed a parent company guarantee with regard to the performance of Siemens Industry, Inc. in connection with the Agreement and the water system improvement project for the City.   Siemens Corporation guaranteed performance of all obligations related to the project and the Agreement, and Siemens Corporation provided its full financial backing for performance of the Agreement and assumed full liability for non-performance of the Agreement and all other liability and damages associated with the water system project.   Siemens Industry, Inc. and Siemens Corporation are jointly and severally liable for damages related to the Agreement and the water system project.   In addition, McNeil, Gagliardi, and Carter were acting as agents for both Siemens Industry, Inc. and Siemens Corporation.  Both Siemens Industry, Inc. and Siemens Corporation are liable for any fraudulent

and tortious conduct of McNeil, Gagliardi, Carter, and any other Siemens representatives involved with the water system project.

109.    To secure the Agreement and induce the City to approve the water system improvement project, Siemens represented itself as an $80 billion global company and provided the City with consolidated financial information for Siemens AG and all of its related entities and subsidiaries in representing that Siemens was the most qualified company to perform the water system improvement project for the City.  Siemens relied on the global experience and financial backing of all Siemens entities, including Siemens AG, Siemens Corporation, and Siemens Industry, Inc., in inducing the City to enter into the Agreement and approve the water system project.

110.    Siemens Corporation and Siemens Industry, Inc. were the alter egos and mere instrumentalities of Siemens AG and each other with regard to the water system project performed for the City and the negotiation and performance of the Agreement.  In addition, Siemens Corporation and Siemens Industry, Inc. were acting as the agents of Siemens AG and agents of one another in entering into and performing the Agreement and in all dealings with the City related to the water system improvement project, including representations to the City to induce the City to approve the project and enter into the Agreement.

111.    Under the circumstances, the separate corporate identity of Siemens Industry, Inc. should be disregarded and the corporate veil should be pierced to hold Siemens Corporation jointly and severally liable with Siemens Industry, Inc. for all conduct and damages alleged against Siemens in this Complaint.  With regard to all allegations against Siemens in this Complaint, Siemens Corporation and Siemens Industry, Inc. should be held jointly and severally liable and the separate corporate identities of the companies should be disregarded.

## VIII.  DAMAGES

112.    At this time, the City seeks to recover more than $450 million in actual and consequential damages.  The damages sought by the City include more than $200 million for the City's costs of funding the fraudulent Siemens project, more than $175 million for lost revenue from the defective system installed by Siemens, and more than $75 million for costs to stabilize, repair, and manage the system into the future.

113.    In addition to these damages of more than $450 million, the City has incurred other substantial losses due to damage to the City's creditworthiness and reputation, which has resulted in the City's inability to complete other public works projects.  In total, the City will likely suffer ***more than $700 million in damages*** caused by the disastrous Siemens project.  The monetary damages sought by the City may increase as the City continues to investigate the scope of the City's injuries caused by the Defendants' conduct.

114.    The City also seeks punitive and exemplary damages due to the Defendants' fraud, malice, gross negligence, reckless conduct, and disregard of the City's rights as set forth in this Complaint.  The City further seeks an award of its costs and attorneys' fees.

## IX.  JURY DEMAND

115.    The City demands a trial by jury.

## X.  PRAYER

The City prays that Defendants Siemens Industry, Inc., Siemens Corporation, Chris McNeil, Mueller Systems LLC, U.S. Consolidated, Inc., U.S. Consolidated Group LLC, M.A.C. & Associates, LLC, Ivision IT Consultants LLC, and Garrett Enterprises Consolidated, Inc., be cited to appear and answer herein, and that the City be awarded the following relief:

(a)    all actual and consequential damages resulting from Siemens's breach of contract and the Defendants' tortious conduct in an amount to be proved at trial, including

but not limited to the costs incurred by the City in connection with the Agreement and the water meter and sewer system project, lost profits, lost revenue, debt service costs, repair costs, loss of use, loss of credit and damage to credit reputation, business interruption losses, restitution of Defendants' wrongfully-obtained gains, and reimbursement for funds or property which in equity and good conscience belong to the City;

(b)     pre-judgment and post-judgment interest;

(c)     costs and attorney's fees;

(d)     punitive damages; and

(e)     such other and further relief, in equity or in law, to which the City may show itself justly entitled.

Respectfully submitted,


/s/ *Winston J. Thompson, III*
Winston J. Thompson, III
Mississippi Bar No. 100157
wjt3law@yahoo.com
Post Office Box 23579
Jackson, Mississippi  39225
Telephone:  (769) 233-7163
Facsimile:  (769) 233-7927

John M. Johnson (*seeking admission pro hac vice*)
Alabama Bar No. 7318o52
jjohnson@lightfootlaw.com
Brandon K. Essig (*seeking admission pro hac vice*)
Alabama Bar No. 4186n51e
bessig@lightfootlaw.com
Zachary P. Martin (*seeking admission pro hac vice*)
Alabama Bar No. 3908d11o
zmartin@lightfootlaw.com
Lightfoot, Franklin & White LLC
The Clark Building
400 20th Street North
Birmingham, Alabama 35203
Telephone: (205) 581-0700
Facsimile: (205) 581-0799

Brian C. Boyle (*seeking admission pro hac vice*)
Texas Bar No. 24045543
bboyle@lightfootlaw.com
Charles M. Stam (*seeking admission pro hac vice*)
Texas Bar No. 24106462
cstam@lightfootlaw.com
Lightfoot, Franklin & White LLC
1885 Saint James Place, Suite 1150
Houston, Texas  77056
Telephone:  (713) 960-1488
Facsimile:  (713) 960-8991

ATTORNEYS FOR PLAINTIFF,
THE CITY OF JACKSON, MISSISSIPPI