## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
## SOUTHERN DIVISION

| | |
|---|---|
| PRISCILLA STERLING, RAINE BECKER, SHAWN MILLER, AND JOHN BENNETT, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,<br><br>                Plaintiffs,<br><br>   vs.<br><br>THE CITY OF JACKSON, MISSISSIPPI; CHOKWE A. LUMUMBA; TONY YARBER; KISHIA POWELL; ROBERT MILLER; JERRIOT SMASH; SIEMENS INDUSTRY, INC.; AND TRILOGY ENGINEERING SERVICES LLC.,<br><br>                Defendants. | Civil No.  3:22-cv-531-KHJ-MTP<br><br>**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO SIEMENS INDUSTRY, INC.'S MOTION TO DISMISS PLAINTIFFS' COMPLAINT** |

# TABLE OF CONTENTS

**Page**

Preliminary Statement ................................................................................................ 1

Factual Background ................................................................................................... 2

Legal Standard .......................................................................................................... 4

Argument ................................................................................................................... 5

    I.    Siemens Cannot Use the Gravity of its Error to Eschew Responsibility for its Negligence ....................................................................................................... 5

        A.    Having Taken Responsibility for the Lifeblood of Jackson's Water System, Siemens Knew its Work Would Impact Jackson's Residents. ............................................................................................... 5

        B.    The Complexities of Jackson's Water Crisis Do Not Obscure Siemens' Clear Contribution ............................................................... 8

        C.    Plaintiffs' Physical Injury Claims are not Limited by the Economic Loss Rule or Inconsistent with *Poindexter Park*. ................................... 11

            1.    Plaintiffs Suffered Physical Injuries not Purely Economic Loss. ................................................................................................ 11

            2.    Poindexter Park's "Cleanup Analysis" Does Not Apply to Plaintiffs' Common Law Negligence Claims. ............................ 12

            3.    Plaintiffs' Services Claims Would Not be Limited by the Economic Loss Rule, Even if It Applied. ................................... 14

    II.    Siemens' Professional Negligence Duties Apply, Especially to Work on a PWS. ........................................................................................................... 15

    III.    Plaintiffs' Injuries Were Caused By and are Fairly Traceable to Siemens, Satisfying the Requirements of Article III Standing ............................................ 15

    IV.    Plaintiffs Will Not Seek Injunctive Relief Against Siemens. .............................. 18

    V.    Named Plaintiffs Have Stated a Claim for Medical Monitoring. ....................... 18

Conclusion ................................................................................................................ 19

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allen v. U.S. Steel Corp.*,
  665 F.2d 689 (5th Cir. 1982) ............................................................... 18

*Baker v. Putnal*,
  75 F.3d 190 (5th Cir. 1996) ................................................................. 5

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)............................................................................. 5

*Bennett v. Spear*,
  520 U.S. 154 (1997)...................................................................... 16, 17

*Bower v. Westinghouse Elec. Corp.*,
  206 W. Va. 133 (1999) ......................................................................... 19

*Delta Elec. Power Ass'n v. Burton*,
  240 Miss. 209, 126 So.2d 258 (1961)................................................... 6

*E. Mississippi Elec. Power Ass'n v. Porcelain Prod. Co. (Inc.)*,
  729 F. Supp. 512 (S.D. Miss. 1990)..................................................... 11

*Eli Invs., LLC v. Silver Slipper Casino Venture, LLC*,
  118 So. 3d 151 (Miss. 2013 .......................................................... 9, 10

*Entrican v. Ming*,
  962 So. 2d 28 (Miss. 2007)...................................................... 7, 10, 17

*Env't Texas Citizen Lobby, Inc. v. ExxonMobil Corp.*,
  968 F.3d 357 (5th Cir. 2020), *as revised* (Aug. 3, 2020)................... 16

*Full House Resorts, Inc. v. Boggs & Poole Contracting Grp., Inc.*,
  No. 1:14CV223-KS-MTP, 2015 WL 1427284 (S.D. Miss. Mar. 27, 2015)............................. 16

*Glover ex rel. Glover v. Jackson State Univ.*,
  968 So. 2d 1267 (Miss. 2007)...................................................... 6, 17

*In re Great Lakes Dredge & Dock Co. LLC*,
  624 F.3d 201 (5th Cir. 2010) ........................................................ 8, 9

*In re Mattel, Inc.*,
  588 F. Supp. 2d 1111 (C.D. Cal. 2008) ............................................... 19

*John C. Nelson Constr., LLC v. Britt, Peters & Assocs., Inc.*,
  No. 2:18-CV-222-KS-MTP, 2020 WL 5578692 (S.D. Miss. Sept. 17, 2020) ........ 13

*Keyes v. Guy Bailey Homes, Inc.*,
  439 So. 2d 670 (Miss. 1983)................................................................. 13

*Lyndon Prop. Ins. Co. v. Duke Levy & Assocs.*,
  475 F.3d 268 (5th Cir. 2007) ............................................... 13, 14, 15

*Magnolia Const. Co. v. Mississippi Gulf S. Engineers Inc.*,
  518 So. 2d 1194 (Miss. 1988) .............................................................. 15

*McCulloch v. Glasgow*,
  620 F.2d 47 (5th Cir. 1980) ................................................................. 6

## TABLE OF AUTHORITIES
### (continued)

Page(s)

*Paz v. Brush Engineered Materials, Inc.*,
   949 So. 2d 1 (Miss. 2007) ........................................................................ 18

*Poindexter Park After-Sch. Club v. Siemens Indus., Inc.*,
   No. 3:19CV474TSL-LRA, 2020 WL 13526629 (S.D. Miss. June 2, 2020). ......... 11, 12, 13, 14

