## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF MISSISSIPPI
## NORTHERN DIVISION

**Priscilla Sterling, Raine Becker, Shawn Miller, and John Bennett, individually and on behalf of all others similarly situated Plaintiffs**

**v.**                                                  **Civil No. 3:22-cv-531-KHJ-MTP**

**The City of Jackson, Mississippi; Chokwe A. Lumumba; Tony Yarber; Kishia Powell; Robert Miller; Jerriot Smash; Siemens Corporation; Siemens Industry, Inc.; and Trilogy Engineering Services LLC**                    **Defendants**

### TONY YARBER AND KISHIA POWELL'S MEMORANDUM IN SUPPORT OF THEIR MOTION FOR QUALIFIED IMMUNITY AND JUDGMENT ON THE PLEADINGS TO DISMISS THE AMENDED CLASS ACTION COMPLAINT FOR INJUNCTIVE RELIEF AND MONEY DAMAGES

Plaintiffs bring two constitutional claims under § 1983 against Yarber and Powell in their individual capacities. As an initial matter, and for the reasons stated in the City of Jackson's Motion for Judgment on the Pleadings, which Yarber and Powell adopt and incorporate by reference, Plaintiffs' state-created-danger claim fails as a matter of law.

Plaintiffs also bring a bodily-integrity claim. The Fifth Circuit has never recognized a bodily-integrity violation for exposure to an environmental harm, so that claim fails, too. Further, to demonstrate a substantive due process violation of bodily integrity, a plaintiff must plead facts showing a public official's actions shock the conscience and his or her decisions were made with deliberate indifference. The news articles and exhibits Plaintiffs identify in their pleadings close the holes in Plaintiffs' Complaint and show neither Yarber nor Powell's actions rose to the outrageous level necessary to support a substantive-due-process claim.

Nevertheless, both Yarber and Powell are entitled to the protection afforded by qualified immunity, which protects government officials from liability for reasonable decisions, the

1

outcome of those decisions notwithstanding.  *See Pearson v. Callahan*, 555 U.S. 223, 231 (2009)

("The protection of qualified immunity applies regardless of whether the government official's

error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and

fact.") (cleaned up).  Whether, in hindsight, Yarber or Powell could have made different

decisions is irrelevant; what matters is whether "*no* reasonable [official] could have acted as

[Yarber or Powell] did here, or every reasonable officer faced with the same facts would not

have [acted as Yarber or Powell did]."  *Mason v. Faul*, 929 F.3d 762, 764 (5th Cir. 2019).

Plaintiffs do not meet that burden.[1]

## RELEVANT FACTUAL BACKGROUND

The City provides water to approximately 173,514 residents.  *See* Am. Compl. [Doc. 57]

at 12 (¶ 33).  It does so through two public drinking-water systems, identified separately as PWS

ID No. MS0250012 and PWS ID No. MS0250008.  *See* Ex. 1 to Am. Compl. [Doc. 57-1], Mar.

27, 2020 Em. Admin. Ord.  PWS MS0250012 serves a small portion of the City's residents and

portions of Byram (approximately 16,000 connections total).  *See id*; *see generally* Am. Compl.

[Doc. 57] at 28 (¶¶ 120, 124).  This system uses groundwater drawn from wells.  *See id.*  PWS

MS0250008 provides water to the vast majority of the City's water users.  *See id.*  This system

uses surface water drawn from the Reservoir and the Pearl River.  *See id.*  It has two water-

treatment plants, O.B. Curtis Water Treatment Plant and J.H. Fewell Water Treatment Plant.  *See*

*id*.  Among other functions, both plants regulate the water's pH level.

---

[1] Judge Carlton W. Reeves granted Yarber and Powell's request for qualified immunity on other grounds
in consolidated litigation, captioned *J.W., et al. v. The City of Jackson, et al.*, in which the plaintiffs pled
facts and claims against Yarber and Powell similar to those alleged here. Or. [Doc. 135], No. 3:21-CV-
663-CWR-LGI (S.D. Miss. Mar. 23, 2023), at 27-33.

#101498340v3

In 2011, then-Mayor Harvey Johnson announced in his State-of-the-City address that the City was moving forward with bidding contracts "that will allow us to abandon the well system [PWS MS0250012], which is not as reliable as our surface water supply [PWS MS 0250008]." *See* Exhibit "A," 2011 State-of-the-City Address.[2]

According to Plaintiffs, "[b]y late 2013 or early 2014," Willie Bell met with Cynthia Hill to discuss the water system's corrosion control. *See* Am. Compl. [Doc. 57] at 22 (¶¶ 85-86). Bell was the interim Public Works Director under then-Mayor Chokwe Lumumba; Hill "ran Jackson's water treatment plants." *Id.* at 21-22 (¶¶ 81,85). One issue Bell and Hill discussed was a defective lime-injection pump at O.B. Curtis. *See id.* at 22 (¶ 88). Bell asked Hill to estimate the "cost of repairs, including the cost to switch to liquid lime treatment to improve corrosion control." *See id.* at 22 (¶¶ 85-88). The estimated cost was $400,000. *See id.* Bell then met with then-Mayor Lumumba. *See id.* at 21 (¶¶ 81-84). According to Bell, after he met with Lumumba, Bell had follow-up discussions with Hill, asking, "Can this wait until the next budget year?" *See* Anna Wolfe, *Ex-official: Jackson Has Water Solution, Hasn't Acted*, CLARION-LEDGER (Mar. 23, 2016), identified in Am. Compl. [Doc. 57] at 26 n.32.

Then-Mayor Lumumba passed away in February 2014. In March 2014, the City approved notice of substantial completion of phases of the well water replacement project. *See* Exhibit "B," Mar. 25, 2014 Minutes. Yarber was elected to complete his term in April 2014. *See* Am. Compl. [Doc. 57] at 23 (¶ 95). Yarber did not retain Bell. The City Council confirmed Powell as Public Works Director.

---

[2] "When deciding a Rule 12(c) motion, a court may consider evidence subject to judicial notice." *Wright v. Moore*, No. 3:20-CV-473-DPJ-FKB, 2021 U.S. Dist. LEXIS 174049, at *17-18 (S.D. Miss. Sept. 14, 2021).

#101498340v3

Around August 2014, the City transferred approximately 16,000 water connections from PWS MS0250012 to PWS MS0250008. *See* Am. Compl. [Doc. 57] at 28 (¶ 120).

On June 23-25, 2015, MSDH performed Safe Drinking Water Act testing in the City. *See* Am. Compl. [Doc. 57] at 31 (¶ 139). Before receiving the test results, the City identified renovation and repair needs for both O.B. Curtis, totaling $3.5 million, and J.H. Fewell, totaling $4.9 million, which would have included—among other projects—improving the lime-feed system. *See* Tim Summers, Jr., *Update: Council Approves Trilogy for Water Corrosion Study; Emergency Loan to Fund It*, JACKSON FREE PRESS (Apr. 5, 2016), identified in Am. Compl. [Doc. 57] at 44 n.66. At that time, Powell "knew that because of clogging of the lines, that the system was not the most efficient system, but…did not have any data…the water leaving the plant [was] creating a problem out in the system." *See id.* (internal quotations omitted).

