## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
## NORTHERN DIVISION

| | |
|---|---|
| PRISCILLA STERLING, RAINE BECKER, SHAWN MILLER, AND JOHN BENNETT, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,<br><br>               Plaintiffs,<br><br>    vs.<br><br>THE CITY OF JACKSON, MISSISSIPPI; CHOKWE A. LUMUMBA; TONY YARBER; KISHIA POWELL; ROBERT MILLER; JERRIOT SMASH; AND TRILOGY ENGINEERING SERVICES LLC.,<br><br>               Defendants. | Civil No.  3:22-cv-531-KHJ-MTP<br><br>**MEMORANDUM IN SUPPORT OF PLAINTIFFS' RESPONSES TO CITY DEFENDANTS' MOTIONS FOR JUDGMENT ON THE PLEADINGS AND FOR QUALIFIED IMMUNITY** |

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ............................................................................ 1

II.    FACTS ............................................................................................ 2

III.    LEGAL STANDARD ..................................................................... 11

IV.    ARGUMENT ................................................................................. 11

        A.    Plaintiffs Sufficiently Plead Fourteenth Amendment Claims.................. 11

                1.    Plaintiffs Adequately Plead Their Bodily Integrity Claim. ......... 11

                        a.    Deceiving Plaintiffs into Consuming Lead Violates Their Right to Bodily Integrity. ...................................... 11

                        b.    Defendants' Conduct Shocked the Conscience. .............. 15

                        c.    Defendants' Narrow Interpretation of Bodily Integrity Ignores Controlling Precedent........................... 21

                2.    Plaintiffs Adequately Plead Their Claim for State-Created Danger. ........................................................................ 23

        B.    Defendants Are Not Entitled to Qualified Immunity.............................. 25

                1.    Plaintiffs have alleged violations of their constitutional rights. ........................................................................... 26

                2.    Plaintiffs' constitutional rights to bodily integrity and freedom from state-created dangers are clearly established. ....... 26

V.    CONCLUSION.............................................................................. 32

2828506.7

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) .................................................................................. 11, 30

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 553 (2007) ........................................................................................ 11

*Benzman v. Whitman,*
  523 F.3d 119 (2d Cir. 2008) ........................................................................... 14

*Carroll v. Ellington,*
  800 F.3d 154 (5th Cir. 2015) ......................................................................... 26

*Cnty. of Sacramento v. Lewis,*
  523 U.S. 833 (1998) ...................................................................... 15, 16, 20, 22

*Contra Guertin v. Michigan,*
  No. 16-CV-12412, 2017 WL 2418007 (E.D. Mich., June 5, 2017) *aff'd in part, rev'd in part*
  912 F.3d 907 (6th Cir. 2019) ......................................................................... 24

*Cruzan by Cruzan v. Dir., Missouri Dep't of Health,*
  497 U.S. 261 (1990) ....................................................................................... 29

*Cruzan v. Dir., Missouri Dep't of Health,*
  497 U.S. 261 (1990) ....................................................................................... 29

*Dandridge v. Williams,*
  397 U.S. 471 (1970) ....................................................................................... 13

*Dixon v. Alcorn Cnty. Sch. Dist.,*
  499 F. App'x 364 (5th Cir. 2012) ................................................................... 24

*Doe v. Claiborne Cnty., Tenn. By & Through Claiborne Cnty. Bd. of Educ.,*
  103 F.3d 495 (1996) ....................................................................................... 30

*Est. of B.I.C. v. Gillen,*
  710 F.3d 1168 (10th Cir. 2013) ..................................................................... 22

*Farmer v. Brennan,*
  511 U.S. 825 (1994) ....................................................................................... 22

*Fisher v. Moore,*
  73 F.4th 367 (5th Cir. 2023) .......................................................................... 25

*Gagne v. Galveston,*
  805 F.2d 558 (5th Cir. 1986) ..................................................................... 31, 32

*Goldberg v. Kelly,*
  397 U.S. 254 (1970) ....................................................................................... 13

*Guertin v. State*
  (6th Cir. 2019) 912 F.3d 907 ....................................................... 13, 14, 16, 29

*Harlow v. Fitzgerald,*
  457 U.S. 800 (1982) ....................................................................................... 26

*Hernandez ex rel. Hernandez v. Texas Dep't of Protective & Regul. Servs.,*
  380 F.3d 872 (5th Cir. 2004) ......................................................................... 16

-ii-

## TABLE OF AUTHORITIES
### (continued)

Page

*Hope v. Pelzer*,
  536 U.S. 730 (2002) .................................................................................... 27, 28, 31

*Hudson v. Bowling*,
  232 W.Va. 282 (2013) ................................................................................ 13

*J.W. by and through Williams v. City of Jackson, Mississippi*,
  No. 3:21-CV-663-CWR-LGI, 2023 WL 2617395 (S.D. Miss., Mar. 23, 2023) .............. passim

*Jefferson on behalf of Jefferson v. Ysleta Independent School Dist.*,
  817 F.2d 303 (5th Cir. 1987) ...................................................................... 12

*Johnson v. Johnson*,
  385 F.3d 503 (5th Cir. 2004) ...................................................................... 11

*Kinney v. Weaver*,
  367 F.3d 337 (5th Cir. 2004) ...................................................................... 28, 29

*M. D. by Stukenberg v. Abbott*,
  907 F.3d 237 (5th Cir. 2018) ...................................................................... 16

*McClendon v. City of Columbia*,
  305 F.3d 314 (5th Cir. 2002) ...................................................................... 23, 27, 30

*McKinney v. Irving Indep. Sch. Dist.*,
  309 F.3d 308 (5th Cir. 2002) ...................................................................... 23

*Missouri v. McNeely*,
  569 U.S. 141 (2013) .................................................................................... 12

*Moore v. East Cleveland*,
  431 U.S. 494 (1977) .................................................................................... 12

*Mullenix v. Luna*,
  577 U.S. 7 (2015) ...................................................................................... 26

*Palko v. Connecticut*,
  302 U.S. 319 (1937) .................................................................................... 12

*Piotrowski v. City of Houston*,
  51 F.3d 512 (5th Cir. 1995) ........................................................................ 23

*Riggins v. Nevada*,
  504 U.S. 127 (1992) .................................................................................... 29

*Sause v. Bauer*,
  859 F.3d 1270 (10th Cir. 2017), *cert. granted, judgment rev'd*, 138 S. Ct. 2561 (2018) ......... 28

*Scanlan v. Tex. A&M Univ.*,
  343 F.3d 533 (5th Cir. 2003) ...................................................................... 23, 24

*Sell v. United States*,
  539 U.S. 166 (2003) .................................................................................... 29

*Stewart v. Metro. Transp. Auth.*,
  566 F. Supp. 3d 197 (E.D.N.Y. 2019) ........................................................ 14

*Taylor v. Riojas*,
  141 S. Ct. 52 (2020) .................................................................................... 28

**TABLE OF AUTHORITIES**
(continued)

**Page**

*Union Pac. R. Co. v. Botsford*,
  141 U.S. 250 (1891)................................................................. 12

*Villarreal v. City of Laredo, Texas*,
  44 F.4th 363 (5th Cir. 2022), *reh'g en banc granted, opinion vacated,* 52 F.4th 265 (5th Cir.
  2022) ................................................................................... 27

*Wallace v. Cnty. of Comal*,
  400 F.3d 284 (5th Cir. 2005) ................................................. 26

*Washington v. Glucksberg*,
  521 U.S. 702 (1997)............................................................... 12

*Washington v. Harper*,
  494 U.S. 210 (1990)...................................................... 12, 21, 29

*Washington v. Hous. Auth. of City of Columbia*,
  58 F.4th 170 (4th Cir. 2023) ................................................. 14

**Statutes**

40 C.F.R. §141.85(d)(2)............................................................. 31

Miss. Code § 11-46-7(2)............................................................ 2

Miss. Code. § 41-26-13.............................................................. 31

I.    **INTRODUCTION**

Plaintiffs, residents of the City of Jackson, have been poisoned by lead and other contaminants released into Jackson's public water supply as a result of the Defendants City of Jackson and its officials' conscience-shocking conduct and deliberate indifference. In short, the government caused, by deception and other bad conduct, Plaintiffs to put harmful chemicals in their bodies. Plaintiffs bring claims pursuant to 42 U.S.C. § 1983 alleging violations of Plaintiffs' rights to bodily integrity and to be free from state created dangers protected by the Due Process Clause of the Fourteenth Amendment to the United States Constitution as well as negligence claims. After years of deceit, extreme neglect, and mismanagement to the detriment of the health of residents of Jackson, Defendants now seek to avoid accountability for violating Plaintiffs' constitutional rights.