*Prestress Servs. Indus. of TN, LLC v. W. G. Yates & Sons Constr. Co.*,
   280 F. Supp. 3d 908 (N.D. Miss. 2017) ................................................... 14

*Progressive Ins. Co. v. Monaco Coach Corp.*,
   No. 1:05 CV 37 DMR JMR, 2006 WL 839520 (S.D. Miss. Mar. 29, 2006) ............ 12

*Rein v. Benchmark Const. Co.*,
   865 So. 2d 1134 (Miss. 2004) ..................................................... 6, 8, 10

*Sierra Club, Lone Star Chapter v. Cedar Point Oil Co. Inc.*,
   73 F.3d 546 (5th Cir. 1996) ......................................................... 16

*State Farm Mut. Auto. Ins. Co. v. Ford Motor Co.*,
   736 So. 2d 384 (Miss. Ct. App. 1999) ................................................. 11

*Walker v. Williamson*,
   131 F. Supp. 3d 580 (S.D. Miss. 2015) ................................................ 14

*West v. Drury Co.*,
   412 F. App'x 663 (5th Cir. 2011) ..................................................... 5

*Wiltz v. Bayer CropScience, Ltd. P'ship*,
   645 F.3d 690 (5th Cir. 2011) ........................................................ 12

**Statutes**

Miss. Code. Ann. § 11-7-20 ............................................................. 13

**Treatises**

6 MS Prac. Encyclopedia MS Law § 52:11 (2d ed.) ....................................... 13

6 MS Prac. Encyclopedia MS Law § 52:24 (2d ed.) ....................................... 10

Restatement (Second) of Torts § 402A (1965) ........................................... 11

**Preliminary Statement**

Plaintiffs Priscilla Sterling, Raine Becker, Shawn Miller, and John Bennett, individually and on behalf of all other similarly situated, ("Plaintiffs") bring claims against Defendant Siemens Industry Inc. ("Siemens") for traditional and professional negligence. Playing up that it is only one of several Defendants who caused the problems in the City of Jackson ("City")'s public water system ("PWS") and harmed Plaintiffs, Siemens filed this motion arguing that it had no duty to Plaintiffs, who it claims it did not work directly for, could not foresee harming, and whose injuries are not "fairly traceable" to it. But to present that analysis, Siemens' brief must strain to ignore the nature, severity, and consequences of its misconduct pled in the Complaint.

Siemens is a sophisticated corporation who, knowing how strained Jackson's PWS was, urged the City to entrust it with the PWS' entire revenue generation engine for a $90 million "upgrade." That "upgrade" was funded via a bond that will cost Jackson's tax payers $200 million over almost 30 years. Siemens' upgrade not only failed to improve the PWS' monitoring and billing infrastructure, it replaced the City's old but working system with a disastrous combination of pieces that did not fit together. The final product was wholly unable to calculate water usage and bills for tens of thousands of residents. Public records show that this resulted in, among other problems, a $175 million revenue shortfall, loss of credit rating, and a refund by Siemens to the City of the entire original contract price.

Siemens' arguments that its notable contributions to the crisis could not have been foreseen and cannot now be "fairly traced" make little sense in this context. By destroying the economic engine of Jackson's PWS, Siemens' negligence robbed Jackson of the resources it needed to maintain its water system, including components that decontaminate and deliver water.

The notion that, when planning its upgrade, it could not have anticipated that its work could injure Jackson residents, or that a nearly penniless water system with no credit may struggle to complete its ongoing projects and meet upcoming safety goals, is simply not credible.

Plaintiffs' complaint does not allege that Siemens is the *sole* cause of Jackson's water crisis. Siemens will have opportunities, at summary judgment and trial, to compare the consequences of the $175 million revenue shortfall with the conduct of other Defendants (or anyone else Siemens may seek to blame). But such causation questions require a factual record and experts. Siemens' brief prematurely raises questions of responsibility, not cognizable as justifications for a motion to dismiss, because they do not question the legal sufficiency of Plaintiffs' claims. Accordingly, Siemens' motion must be denied.

## Factual Background

As alleged in Plaintiffs' Class Action Complaint, Jackson's PWS is in crisis. Compl. ¶¶ 2–3, 46, 249. Due to poor maintenance, neglect, and a slew of related problems, its water is contaminated with lead and E-coli and has, on several recent occasions, stopped flowing entirely for days at a time. *Id.* A common source of these problems is lack of financial resources, which has subverted attempts to maintain the system, retain and hire persons with the skills necessary to operate it, and fix issues with antiquated equipment that are known to raise the risk of lead contamination and delivery system failure. *Id.* ¶¶ 46, 252–4, 263, 271–3, 275.

Siemens is a sophisticated company with experience working with public entities, water systems, and both together. Even before its involvement in Jackson, Siemens knew that public water systems need revenue to operate, hire personnel, check for problems, conduct repairs, and maintain equipment. Compl. ¶¶ 264, 266, 271, 273, 392. They also knew that residents of Jackson depend on the PWS and that if the project failed it could dry up resources needed to

operate the system, and harm those residents. *Id.* And that when a PWS, especially one like Jackson's, breaks down, the most likely adverse consequences are water contamination or delivery problems.

Many of the problems with Jackson's PWS were known to Siemens as early as 2010, when it "urged the City to hire it" to upgrade the PWS' water monitoring and billing system. *Id.* ¶¶ 264, 273. It made this pitch while "[k]nowing that the system was already troubled and resource starved." *Id.* Indeed, during that same period, the City was trying to complete a series of fixes and comply with an EPA consent decree. Dkt. 26-2 ¶ 25. By 2013, shortly before the City hired Siemens, the latter was also aware that state (and other) investigators had already identified serious problems, including dire need for maintenance and "high-risk for lead poisoning." Mtn. at 3.