On or about January 29, 2016, MSDH informed the City that 13 of the 58 samples tested in June 2015 detected lead levels above the federal action level. *See* Am. Compl. [Doc. 57] at 32 (¶ 145); Anna Wolfe & Sara Fowler, *Jackson, MSDH Report Lead Detection in City Water*, CLARION-LEDGER (Jan. 29, 2016), identified in Am. Compl. [Doc. 57] at 33 n.42. Those 13 samples were taken from southwest and north Jackson. *See id.* That day, the City held a press conference. *See id.* During the press conference, Powell reported she "immediately dispatched crews to those homes" for samples that showed an exceedance. *See* R.L. Nave, *Jackson Has Long Been at High Risk for Lead Poisoning*, JACKSON FREE PRESS (Feb. 3, 2016), identified in Am. Compl. [Doc. 57] at 14 n.10. She also stated, "We want people to understand how they should be flushing their internal plumbing system before using water…These are just measures you take." *See id.* Specific recommendations and precautions were issued for small children and

pregnant women. *See* Tim Summers, Jr., *As the Water Turns, City Wrestles Over Corrosion Study*, JACKSON FREE PRESS (Mar. 16, 2016), identified in Am. Compl. [Doc. 57] at 27 n.34.[3]

The recommendations and measures included, among others, running tap water on cold for one to two minutes before consumption; never using hot water for consumption; children under 5 and pregnant women not consuming tap water; using filtered or bottled water when mixing formula; and screening children under 6 for lead. *See, e.g.*, Anna Wolfe, *6 Things to Know About the Lead Water in Jackson*, CLARION-LEDGER (Mar. 25, 2016), identified in the Am. Compl. [Doc. 57] at 41 n.55.

On February 12, 2016, MSDH provided a Compliance Plan for City. *See* Am. Compl. [Doc. 57] at 44 (¶ 199); Ex. 3 to Compl. [Doc. 57-3], Compliance Plan. The Compliance Plan directed the City, in pertinent part, to:

- [I]dentify an individual or firm providing professional engineering service to the City of Jackson for drinking water matters and provide the name or firm by written notice to the Director of the MSDH Bureau of Public Water Supply…

- [P]rovide the required Public Education pamphlet to all City of Jackson Water System customers…

- [P]rovide the required Public Education pamphlet to all Child Care Centers, Head Start Centers, Schools, Healthcare Facilities and any other locations where the City of Jackson is aware of children in congregate settings…

---

[3] Since MSDH notified the City of actionable lead levels, the City has been consistent by continually advising residents (1) to run the cold tap for one to two minutes before using tap water; (2) not to use hot water for cooking or drinking; (3) pregnant women and small children should refrain from using tap water; (4) to refrain from mixing baby formula with tap water; and (5) to screen small children for lead. *See* Anna Wolfe, *Jackson Hit with Technical Violation for Water Treatment*, CLARION-LEDGER (June 9, 2016), identified in Am. Compl. [Doc. 57] at 19 n.24 (noting that precautions for pregnant women and children would stay in place); Justin Vicory, *Department of Health Says Jackson Is In Violation of Safe Drinking Water Requirements*, CLARION-LEDGER (July 18, 2018), identified in Am. Compl. [Doc. 57] at 38 n.49.

#101498340v3

- [S]ubmit an engineer-designed corrosion control study and plan for optimization of water treatment for the City of Jackson Water System to the Director of the MSDH Bureau of Public Water Supply…

*Id.* The City complied with its obligations to provide the required public education materials required by the Compliance Plan. *See id.* at 7.

The City selected Trilogy Engineering to design a corrosion control study and plan for optimizing the City's water treatment. *See* Am. Compl. [Doc. 57] at 44 (¶ 201). Trilogy's president was Phillip West Gibson, a licensed professional engineer "who [had] a history working on the city's water systems." *See* Tim Summers, Jr., *As the Water Turns, City Wrestles Over Corrosion Study*, JACKSON FREE PRESS (Mar. 16, 2016), identified in Am. Compl. [Doc. 57] at 27 n.34; *see also* Exhibit "C," Miss. Bd. of Licensure for Prof. Engineers Licensee Details. The City did so because "lime treatment [would] likely not be all that [needed to be change[d]." Anna Wolfe, *Ex-official: Jackson Has Water Solution, Hasn't Acted*, CLARION-LEDGER (Mar. 23, 2016), identified in Am. Compl. [Doc. 57] at 26 n.32. The rationale for proceeding with the Compliance Plan's mandated corrosion control study, before purchasing new equipment, was explained as follows:

> Whatever has been put in the budget in the past has had to be spent on emergencies…The reality though is now we're seeing that the liquid lime feed system, had it been installed, may not have been the optimal measure after all, and if we had just put in a piece of equipment because someone said that that would work without there actually being a proper corrosion control treatment optimization study, then we could have very well lost $400,000.

*Id.*

The City also selected Trilogy to suggest interim solutions for water treatment while the study took place. *See* Tim Summers, Jr., *Update: Council Approves Trilogy for Water Corrosion Study; Emergency Loan to Fund It*, JACKSON FREE PRESS (Apr. 5, 2016), identified in Am.

Compl. [Doc. 57] at 44 n.66.  Trilogy considered a number of options for corrosion control, ultimately recommending soda ash.  *See* Anna Wolfe, *Jackson Water System Contains Lead Joints*, CLARION-LEDGER (May 10, 2016), identified in Am. Compl. [Doc. 57] at 14 n.9; *see also* Am. Compl. [Doc. 57] at 48 (¶ 213).

The City's remedial action improved corrosion control.  *See* Anna Wolfe, *A Year Later, Jackson's Lead-Water Issue Not Solved*, HATTIESBURG AMERICAN (Dec. 13, 2016), identified in Am. Compl. [Doc. 57] at 41 n.57 ("The latest pH field sampling in November shows an average pH of 9.4 across the city's water system, indicating marked improvement."); Anna Wolfe, *Jackson Water Issues Persist, Lead Levels Down*, CLARION-LEDGER (July 3, 2017), identified in Am. Compl. [Doc. 57] at 46 n.69 ("It appears that water quality results from the treatment facilities and the field water quality parameters have fallen slightly over the last two months.").

With regard to the overall process of optimizing corrosion control, the EPA stated:

> [F]ederal law gives a utility years to optimize corrosion control to come into compliance, so lead exceedances persisting a year after discovery is certainly not unusual. For a city the size of Jackson, the Lead and Copper Rule gives up to 18 months to complete corrosion control studies, six months to determine the best treatment method and up to 24 months to install the treatment.

Anna Wolfe, *A Year Later, Jackson's Lead-Water Issue Not Solved*, HATTIESBURG AMERICAN (Dec. 13, 2016), identified in the Am. Compl. [Doc. 57] at 41 n.57.  "Regulators and public-work officials agree that Jackson's water-treatment facilities have completed key improvement[s]…." Nick Judin, *EPA Tours Jackson Water Treatment Plants as City Faces Long Road to Rehab*, MISS. FREE PRESS (July 26, 2021), identified in Am. Compl [Doc. 57] at 65 n.112.