Plaintiffs file this Memorandum in Opposition to the following six motions: (1) Mayor Lumumba and Robert Miller's Motion for Judgment on the Pleadings (ECF No. 66); (2) Mayor Lumumba and Robert Miller's Motion for Qualified Immunity (ECF No. 68); (3) the City of Jackson's Motion for Judgment on the Pleadings (ECF No. 70); (4) Jerriot Smash's Motion for Judgment on the Pleadings and/or for Qualified Immunity (ECF No. 72); (5) Tony Yarber and Kishia Powell's Motion for Qualified Immunity (ECF No. 74); and Tony Yarber and Kishia Powell's Motion for Judgement on the Pleadings (ECF No. 75). Plaintiffs respond in one memorandum as Defendants raise the same arguments, often verbatim, or adopt and incorporate each other's arguments by reference.

Defendants City of Jackson, Mayor Lumumba, Robert Miller, Jerriot Smash, Tony Yarber, and Kishia Powell (collectively, "Defendants") move to dismiss Count I (Bodily Integrity), Count II (State Created Danger), and/or Count V (Negligence) of Plaintiffs' Amended Class Action Complaint ("Complaint") (dkt. 57) under Federal Rule of Civil Procedure 12(c).

-1-

Defendants Lumumba, Miller, Smash, Yarber, and Powell (collectively, "Individual City Defendants") seek to dismiss Counts I and II under a theory of qualified immunity, and Count V for failure to state a claim.[1] Defendant City of Jackson ("City") seeks to dismiss Counts I and II for failure to state a claim but does not seek to dismiss Count V.

Plaintiffs' Complaint details how Defendants created, exacerbated, failed to remediate, and covered up Jackson's lead water crisis, resulting in the lead poisoning of Plaintiffs. Plaintiffs have more than adequately pleaded that Defendants have acted with deliberate indifference in violation of Plaintiffs' fundamental constitutional rights to bodily integrity and to be free from state-created dangers. Accepting the well-pleaded facts as true and viewing them in the light most favorable to the Plaintiffs, Defendants' Rule 12 motions should be denied.

## II.    FACTS

With complete disregard for Plaintiffs' health, Defendants chose not to provide water fit for human consumption and induced the Jackson community to consume this contaminated water for years without their informed consent. Perhaps to avoid public criticism and negative media reports—especially in light of the influx of media attention on the Flint water crisis, which began in April 2014—Defendants opted to cover up and downplay the severity of the Jackson water crisis and publicly deny the City's worsening water quality. By encouraging Plaintiffs to continue consuming the City's water as usual, Defendants subjected Plaintiffs' bodies to lead and other harmful contaminants.

Lead is known to have devastating health effects on humans, especially on children's development. Amended Compl., dkt. 57 ("Compl.") ¶¶ 228–29. Lead exposure has long-lasting

---

[1] Plaintiffs concede that the Mississippi Tort Claims Act generally precludes most claims against government employees in their individual capacities for conduct that occurred "within the course and scope of the employee's duties." Miss. Code § 11-46-7(2). Plaintiffs therefore do not oppose the dismissal of Count V as to only the Individual City Defendants.

effects on the body. *Id.* ¶¶ 228–234. After entering the bloodstream, it can cycle to major organs such as the nervous system, kidneys, intestines, and the reproductive system. It then stores in the calcium of the bones and teeth and may cycle back into the bloodstream, especially for children whose bones are developing and during pregnancy. *Id.* According to the U.S. Environmental Protection Agency, "ingestion of lead can cause seizures, coma and even death." *Id.* ¶ 232. Increased lead levels in childhood are associated with an increased likelihood of ADHD behaviors, delinquent behaviors, and arrests. *Id.* ¶ 231. Lead is also harmful to adults as it can cause cardiovascular effects, increased blood pressure, hypertension, decreased kidney function, and reproductive problems in both men and women. *Id.* ¶ 234. Under the Safe Drinking Water Act, the EPA sets the maximum permissible concentration of lead in public drinking water at 15 parts per billion ("ppb"). *Id.* ¶ 47, n.11.

In 2011, the Mississippi Department of Health ("MSDH") identified Jackson to be at "high-risk for lead poisoning," and triennial testing from 2010 through 2013 showed that the concentration of lead in Jackson's drinking water was increasing at an alarming rate. *Id.* ¶¶ 46, 73–76. By late 2013 or early 2014, Jackson officials knew lead was leaching from pipes and fixtures into the City's drinking water. *Id.* ¶ 80. For example, for the testing period ending in 2009, Jackson's surface water system measured at 4.8 ppb at the 90th percentile and 8.8 ppb at the 95th percentile. *Id.* ¶ 74. By December 31, 2013, officials measured the lead concentration in Jackson's surface water system at 13.7 ppb for the 90th percentile and as high as 33.5 ppb at the 95th percentile. *Id.* ¶ 75. While these concentrations did not yet trigger mandatory action, officials were alerted to the escalating situation, and this should have raised concerns about potential health risks to water users. *See id.* ¶ 76.

In 2013, Mayor Chokwe Lumumba ("Lumumba") presided over the City of Jackson. At that time his Interim Director of Public Works, Willie Bell ("Director Bell") raised "issues with the water's pH," stressed Jackson's need to alter its corrosion control treatment method, discussed the potential risks associated with lead in drinking water, and brought proposals to Jackson officials to remedy the impending crisis. *Id.* ¶¶ 81, 84. Director Bell explained in a presentation to Lumumba and other officials, including Defendant Tony Yarber, that Jackson's increasing lead levels were due to the acidity (low pH) in the City's water, which corrodes the lead pipes and fixtures it runs through, causing lead to leach into the water supply. *Id.* ¶ 82. He also explained that  given the age of Jackson's water distribution infrastructure and the date that most homes were built, it was extremely likely that Jackson had lead service lines and that the vast majority of Jackson homes had lead pipes and fixtures. *Id.* ¶ 83. Jackson's treatment plant had a lime injection system, designed to add lime to the water to increase its pH, thus reducing the acidity and thereby the corrosiveness of the water. This in turn reduces the risk of lead leaching into the water from the pipes and fixtures. *Id.* ¶ 68.  Jackson's lime injection system was designed for liquid lime, but the City used lime powder that clogged underground pipes at the treatment facility. *Id.* ¶¶ 68–70. Jackson's lime injection valve had been clogged for years, making even post-treatment water highly acidic and corrosive. *Id.* ¶ 209. To fix the City's corrosion control program, Director Bell estimated the cost of repairs at $400,000.00, which included switching to a liquid lime treatment and repairing a long-broken lime injection pump. Given the fragility of Jackson's public water system ("PWS"), Director Bell also cautioned against taking actions that might shock the system. *Id.* ¶ 89.

Director Bell informed Jackson officials about the chronically low pH of Jackson's water sources, which include the Pearl River (which is treated by the J.H. Fewell Water Treatment

2828506.7

Plant) and the Ross Barnett Reservoir (which is treated by the O.B. Curtis Water Treatment Plant). *Id.* ¶¶ 35, 38–40, 90. At that time, Jackson's PWS also included a number of groundwater wells and appurtenant collection, treatment, storage, and distribution systems. *See id.* ¶ 35. Surface water, such as lakes, rivers, and reservoirs are generally more likely to contain contaminants than groundwater, such as aquifers or wells, and is thus likely to exhibit low pH levels (high acidity). Jackson's water sources have consistently exhibited low pH levels. *Id.* ¶ 57. The State has listed certain segments of the Pearl River as impaired due to low pH, which it defines as below 6.5 pH. Likewise, surface water from the Ross Barnett Reservoir has a pH of just above 6. *Id.* ¶ 59. In contrast, the MSDH, Water Supply Division, "prefers a pH of 8.5 for public water supplies."[2] *Id.* ¶ 53. One potential cause of the low pH levels of Jackson's two main water sources is the runoff from the surface mining industry, which creates the opportunity for "acid mine drainage" that creates a highly acidic chemical reaction in mine-impacted waters associated with metals like iron and aluminum. *Id.* ¶¶ 60–62. The City's failing lime-feed system at the O.B. Curtis Water Treatment Plant meant that the low pH source water was effectively not treating water drawn from the reservoir, and thus, the water running through lead pipes and fixtures was likely to corrode.