Siemens promised the City that the upgrade project would generate "$120 million in guaranteed savings" in the first 15 years with "no risk" and would ultimately more than pay for itself. Compl. ¶ 264. Although such contracts would normally require a competitive bidding process, Siemens worked with relevant officials and agencies to ensure that—even though the contract took several years to ultimately approve—no competitive bidding occurred during that long process. *Id.* ¶¶ 264–65, Mtn. at 1.

In 2015 Siemens began its upgrade, which focused on installing water meters that were supposed to measure water usage more accurately, and thereby raise City revenue. *Id.* ¶ 267. But the meters it installed were not compatible with the City's existing systems or the "Customer Care and Billing System" from Oracle software that Siemens tried to pair them with. *Id.* ¶¶ 268–69. Indeed, subsequent investigations would reveal that Siemens had never before successfully paired the water meter and separate billing systems together, and was using the City as a $90

- 3 -

million test case for an unproven method. [1] After replacing the City's old but not broken system with Siemens' meters, the City and Siemens were unable to measure and bill tens of thousands of customers for water usage, resulting in a $175 million revenue shortfall. *Id.* ¶¶ 268, 271. The total costs of Siemens' failed project, including attempts to implement and repair it, exceed $450 million. Dkt. 26-2 ¶¶ 24–25. The loss of revenue also destroyed the PWS' credit rating, which impeded ongoing repair and maintenance projects. *Id.*, Compl. ¶¶ 272–73. These financial problems, predictably, undermined Jackson's efforts to repair and maintain the system, and comply with state and federal orders concerning water safety. *Id.* ¶¶ 266, 271–73, 275, 392; dkt. 26-2 ¶¶ 24–25. Although Siemens would ultimately refund the original contract price after litigation, those $90 million (Mtn. at 1) paled in comparison to the preceding costs and the fact that the City was now stuck with Siemens' non-functional system.

Plaintiffs are residents of Jackson who have consumed its water for years and suffered during the recent outages. Compl. ¶¶ 19–20. As a result of consuming Jackson's water, Plaintiffs have experienced physical symptoms of lead poisoning including, for example, headaches, unexplained itching, yeast infections, and learning disabilities. *Id.*, *id.* ¶ 313. They have brought claims against Siemens for negligence in an attempt to redirect funds back towards improving access to safe, clean water in Jackson.

## **Legal Standard**

In adjudicating a motion to dismiss, "the district court must accept all well-pleaded facts as true and view them in the light most favorable to the plaintiff." *Baker v. Putnal*, 75 F.3d 190,

---

[1] Emphasizing the extent to which Siemens underestimated the complexity of the City's water meters and billing needs and withheld their plan's capabilities in real-world application. *See, e.g.*, Legum, Judd, "This multi-billion dollar corporation exacerbated the water crisis in Jackson, Mississippi" (*Popular Information*, Sept. 6, 2022) https://popular.info/p/this-multi-billion-dollar-corporation.

196 (5th Cir. 1996). "[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007) (internal quotation omitted). A motion to dismiss only asks the court to assess the facts pled, and inferences that may be made from them, to determine if the claims are more than mere speculation and "raise a reasonable expectation that discovery will reveal evidence of [the misconduct alleged]." *Id.* Questions of fact may not be assessed on a motion to dismiss, and must wait for summary judgment. *See Baker*, 75 F.3d at 196.

## Argument

### I.   Siemens Cannot Use the Gravity of its Error to Eschew Responsibility for its Negligence.

Negligence is a simple claim designed to incentivize "every person who undertakes an action" to take reasonable precautions to protect their follow citizens from preventable harm. *West v. Drury Co.*, 412 F. App'x 663, 667 (5th Cir. 2011) (applying Mississippi law). Nearly any citizen can assert a claim for breach of the universal duty of reasonable care. *Id.* There is only one exception. When someone outside an expected category of risk suffers harm that the responsible party could not reasonably have foreseen, they cannot assert a negligence claim for lack of duty. *Id.* This makes sense. Civil liability in such tragic circumstances would not serve the purpose of incentivizing responsible behavior. Siemens' motion distorts this simple exception, overextending it, the facts of this case, and Mississippi law.

#### A.   Having Taken Responsibility for the Lifeblood of Jackson's Water System, Siemens Knew its Work Would Impact Jackson's Residents.

Foreseeability is a question of the scope of risk at issue. As Siemens' brief acknowledges but then overlooks, the foreseeability analysis concerns the "kind or class of injury or harm" suffered by Plaintiffs. Mtn. at 11. The purpose of this doctrine is to exclude claims by outlier

claimants harmed by an unfathomable type of danger. *Glover ex rel. Glover v. Jackson State Univ.*, 968 So. 2d 1267, 1278–79 (Miss. 2007). But that does not limit liability in the anticipated zone of danger, as the Mississippi Supreme Court explains:

> a plaintiff is not required to prove that the exact injury sustained by the plaintiff was foreseeable; rather, it is enough to show that the plaintiff's injuries and damages fall within a particular kind or class of injury or harm which reasonably could be expected to flow from the defendant's negligence.