#101498340v3

## ARGUMENT AND AUTHORITIES

### I.    Standard of Review

A Rule 12(b)(6) motion tests the sufficiency of a party's complaint. *See Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 562-63, 570 (2007). To survive a motion to dismiss, a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Brand Coupon Network, L.L.C. v. Catalina Mktg. Corp.*, 748 F.2d 631, 634 (5th Cir. 2014); *Petersen Indus., Inc. v. Hol-Mac Corp.*, No. 4:10-cv-152-CWR-FKB, 2011 U.S. Dist. LEXIS 13338, at *3 (S.D. Miss. Feb. 9, 2011). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Petersen Indus.*, 2011 U.S. Dist. LEXIS 13338, at *3-4 (quoting *Iqbal*, 556 U.S. at 678).

The facial plausibility standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me-accusation." *Iqbal*, 556 U.S. at 678. "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*; *see also Petersen Indus.*, 2011 U.S. Dist. LEXIS 13338, at *3 ("A plaintiff's complaint must provide more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.") (quoting *Twombly*, 550 U.S. at 555).

If the exhibits attached to or incorporated into the complaint contradict the pleadings, the exhibits control. *U.S. ex rel. Wilkins v. N. Am. Constr. Corp.*, 101 F. Supp. 2d 500, 513-14 (S.D. Tex. 2000) (citing *Blackburn v. City of Marshall*, 42 F.3d 925, 931 (5th Cir. 1995)). The Court is also free to consider matters of public record or other matters appropriate for judicial notice. *Id.*;

#101498340v3

*see also Wright v. Moore*, No. 3:20-CV-473-DPJ-FKB, 2021 U.S. Dist. LEXIS 174049, at *17-18 (S.D. Miss. Sept. 14, 2021).

The legal standard is the same for dismissal motions filed under Rule 12(c). *In re Great Lakes Dredge & Dock Co.*, 624 F.3d 201, 209-10 (5th Cir. 2010); *Atwood v. Tullos*, 312 F. Supp. 3d 553, 559-60 (S.D. Miss. 2018) ("In deciding a 12(c) motion, the court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff.") (internal quotations omitted). The standard for a qualified immunity motion brought at the pleadings stage is the same as any other Rule 12(b)(6) or 12(c) motion, save for one difference: the burden is on the *plaintiff*, not the movant, to demonstrate the inapplicability of the defense. *Cantrell v. City of Murphy*, 666 F.3d 911, 918 (5th Cir. 2012).

## II.    Powell and Yarber are entitled to qualified immunity.

For Plaintiffs to meet their burden on a motion to dismiss for qualified immunity, the pleading must allege "(1) defendants committed a constitutional violation under current law and (2) the defendants' actions were objectively unreasonable in light of the law that was clearly established at the time of the actions complained of." *Club Retro LLC v. Hilton*, 568 F.3d 181, 194 (5th Cir. 2009) (internal quotations omitted). The Court may consider the prongs in either order; and the failure to satisfy one prong is fatal to a § 1983 claim. *See Pearson*, 555 U.S. at 236. Plaintiffs cannot satisfy either prong.

### 1.    The United States Constitution Does Not Guarantee Access to Clean Water.

No court has recognized a fundamental right to water services. *In re Detroit*, 841 F.3d 684, 700 (6th Cir. 2016) ("[T]here is no fundamental right to water service.") (quoting *Golden v. City of Columbus*, 404 F.3d 950, 961 (6th Cir. 2005)). Nor has a court recognized a constitutional right to clean water; in fact, all have denied its existence. *See, e.g.*, *Mattoon v.*

*City of Pittsfield*, 980 F.2d 1, 5-6 (1st Cir. 1992) (holding that the plaintiffs had no

"'constitutional right' to safe drinking water," and that even if they did, their claims were

preempted by the Safe Drinking Water Act); *Brown v. Detroit Pub. Sch. Comm. Dist.*, 763 F.

App'x 497, 503 (6th Cir. 2019) (rejecting claim the defendants' provision of contaminated water

violated plaintiff's right to bodily integrity because "neither the text nor history of the Due

Process Clause" supports a right to a contaminant-free environment); *see also Lake v. City of

Southgate*, No. 16-10251, 2017 WL 767879, at *10 (E.D. Mich. Feb. 28, 2017) (finding found no

fundamental constitutional right to "freedom from harmful contaminants"); *Concerned Citizens

of Neb. v. U. S. NRC*, 970 F.2d 421, 426-27 (8th Cir. 1992) (rejecting constitutional claims for

exposure to radiation from a radioactive waste disposal facility); *MacNamara v. Cty. Council of

Sussex Cty.*, 738 F. Supp. 134, 142 (D. Del. 1990) (finding no substantive due process right to

health where plaintiff claimed the placement of an electrical substation would harm her health);

*Hagedorn v. Union Carbide Corp.*, 363 F. Supp. 1061, 1063 (N.D.W. Va. 1973) (holding that

plaintiffs failed to state a constitutional claim for damage from a "rain of pollutants [with] the

[attendant] stench of gasses [sic] and fumes.").

      Recently, Judge Reeves concluded that the Constitution does not guarantee positive rights

to "contamination-free water" or "a clean environment", stating, "After all, it is black-letter law

that the Fourteenth Amendment generally confers no affirmative right to governmental aid, even

where such aid may be necessary to secure life, liberty or property." *See* Or. [Doc. 135], No.

3:21-CV-663-CWR-LGI (S.D. Miss. Mar. 23, 2023), at 34 (internal quotations omitted).

      And, the United States' executive branch agrees. In the United States' Explanation of

Position on the United Nations Human Rights Council's recognition of the right to water as a

human right, the United States government states, **"The right to safe drinking water and**

**sanitation is not one that is protected in our Constitution, nor is it justiciable as such in U.S. courts**, though various U.S. laws protect citizens from contaminated water." The United States, *Observations by the United States of America on the Relationship Between Climate Change and Human Rights*, http://www.ohchr.org/Documents/Issues/ClimateChange/Submissions/USA.pdf (emphasis added).

Because access to a public water supply is not a right protected by the Constitution, necessarily, the quality or quantity of the water provided by a public supply is not a matter of constitutional concern (although it may fall into the realm of tort law, statutory law, or various regulatory regimes). Nevertheless, Plaintiffs ask this Court to disregard legal precedent and clear pronouncements from our government, and to expand the scope of the Fourteenth Amendment to guarantee "Plaintiffs' access to safe drinking water", a right not set forth in the first eight Amendments to the Constitution or rooted in the United States' history and tradition. *See, e.g.*, Am. Compl. [Doc. 57] at 78 (¶361) (claiming the City violated Plaintiffs' constitutional rights by "denying and obstructing Plaintiffs' access to safe drinking water"). The Supreme Court's recent decision in *Dobbs v. Jackson Women's Health Organization*, 142 S. Ct. 2228 (2022) cautions against such expansion. The Court warned,

> In interpreting what is meant by the Fourteenth Amendment's reference to 'liberty,' we must guard against the natural human tendency to confuse what that Amendment protects with our own ardent views about the liberty that Americans should enjoy. That is why the Court has long been 'reluctant' to recognize rights that are not mentioned in the Constitution.

*Id.* at 2247-48 (quoting *Collins* v. *Harker Heights*, 503 U. S. 115, 125 (1992)).