Lumumba recognized the importance of fixing the City's corrosion control program and accepted Director Bell's professional recommendation, approving this expenditure in the City budget. *Id.* ¶¶ 91, 93. However, in February 2014, shortly after approving funding to fix this equipment, he passed away. *Id.* ¶ 94. In April 2014, Defendant Tony Yarber was elected to finish Lumumba's term. *Id.* ¶ 95. Defendant Yarber was serving on Jackson's City Council and in the

---

[2] pH is measured on a logarithmic scale, meaning that the Pearl River and the Ross Barnett Reservoir, which are used as source water for Jackson's drinking water, have been found to be at least 20 times more acidic than the level the MSDH prefers for drinking water sources. *Id.* ¶ 58.

spring of 2014 served on the Budget Committee. *Id.* ¶ 96–97. He was present for and aware of Director Bell's presentation to Lumumba regarding the urgent need to upgrade the City's water infrastructure, particularly its corrosion control system, and the health risks to residents if upgrades were not implemented. *Id.* ¶ 98.

Rather than take the needed steps to stop lead from leaching further into the water, Defendant Yarber made conscience-shocking decisions – a metaphoric switch-flipping – to abandon efforts to fix the City's corrosion control system and other aging water treatment and distribution infrastructure. *Id.* ¶ 101. Defendant Yarber ousted Director Bell and replaced him with Defendant Kishia Powell as Director of Public Works. *Id.* ¶ 103. Defendants Yarber and Powell, as well as several other high-ranking officials in Jackson's government were aware of the rising lead levels, understood the cause, the risks, and Director Bell's proposed solution, including the cost to repair. *Id.* ¶¶ 104–05. Despite Yarber's knowledge of the reasons for the City's budget allocations for corrosion control treatment and repairs, he withdrew the funding necessary to avert an impending public health crisis, essentially flipping off the switch on the plan to take steps necessary to make Jackson's water safe. *Id.* ¶¶ 106–11.

Not only did Yarber and Powell ignore Director Bell's warnings about the impending health risks if Jackson's PWS went unrepaired, but they also went against his advice not to take any action that might shock Jackson's PWS. Despite rising lead levels, Yarber and Powell switched a section of the City's water source from well water to surface water, adding 16,000 connections from the Maddox Road Well System. These groundwater systems had previously tested at low levels of lead and low corrosivity. *Id.* ¶¶ 119–21. This decision did not only endanger the users who had previously been on the well system, but also endangered those whose water was drawn from surface water sources because Jackson's PWS was not prepared to

handle the increased flow associated with the sudden addition of 16,000 connections. *Id.* ¶¶ 124–26.

Not surprisingly, as a result of these two decisions to forego repairs and add 16,000 connections to the surface water system, in June 2015, MSDH's triennial testing showed that lead levels in Jackson had jumped again. *Id.* ¶¶ 132, 139, 144. This time, Jackson's lead levels exceeded the 15 ppb regulatory limit at 28 ppb. *Id.* ¶ 142. Yet none of the Defendants notified residents whose lead levels exceeded the regulatory limit, nor did they notify the public until at least seven months later. *Id.* ¶¶ 144–45. Because lead in drinking water cannot be seen or tasted, Plaintiffs could not know that the City was providing them with lead-contaminated water. Moreover, this failure to notify residents was a violation of EPA guidelines and the Mississippi Safe Drinking Water Act, which mandate that the public be informed of lead exceedances as soon as practicable. During these seven months, Defendants did not take any measures to mitigate the lead levels measured in the water or protect water users. *Id.* ¶ 146.

Instead, Defendant City of Jackson, Defendant Yarber, and Defendant Powell each affirmatively mislead the public into thinking the water was safe to drink when in fact, it was not. *Id.* § II.F. For example, Defendant Powell stated to the Jackson Free Press that, "This is not a situation where you have to stop drinking the water. This is not a widespread issue, although we are treating it very similarly." *Id.* ¶¶ 148, 151 ("A major difference between Flint, Mich. and Jackson, Miss.," Powell said, "is that the crisis in Flint began because the city did not have corrosion control measures in place, whereas Jackson does."), 152 ("We are nowhere near the levels seen in Flint."), 162,165. At the same conference, she stated, the June 2015 finding of lead above the LCR's action level "does not mean that the City has violated the Safe Drinking Water Act, and our water is safe." *Id.* ¶ 150. With these false statements, Defendant Powell encouraged

the public to continue drinking the water, despite knowing its severe health risks. Defendant

Powell also downplayed the severity and extent of how widespread the contamination was,

blaming plumbing at individual homes rather than pipes in the system. *Id.* ¶¶ 157, 160 ("[T]he

problem with the lead was happening at specific homes with lead pipes, and that the water

leaving the treatment plant was not contaminated."). Yet, as a professional, Defendant Powell

understood these statements to be misleading because lead is rarely in source water and therefore

unlikely to be in the drinking water as it leaves the plant. Rather, low pH water can be corrosive

and therefore cause lead to leach out of drinking water pipes after it leaves a municipal water

treatment plant. *Id.* ¶¶ 158–59. Beyond false or misleading statements, Defendant Powell

actively covered up the crisis. She immediately fired one of her employees for alerting the public

that in fact, the City's pipes contained bands of lead every 20 feet. *Id.* ¶¶ 195–198.

Like Powell, Defendant Yarber also chose to place his reputation above the public's

safety, and in midst of the media attention surrounding the Flint water crisis, he chose to deny

and feign ignorance of the crisis in Jackson. *Id.* ¶ 154 ("I don't want to sound the wrong alarm

[and have] folks saying, 'We're Flint.' We're not Flint."), 162.[3] Throughout 2018, City officials

continued to make false and misleading statements. Defendant Robert Miller stated that "there's

been no detecting of lead or copper in the water supply." *Id.* ¶ 168. Even when Jackson had just

been cited for failure to comport with the MSDH compliance plan, he assured residents that the

---

[3] Representatives repeatedly suggested declaring a civil emergency to ensure expanded testing and federal resources to remedy the crisis. Yet Defendant Yarber opposed the declaration, suggesting instead that the public would prefer that the potholes in the road be fixed. The article by Anna Wolfe, entitled *Jackson City Council Talks Lead Water*, Clarion-Ledger, Feb. 19, 2016 (https://www.clarionledger.com/story/news/local/2016/02/17/jackson-city-council-talks-lead-water/80538910/) cited in the Complaint ¶ 151 contains a link at the bottom to the full video of the February 17, 2016 City Council meeting. The meeting may also be accessed by following this link: https://jacksonms.new.swagit.com/videos/02172016-843.

"water is still safe to drink." *Id.* ¶ 171. In fact, the only recommendations that Defendants made

to residents regarding water safety exacerbated the lead problem. From January to March 2016,

Jackson issued boil water notices, but boiling water causes lead concentrations to *increase*

because it causes the water to evaporate, leading to a higher concentration of lead. *Id.* ¶¶ 193–94.

In February 2016, MSDH issued a compliance plan for Jackson, which required that it

obtain an engineer-designed corrosion control study and plan for optimization of water treatment

to be approved by MSDH. *Id.* ¶¶ 172–74. Until MSDH approved the plan, Jackson was required

to ensure a constant pH of at least 8.5 and to implement repairs or modifications to its PWS to

establish these values "as soon as possible but no later than October 1, 2016." *Id.* ¶¶ 174–77. Yet

Jackson repeatedly failed to comply with its obligations under the plan. *Id.* ¶¶ 178–79. Despite

the mandates of the Compliance Plan, Jackson failed to install necessary components for

corrosion control until around October 2017. *Id.* ¶¶ 180, 182. Even two years after the

Compliance Plan had been issued, in July 2018, the City was cited with technical violations for

"fail[ing] to consistently meet the minimum pH required" by the Plan, and these violations likely

continued until February 17, 2022. *Id.* ¶ 186.

MSDH's February 2016 Compliance Plan also required Jackson to identify a professional

engineer or engineering firm providing its professional services to the City of Jackson for

drinking water matters. *Id.* ¶¶ 199–200. Over the City Council's preference to secure cost-

effective federal assistance, Defendants Yarber and Powell quietly installed a political ally to

pursue a costly corrosion study to avoid declaring an emergency to trigger federal assistance. *See

id.* ¶¶ 201–04. The City Council first voted unanimously against the contract with Trilogy. *Id.* ¶

202. But, eventually, the City hired Trilogy Engineering Services, owned and managed in part by

Thessalonian LeBlanc, who held an unreported campaign fundraiser for Defendant Yarber in 2014. *Id.* ¶¶ 203–04.

Trilogy authored its Corrosion Control Plan in 2017, and its lead engineer at that time, Phillip Gibson, even mentioned in the report that "a switch to liquid lime treatment might alleviate the clogging issue." *Id.* ¶¶ 207–12. Yet, Trilogy instead recommended that Jackson use soda ash to control corrosion by raising the pH of the water as it left the City's two water treatment plants. *Id.* ¶ 213. As stated previously, Defendants Yarber, Powell, and the City knew that repairing the lime feed and using liquid lime (rather than powdered lime) would alleviate the low pH problem in Jackson's PWS. Moreover, Defendants Smash and Miller, Kishia Powell's successors, also understood that Mississippi's uniquely humid climate would cause soda ash to clump in the feed (which is what happened) and that liquid lime would alleviate the problem. *Id.* ¶¶ 219–20, 222, 226. Nevertheless, the City adopted Trilogy's plan, and retrofitted the lime silos to feed soda ash, even though the equipment was designed to feed liquid lime, not soda ash or powdered lime. *Id.* ¶¶ 214–215, 226.