*Id*. Illustrating the strength of this principal, the Fifth Circuit used it to uphold a negligence claim for an illegal government land seizure that caused the land's owner to suffer a heart attack. *McCulloch v. Glasgow*, 620 F.2d 47, 51 (5th Cir. 1980). Applying Mississippi law, it reasoned that the heart attack "itself need not have been foreseeable" where "defendants reasonably should have foreseen that their actions would expose plaintiffs to risk of some otherwise compensable injury." *Id.*

   *Rein v. Benchmark Const. Co.*—a case, at summary judgment and not the more permissive motion to dismiss stage here, that Siemens' brief cites five times—agrees with this principal. 865 So. 2d 1134 (Miss. 2004). It makes clear that a defendant "cannot escape liability because a particular injury could not be foreseen, if *some* injury ought to have been reasonably anticipated." *Id.* at 1145 (*quoting Delta Elec. Power Ass'n v. Burton*, 126 So.2d 258, 261 (1961)) (emphasis in original). Siemens' deployment of *Rein* also proves this point. At one point, its motion attempts to compare the fire ants attacking a nursing home in *Rein* with Jackson's failing water system. Mtn. at 12. But even that (absurd) example focuses only on the construction defendant in *Rein*. Mtn. at 12. The court also applied the same rule to a landscaping defendant, against whom it *reversed* summary judgment finding that while that company seemed no more able to foresee the fatal fire ant invasion, it—crucially—had responsibilities in the area of pest

- 6 -

control. This demonstrates that foreseeability is an *ex ante* question of what risks a party could anticipate, not an *ex post* analysis of the specific consequences that ultimately resulted.

That distinction is fatal to Siemens' motion. It argues that it "could not have reasonably foreseen that [its conduct] would cause Plaintiffs to suffer injuries from lead in decades-old pipes and the City being unable to provide a reliable flow of water." Mtn. at 13. That overly narrow question is one that Plaintiffs may choose to add to their investigation during discovery.[2] But they have pled their case far more simply. Siemens knew that the users of Jackson's PWS were depending on it. It took responsibility for the PWS' entire revenue-generating apparatus then broke it. Compl. ¶¶ 264, 266, 273, 392. After Siemens destroyed the ability of Jackson's PWS to collect revenue, the PWS suffered a $175 million funding shortfall. *Id.* ¶ 271.The plausibility of Plaintiffs' contention that Siemens' project failed catastrophically is supported by its decision, upon being sued, to "refund the entire contract price." Mtn at 1.

Siemens is no stranger to public utilities or water systems.[3] It knew that, like any business or utility, Jackson's PWS needs revenue to operate, hire personnel, check for problems, conduct repairs, and maintain equipment. Compl. ¶¶ 264, 266, 271, 273, 392. So it would have appreciated that if its project failed—particularly to a$175 million degree—the PWS would lose resources that are necessary for its function and long-term sustainability. *Id.* And when a PWS, especially one like Jackson's, breaks down, the most likely adverse consequences are water

---

[2] Underscoring the plausibility of that causal connection, numerous journalists have had no trouble linking Siemens' conduct with the current crisis. *See, e.g.*, Legum, Judd, "This multi-billion dollar corporation exacerbated the water crisis in Jackson, Mississippi" (*Popular Information*, Sept. 6, 2022) https://popular.info/p/this-multi-billion-dollar-corporation.
[3] As Siemens notes, foreseeability is evaluated from the point of view of the actor. Mtn. at 12. It includes risks that defendant in the circumstances had reason to anticipate, or which would ordinarily be expected. *Entrican v. Ming*, 962 So. 2d 28, 35–36 (Miss. 2007).

contamination, delivery problems, and billing issues. Those are the precisely the claims being brought by Plaintiffs, on behalf of a class of Jackson water consumers.

When it comes to negligent work on a PWS, Plaintiffs are the most anticipatable category of victims and suffered the most predictable types of injuries. If NASA astronauts had decided to tap into Jackson's PWS while in town conducting a secret training mission, Siemens could likely argue that damages arising from delaying that mission several weeks were not foreseeable. But it cannot credibly contend that when it took such an important piece of Jackson's PWS in its hands, it could not have reasonably foreseen drying up the funding of a public water system would harm the citizens of Jackson who depend on public infrastructure for their everyday water.

**B.      The Complexities of Jackson's Water Crisis Do Not Obscure Siemens' Clear Contribution.**

The severity and complexity of Jackson's water crisis do not reduce Siemens' nuisance liability. None of Siemens' references to complexities of the crisis are cognizable as legal arguments under Mississippi nuisance law, especially on a motion to dismiss. For example, Siemens attempts to characterize the water crisis as "extraordinary." Even if that term could apply colloquially to the severity of the crisis' consequences, that usage is not comparable to the legal meaning of the term. Cases like *Rein* use "extraordinary" to describe unforeseeable events that are outside any expected category of risk, not any tragedy with significant consequences. *See, e.g.,* 865 So. 2d at 1146.

Nor does case law suggest that extreme harm connected to large humanitarian disasters is not foreseeable. On this issue, Siemens' discussion of *In re Great Lakes Dredge & Dock Co. LLC*, 624 F.3d 201 (5th Cir. 2010) concerning Hurricane Katrina is misleading and ignores Mississippi law. In that case, the Fifth Circuit was applying *Louisiana maritime law* and found that a dredging company (focused on clearing waterways) could not have foreseen "that its

negligence would make the difference between the levee systems holding or failing in the event of a hurricane." *Id.* at 213. That outcome may be correct, but it has no application to Siemens. It was hired for its expertise in water systems and was not confronting an extreme risk in a discipline beyond its knowledge base.

Nor it is relevant to *civil* litigation in *Mississippi*, where state law on nuisance claims during Hurricane Katrina—coming from our highest authority— cuts decisively against Siemens. In *Eli Invs., LLC v. Silver Slipper Casino Venture, LLC*, 118 So. 3d 151 (Miss. 2013) businesses holding damaged property on a barge sued the barge's owner for inadequately securing it against potential storms. *Id.* at 154–56. On the duty question, the Mississippi Supreme Court reversed summary judgment, concluding that the owner could be liable for not foreseeing storm surges of Katrina's magnitude, particularly considering prior local experience. *Id.* It found the factual question of the scope of the owner's foreseeability was a factual question that only a jury can resolve. *Id.*

Those principals bolster the case against Siemens. It took full responsibility for the revenue-generating engine of Jackson's PWS and professed to have expertise in that area. It pitched the project as part of a solution to the system's historical problems, of which it was well aware. From the beginning, when Siemens first proposed the project, it did so "[k]nowing that the system was already troubled and resource starved." *Id.* ¶ 264. Siemens' motion even admits that before signing the contact in 2013 (or beginning work in 2015) state investigators had already identified serious problems, including dire need for maintenance and "high-risk for lead poisoning." Mtn. at 3. It was clear to Siemens that Jackson could not afford to be robbed of the limited resources it had to address these problems. Which also means that, even if Plaintiffs had

a burden to show that contamination and system outages were foreseeable to Siemens (which they do not), the facts pled to the Court could meet that burden as well.