The Court should join its sister courts, and reject Plaintiffs' attempt to move substantive-due-process jurisprudence into the environmental-control arena, an area one court has noted "the

#101498340v3

judicial process, through constitutional litigation, is peculiarly ill suited." *See Tanner v. Armco Steel Corp.*, 340 F. Supp. 532, 536 (S.D. Tex. 1972).

        **2.**       **Neither Yarber nor Powell violated Plaintiffs' right to bodily integrity.**

        a.       <u>Bodily-integrity law does not encompass exposure to contaminants.</u>

Plaintiffs claim that Yarber and Powell violated their substantive-due-process right to bodily integrity in Count I of the Complaint. *See* Am. Compl. [Doc. 57] at 77-78 (¶¶ 356-64). Fifth Circuit "case law in this area is sparse." *Young v. Isola, Miss.*, No. 3:15cv108, 2016 WL 6916790, at *5 (N.D. Miss. Nov. 23, 2016), *rev'd on other grounds*, 708 F. App'x 152 (5th Cir. 2017) (per curiam). In the few cases in which a plaintiff claimed a bodily-integrity violation due to exposure to environmental contaminants, courts have declined to expand the scope of substantive due process to encompass environmental control. For instance, in *Gasper v. Louisiana Stadium & Exposition District*, 418 F. Supp. 716 (E.D. La. 1976), a group of nonsmokers brought constitutional claims to ban smoking in the Louisiana Superdome. The plaintiffs alleged that "allowing patrons to smoke in the Louisiana Superdome, [the Louisiana Stadium and Exposition District] is causing other nonsmokers involuntarily to consume hazardous tobacco smoke, thereby causing physical harm and discomfort to those nonsmokers…." *Id.* at 717. The district court found there is "no constitutional right to a clean environment." *Id.* at 720-21. The Fifth Circuit agreed. *See Gasper v. La. Stadium & Exposition Dist.*, 577 F.2d 897 (5th Cir. 1978).

The *Gasper* district court relied on *Tanner*, 340 F. Supp. 532. In *Tanner*, the plaintiffs brought substantive due process claims for petroleum refineries' emissions of pollutants into the air, which the plaintiffs alleged caused pulmonary damage. *Id.* at 534. The district court found

that, assuming the plaintiffs could plead sufficient state action, they still failed to state a constitutional claim.  The court noted,

> [F]rom an institutional viewpoint, the judicial process, through constitutional litigation, is peculiarly ill-suited to solving problems of environmental control. Because such problems frequently call for the delicate balancing of competing social interests, as well as the application of specialized expertise, it would appear that their resolution is best consigned initially to the legislative and administrative processes.

*Id.* at 536.  This Court should not expand the scope of substantive due process into the environmental-control arena, either.

In the Fifth Circuit, the right to bodily integrity "appears to arise almost exclusively in the context of sexual abuse" cases.  *Bickford*, 2016 U.S. Dist. LEXIS 69101, at *11 n.4; *see also Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d 443, 50-51 (5th Cir. 1994); *Doe v. Rains Cnty. Indep. Sch. Dist.*, 66 F.3d 1402, 1407 (5th Cir. 1995); *Doe v. Edgewood Indep. Sch. Dist.*, 964 F.3d 351, 365 (5th Cir. 2020).  In *every* case in which the Fifth Circuit has found a violation of bodily integrity, a state actor has coerced – either directly through force or otherwise -- the plaintiff to act in a manner that violated his or her bodily integrity.  For example, in the *Doe* cases cited above, a teacher sexually abused a student.  In *Jefferson v. Ysleta Independent School District*, 817 F.2d 303, 305 (5th Cir. 1987), a teacher tied a second grader to a chair.  And, in *United States v. Guidry*, 456 F.3d 493, 506 (5th Cir. 2006), a police officer sexually assaulted female arrestees. In short, those cases all involve the government forcing an intrusion upon the plaintiff's body.

Absent coercion (e.g., assault, rape, sexual assault or harassment, or nonconsensual stripping, prolonged nudity and manual manipulation of the privates for a state actor's sexual gratification[4]), the Fifth Circuit has declined to find a substantive-due-process violation.  For

---

[4] *See generally Tyson v. Cnty of Sabine*, 42 F.4th 508, 519 (5th Cir. 2022).

#101498340v3

example, in *Pierce*, the court found no violation of the substantive due process right to bodily integrity when a student was killed while driving his teacher's ATV.  600 F. App'x at 194.  In its opinion, the Fifth Circuit distinguished sexual abuse and corporeal punishment cases from a traditional claim of negligence, finding that the teacher did not "deliberately abuse, restrain, threaten or touch [the deceased]."  *Id.* at 199.  The court noted Supreme Court precedent, warning courts against expanding substantive due process rights by turning a negligence claim into a constitutional matter.  *Id.* (citing *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992)).  Likewise, in *Bickford*, the Court declined to find plaintiff pleaded a bodily-integrity violation arising out of a stage-production accident, in which the plaintiff's spine was crushed, lungs were punctured, and legs were shattered.  2016 U.S. Dist. LEXIS 69101, *1, 11-13.

The Supreme Court cases addressing bodily-integrity claims confirm that the right is violated when the state forces or compels intrusion into the claimant's body.  *See, e.g.*, *Union Pacific Railway Co. v. Botsford*, 41 U.S. 250 (1891) (determining the state could not force an individual to submit to a surgical examination); *Rochin v. Cal.*, 342 U.S. 164, 166, 172 (1952) (finding the state could not force an "an emetic solution through a tube into [a claimant's] stomach"); *Wash. v. Harper*, 494 U.S. 210 (1990) (finding that the state could forcibly inject antipsychotic drug into an unwilling claimant).

The holdings of those cases are inapplicable here.[5]  Plaintiffs do not allege Yarber or Powell forced them to consume water.  Coercion is what distinguishes a viable bodily-integrity

---

[5] *Guertin v. Michigan*, 912 F.3d 907, 922 (6th Cir. 2019), is neither controlling nor persuasive. First, unlike in *Guertin*, neither Yarber nor Powell made a false statement.  Second, *Guertin* cited no case in which a state actor did not intentionally coerce an intrusion on the plaintiff's body.  Third, the *Guertin* court greatly expanded the law of substantive due process to analogize a state's forcible injections to a state's assurances that contaminated water was safe to drink.  Because the Fifth Circuit has cautioned against expanding substantive due process rights, and because the Fifth Circuit has never recognized a bodily-integrity violation without coercion, this Court should decline finding such a violation here.

#101498340v3

claim from Plaintiffs'.  The latter lacks merit because a robust consensus of cases holds there is *no* substantive-due-process right to a clean environment.  In each of those cases, the plaintiff claimed that some pollutant—whether sewage, mold, chemicals, tobacco smoke, or radiation—entered or threatened to enter their body and that the government was aware of, and responsible for, the risk.  None found a violation of the plaintiff's bodily integrity.

This Court should follow that precedent, and not expand substantive due process rights by turning a negligence claim into a constitutional matter.

> b.    Neither Yarber nor Powell coerced Plaintiffs to consume water.