Throughout 2018 to 2021, which coincides with Defendant Mayor Lumumba Jr.'s tenure and most of which coincides with Defendant Miller's tenure, the City remained in violation of both the MSDH Compliance Plan and the SDWA. *See id.* ¶ 278. On March 27, 2020, the EPA issued Defendant Lumumba an Administrative Order which cited multiple SDWA violations and noted that the water system "present[s] an imminent and substantial endangerment to the persons served by the system." *Id.* ¶¶ 265–267. The EPA identified numerous violations that contributed to these conditions, such as monitoring equipment, including pH and chlorine monitors, that had not been repaired or calibrated in three years because necessary technician positions had gone

unfilled during that time. *Id.* ¶¶ 268, 270. Other components of the PWS were also not properly staffed by operators with adequate qualifications and training. *Id.* ¶ 268.

Defendants' conscience-shocking conduct and deliberate indifference caused Plaintiffs to consume lead-contaminated water, resulting in personal injuries and in violation of Plaintiffs' Due Process rights protected by the Fourteenth Amendment. *Id.* ¶¶ 4, 21–26.

## III.    LEGAL STANDARD

A motion for judgment on the pleadings under Rule 12(c) is subject to the same standard as a motion to dismiss under Rule 12(b)(6). *Johnson v. Johnson*, 385 F.3d 503, 529 (5th Cir. 2004). Plaintiffs are required to plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 553, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).

The Court must accept the well-pleaded facts as true and views them in the light most favorable the plaintiff. *Johnson*, 385 F.3d at 529. "The motion to dismiss should not be granted unless the plaintiff would not be entitled to relief under any set of facts that he could prove consistent with the complaint." *Id.*

## IV.    ARGUMENT

### A.    Plaintiffs Sufficiently Plead Fourteenth Amendment Claims.

#### 1.    Plaintiffs Adequately Plead Their Bodily Integrity Claim.

##### a.    Deceiving Plaintiffs into Consuming Lead Violates Their Right to Bodily Integrity.

The Fourteenth Amendment of the Constitution protects against bodily invasions, including by dangerous substances. Its Due Process Clause "protects those fundamental rights

and liberties which are, objectively, 'deeply rooted in this Nation's history and tradition' . . . and 'implicit in the concept of ordered liberty,' such that 'neither liberty nor justice would exist if they were sacrificed.'" *Washington v. Glucksberg*, 521 U.S. 702, 720–721 (1997) (*quoting Moore v. East Cleveland*, 431 U.S. 494, 503 (1977) and *Palko v. Connecticut*, 302 U.S. 319, 326 (1937); *accord Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d 443, 450 (5th Cir. 1994). The right to bodily integrity is one of those fundamental rights, and the Supreme Court has fiercely protected it for more than a century. "No right is held more sacred, or is more carefully guarded by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law." *Union Pac. R. Co. v. Botsford*, 141 U.S. 250, 251 (1891) (finding that the Constitution protects against nonconsensual surgery to obtain evidence); *see also Jefferson on behalf of Jefferson v. Ysleta Independent School Dist.*, 817 F.2d 303, 305 (5th Cir. 1987).

These protections apply to *any* invasions of citizens' bodies, even seemingly minor invasions like blood tests, that could compromise their privacy. *Missouri v. McNeely*, 569 U.S. 141, 159 (2013). ("We have never retreated, however, from our recognition that *any* compelled intrusion into the human body implicates significant, constitutionally protected privacy interests.") (emphasis added). It should therefore come as no surprise that invasions of citizens' bloodstreams that expose them to dangerous chemicals without their consent also violate their right to bodily integrity. *Washington v. Harper*, 494 U.S. 210, 221–22, (1990) (There is "no doubt that . . . respondent possesses a significant liberty interest in avoiding the unwanted administration of antipsychotic drugs under the Due Process Clause of the Fourteenth Amendment.").

The Sixth Circuit has found the Supreme Court's bodily integrity precedent to apply to citizens who consumed public water under false pretenses about its lead content. *Guertin v. State* (6th Cir. 2019) 912 F.3d 907, 920–921 ("Involuntarily subjecting nonconsenting individuals to foreign substances with no known therapeutic value—often under false pretenses and with deceptive practices hiding the nature of the interference—is a classic example of invading the core of the bodily integrity protection."). In this district, Judge Reeves reached the same conclusion on a motion by the same Defendants seeking to dismiss similar claims by other plaintiffs, holding "the weight of Supreme Court precedent and the persuasive precedent of the Courts of Appeals reveal that the Fourteenth Amendment's right to bodily integrity is violated when the government induces unwitting citizens to consume lead-contaminated water without their consent." *J.W. by and through Williams v. City of Jackson, Mississippi*, No. 3:21-CV-663-CWR-LGI, 2023 WL 2617395, at *12 (S.D. Miss., Mar. 23, 2023).[4] Like the Sixth Circuit, Judge Reeves concluded that the allegations against the Defendants were "on all fours with the kinds of forced, involuntary intrusions on bodily integrity that the Supreme Court recognized in" *Botsford* and *Harper* (cited *supra*). *Id.* at *13.

---

[4] Defendants' argument that Judge Reeves "reaches an incorrect legal conclusion" is premised on a flawed analysis. Dkt. 71 at 14. Their brief spends more than a page arguing that one footnote, citing *Goldberg v. Kelly*, 397 U.S. 254 (1970) for the proposition that voluntary governmental services are still subject to constitutional constraints, is not supported by sufficient authority. That footnote is tangential, but even the minor point that Defendants found weakest in Judge Reeves' order is still sound and well supported. Although *Goldberg* did have its judgment superseded by statute, that statute only reformed the food stamp program in place at that time, it did not abrogate the constitutional protections applicable to programs like food stamps. *Hudson v. Bowling*, 232 W.Va. 282, 291 (2013). Accordingly, *Goldberg*'s analysis is still true, which is also why none of the other examples it cites of voluntary government action being subject to constitutional constraints, like the firing of government employees, have been superseded. *Goldberg*, 397 U.S. at 262. Defendants also question Judge Reeves's citation to Justice Marshall's dissent in *Dandridge v. Williams*, 397 U.S. 471, 522 (1970). But again, beyond the judgment in that case, the legal principal Judge Reeves cites from it is an accurate statement of law (and is also supported by the opinions Justice Marshall cites). *Id.*

-13-

Other courts agree with Judge Reeves' application of *Guertin*. For example, the Fourth Circuit held that poor maintenance causing carbon monoxide poisoning violates the right to bodily integrity. *Washington v. Hous. Auth. of City of Columbia*, 58 F.4th 170, 178, 181 (4th Cir. 2023) (upholding claims against public housing officials engaged in a "pattern of mismanagement and poor maintenance," including taking only "half-measures" to fix known problems) (*citing Guertin*, 912 F.3d at 926.) *See also Stewart v. Metro. Transp. Auth.*, 566 F. Supp. 3d 197, 210 (E.D.N.Y. 2019) (upholding claims against public officials who covered up risks of lead poisoning).[5]

The factual arguments as to bodily integrity in Defendants' motion are limited to strawperson claims. Dkt. 11–15. That Plaintiffs have not pleaded that Defendants literally forced citizens to drink poisoned water or made false statements about the lack of lead in the water with the specific intent of poisoning citizens is of no moment.[6] Such allegations are not legally required. As Judge Reeves determined when assessing the same arguments raised here, Plaintiffs can proceed on the bodily integrity claim that "once the government has opted to provide water, it cannot poison the water's recipients and then mislead them about the presence of that poison." *Williams*, 2023 WL 2617395, at *15. Plaintiffs have pled that Defendants violated their right to bodily integrity by causing them to ingest lead by deliberate indifference, spreading false

---

[5] *Stewart*, decided in the Second Circuit, also demonstrates how Defendants overstretch *Benzman v. Whitman*, 523 F.3d 119 (2d Cir. 2008). Dkt. 67 at 14. *Benzman* did not hold that press releases or public statements could *never* form the basis of a bodily integrity claim, only that the substance and context for those statements in the facts before it were insufficient. *Stewart*, along with *Guertin* and *Williams*, demonstrate how governmental statements can support a bodily integrity claim, particularly where they cover up a crisis rather than "reassuring the public" after the crisis.