Siemens' attempts to suggest the opposite are self-defeating. For example, it questions whether it could have foreseen that "the City would fail to comply with a State-mandated compliance plan." *Id.* at 14. But a significant reason for that lack of compliance, and the City's failure to hire personnel with the skills to make the necessary repairs, was lack of funds. Compl. ¶¶ 271, 273, 275, *see also id.* at 249–53. Indeed, the loss of revenue from Siemens' failed project was so catastrophic that Jackson's PWS could not afford to pay its other debts, crushing its credit rating and preventing it from completing other projects that would fix its PWS. *Id.* ¶¶ 272–73. This reality is confirmed by the very complaint that Siemens attached to the instant motion:

> In addition to these damages of more than $450 million, the City has incurred other substantial losses due to the Siemens project destroying the City's credit rating and ability to borrow necessary funds. This has *resulted in the City's inability to complete other public works projects*, including work required by a preexisting consent decree in an enforcement action by the United States Environmental Protection Agency. In total, the City will likely suffer more than $700 million in losses caused by the supposedly "guaranteed" and "risk-free" water meter project promised by Siemens.

Dkt. 26-2 ¶ 25 (emphasis added). Regardless of how one characterizes other factors that may have contributed to Jackson's water crisis,[4] Siemens' conduct caused clear, foreseeable, and significant harm.

---

[4] Siemens may later raise variations of these quasi-causation arguments, which its brief presumably recognized cannot be properly resolved on a motion to dismiss. For example, arguments that the PWS would have failed without Siemens are fact questions that cannot be decided on a motion to dismiss. *Eli Invs.,* 118 So. 3d at 151. *See also Rein*, 865 So. 2d at 1143–44 (finding that nuisance causation, and foreseeability questions requiring evidence, are issues of fact). That position would likely also conflict with Mississippi's eggshell plaintiff rule. *See* 6 MS Prac. Encyclopedia MS Law § 52:24 (2d ed.). Similarly, if Siemens emphasizes to its points about the City's conduct contributing to the crisis (Mtn. at 13), those would be questions of contributory negligence and causation that must also go to a jury. *Rein*, 865 So. 2d at 1143–44. If it instead shifts blame to third-party "intervening actors," that analysis could apply to duty but would be subject to the foreseeability analysis applied above. *Glover*, 968 So. 2d at 1279–80; *Entrican*, 962 So. 2d at 36.

C.   **Plaintiffs' Physical Injury Claims are not Limited by the Economic Loss Rule or Inconsistent with *Poindexter Park*.**

1.   **Plaintiffs Suffered Physical Injuries not Purely Economic Loss.**

*Poindexter Park After-Sch. Club v. Siemens Indus., Inc.* dismissed negligence claims that Siemens' failed meter system upgrades caused plaintiffs to overpay for water and lose business income. [5] No. 3:19CV474TSL-LRA, 2020 WL 13526629, at *9 (S.D. Miss. June 2, 2020). Its central holding was that the economic loss rule applied and required dismissal of claims for "pure economic loss" because "a plaintiff who suffers *only economic loss* as the result of a defective product may have no recovery in strict liability or negligence." *Id.* (*quoting State Farm Mut. Auto. Ins. Co. v. Ford Motor Co.*, 736 So. 2d 384, 387 (Miss. Ct. App. 1999)) (emphasis added). Similar to foreseeability, the economic loss rule is designed to exclude claims by persons who suffered *pure* economic loss, which can be too remote, while safeguarding claims by plaintiffs whose claims include "physical injury" to body or property and who are thus well within the scope of traditional tort law protections. *E. Mississippi Elec. Power Ass'n v. Porcelain Prod. Co. (Inc.)*, 729 F. Supp. 512, 514–18 (S.D. Miss. 1990).

The economic loss rule has no application where, as here, Plaintiffs have pled physical bodily injury. Compl. ¶ 20; *E. Mississippi Elec. Power Ass'n,* 729 F. Supp. at 514–18. (distinguishing viable product cases involving physical injury from purely economic loss cases

---

[5] The court summarized Plaintiffs' narrow economic loss claims in that matter as follows:
>      Plaintiffs herein allege that due to the problems with the Siemens-installed water-sewer/billing system, each of them has been significantly overcharged for water-sewer usage. Plaintiff Kellum claims because of his unexplainable balance of over $10,000, which he is in the process of appealing to the City Attorney, he has had to pay $100 to avoid suspension of his service. [similar examples omitted] They demand money damages, including amounts attributable to overpayment for water, alleged economic losses caused by the loss of reliable service, and costs associated with disputing their erroneous bills.