Plaintiffs have not stated a bodily-integrity claim against Yarber or Powell, because they fail to allege either coerced them to consume the water.  Plaintiffs' pleadings and incorporated exhibits demonstrate the absence of coercion.

The Amended Complaint raises a number of alleged deficiencies regarding certain operational decisions that were made when Yarber was mayor and Powell was the public-works director (e.g., the decision to switch the well-water users to surface water, the decision to retain Trilogy and accept Trilogy's soda-ash recommendation).  None of those alleged deficiencies give rise to a substantive-due-process, bodily integrity claim.  *See generally Hernandez*, 380 F.3d at 879 ("The threshold issue presented by any case arising under Section 1983 is whether the plaintiff has sufficiently alleged a deprivation of a right secured by the Constitution.").  As shown, the Constitution does not guarantee access to a public water supply.  Because the Constitution does not guarantee access to a public water supply, then, necessarily, the quality and quantity of a public water supply, or the manner in which the public water supply is provided, is not a matter of constitutional concern.

The only allegations in the Amended Complaint that may give rise to a constitutional claim relate to public pronouncements Yarber and Powell made that Plaintiffs allege may have coerced them to consume the water.  Regarding those pronouncements, the question is whether Yarber or Powell intentionally made statements that compelled Plaintiffs to consume water they knew was contaminated.  Plaintiffs' pleadings and the incorporated exhibits show Yarber and Powell provided guidance as to how to use the water safely, discouraging the use of the water under certain circumstances.

Unlike in *Guertin v. Michigan*, 912 F.3d 907 (6th Cir. 2019),[6] Yarber and Powell's public pronouncements were not false.[7]  Plaintiffs quote Powell out of context.  She gave specific recommendations on *how* the water would be safe to drink: by flushing the system.  She and the City gave specific warnings about *who* should avoid drinking the water: pregnant women and children under 6.  She and Yarber *accurately* stated that the crisis in Flint—where people immediately developed rashes and lost hair after drinking untested and untreated water—was not the situation in Jackson.  And the City dispatched teams to warn affected homes, distributed pamphlets, and gave specific warnings to high-risk users.  Taken together, Yarber and Powell's

---

[6]    Ultimately, the *Guertin* court found state actors knowingly made false statements to coerce the public to consume tap water.

[7]    The Court is under no obligation to accept Plaintiffs' conclusory statements that Yarber or Powell's public pronouncements were false when those statements are contradicted by Plaintiffs' own exhibits to the Amended Complaint.  *See Wilkins*, 101 F. Supp. 2d at 513-14 (finding that if the exhibits attached to or incorporated into the complaint contradict the allegations of the complaint, the exhibits control.).

For example, Plaintiffs claim an employee was fired because he confirmed "the City's cast-iron water lines had solid bands of lead every twenty feet."  Am. Compl. [Doc. 57] at 36 (¶ 161).  That statement is false; that employee provided no such confirmation.  *See* KARE Staff, *Water Worker Fired After Talking About Lead to Media*, KARE 11 (Mar. 29, 2016) (https://www.kare11.com/article/news/nation-now/water-worker-fired-after-talking-about-lead-to-media/108980682), identified in Am. Compl. [Doc. 57] at 44 n.63.

16

pronouncements sought to encourage safety, not to force citizens to consume lead.  The Amended Complaint ignores the precautions Yarber and Powell provided; Plaintiffs do not aver the precautions were false.

Nevertheless, insufficient, or even misleading, public pronouncements do not give rise to a bodily-integrity claim.  *See Benzman v. Whitman*, 523 F.3d 119 (2d Cir. 2008).  In *Benzman*, plaintiffs sued the EPA administrator for issuing press releases with misleading statements.  *Id.* at 123-24.  Specifically, the plaintiffs alleged the EPA administrator knew that the air was not safe to breathe and falsely represented in press releases that it was.  *Id.* at 125.  The Second Circuit noted that "no court has ever held a government official liable for denying substantive due process by issuing press releases or making public statements."  *Id.*  The court went further, however, holding that the plaintiffs did not plead a substantive-due-process claim based on "public statements that offered assurances of environmental safety that turned out to be substantially exaggerated".  *Id.* at 127.  The Second Circuit did so, because – absent allegations of an intent to harm – the government cannot be held liable for statements when reassuring the public following events affecting public health.  *See id.* at 127-129.

The Court should reach a similar conclusion here.  As shown, Yarber and Powell's public pronouncements were not false.  And, Plaintiffs make no allegations that Yarber or Powell intended to hurt anyone, much less Plaintiffs.  Instead, they offered assurances to the public the water was safe to drink subject to certain precautions that were clearly and consistently conveyed to the public.  Whether they should have said more (or nothing at all) does not give rise to a substantive-due-process claim, especially in the absence of allegations of an intent to harm.  Finding otherwise would – without guidance – greatly expand the scope of substantive-due-

process.  The Supreme Court has cautioned courts not to do so, and Yarber and Powell ask the Court to follow that guidance here.

Even if the pronouncements were false (which they were not), Plaintiffs' bodily-integrity claim fails because Plaintiffs do not allege any Plaintiff relied on the alleged statements. Causation is an element of any § 1983 claim.  *See Sims v. Adams*, 537 F.2d 829, 831 (5th Cir. 1976) (discussing the level of connection necessary between a supervisory defendant's actions and the plaintiff's deprivation of constitutional rights to adequately establish causation).  And "[c]ausation is a requirement for . . . liability that is separate from deliberate indifference." *See Cole v. Jenkins*, No. 4:21-CV-01779, 2022 U.S. Dist. LEXIS 108868, at *15 (M.D. Pa. 2022) (quoting *Thomas v. Cumberland Cnty.*, 749 F.3d 217, 226 (3d Cir. 2014)); *see also Lozano v. Baylor Univ.,* 408 F. Supp. 3d 861, 891 (W.D. Tex. 2019) ("[A] substantive due process plaintiff must allege that the challenged policies or practices 'were the direct cause of the constitutional deprivation.'" (quoting *M.D. v. Abbott*, 907 F.3d 237, 248 (5th Cir. 2018)). Putting aside the warnings Yarber and Powell gave, Plaintiffs do *not* allege that they even read, or heard, any of Yarber and Powell's alleged statements, let alone that they relied upon the statements in drinking the water without taking any precautions.  In other words, Plaintiffs do not allege Yarber or Powell's statements coerced them to ingest lead.  And without an element of coercion, Plaintiffs' claim is meritless.

Admittedly, when faced with an identical bodily-integrity claim, Judge Reeves found the plaintiffs sufficiently alleged a bodily-integrity claim.  *See* Or. [Doc. 135], No. 3:21-CV-663-CWR-LGI (S.D. Miss. Mar. 23, 2023), at 33-36.  Yarber and Powell respectfully disagree wotj that ruling, which is not binding on this Court, for a number of reasons.  First, the Court based its opinion on a line of Supreme Court cases, in which the state forced or compelled intrusion into

#101498340v3

the claimants' body. *See, e.g.*, *id.* at 35-36. The Court did not address precedent from the Fifth Circuit finding no substantive-due-process violation where a claimant alleged exposure to an environmental contaminate, or the Second Circuit's on-point decision, holding that a substantive-due-process claim cannot be based on public reassurances. The Court also did not address whether those plaintiffs pleaded the causation element of their § 1983 claim, the absence of which is fatal to the plaintiffs' claim.