[6] Defendants accompanying arguments that on some occasions they provided non-deceptive information are not material, create disputes of fact that cannot be resolved on a motion for judgment on the pleadings, and in many cases are taken out of context. Several of these statements are explained in detail in §§ II and IV(A)(1)(b).

information, switching water sources, and mismanaging the water system. Compl. ¶¶ 80–227, 262–289, 358–362; *see supra* at Section II.

Defendants also contend that Plaintiffs have not alleged that they "relied" on public statements or plead "causation." This is incorrect. Plaintiffs alleged that they depend on the public water system. Compl. ¶¶ 302, 311, 329, 342. Unlike a false advertising case, Defendants are not accused of marketing public water in a way that induced citizens to stop buying bottled water and drink tap water instead. Rather, the central allegation is that when Defendants received information about dangers in the water, they covered it up and lied about it, thereby preventing the public from learning information that they could use to protect themselves (and did once they learned that their water contained lead). *Id.* ¶¶ 139–156, 273. Plaintiffs also expressly plead that Defendants' "cover up" made them "more vulnerable" to the lead in their water. *Id.* ¶ 368; *accord id.* ¶¶ 153, 406–7; *see also id.* ¶¶ 394, 199–227. Contrary to Defendants' assertion, the City did not promptly inform the public of the risks of lead when it learned about the contamination. Dkt. 71 at 11. To the contrary, it sat on and concealed this information for years, and mischaracterized the risks even when it purported to disclose them. Compl. ¶¶ 73–84, 100–06, 112–13, 139–44, 150–171; *Williams* 2023 WL 2617395, at *2–3.[7] Plaintiffs' allegations as pled in the Complaint are sufficient to state a claim for invasion of bodily integrity.

### b.  Defendants' Conduct Shocked the Conscience.

The guarantee of due process prevents the government from engaging in conduct that "shocks the conscience." *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998). To establish a

---

[7] Similarly, Defendants' arguments about how they made disclosures once the EPA's action levels were reached ignore the false statements in those disclosures and the cover up that preceded them. *Id.*; dkt. 71 at 15. Plaintiffs have also pleaded that years of prior results approaching the action levels should have prompted officials to take action. Compl. ¶¶ 76, 113, 139–43, 150, 166, 185.

constitutional violation, a plaintiff need not show that government officials acted with intent to injure as Defendants incorrectly assert. Dkt. 67 at 18. Rather, a due process violation can be established when that action constitutes deliberate indifference. *See M. D. by Stukenberg v. Abbott*, 907 F.3d 237, 252 (5th Cir. 2018). Courts have long recognized that deliberate indifference falls in the middle range of culpability, *i.e.*, something less than intentional conduct, but something more than negligence, such as "recklessness or gross negligence." *Lewis*, 523 U.S. at 846 (internal quotation marks and citation omitted); *see also Abbott*, 907 F.3d at 252. Of course, as the term implies, deliberate indifference requires that the situation permit time for actual deliberation. *Lewis*, 523 U.S. at 851. "When such extended opportunities to do better are teamed with protracted failure even to care, indifference is truly shocking." *Id.* at 853.

"To act with deliberate indifference, a state actor must consciously disregard a known and excessive risk to the victim's health and safety." *Abbott*, 907 F.3d at 252. As the Fifth Circuit has recognized, "'it is enough that the [State] acted or failed to act despite [its] knowledge of a substantial risk of serious harm'—the plaintiffs need not show that the State anticipated the exact form the harm would take." *Id.* (brackets in original) (quoting *Hernandez ex rel. Hernandez v. Texas Dep't of Protective & Regul. Servs.*, 380 F.3d 872, 881 (5th Cir. 2004)). Courts, including in this District, agree that inducing or prolonging water users to unknowingly ingest lead-laced water and actively concealing and understating this danger amounts to conscience-shocking conduct. *Williams*, WL 2617395, at \*13 (finding that the same Defendants as in this case acted with deliberate indifference because the way they handled the water crisis "stripped the Plaintiffs of the ability to decide for themselves how they would protect their health"); *Guertin*, 912 F.3d at 926, 924–929 (finding government officials were deliberately

indifferent in "[m]isleading Flint's residents as to the water's safety—so that they would continue to drink the water and Flint could continue to draw water from the Flint River").

Here, the Complaint alleges that Defendants "consciously disregard[ed] a known and excessive risk to the victim's health and safety" amounting to deliberate indifference. *Abbott*, 907 F.3d at 252. Defendants knew they were providing contaminated water through the PWS to Plaintiffs, falsely assured Plaintiffs that the water was safe to drink, failed to mitigate the danger they created, and actively concealed and downplayed the severity and scope that the contamination posed to Plaintiffs' long-term health. *Supra* Section II. The allegations in the Complaint, detailed above in Section II, are summarized in the following table:

| Defendant | Role | Conduct Toward Plaintiffs |
|-----------|------|---------------------------|
| Tony Yarber | Former Mayor of Jackson | • Knew Jackson's water sources have consistently exhibited low pH levels, urgent need to upgrade the City's water infrastructure, and aware of the rising lead levels. Compl. ¶¶ 35, 38–40, 57, 90, 98, 132, 139, 144.<br>• Knew that Director Bell cautioned against taking actions that might shock the system. *Id.* ¶ 89.<br>• Withdrew funding necessary to fix Jackson's infrastructure and corrosion control system. *Id.* ¶ 98.<br>• Ousted Director Bell as Director of Public Works and installed Defendant Kishia Powell. *Id.* ¶ 103.<br>• Switched a section of the City's water source from well water to surface water, adding 16,000 connections from the Maddox Road Well System. *Id.* ¶¶ 119–21, 124.<br>• In June 2015, learned that lead levels had exceeded 15 ppb, but |

| Defendant | Role | Conduct Toward Plaintiffs |
|---|---|---|
|  |  | did not take measures to protect water users. *Id.* ¶¶ 142, 146.<br>• Failed to notify residents that lead levels exceeded 15 ppb for seven months after it happened. *Id.* ¶¶ 144–45.<br>• Downplayed the crisis and assuaged residents into thinking the water was safe to drink when it wasn't. *Id.* ¶¶ 154, 162, 168, 171.<br>• Issued a boil water notice that, which exacerbated the lead problem. *Id.* ¶¶ 193-94.<br>• Hired political ally, Trilogy Engineering Services. *Id.* ¶¶ 202–04.<br>• Knew that repairing the lime feed system and using liquid lime would likely alleviate the low pH problem, but accepted Trilogy's soda ash proposal. *Id.* ¶¶ 213–16. |
| Kishia Powell | Former Director of Public Works | • Knew Jackson's water sources have consistently exhibited low pH levels, urgent need to upgrade the City's water infrastructure, and aware of the rising lead levels. Compl. ¶¶ 35, 38–40, 57, 90, 98.<br>• Switched a section of the City's water source from well water to surface water, adding 16,000 connections from the Maddox Road Well System. *Id.* ¶¶ 119–21, 124.<br>• Encouraged the public to continue drinking the water, despite knowing its severe health risks. *Id.* ¶¶ 148, 150, 151, 152, 162, 165.<br>• Downplayed the severity and extent of how widespread the contamination was. *Id.* ¶¶ 157, 160. |

| Defendant | Role | Conduct Toward Plaintiffs |
|---|---|---|
| | | • Fired employee for alerting the public that the City's pipes contained bands of lead every 20 feet. *Id.* ¶¶ 195–198.<br>• Understood that Mississippi's uniquely humid climate would cause soda ash to clump in the feed and that liquid lime would alleviate the problem, yet allowed City to adopt Trilogy's soda ash plan. *Id.* ¶¶ 214–215, 219–20, 222, 226. |
| Robert Miller | Former Director of Public Works | • Knew Jackson's water sources have consistently exhibited low pH levels and aware of the rising lead levels. Compl. ¶ 170.<br>• Lied to residents that "there's been no detecting of lead or copper in the water supply." *Id.* ¶ 168.<br>• Assured residents that "[t]he water is still safe to drink." *Id.* ¶ 171.<br>• Understood that Mississippi's uniquely humid climate would cause soda ash to clump in the feed and that liquid lime would alleviate the problem, yet allowed City to adopt Trilogy's soda ash plan. *Id.* ¶¶ 214–215, 219–20, 222, 226. |
| Jerriot Smash | Former Director of Public Works | • Understood that Mississippi's uniquely humid climate would cause soda ash to clump in the feed and that liquid lime would alleviate the problem, yet allowed City to adopt Trilogy's soda ash plan. Compl. ¶¶ 214–215, 219–20, 222, 226. |
| Mayor Chokwe Lumumba | Mayor of Jackson | • Understood that Mississippi's uniquely humid climate would cause soda ash to clump in the feed and that liquid lime would alleviate the problem, yet allowed City to adopt Trilogy's soda ash |