*Id.* at 2.

not permitted by law) (*citing, e.g.*, Restatement (Second) of Torts § 402A (1965)); *see also Progressive Ins. Co. v. Monaco Coach Corp.*, No. 1:05 CV 37 DMR JMR, 2006 WL 839520, at *2–3 (S.D. Miss. Mar. 29, 2006) (same). Unlike the "pure economic loss" claims in *Poindexter Park*, Plaintiffs here claim physical injuries to their bodies including "dehydration, malnutrition, lead poisoning, E. Coli exposure, [and] exposure to other hazardous contaminants." 2020 WL 13526629, at *9; Compl. ¶ 20. Those physical injuries remove this case from the scope of the economic loss rule. *Wiltz v. Bayer CropScience, Ltd. P'ship*, 645 F.3d 690, 695 (5th Cir. 2011) (finding that under the laws of Texas, Louisiana, and "most jurisdictions, the 'economic-loss rule' bars recovery in tort when a party suffers economic loss *unaccompanied by harm to his own person* or property.") (emphasis added).[6] Thus, the essential holding of *Poindexter Park* has no application here.

## 2. Poindexter Park's "Cleanup Analysis" Does Not Apply to Plaintiffs' Common Law Negligence Claims.

Having rejected essentially all of plaintiffs' claims as precluded by the economic loss rule, the *Poindexter Park* court spent one additional paragraph considering whether any other portions of plaintiffs' complaint could be read so as to raise claims beyond the economic loss rule before ordering full dismissal (and denying leave to amend). 2020 WL 13526629, at *9. That single paragraph focuses on potential claims that were under pled, including services beyond the sale of water meters (outside product liability law and therefore the economic loss rule) and duties supported by the contract (arising outside of tort and therefore not limited by the economic loss rule). It found that any such claims were not properly pled since there was "nothing in the complaint to suggest in what respect Siemens failed to perform some duty under the contract," or "with respect to the water delivery system," and no allegations connecting any

---

[6] The Fifth Circuit does not appear to have considered this issue under Mississippi law.

such failures (even if they had been identified) with harm. *Id.* It concluded by reiterating that

since it had found Siemens had no tort duty to plaintiffs (to prevent purely economic loss) breach

of the contract could not support a tort claim (which was the only remaining angle since it had

also previously found that Plaintiffs were not parties to or third-party beneficiaries of that

agreement). *Id.* None of these findings concern common law negligence claims for personal

injury.

Siemens' attempts to spin excerpts from this paragraph into helpful findings is incorrect

and inconsistent with Mississippi law. It tries to argue that the court held there could be no duty

outside of the contract. Mtn. at 4, 16. But that analysis began with a scenario where the economic

loss rule had already eliminated tort duties—which is not the case here. Where Plaintiffs'

negligence claim is based on common law tort duties, the absence of a contractual duty is not

material under Mississippi law. Mississippi has not required breach of a contractual duty or

privity with a contracting party for negligence claims in almost 50 years. Miss. Code. Ann. § 11-

7-20 (West) (eliminating Mississippi's privity requirement for negligence claims); *Keyes v. Guy*

*Bailey Homes, Inc.*, 439 So. 2d 670, 671, 673 (Miss. 1983) (holding based on § 11-7-20 that

builders have duty of reasonable care even where there is no contractual relationship or privity);

§ 52:11; 6 MS Prac. Encyclopedia MS Law § 52:11 (2d ed.) ("In no context does Mississippi law

impose an absolute requirement of contractual privity to maintain a negligence action."); *see also*

*John C. Nelson Constr., LLC v. Britt, Peters & Assocs., Inc.*, No. 2:18-CV-222-KS-MTP, 2020

WL 5578692, at *3 (S.D. Miss. Sept. 17, 2020) *citing Lyndon Prop. Ins. Co. v. Duke Levy &*

*Assocs.*, 475 F.3d 268, 273 (5th Cir. 2007). Unlike in *Poindexter Park*, Plaintiffs' complaint here

is rooted in common law negligence duties, which it has contextualized to Siemens at the time it

began work on the PWS, and which give rise to claims for bodily injury. Compl. ¶¶ 264, 266, 393, 403. That is all that Mississippi law requires.

### 3. Plaintiffs' Services Claims Would Not be Limited by the Economic Loss Rule, Even if It Applied.

Plaintiffs' negligence claims are also independently distinguishable because they arise from Siemens' services. Mississippi's economic loss rule has not been extended beyond product liability and courts sitting in diversity should follow this limit. *Lyndon*, 475 F.3d at 274; *Walker v. Williamson*, 131 F. Supp. 3d 580, 594–95 (S.D. Miss. 2015). As *Poindexter Park* implicitly recognizes, the economic loss rule from product liability law applicable to defective water meters would not apply to claims arising from services. *See* 2020 WL 13526629, at *9. Nor would it make sense to limit duties arising from engineering services using the economic loss rule, because (unlike manufactures being sued by third-parties injured by products they sold to others) such professionals, especially when serving the public on local projects, are well-positioned to protect against economic harm, particularly where—as here—the negligence claim arises from a known local problem. *Prestress Servs. Indus. of TN, LLC v. W. G. Yates & Sons Constr. Co.*, 280 F. Supp. 3d 908, 917–19 (N.D. Miss. 2017) (dismissing summary judgment motion on the economic loss rule and disfavoring its application pending subsequent briefing).

Unlike in *Poindexter Park*, Plaintiffs' complaint does not have a "central focus [on] Siemens' installation of water meters which . . . were defective." 2020 WL 13526629, at *9. It argues that Siemens' plan for the project was negligent, failing to establish a system that could transmitted readings properly from (even 100% working) water meters, and that it provided inadequate services, hired improper contractors, and installed certain water meters incorrectly. Compl. ¶¶ 267, 269–270. Those claims are not rooted in product law, and therefore not limited by the economic loss rule or *Poindexter Park*.