Importantly, given the allegations at issue, the Court's opinion reaches an incorrect legal conclusion. Judge Reeves wrote: "The Supreme Court has long recognized that the government does not have to provide a service, but once it does, the provision of that service is subject to constitutional constraints. *See, e.g., Goldberg v. Kelly*, 397 U.S. 254 (1970); *see also Dandridge v. Williams*, 397 U.S. 471, 522 (1970) (Marshall, J., dissenting) ('[T]he Court has already recognized several times that when a benefit, even a 'gratuitous' benefit, is necessary to sustain life, stricter constitutional standards, both procedural and substantive, are applied to the deprivation of that benefit.')." *See* Or. [Doc. 135], No. 3:21-CV-663-CWR-LGI (S.D. Miss. Mar. 23, 2023), at 35 n.122. But – again, respectfully – the cases the Court relied upon do not support the conclusion that Plaintiffs have alleged a bodily integrity claim.

As an initial matter, *Goldberg* was superseded by statute, 42 U.S.C. 601. *See Hudson v. Bowling*, 232 W. Va. 282, 290-91 (2013). And *Goldberg* addressed the procedural due process rights of a welfare recipient. The welfare benefits at issue there were a matter of statutory entitlement for persons qualified to receive them and the Court recognized that state action terminating those rights had constitutional implications. The case has no bearing on the substantive due process right of a recipient of government water services. And the *Dandridge* majority opinion applied rational basis review, not strict scrutiny, to an equal protection

challenge to a Maryland Department of Public Welfare regulation.  In upholding the regulation, the *Dandridge* majority opinion held, "the Equal Protection Clause does not require that a State must choose between attacking every aspect of a problem or not attacking the problem at all."  397 U.S. at 487.[8]  "Going further, the Court stated: "[t]he Constitution may impose certain procedural safeguards upon systems of welfare administration. But the Constitution does not empower this Court to second-guess state officials charged with the difficult responsibility of allocating limited public welfare funds among the myriad of potential recipients." *Id.* (internal quotations omitted).  For avoidance of doubt, no Court has held that the provision of water, once provided, subjects a municipality or its officials to constitutional strict scrutiny as to how that water is provided.

### 3. Plaintiffs cannot demonstrate Yarber or Powell made a conscious-shocking decision with deliberate indifference to Plaintiffs' constitutional rights.

"[I]n a due process challenge to executive action, the threshold question is whether the behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998); *see also Pena v. Givens*, 637 F. App'x 775, 782 (5th Cir. 2015) (unpublished).  In *Lewis*, the Supreme Court emphasized that "only the most egregious official conduct can be said to be 'arbitrary in the constitutional sense.'" *Id.* at 846 (quoting *Collins v. City of Harker Heights*, 503 U.S. 115, 129 (1992)).

Not only must the executive action be conscience-shocking, but it must also be made with subjective "deliberate indifference." *Sanchez v. Oliver*, 995 F.3d 461, 473 (5th Cir. 2021). "'Deliberate indifference is an extremely high standard to meet.'" *Id.* (quoting *Gobert v.*

---

[8]    The dissenting opinion in *Dandridge* relied on *Shapiro v. Thompson*, 394 U.S. 618 (1969), which was overturned by *Edelman v. Jordan*, 415 U.S. 651 (1974).

#101498340v3

*Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006)). In *Pierce v. Hearne Independent School District*,

600 F. App'x 194 (5th Cir. 2015), the Fifth Circuit stressed:

> A due process violation results from "*deliberate* decisions of
> government officials to deprive a person of life, liberty, or
> property." *Daniels v. Williams*, 474 U.S. 327, 331 (1986). "Actions
> and decisions by officials that are merely inept, erroneous,
> ineffective, or negligent do not amount to deliberate indifference
> and do not divest officials of qualified immunity." *Alton v. Texas
> A&M Univ.*, 168 F.3d 196, 201 (5th Cir. 1999) (citation
> omitted). As the Seventh Circuit has explained, deliberate
> indifference entails "conduct that reflects complete indifference to
> risk—when the actor does not care whether the other person lives
> or dies, despite knowing that there is a significant risk of
> death." *Salazar v. City of Chicago*, 940 F.2d 233, 238 (7th Cir.
> 1991) (citations and internal quotations omitted).

*Id.* at 198 (emphasis in original). Plaintiffs cannot demonstrate conscience-shocking deliberate

indifference with respect to *any* alleged decisions Yarber or Powell made.

### a.    Switching the well-serviced connections to an established source.

Plaintiffs cannot show that the decision to switch the source for a minority of connections

(well water) to the source for the majority (surface water) shocks the conscience or was made

with deliberate indifference. To begin with, as shown by public records, neither Yarber nor

Powell created the well-publicized plan to abandon the well water system. *See* Exhibits "A"-

"B." That plan preceded them both by almost 20 years.[9] Under former Mayor Johnson and

---

[9] In *Williams v. Barbour*, the district court sets forth the pleading requirement for alleging a
constitutional claim against a government official in his individual capacity in the Fifth Circuit:

> The generic pleading requirements of [Rule] 8 govern suits against
> individual defendants in their official capacity. Oliver need only provide
> a short and plain statement of the claim that will give the defendant fair
> notice of what the plaintiff's claim is and the grounds upon which it
> rests. Plaintiffs suing government officials *in their individual capacities,
> however must allege specific conduct giving rise to a constitutional
> violation. This standard requires more than conclusory assertions: The
> plaintiff must allege specific facts giving rise to a constitutional
> violation.*

#101498340v3

former Mayor Lumumba's tenures, the City spent millions of dollars on infrastructure upgrades to enable moving all users to surface water.  *See* Exhibit "C," Mar. 25, 2014 Minutes.  The decision to abandon the well water system—a decision that neither Yarber nor Powell made—cannot be called outrageous when it was based on those concerns.

But *even if* Yarber and Powell could somehow be responsible for a decision they did not make, Plaintiffs cannot show the decision was made in deliberate indifference to Plaintiffs' constitutional rights.  Plaintiffs do not, and cannot, plead Yarber and Powell knew that moving all of Jackson's water users to the same surface water source would cause lead to leach into the water system, but yet decided to do so anyway.