-19-

| Defendant | Role | Conduct Toward Plaintiffs |
|---|---|---|
| | | plan. Compl. ¶¶ 214–215, 219–20, 222, 226.<br>• Failed to properly staff the PWS with operators with adequate qualifications and training. *Id.* ¶¶ 268, 270.<br>• Repeatedly failed to comply with his obligations under the Compliance plan issued in February 2016. *Id.* ¶¶ 172–80, 182, 186.<br>• Oversaw a PWS that "present[ed] an imminent and substantial endangerment to the persons served by the system." *Id.* ¶¶ 262–67. |
| City of Jackson | | • Switched a section of the City's water source from well water to surface water, adding 16,000 connections from the Maddox Road Well System. Compl. ¶¶ 119–21, 124.<br>• Repeatedly failed to comply with its obligations under the Compliance plan issued in February 2016. *Id.* ¶¶ 172–80, 182, 186.<br>• Failed to properly staff the PWS with operators with adequate qualifications and training. *Id.* ¶¶ 268, 270.<br>• Ran a PWS that "present[ed] an imminent and substantial endangerment to the persons served by the system." *Id.* ¶¶ 262–67. |

Plaintiffs have adequately alleged that Defendants' disregard of Plaintiffs' health amounted to deliberate indifference and "can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense." *Cnty. of Sacramento*, 523 U.S. at 847.

Finally, Defendants argue that they are entitled to qualified immunity because they had legitimate justifications for their actions. Yet, even if this were true, whether Defendants acted for legitimate governmental reasons is a question of fact that cannot be determined on a motion for judgment on the pleadings. Defendants asserted justifications present factual disputes with the Complaint and at this stage of the litigation must be resolved in Plaintiffs' favor.

### c.    Defendants' Narrow Interpretation of Bodily Integrity Ignores Controlling Precedent.

Defendants' attempts to wish away the precedent supporting lead poisoning as a violation of bodily integrity are unpersuasive. Their argument that the right to bodily integrity does not protect against "contamination" (Dkt. 67 at 8–9)[8] ignores not only lead cases like *Guertin* and *Williams*, but controlling case law from the Supreme Court. Under *Washington*, state action that causes citizens to ingest unwanted medicine violates the right to bodily integrity. 494 U.S. at 221–22. Given that forced medication violates bodily integrity, it strains credulity to argue that governmental action which causes citizens to ingest a poisonous chemical that is not safe at any level of exposure—instead of a medicinal chemical—is somehow less of a constitutional violation. Defendants' premise that "contamination" is not covered is simply not reconcilable with controlling authority. There is nothing about the *nature of the invasion* that makes involuntary consumption of dangerous chemicals a category of violation that is exempt from the right to bodily integrity.

Defendants' citation to cases like *Gasper* and *Tanner* are of no moment. The fact that there is no recognized universal right to be free from all contamination, in a stadium where guests voluntarily attending may be exposed to tobacco smoke unleashed by other private

---

[8] This and subsequent references to dkt. 67 are also applicable to the identical sections of other Defendants' briefings that repeat the same argument, often word for word. *See, e.g.*, dkt. 69 at 8–9.

patrons (*Gasper*), or a neighborhood near a private refinery (*Tanner*), does not give the government carte blanche to pump dangerous chemicals into citizens' homes and tell them that they are safe to consume. None of Defendants' cases isolate a contamination exception to the right to bodily integrity.

Defendants may argue that the true difference between cases like *Washington* and this one is their second argument, that violations of bodily integrity supposedly require governmental coercion. Dkt. 67 at 9–11. This is not the law. Even in the narrow category of cases Defendants select, where the rights violation is physical violence and abuse, there is no requirement that the person inflicting the physical harm be a governmental actor. *Farmer v. Brennan*, 511 U.S. 825, 849 (1994) (holding that prison officials cannot disclaim liability for failing to stop inmates from abusing and harassing a prisoner); *Est. of B.I.C. v. Gillen*, 710 F.3d 1168, 1174 (10th Cir. 2013) (upholding claim against social worker keeping a child in a dangerous home despite reports of violence and abuse). In both cases there was no coercive action by the government but the government was held responsible for its conscience-shocking failure to stop the loss of rights. That is the purpose of the Supreme Court's "deliberate indifference" standard (that *Guertin* and *Williams* also applied), which Defendants' theory reads into oblivion. *See, e.g.*, *Lewis*, 523 U.S. at 834–35, 849–50, 853–54.

Defendants presented the same argument to Judge Reeves in *Williams*. His rejection of it was resounding and persuasive:

> Defendants argue, both in their brief and again at oral argument,
> that they "did not compel [the Plaintiffs] to drink water." That
> argument is as shocking as it is meritless. The toxic water that
> caused the Plaintiffs' injuries flowed throughout the City of
> Jackson, saturating every school, day care, church, sports facility,
> medical clinic, restaurant, and recreational gathering spot—every
> place the Plaintiffs could have been expected to use or drink water.
> Without accurate information about the severity of the water crisis,

-22-

> the Plaintiffs could not weigh the risks or make an informed choice
> about their water consumption. In a very real way, the Defendants'
> actions stripped the Plaintiffs of the ability to decide for
> themselves how they would protect their health.

*Williams*, 2023 WL 2617395, at *13 (brackets in original). Although coercion is not required,

Defendants' conduct steered residents of Jackson toward lead contaminated public water to such

a degree that their decision to drink it was no decision at all. Thus, Plaintiffs' Complaint is more

than sufficient to establish a claim that when Defendants' conduct caused them to drink lead

contaminated water, it violated their right to bodily integrity.

### 2.   Plaintiffs Adequately Plead Their Claim for State-Created Danger.

Plaintiffs also adequately plead a state-created danger claim under the substantive Due

Process Clause under the same standard, deliberate indifference, and based on the same

allegations as set forth above. *See, e.g.*, *McClendon v. City of Columbia*, 305 F.3d 314, 325 (5th

Cir. 2002). Under Fifth Circuit law, a claim for state-created danger requires a showing that "(1)

the state actors *created or increased* the danger to the plaintiff and (2) the state actors acted with

deliberate indifference." *McKinney v. Irving Indep. Sch. Dist.*, 309 F.3d 308, 313 (5th Cir. 2002)

(*citing Piotrowski v. City of Houston*, 51 F.3d 512, 515 (5th Cir. 1995)) (emphasis added).

Plaintiffs' allegations, *supra*, that the Defendants acting with deliberate indifference caused and

increased the lead exposure to Plaintiffs, support a claim for state-created danger.

Defendants argue that a state-created danger claim is only available when the danger at

issue originated with third-party action. Dkt 71 at 16. Yet, the Fifth Circuit, applying this two-

prong test, found students had pleaded a § 1983 claim under the state-created danger doctrine

where the state university caused the harm. *Scanlan v. Tex. A&M Univ.*, 343 F.3d 533, 536–37

(5th Cir. 2003). In *Scanlan*, the Fifth Circuit reversed the district court finding,

> If these allegations were construed in the light most favorable to
> the plaintiff, the district court should have determined the plaintiffs

> had pleaded sufficient factual allegations to show the bonfire
> construction environment was dangerous, the University Officials
> knew it was dangerous, and the University Officials used their
> authority to create an opportunity for the resulting harm to occur.
> As a result, the district court should have concluded that the
> plaintiffs stated a section 1983 claim under the state-created danger
> theory.

*Id*. at 538. Moreover, Plaintiffs' Complaint alleges that Defendants created, exacerbated, and failed to remediate the danger to Plaintiffs independent of *and* in conjunction with the acts of a third party, Defendant Trilogy, not a party to this present motion.

Defendants also rely on *Dixon v. Alcorn Cnty. Sch. Dist.*, 499 F. App'x 364, 368 (5th Cir. 2012), an unpublished case, to argue that state-created danger claims require a "known victim." Dkt. 71 at 17. But there is no viable duty issue here because the Defendants knew that their conduct would harm the very citizens they are supposed to be protecting: public water users. Additionally, Plaintiffs plead that "[t]he dangers and risks of harm were discreet and special to Plaintiffs, as Jackson water users, and not risks affecting the public at large." Compl. ¶ 371. The fact that Defendants' conduct harmed thousands of victims instead of a smaller subset does not make it less of a constitutional violation. To hold otherwise would allow government officials to escape constitutional liability in the most heinous cases, where they knowingly injure entire communities. *Contra Guertin v. Michigan*, No. 16-CV-12412, 2017 WL 2418007, at *20 (E.D. Mich., June 5, 2017) *aff'd in part, rev'd in part* 912 F.3d 907 (6th Cir. 2019) (dismissing state-created danger claim due to lack of government actor's interaction with plaintiffs, a decision not presented on appeal to the Sixth Circuit). In the context of a PWS, Plaintiffs complaint contains all the necessary allegations.