## II.   Siemens' Professional Negligence Duties Apply, Especially to Work on a PWS.

Siemens argues that professional negligence duties are limited to contracting parties and construction or design professionals or subcontractors. But its brief focuses on cases extending such limited duties to those professions, not cases finding that differently situated plaintiffs—like those for whom the work is ultimately intended—can never assert negligence claims. *See, e.g., Magnolia Const. Co. v. Mississippi Gulf S. Engineers Inc.*, 518 So. 2d 1194, 1202 (Miss. 1988). Indeed, such a limitation would be at odds with Mississippi law, which recognizes that engineers' duties of professional care arise from the common law, independent of any contract. *Nelson Constr.*, 2020 WL 5578692, at *3 (*citing Lyndon*, 475 F.3d at 273). Siemens' argument that such duties should be limited to contacting and contract-adjacent parties is essentially a call for contractual privity. But as discussed in § I(C)(2), Mississippi's legislature and Supreme Court have resoundingly rejected any privity requirement for negligence, in any context. There is, accordingly, no legal reason to limit the professional version of the negligence claim. Siemens' suggestion that "the general public does not foreseeably rely on the professional's work" (Mtn. at 17) does not make sense in the context of this case, where it performed work that was expressly designed to benefit the public for a government entity which represented them. Accordingly, there is no basis for excusing Siemens from its basic duty of professional care.

## III.   Plaintiffs' Injuries Were Caused By and are Fairly Traceable to Siemens, Satisfying the Requirements of Article III Standing.

Siemens' standing argument merely repeats its nuisance position under a parallel but far weaker standard. Its brief focuses on the second prong of Article III standing, the causal element, arguing that Plaintiffs have not shown a "causal connection" between its conduct and Plaintiffs' injury such that the injury is "fairly traceable" to its conduct. Mtn. at 7. But Siemens' own cases concede that this doctrine, including traceability "requires less of a causal connection than tort

law" without any need for "specific proof." *Env't Texas Citizen Lobby, Inc. v. ExxonMobil Corp.*, 968 F.3d 357, 368 (5th Cir. 2020), *as revised* (Aug. 3, 2020) (*cited by* Mtn. at 7). *See also Bennett v. Spear*, 520 U.S. 154, 168–69 (1997) (rejecting defendant's argument that traceability requires that their conduct be the last step in the causal chain before injury) (*cited by* Mtn. at 7). Traceability "requires something more than conjecture" which—paralleling the foreseeability analysis in § I(A)—shows that "defendant's violations were *of a type* that causes or contributes to the kinds of injuries alleged by the plaintiffs." *Env't Texas Citizen Lobby,* 968 F.3d at 368 (emphasis added) (internal quotation omitted).

For example, where many entities are discharging chemicals into a public bay, "the fairly traceable element does not require that the plaintiffs show to a scientific certainty that [the] defendant's effluent, and [the] defendant's effluent alone, caused the precise harm suffered by the plaintiffs." *Sierra Club, Lone Star Chapter v. Cedar Point Oil Co. Inc.*, 73 F.3d 546, 558 (5th Cir. 1996). Instead, plaintiffs can establish traceability by showing that Defendants' chemical discharges "contributes to the pollution that impairs [plaintiff's] use of the bay." *Id.*

In this framework, the causal connection outlined in § I(A), showing the strong connection between Siemens' conduct and Plaintiffs' injuries, which Siemens could have foreseen, is more than enough to establish a causal link and fair traceability. [7] By drying up the revenue of Jackson's PWS and destroying its credit rating, Siemens disrupted maintenance and repair projects that were important to preventing contamination and water delivery failure. Compl. ¶¶ 264, 266, 271–73, 392. The plausibility of this connection is underscored by press

---

[7] Mississippi law has also recognized that plaintiffs have standing to bring negligence cases against construction service companies even where they were not parties to a contract and do not have contractual privity. *Full House Resorts, Inc. v. Boggs & Poole Contracting Grp., Inc.*, No. 1:14CV223-KS-MTP, 2015 WL 1427284, at *8, n. 7 (S.D. Miss. Mar. 27, 2015).

articles which have conducted similar traceability analyses and linked the current problems in Jackson's PWS back to Siemens. *Supra* at n. 1.

Siemens' contention that this relies on speculation about what the City would have done (Mtn. at 8) ignores the facts pled in the Complaint. Jackson's PWS deteriorated faster after Siemens' "upgrade" because the $175 million revenue shortfall and loss of credit rating prevented the PWS from conducting regular maintenance, fixing known problems, and hiring and retaining personnel with the skills necessary to operate the system properly.[8] *Id.* Although some problems certainly predated Siemens' project, the City was working to fix many of those problems, and comply with related state and federal orders, before the revenue shortfall eliminated resources necessary to complete those projects. Dkt. 26-2 ¶ 25. Siemens cannot avoid responsibility, as well as other foreseeable consequences of its mistakes, including decisions made by the City as a natural result of the revenue shortfall and loss of credit rating. *Bennett*, 520 U.S. at 168–69; *Glover*, 968 So. 2d at 1279–80; *Entrican*, 962 So. 2d at 36. Deterioration of the PWS is the source of Plaintiffs' injuries and, as in *Sierra Club*, it is abundantly clear that Siemens contributed to that problem.

These strong causal connections are not comparable to those in *Allen*. Mtn. at 8. Unlike the ongoing and cascading harm in PWS operations here, *Allen* considered an attenuated chain of hypothetical future actions by third-parties that, if each unfolded in a specific direction, could

---

[8] Siemens' suggestion that its refund of the contract price, and its decision to let the City keep non-working equipment, removed likely sources of harm is shortsighted and incorrect. (Mtn. at 9). The budget shortfall from the broken billing systems was $175 million, nearly double the contract price. Compl. ¶ 271, 274. That initial forecast focused on the first few years and the City estimated that total costs during that period exceeded $450 million. Dkt. 26-2 ¶¶ 24–5. And the equipment that Siemens allowed the City to "keep" were non-working meters that it was effectively stuck with even though, unlike the old system, they could not properly track and will water usage.

reverse momentum within other institutions triggering reform that would ameliorated harm "(e.g. withdrawal of IRS tax exempt status could reduce the revenue of discriminatory schools, which could decrease the quality of education, which could cause parents to demand reform, who the school might decide it cannot afford to lose, which may cause the schools to stop discriminating)." *Id.* Here, Plaintiffs pled verifiable harms that were not present before Siemens' conduct and which surfaced after it, and concrete efforts to avoid them, which began before Siemens' "upgrade," which were disrupted by the revenue shortfall. That is more than sufficient to connect their injuries to Siemens, readily satisfying the second-prong of the Article III standing inquiry

## IV.   **Plaintiffs Will Not Seek Injunctive Relief Against Siemens.**

In the interests of judicial economy, Plaintiffs will no longer seek injunctive relief against Siemens.