Though Plaintiffs attempt to fit the facts of this case into *Guertin*, there are significant differences that make deliberate indifference too high of a hurdle for Plaintiffs to overcome.  In *Guertin*, Flint switched the source water for *all* of its users from the Detroit Water and Sewerage Department to the Flint River.  *See Mason v. Lockwood, Andrews & Newnam, P.C.*, 842 F.3d 383, 387 (6th Cir. 2016).  Thus, Flint switched from a known source to an unknown, untested source.  Here, the City switched a minority of users from a known source (well water) to another known source (the Reservoir) that had successfully supplied the majority of Jackson water users

---

2009 U.S. Dist. LEXIS 98114, at *7 (S.D. Miss. Oct. 2, 2009) (emphasis added); *see also Spikes v. McVea*, 2021 U.S. App. LEXIS 27612, at *1 (5th Cir. Sept. 14, 2021) (noting the qualified-immunity inquiry must focus on the role of each defendant, not the collective action of a group of defendants); *Dyer v. Houston*, 964 F.3d 374, 382 n.6 (5th Cir. 2020).  That pleading standard is consistent with *Iqbal* and *Twombly*, requiring "allegations of fact focusing specifically on the conduct of the individual who caused the plaintiffs' injury."  *Williams*, 2009 U.S. Dist. LEXIS 98114, at *7-8 (quoting *Reyes v. Sazan*, 168 F.3d 158, 161 (5th Cir. 1999)); *see generally Petersen Indus. v. Hol-Mac Corp.*, 2011 U.S. Dist. LEXIS 13338, at *3-4 (S.D. Miss. Feb. 9, 2011) ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.") (quoting *Iqbal*, 556 U.S. at 678); *Twombly*, 550 U.S. at 570 (requiring plaintiff to plead "enough facts to state a claim to relief that is plausible on its face").  Neither Yarber nor Powell is liable for the conduct of other government officials.

for years.  Flint also implemented *no* anti-corrosion measures on the Flint River water.  *Mason*, 842 F.3d at 387; *see also Guertin*, 912 F.3d at 915.  Flint did not treat the water *at all*.  Here, the City *did* treat the Reservoir water.  As Plaintiffs admit, water drawn from the Reservoir was treated at O.B. Curtis.  Plaintiffs criticize the effectiveness of the City's treatment equipment, but they do not, and cannot, allege the City did not attempt to treat the water it provided.  *See* Am. Compl. [Doc. 57] at 46 (¶ 208).

### b.    Budgeting for a liquid lime pump or hiring Trilogy.

Plaintiffs cannot show Yarber or Powell acted with deliberate indifference in not budgeting for upgrades to O.B. Curtis.  Budgeting decisions are complex and involve the types of public policy decisions that courts are loathe to second-guess.  Moreover, those decisions are legislative, not executive.  As a matter of law, the City Council is responsible for approving and adopting the City's budget, and neither the Mayor nor the Public Works Director can unilaterally decide the City's budget.  *See Advanced Tech. Bldg. Sols., L.L.C. v. City of Jackson*, 817 F.3d 163, 166 (5th Cir. 2016).  Plaintiffs may not base a constitutional-violation claim against Yarber or Powell on budgeting decisions.

Similarly, Plaintiffs cannot show Yarber or Powell committed a constitutional violation by hiring Trilogy, because neither had the sole authority to hire Trilogy.  As the Court is aware, a public body speaks only through its minutes.  *Warnock & Assocs., LLC v. City of Canton*, 328 So. 3d 1254, 1260 (Miss. Ct. App. 2021).  The City Council, on behalf of the City, approved hiring Trilogy.  *See* Am. Compl. [Doc. 57] at 44 (¶ 201-02).  Again, neither Yarber nor Powell had the legal power or right to enter into a contract with Trilogy without City Council approval.

Further, the State *required* the City to hire an engineering firm to conduct a corrosion control study and make recommendations.  *See* Ex. 3 to Am. Compl. [Doc. 57-3], Compliance

23

Plan.  Contrary to Plaintiffs' misleading allegations, Trilogy was a licensed professional engineering firm that employed a licensed professional engineer who specialized in water infrastructure and had a prior relationship with the City.  *See* Tim Summers, Jr., *As the Water Turns, City Wrestles Over Corrosion Study*, JACKSON FREE PRESS (Mar. 16, 2016), identified in Am. Compl. [Doc. 57] at 45 n.68; *see also* Exhibit "C," Miss. Bd. of Licensure for Prof. Engineers Licensee Details.  There is nothing at all conscience-shocking about hiring a licensed professional engineer when ordered by the State to do so.

### c.    Following Trilogy's soda ash recommendation.

The Court should reject Plaintiffs' attempt to hold Powell and Yarber responsible for the decision to follow Trilogy's soda ash recommendation.  To begin with, Plaintiffs do not allege *when* the decision to follow Trilogy's recommendation was made or when the change to soda ash was implemented.  Powell left the City in May 2016 before Trilogy made any recommendation to the City.

Yarber did not act with deliberate indifference, either.  The Fifth Circuit has held that taking efforts to remediate a situation, even if inadequate, do not show deliberate indifference unless the state actor "*knew* they were insufficient and intentionally failed to do more out of indifference to [the plaintiff's] well-being."  *Estate of Aguirre v. San Antonio*, 995 F.3d 395, 421 (5th Cir. 2021) (finding gross negligence insufficient to establish the kind of subjective, deliberate indifference that must be demonstrated to establish a due process violation).  Yarber is not a professional engineer.  It defies common sense for anyone to expect Yarber to have found flaw with a licensed professional engineer's recommendation to use soda ash, which the State approved.  Plaintiffs do not even allege Yarber subjectively knew that the soda ash proposal would be insufficient and intentionally failed to do more.

24

**d.    Statements made to the press.**

Plaintiffs cannot demonstrate conscious-shocking deliberate indifference with respect to *any* public pronouncement Yarber or Powell made, because Plaintiffs do not allege either made a false statement.

Second, Plaintiffs do not allege Yarber or Powell intended to hurt anyone when making public pronouncements as to how to consume the public-supplied water safely.  The Second Circuit holding in *Benzman* is illustrative here.  In that case, the Court found that a public official's public pronouncements are not "conscience-shocking merely because for some persons it resulted in grave consequences that a correct decision could have avoided."  523 F.3d at 128-29.  In reaching that conclusion, the *Benzman* court stated:

> [W]hen agency officials decide how to reconcile competing governmental obligations in the face of disaster, only intent to cause harm arbitrarily can shock the conscience in a way that justifies constitutional liability. . . . Accepting as we must the allegation that the defendants made the wrong decision by disclosing information they knew to be inaccurate, and that this had tragic consequences for the plaintiffs, we conclude that a poor choice made by an executive official between or among the harms risked by the available options is not conscience-shocking . . .

The Court should reach a similar conclusion here.

**4.    The law was not clearly established in 2016.**

Plaintiffs also cannot show a violation of clearly-established law.  A law is "clearly established" when "[t]he precedent [is] clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply.  Otherwise, the rule is not one that 'every reasonable official' would know."  *District of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018) (cleaned up).  A court must determine whether a "controlling authority" or "robust consensus of cases of persuasive authority" establishes the unlawfulness of the conduct at issue.  *Ashcroft v. al-Kidd*, 563 U.S. 731, 741-42 (2011) (citation omitted); *see also McClendon v. City*

25

*of Columbia*, 305 F.3d 314, 327 n.10 (5th Cir. 2002).  "Generally, to satisfy this standard, the plaintiff must 'identify[] a case in which an officer acting under similar circumstances was held to have violated the [Constitution], and…explain[] why the case clearly proscribed the conduct of that individual officer.'"  *Cope v. Cogdill*, 3 F.4th 198, 205 (U.S. 5th Cir. 2021) (quoting *Joseph ex rel. Estate of Joseph v. Bartlett*, 981 F.3d 319, 345 (5th Cir. 2020)).  "While an exact case on point is not required, the confines of the officers' violation must be 'beyond debate.'"  *Id.* (quoting *Baldwin v. Dorsey*, 964 F.3d 320, 326 (5th Cir. 2020)).  "**Broad general propositions are not enough to overcome qualified immunity**."  *Id.* (emphasis added). "Plaintiffs are only excused of their obligation to identify an analogous case in 'extreme circumstances' where the constitutional violation is 'obvious.'"  *Id.* at 206.