Plaintiffs' state-created danger claim is based on similar conduct giving rise to the bodily integrity claim. A few additional allegations are particularly supportive of the state-created danger claim: the Defendants endangering Plaintiffs by switching well users to surface water,

-24-

failing to switch to liquid lime, removing funding for corrosion control, and accepting the knowingly deficient recommendations of Trilogy to convert a liquid lime corrosion control system to soda ash. Compl. ¶¶ 118–138, 208–227.

Defendants also argue that the Fifth Circuit has not recognized a state-created danger claim and may be refusing to adopt the doctrine. Either way, this Court is free to apply Supreme Court law. As Judge Reeves recognized, "Supreme Court precedent has recognized the state-created danger cause of action" and the Fifth Circuit has "not specifically disclaimed a cause of action under the state-created danger theory" either. *Williams*, 2023 WL 2617395, at *17.[9] Several Fifth Circuit judges recently called for it to stop ignoring this cause of action. *See, e.g.*, *Fisher v. Moore*, 73 F.4th 367, 375 (5th Cir. 2023) (Wiener, J., *concurring*) ("It is well past time for this circuit to be dragged screaming into the 21st century by joining all those other circuits that have now unanimously recognized the state-created danger cause of action."); *id.* at 376 (Higginson, J., concurring) ("Litigants should continue asking this court to decide the state-created danger issue," particularly since the absence of a decision prevents the issue from becoming ripe for Supreme Court review). Since the elements of Plaintiffs' State-Created Danger claim are pleaded here, this Court should uphold the claim.

### B. Defendants Are Not Entitled to Qualified Immunity.

Individual City Defendants' violations of Plaintiffs' clearly established substantive due process rights are not shielded by the judicially-created defense of qualified immunity. "The doctrine of qualified immunity shields government officials acting within their discretionary

---

[9] Judge Reeves found that plaintiffs had not pleaded a state-created danger claim because they had failed to allege 1) a third party had caused the harm and 2) defendants knew of the risk of harm to a "known victim." *Id*. at 19. However, as discussed *supra* at 23–24, even though Plaintiffs are not required to plead that a third-party is the sole cause of the harm, Plaintiffs have pleaded that Defendants caused the harm independent of and in conjunction with the acts of a third party, Defendant Trilogy, and have alleged Defendants knew of the risk to known victims.

authority from liability when their conduct does not violate clearly established statutory or constitutional law of which a reasonable person would have known." *Wallace v. Cnty. of Comal*, 400 F.3d 284, 289 (5th Cir. 2005) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

The court's analysis of the qualified immunity defense is two-fold: first, the "court must decide whether the plaintiffs' allegations, if true, establish a violation of a clearly established right," and second, "if the plaintiffs have alleged a violation, the court must decide whether the conduct was objectively reasonable in light of clearly established law at the time of the incident." *Wallace*, 400 F.3d at 289 (internal citation omitted) (affirming denial of qualified immunity).

### 1.    Plaintiffs have alleged violations of their constitutional rights.

In the qualified immunity analysis, the court first asks "whether the undisputed facts and the disputed facts, accepting the plaintiffs' version of the disputed facts as true, constitute a violation of a constitutional right." *Carroll v. Ellington*, 800 F.3d 154, 169 (5th Cir. 2015). As argued *supra* in Section IV.A, Plaintiffs have sufficiently alleged a violation of Plaintiffs' Fourteenth Amendment substantive due process rights by the Individual City Defendants, satisfying the first prong of the analysis.

### 2.    Plaintiffs' constitutional rights to bodily integrity and freedom from state-created dangers are clearly established.

Next in the qualified immunity analysis, "the court must decide whether the conduct was objectively reasonable in light of clearly established law at the time of the incident." *Wallace*, 400 F.3d at 289. "A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (quotation marks and citation omitted). When determining whether a right is "clearly established" under the second prong of the qualified immunity analysis, the Fifth Circuit

has held that it is appropriate for a court to look to the law of other circuit courts when there is neither controlling authority from this Circuit or the Supreme Court. *McClendon*, 305 F.3d at 329 ("*Shipp*'s statement that 'we are confined to precedent from our circuit or the Supreme Court' in analyzing whether a right is clearly established for the purposes of qualified immunity analysis is overruled.") (citation omitted).

This prong of the analysis "does not require plaintiffs to show that the exact act has been previously held unlawful," rather, "it requires only that the unlawfulness of the challenged act be apparent in light of pre-existing law. In other words, "qualified immunity does not attach when state actors engage in obvious violations of the Constitution." *Williams*, 2023 WL 2617395, at *6 (internal citation and quotation marks omitted).[10] A court may deny qualified immunity to government officials where the constitutional violation is obvious, or where "reasonable warning" may be imparted to government officials by cases with "notable factual distinctions." *Hope v. Pelzer*, 536 U.S. 730, 740 (2002); *see also Villarreal v. City of Laredo, Texas*, 44 F.4th 363, 367 (5th Cir. 2022), *reh'g en banc granted, opinion vacated,* 52 F.4th 265 (5th Cir. 2022) ("as the Supreme Court has repeatedly held, public officials are not entitled to qualified immunity for obvious violations of the Constitution.").

"Although earlier cases involving 'fundamentally similar' facts can provide especially strong support for a conclusion that the law is clearly established, *they are not necessary to such a finding*." *Hope*, 536 U.S. at 741 (emphasis added). This makes sense because "officials can still

---

[10] Judge Reeves ultimately found that while Defendants' conduct violated the plaintiffs' right to bodily integrity, that right was not clearly established at the time the Defendants engaged in it. *Williams,* 2023 WL 2617395, at *15. For the reasons set forth below, namely failing to consider Supreme Court precedent as early as 1990 and precedent from other circuit courts, which predates the conduct at issue here, Plaintiffs respectfully disagree with Judge Reeves' conclusion.

be on notice that their conduct violates established law even in novel factual circumstances." *Id*. "'[A] general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has [not] previously been held unlawful.'" *Id*. at 739–745 (denying qualified immunity even though there was no "materially similar" case finding a constitutional violation under those particular facts) (internal quotation marks and citation omitted); *see also Taylor v. Riojas*, 141 S. Ct. 52, 53 (2020) (holding the "Fifth Circuit erred in granting the officers qualified immunity" where there was no binding caselaw involving the particular facts but the constitutional violation was obvious). In *Sause v. Bauer*, the Tenth Circuit granted qualified immunity finding the plaintiff had failed to "identify a single case in which this court, or any other court for that matter, has found a First Amendment violation based on a factual scenario even remotely resembling the one we encounter here." 859 F.3d 1270, 1275 (10th Cir. 2017), *cert. granted, judgment rev'd,* 138 S. Ct. 2561 (2018). Yet the Supreme Court reversed the Tenth Circuit's grant of qualified immunity, finding that, despite the novel facts, the alleged constitutional violation was obvious. *Sause*, 138 S. Ct. at 2562 ("There can be no doubt that the First Amendment protects the right to pray.").

In *Kinney*, the Fifth Circuit applied Supreme Court precedent to deny qualified immunity despite the novel factual circumstances, explaining "the 'clearly established' standard does not mean that officials' conduct is protected by qualified immunity unless 'the very action in question has previously been held unlawful.'" *Kinney v. Weaver*, 367 F.3d 337, 350 (5th Cir. 2004) (citation omitted); *id*. ("the [Supreme] Court held that one of our sister circuits had erred in defining clearly established law in such a way that qualified immunity was mandated unless the facts of past cases were 'materially similar' to the conduct then being challenged.") (citation

omitted). Indeed, "[i]f we accepted the defendants' view of what it means for the law to be clearly established, qualified immunity would be available in almost every case, even those cases in which 'in the light of pre-existing law the unlawfulness [was] apparent.'" *Id.* at 371 (citation omitted).

Here, Individual City Defendants engaged in obvious violations of the Constitution and qualified immunity cannot shield their actions. Although *Guertin* was decided after most of the conduct alleged here, its finding that Supreme Court precedent sufficiently defined the contours of the bodily integrity right to encompass lead contamination demonstrates that Plaintiffs' right to bodily integrity is clearly established. *Guertin*, 912 F.3d at 920 (citing *Cruzan v. Dir., Missouri Dep't of Health*, 497 U.S. 261, 269–70 (1990); *Washington v. Harper*, 494 U.S. 210, 213–17 (1990); *Riggins v. Nevada*, 504 U.S. 127, 135–38 (1992); *Sell v. United States*, 539 U.S. 166, 177–86 (2003)). Applying Supreme Court precedent that predates the unconstitutional conduct alleged here, the Sixth Circuit found,

> If an individual has a right to refuse to ingest medication, then surely she has a right to refuse to ingest a life necessity. *Cruzan* instructs as much, recognizing that the logic of its bodily integrity cases . . . encompasses an individual's liberty interest to refuse food and water essential to life. And if an individual has a right to refuse the consumption of beneficial water, then certainly any reasonable official would understand that an individual has a right to refuse the consumption of water known to be lead-contaminated, especially when those individuals involved in tainting the water simultaneously vouched for its safety.