## V.   **Named Plaintiffs Have Stated a Claim for Medical Monitoring.**

Siemens' motion is premature and seems directed only at the proposed class. It argues that "exposure" to lead is not sufficient to justify medical monitoring and Plaintiffs must allege "physical injury." That argument is based on *Paz v. Brush Engineered Materials, Inc.*, which notes that "an exposed plaintiff can recover related reasonable medical monitoring costs as an element of damages if and when he develops symptoms." 949 So. 2d 1, 5 (Miss. 2007) (internal quotation omitted). But the named Plaintiffs met this standard. They have pled that they are currently suffering from lead poisoning, including physical symptoms. Compl. ¶¶ 19–20. *See also id.* ¶ 313 (describing Ms. Sterling's symptoms in detail). Where named plaintiffs' claims are properly before the court, there is no basis for dismissing the claims of similarly situated proposed class members, whose claims are not yet before the court. *Allen v. U.S. Steel Corp.*, 665 F.2d 689, 695, n. 3 (5th Cir. 1982).

Even if a medical monitoring class could face challenges under Mississippi law, those issues would be best addressed in connection with class certification and not at the preliminary motion to dismiss stage, where questions of which class members have lead exposure without current symptoms could be addressed via subclasses, a qualification procedure for medical monitoring eligibility, etc. That posture would also provide the Court with a factual record regarding the prevalence of symptoms from lead poisoning among class members, and whether lead poisoning's pathology is comparable to that of beryllium exposure (the substance considered in *Paz*). Some courts have found that lead poisoning, particularly of children, is so dangerous that justice, and even mere waste-prevention, demand medical monitoring before symptoms begin. *See In re Mattel, Inc.*, 588 F. Supp. 2d 1111, 1117 (C.D. Cal. 2008); *see also Bower v. Westinghouse Elec. Corp.*, 206 W. Va. 133, 142 (1999) ("All that must be demonstrated [for medical monitoring] is that the plaintiff has a significantly increased risk of contracting a particular disease relative to what would be the case in the absence of exposure"). Ultimately, Siemens offers no justification for dismissing all medical monitoring claims, including those of named Plaintiffs already suffering from synonyms of lead poisoning.

## Conclusion

For the forgoing reasons, this Court should deny Siemens' motion. Should this Court grant Siemens' motion in any respect, Plaintiffs request leave to amend their pleading to cure any defects.

Dated: January 23, 2023                    Respectfully submitted,

*/s Robert L. Gibbs*
Robert L. Gibbs (Bar No. 4816)
Gibbs Travis PLLC
210 East Capitol Street, Suite 1801
Jackson, MS 39201
Telephone: 601-487-2640
Fax: 601-366-4295

rgibbs@gibbstravis.com

Mark P. Chalos (Admitted *Pro Hac Vice*)
*Lead Counsel*
Kenneth S. Byrd (Application for Admission *Pro Hac Vice*
Forthcoming)
Lieff Cabraser Heimann & Bernstein, LLP
222 2nd Avenue South, Suite 1640
Nashville, TN 37201-2379
Telephone: 615-313-9000
Facsimile: 615-313-9965
mchalos@lchb.com
kbyrd@lchb.com

Tiseme G. Zegeye (Admitted *Pro Hac Vice*)
Jacob H. Polin (Admitted *Pro Hac Vice*)
Amelia A. Haselkorn (Admitted *Pro Hac Vice*)
Lieff Cabraser Heimann & Bernstein, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone: 415-956-1000
Facsimile: 415-956-1008
tzegeye@lchb.com
jpolin@lchb.com
ahaselkorn@lchb.com

Stuart C. Talley (Admitted *Pro Hac Vice*)
Kershaw Talley Barlow, P.C.
401 Watt Avenue, Suite 1
Sacramento, CA 95864
Telephone: 916-779-7000
stuart@ktblegal.com

Larry Moffett (Bar No. 3401)
Law Office of Larry D. Moffett PLLC
P.O. Box 1418
39 CR 231
Oxford, MS 38655
Telephone: 662-298-4435
larry@larrymoffett.com

*Attorneys for Plaintiffs and the Proposed Class*

## <u>CERTIFICATE OF SERVICE</u>

I, Jacob H. Polin, declare as follows:

I am employed in the law firm of Lieff Cabraser Heimann & Bernstein, LLP, whose address is 275 Battery Street, 29th Floor, San Francisco, California  94111-3339.  I am readily familiar with the business practices of this office.  At the time of transmission, I was at least eighteen years of age and not a party to this action.

On January 23, 2023 I directed that the foregoing document be filed via the U.S. District Court's CM/ECF electronic system and a copy thereof was served upon all counsel of record:

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO SIEMENS INDUSTRY, INC.'S MOTION TO DISMISS PLAINTIFFS' COMPLAINT**

I declare under penalty of perjury under the laws of the State of California that the above is true and correct and that this declaration was executed on January 23, 2023.

*/s/ Jacob H. Polin*
Jacob H. Polin

2735076.2