The *only* remotely analogous case to this one in the Fifth Circuit is *Gasper*, in which the court found *no* constitutional claim.  *Gasper*, 577 F.2d at 899.  *Bradley v. Puckett*, 157 F.3d 1022 (5th Cir. 1998), is *not* analogous to the case at bar, factually or legally.  First, *Bradley* involved only an Eighth Amendment claim, not a substantive due process claim.  There, the Court found a prisoner's lack of access to bathing water while in confinement rose to the level of "cruel and unusual," which entails "restrictions of confinement [that] rise to a level that results in physical torture…pain without penological purpose."  *Id.* at 1025 (citing *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)).  Second, the *Bradley* plaintiff had to bathe himself in toilet water, which caused fungal infections, because he was unable to otherwise bathe for several months.  *Id.*  A prison's decision to deprive an inmate a bath for several months is not similar to Yarber and Powell's decisions on how to manage the City's water system.

All Fifth Circuit cases finding a viable bodily substantive due process claim involve coercion.  In light of the total absence of "a case in which an officer acting under similar

26

circumstances was held to have violated" a plaintiff's right to substantive due process, *Cope*, 3 F.4th at 205, Yarber and Powell could not reasonably have expected to find themselves facing a substantive due process claim.

Although Plaintiffs cite the Safe Drinking Water Act and EPA regulations, neither provides a basis for Plaintiffs' claims. Those statutes are irrelevant to the issue before the Court. *See Gagne v. Galveston*, 805 F.2d 558, 560 (5th Cir. 1986) ("[N]either federal nor state officials lose their immunity by violating the clear command of a statute or regulation -- of federal or of state law -- unless *that statute or regulation* provides the basis for the cause of action sued upon.") (citation omitted). The inquiry should be based on whether the constitutional right was clearly established at the relevant time.

There also was no "robust consensus" of persuasive authority that clearly established a constitutional violation. Courts uniformly rejected constitutional claims arising from environmental harms until the Sixth Circuit's decision in *Guertin*. But, the only authority that can be considered is that in place when the alleged violation occurred. *See Kokesh v. Curlee*, No. 20-30356, 2021 U.S. App. LEXIS 28607, at *15-20 (5th Cir. Sept. 21, 2021) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004)). *Guertin* was decided in 2019; Powell left office in 2016, and Yarber left office in 2017. *Guertin* cannot be used to establish the lawfulness of Yarber and Powell's conduct.

*Guertin* is also not persuasive on whether Yarber or Powell's conduct was "clearly proscribed." *See Joseph ex rel. Estate of Joseph v. Bartlett*, 981 F.3d 319, 345 (5th Cir. 2020). *Guertin* relies upon no Supreme Court case with analogous facts. The cases *Guertin* cites deal with forced surgery (*Winston v. Lee*, 470 U.S. 753 (1985)); forced medication (*Harper*); forced stomach-pumping (*Rochin*); and the burden of proof for withdrawal of life support (*Cruzan v.*

27

*Dir., Mo. Dep't of Health*, 497 U.S. 261, 269-70 (1990)). More factually analogous are *Mattoon v. City of Pittsfield*, 980 F.2d 1 (1st Cir. 1992), dealing with contamination of a public water supply, or *Benzman*, dealing with allegedly false statements about the risk of a pollutant.

*Guertin* found the constitutional violations in that case were obvious. In this Circuit, the exception for "obvious" violations is narrow: "[u]nder *Taylor*, plaintiffs are only excused of their obligation to identify an analogous case in extreme circumstances where the constitutional violation is obvious." *Cope*, 3 F.4th at 206 (citing *Taylor v. Riojas*, 141 S. Ct. 52 (2020) (per curiam)) (internal quotations omitted). Here, where there were competing policy reasons for the switch to surface water; where the majority of the City had been served surface water with no violations; and where the City gave tailored notice to the affected citizens, the Court should find there is no "obvious" violation. There is nothing obviously unconstitutional about public servants making difficult decisions when faced with limited resources and competing crises, particularly given that "substantive due process is not the clearest of Supreme Court doctrines…the caselaw in this area is contradictory, imprecise, and, well, messy." *Daves v. Dall. Cty.*, 984 F.3d 381, 411 (5th Cir. 2020) (internal quotations omitted). Certainly, when the *Guertin* court itself divided over whether a constitutional violation had occurred at all, it is not "beyond debate" that the individual Defendants here violated Plaintiffs' constitutional rights.[10]

### III. Plaintiffs do not plead a MTCA claim against Yarber and Powell individually.

To the extent Plaintiffs assert Count V against Yarber and Powell in each's individual capacity—*see generally* Am. Compl. [Doc. 57] at 9 (¶¶ 23-24)—it should be dismissed because Plaintiffs pleaded both "acted in the course and scope of [his] employment." *See, e.g.*, *id.* at 91 (¶

---

[10]    Judge Reeves reached the same conclusion in consolidated litigation, captioned *J.W., et al. v. The City of Jackson, et al.* Or. [Doc. 135], No. 3:21-CV-663-CWR-LGI (S.D. Miss. Mar. 23, 2023), at 33 ("[T]hat right was not clearly established at the time the Defendants . . . .").

#101498340v3

417); *see also City of Clinton v. Tornes*, 252 So. 3d 34, 37 (Miss. 2018) ("While the MTCA permits a government employee to 'be joined in an action against a governmental entity in a *representative* capacity if the act or omission complained of is one for which the governmental entity may be liable,' the MTCA makes clear 'no employee shall be held *personally* liable for acts or omissions occurring within the course and scope of the employee's duties.'") (quoting MISS. CODE § 11-46-7(2) (Rev. 2012)) (emphasis in original); *Dearman v. Stone Cnty. Sch. Dist.*, Civ. No. 1:13-cv-267-HSO-RHW, 2014 U.S. Dist. LEXIS 37489, *19-20 (S.D. Miss. Mar. 21, 2014) ("The MTCA generally provides that employees of a governmental entity who act within the course and scope of employment are not personally liable for injuries arising from their acts or omissions.").  Plaintiffs' pleadings eviscerate any MTCA claim against Yarber or Powell in his individual capacity.

## **CONCLUSION**

The Court should dismiss Counts I, II and V against Yarber and Powell.

RESPECTFULLY SUBMITTED, this the 14th day of July, 2023.


*/s/ Terris C. Harris*
TERRIS C. HARRIS

Terris C. Harris (MSB #99433)
THE COCHRAN FIRM-JACKSON, LLC
197 Charmant Place, Suite 2
Ridgeland, MS 39157
Telephone: (601) 790-7600
tharris@cochranfirm.com
*Counsel for Tony Yarber and*
*Kishia Powell*

#101498340v3

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 14, 2023, I electronically filed the foregoing pleading with the Clerk of the Court using the CM/ECF system which served a copy of the foregoing on all counsel of record.

*/s/ Terris C. Harris*
TERRIS C. HARRIS