*Guertin*, 912 F.3d at 934 (quoting *Cruzan by Cruzan v. Dir., Missouri Dep't of Health*, 497 U.S. 261, 277–79 (1990)) (punctuation omitted). *See also id.* at 935 ("[D]efendants' conduct is so contrary to fundamental notions of liberty and so lacking of any redeeming social value, that no rational individual could believe their conduct is constitutionally permissible under the Due

Process Clause.") (quoting *Doe v. Claiborne Cnty., Tenn. By & Through Claiborne Cnty. Bd. of Educ.*, 103 F.3d 495, 507 (1996)) (punctuation omitted).

Judge Reeves found the right to bodily integrity was not clearly established because, in addition to *Guertin* being decided after the unconstitutional conduct alleged here, there was no Fifth Circuit precedent directly on point and *Guertin* is not controlling authority for this Court. *Id*. at 14. However, not only does this ignore the Supreme Court precedent, *supra*, that predates the unconstitutional conduct, it also ignores *McClendon*, where the Fifth Circuit held it *is* appropriate for a court to look to the law of other circuits when there is neither controlling authority from the Fifth Circuit or the Supreme Court. *McClendon v. City of Columbia*, 305 F.3d 314, 329 (5th Cir. 2002) ("*Shipp*'s statement that 'we are confined to precedent from our circuit or the Supreme Court' in analyzing whether a right is clearly established for the purposes of qualified immunity analysis is overruled.") (citation omitted). Judge Reeves' analysis of *Guertin* and this issue is flawed because it focused on when and where *Guertin* was decided compared to the plaintiffs' allegations, instead of how it applied the "robust consensus" of prior Supreme Court precedent in a manner that also applies in the Fifth Circuit. *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011).

Similarly, Judge Reeves' reasoning that the theory of state-created danger is not clearly established law because it is "not clearly established and uncertain in the Fifth Circuit [and] because that court has avoided every opportunity to clarify it," *Williams,* 2023 WL 2617395, at *17 (internal quotation marks omitted), is also flawed.  As Judge Reeves recognized, "Supreme Court precedent has recognized the state-created danger cause of action for some purposes," *id*., and that precedent is clearly established law and binding on this Court. *McClendon*, 305 F.3d at 329.

2828506.7

Additionally, the Supreme Court's *Hope* decision recognized that administrative notice to the defendant can show obviousness and fair notice: "Our conclusion that 'a reasonable person would have known' of the violation is buttressed by the fact that the DOJ specifically advised the ADOC of the unconstitutionality of its practices before the incidents in this case took place." 536 U.S. at 744 (internal citation omitted). Here, similar notice was provided to Defendants by MSDH in 2013 who tagged Hinds County as "high-risk for lead poisoning" and recognized that "children are especially at risk since their bodies absorb lead more easily than adults." Compl. ¶ 46. Similarly, then-Interim Director of Public Works Willie Bell raised urgent warnings on Jackson's increasing lead levels and the acute dangers to children. *Id.* at ¶¶ 80–84, 89–90, 101–17. As alleged in the Complaint, Individual City Defendants' actions, including cutting the budget and failing to prevent corrosion of Jackson's lead water pipes, exacerbated the lead crisis at every turn, resulting in SDWA violations as early as 2015 and continuing until as late as 2021, almost a decade after MSDH pronounced Jackson to be "high risk." *Id.* The concealment of lead exceedance levels not only violated the Constitution, but it also violated state and federal law of which these Defendants would have known. Miss. Code. § 41-26-13; 40 C.F.R. §141.85(d)(2). These considerations, *inter alia*, are indicia of deliberate indifference that was objectively unreasonable, which further underscore the obviousness of the violation under *Hope*.

On the issue of state and federal statutory and administrative violations, Defendants cite *Gagne v. Galveston*, 805 F.2d 558 (5th Cir. 1986) for the proposition that "[N]either federal nor state officials lose their immunity by violating the clear command of a statute or regulation—of federal or of state law—unless that statute or regulation provides the basis for the cause of action sued upon." *Id.* at 560 (emphasis omitted). This quote appears in the context of whether or not a duty was ministerial or discretionary. *Id. Gagne* holds that "officials sued for constitutional

-31-

violations do not lose their qualified immunity *merely* because their conduct violates some statutory or administrative provision." *Id.* at 559 (emphasis added). However, this does not mean that regulatory violations are not relevant to Defendants' notice that their conduct violates established law. Viewing the facts in the light most favorable to the Plaintiffs, Individual City Defendants had more than fair notice of Plaintiffs' right to keep their bodies free from dangerous chemicals, a state created danger that they did not know about or agree to consume. Plaintiffs have satisfied both prongs of the qualified immunity analysis and Individual City Defendants can be held accountable for violating Plaintiffs' federally protected rights.

## V.    <u>CONCLUSION</u>

Plaintiffs' Complaint details how Defendants created, exacerbated, failed to remediate, and covered up Jackson's lead water crisis, resulting in the lead poisoning of Plaintiffs. For the foregoing reasons, Plaintiffs have more than adequately pleaded that Defendants' conscience-shocking conduct and deliberate indifference amounts to a violation of Plaintiffs' rights to bodily integrity and to be free from state-created dangers. Accepting the well-pleaded facts as true and viewing them in the light most favorable to the Plaintiffs, Defendants' Rule 12 motions for judgment on the pleadings should be denied. Additionally, because Plaintiffs have sufficiently pleaded their bodily integrity and state-created danger claims and these fundamental constitutional rights are "clearly established" based on Supreme Court and other precedent, the Individual City Defendants' requests for qualified immunity should be denied. Should this Court grant Defendants' motions, Plaintiffs request leave to amend their pleading to cure any defects.

Dated: August 16, 2023                    Respectfully submitted,

<u>s/ Mark P. Chalos</u>_____
Mark P. Chalos (Admitted *Pro Hac Vice*)
Kenneth S. Byrd (Application for Admission *Pro Hac Vice* Forthcoming)

-32-

Lieff Cabraser Heimann & Bernstein, LLP
222 2nd Avenue South, Suite 1640
Nashville, TN 37201-2379
Telephone: 615-313-9000
Facsimile: 615-313-9965
mchalos@lchb.com
kbyrd@lchb.com

Tiseme G. Zegeye (Admitted *Pro Hac Vice*)
Jacob H. Polin (Admitted *Pro Hac Vice*)
Amelia A. Haselkorn (Admitted *Pro Hac Vice*)
Lieff Cabraser Heimann & Bernstein, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone: 415-956-1000
Facsimile: 415-956-1008
tzegeye@lchb.com
jpolin@lchb.com
ahaselkorn@lchb.com

Stuart C. Talley (Admitted *Pro Hac Vice*)
Kershaw Talley Barlow, P.C.
401 Watt Avenue, Suite 1
Sacramento, CA 95864
Telephone: 916-779-7000
stuart@ktblegal.com

Larry Moffett (Bar No. 3401)
Law Office of Larry D. Moffett PLLC
P.O. Box 1418
39 CR 231
Oxford, MS 38655
Telephone: 662-298-4435
larry@larrymoffett.com

*Attorneys for Plaintiffs and the Proposed Class*

2828506.7

## CERTIFICATE OF SERVICE

I, Amelia A. Haselkorn, declare as follows:

I am employed in the law firm of Lieff Cabraser Heimann & Bernstein, LLP, whose address is 275 Battery Street, 29th Floor, San Francisco, California  94111-3339.  I am readily familiar with the business practices of this office.  At the time of transmission, I was at least eighteen years of age and not a party to this action.

On August 16, 2023, I directed that the foregoing document be filed via the U.S. District Court's CM/ECF electronic system and a copy thereof was served upon all counsel of record:

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' RESPONSES TO DEFENDANTS' MOTIONS FOR JUDGMENT ON THE PLEADINGS AND FOR QUALIFIED IMMUNITY**

I declare under penalty of perjury under the laws of the State of California that the above is true and correct and that this declaration was executed on August 16, 2023.

*s/ Amelia A. Haselkorn*
Amelia A. Haselkorn

2828506.7