UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

PRISCILLA STERLING, et al.                                      PLAINTIFFS

V.                                      CIVIL ACTION NO. 3:22-CV-531-KHJ-MTP

THE CITY OF JACKSON, MISSISSIPPI, et al.                        DEFENDANTS

ORDER

Before the Court are Motions for Judgment on the Pleadings by Defendants

Chokwe A. Lumumba and Robert Miller, [66]; the City of Jackson ("City"), [70];

Jerriot Smash, [72]; Kishia Powell, [74]; and Tony Yarber, [75]. Lumumba, Miller,

Smash, Powell, and Yarber ("Individual Defendants") also move for qualified

immunity. [68]; [72]; [74]; [75].[1]

I.      Background

This class action arises from the City of Jackson's water crisis. Named

Plaintiffs Priscilla Sterling, Raine Becker, Shawn Miller, and John Bennett are

citizens of Jackson, and they collectively represent the Jackson-Area Resident

Class. Am. Compl. [57] ¶¶ 290–346. Together, they allege the City and Individual

Defendants violated their constitutional rights to bodily integrity and to be free

from state-created danger. *Id.* ¶¶ 356–75.[2]

---

[1] Unlike the other Individual Defendants, Lumumba and Miller filed their [66]
Motion for Judgment on the Pleadings and [68] Motion for Qualified Immunity separately.
The two motions, and supporting memoranda, are identical. The Court thus considers them
together.

[2] Plaintiffs sue the Individual Defendants, current and former City officials, in their
individual capacities. [57] ¶¶ 22–26. Lumumba is the current Mayor of Jackson and has

Jackson's public water system faces multifaceted issues that trace back over 100 years. *See, e.g., id.* ¶¶ 36–42, 60–66. The alleged conduct underlying this litigation, however, began in late 2013 or early 2014. Plaintiffs allege that, somewhere around that time, the City learned that low-pH surface water contributed to an uptick in lead levels. *See id.* ¶ 80. Federally mandated testing for the 2010–2012 period showed an uptick in lead in the City's surface water supply compared to the previous triennial period ending in 2009. *Id.* ¶ 47; *see also id.* ¶¶ 73–79.[3] Plaintiffs concede these results "were not high enough to . . . trigger any mandatory action," but they allege they "should have raised concerns about the potential health risks to system customers." *Id.* ¶ 76.

And they allege they did raise concerns. Around that time, then-Interim Public Works Director Willie Bell presented the issue to then-Mayor Chokwe Lumumba (Defendant Chokwe Antar Lumumba's father) and other City Council members (including Tony Yarber, who became Mayor). *See id.* ¶¶ 80–100. Bell explained that pH control problems at the City's water treatment plants caused the

---

served in that role since July 2017. *Id.* ¶ 22; *The Final Hours: Out-going Mayor Tony Yarber Reflects on Time in Office*, WJTV (June 30, 2017), https://www.wjtv.com/news/the-final-hours-out-going-mayor-tony-yarber-reflects-on-time-in-office/ [https://perma.cc/KVW8-8BXV]. His predecessor, Yarber, served as mayor from April 2014 to June 2017. [57] ¶ 95; WJTV, *supra* note 2. Powell (August 2014–May 2016), Smash (May 2016–October 2017), and Miller (October 2017–July 2020) are former Public Works Directors for the City. *See* [57] ¶¶ 24–26.

[3] For the period ending in 2009, the lead levels for the surface water system were 4.8 parts per billion (ppb) for the 90th percentile and 8.8 ppb for the 95th percentile. [57] ¶ 74. For the period ending in December 2012, those values were 13.7 ppb and 33.5 ppb. *Id.* ¶ 75. The action level under the United States Environmental Protection Agency's Lead and Copper Rule is 15.0 ppb for the 90th percentile. *Id.* ¶ 113. For those same periods, the well water system showed relatively low lead levels—1.7 ppb. *Id.* ¶¶ 78–79.

lead uptick, and he suggested the City spend $400,000 to repair a defective lime injection pump at the O.B. Curtis water treatment plant. *Id.* ¶¶ 81–90. Before his death in February 2014, Mayor Chokwe Lumumba incorporated the purchase into the budget. *Id.* ¶¶ 93–94.

Former Mayor Yarber took over in April 2014. *Id.* ¶ 95. In August 2014, he appointed Kishia Powell to replace Bell as the Public Works Director. *Id.* ¶ 103. The City removed the $400,000 purchase from the budget sometime later. *See id.* ¶ 101. In October 2014, the City switched some well water connections to surface water after completing a new five-million-gallon booster station. EPA Report [57-7] at 14. The City never provided evidence of a completed corrosion control treatment study or water quality evaluation from before the switch. *Id.* Apparently, the City made the switch "to provide treated surface water to the southern portion of Jackson." *Id.* at 8. But the City brought the wells back online in July 2015 after the new booster station failed to provide enough water to the area. *Id.* at 14.

In June 2015, the Mississippi State Department of Health (MSDH) recorded the first lead action level exceedance in the City's drinking water. [57] ¶¶ 139–40. Of the 58 homes sampled, 13 showed lead levels above the action level. *See id.* ¶¶ 139–45.

On January 29, 2016, the day after the MSDH notified the City of the action level exceedance, the City held a press conference where Powell announced the results. Anna Wolfe & Sara Fowler, *Jackson, MSDH Report Lead Detection in City Water*, Clarion Ledger (Jan. 29, 2016),

https://www.clarionledger.com/story/news/local/2016/01/29/small-amount-lead-some-jackson-residents-water/79510298/ [https://perma.cc/F4NQ-LX9J] (cited at [57] ¶ 150 n.42). She stated that the results meant the "[C]ity is required to take additional compliance measures." *Id.* She claimed that "[t]his is not a widespread issue, although we are treating it very seriously." R.L. Nave, *Jackson Has Long Been at High Risk for Lead Poisoning*, Jackson Free Press (Feb. 3, 2016), https://www.jacksonfreepress.com/news/2016/feb/03/jackson-has-long-been-high-risk-lead-poisoning/ [https://perma.cc/4YKS-NTC8] (cited at [57] ¶ 46 n.10). She explained why she believed the problem was not widespread: "[w]e had 58 samples taken, only 13 of them exceeded the actionable level[,] and there were homes on the same street that were sampled that did not exceed those levels." Wolfe & Fowler, *supra*. She stated, "[t]his is not a situation where you have to stop drinking the water." [57] ¶ 148 (quoting Nave, *supra*). She continued, "[w]e want people to understand how they should be flushing their internal plumbing system before using water . . . . These are just measures you take." Wolfe & Fowler, *supra*. Powell stated that the findings do "not mean that the city has violated the Safe Drinking Water Act, and our water is safe." [57] ¶ 150 (quoting Wolfe & Fowler, *supra*).

Statements continued over the next few weeks. Then-Mayor Yarber said, "I don't want to sound the wrong alarm [and have] folks saying, 'We're Flint.' We're not Flint." *Id.* ¶ 154 (quoting Anna Wolfe, *Jackson City Council Talks Lead Water*, Clarion Ledger (Feb. 17, 2016), https://www.clarionledger.com/story/news/local/2016/02/17/jackson-city-council-

talks-lead-water/80538910/ [https://perma.cc/82FC-5UP3]). Powell chimed in, "[a] major difference between Flint, Mich., and Jackson, Miss. . . . is that the crisis in Flint began because the city did not have corrosion control measures in place, whereas Jackson does." *Id.* ¶ 151 (quoting Wolfe, *supra*). She acknowledged that these corrosion control "systems need to be improved and upgraded . . . ." Wolfe, *supra*. She added that "[t]here is no lead in the drinking water as it leaves the [water treatment] plant." [57] ¶ 157 (quoting Wolfe, *supra*).

Plaintiffs allege that these statements and others made about the water in the months that followed were knowingly false, intentionally misleading, and "induced Jackson's citizens and water users to take actions that were dangerous to their health . . . and to avoid taking actions that might mitigate that harm." *Id.* ¶ 153; *see also id.* ¶¶ 147–71.

Also in February 2016, the City produced a Compliance Plan with the MSDH. *Id.* ¶ 172; MSDH Letter [57-3]. The Plan required the City to, among other things, raise the pH in its water system to a level that would prevent lead from leaching out of the decades-old pipes that fed many Jackson homes. *See* [57-3] at 2–3. The City failed to fulfill this obligation consistently. [57] ¶¶ 178–79. The Plan also required the City to adopt "an engineer-designed corrosion control study and plan." [57-3] at 2. The City hired Trilogy Engineering Services (Trilogy) in April 2016 to help with that task. [57] ¶ 201. Trilogy concluded its study in 2017 and recommended that the City convert the liquid lime system into a soda ash system. *Id.* ¶¶ 212–14. The City followed that guidance, but because the system was not

5

designed for soda ash and because of Mississippi's high humidity, the soda ash clumped and jammed feed systems at the water treatment plant. *Id.* ¶¶ 215–18.

Problems continued into 2018 and beyond. Two years after the City issued its Compliance Plan, the City admitted it was still "fail[ing] to consistently meet the minimum pH required." *Id.* ¶ 184. In a 2020 Emergency Administrative Order, the United States Environmental Protection Agency (EPA) listed several violations of the Compliance Plan, the Safe Drinking Water Act, and the National Primary Drinking Water Regulations. *Id.* ¶¶ 265–71. So, even into 2020, the EPA reported that Jackson's public water system "present[ed] an imminent and substantial endangerment to the persons served by the System." EPA Order [57-1] at 2.

In 2021, several Jackson water pipes burst during winter storms, causing thousands of residents to go without water for weeks. [57] ¶ 245. Plaintiffs allege that the City could have averted this crisis by properly maintaining its equipment and adequately staffing the water department. *Id.* The following summer, the system failed again, leaving thousands of Jacksonians without water for a second time. *Id.* ¶¶ 252–57.

Plaintiffs now seek to hold the City and its officials—the Individual Defendants—liable for their conduct in dealing with the water crisis. In Count I, Plaintiffs allege a deprivation of their "clearly established fundamental right under the substantive due process clause of the Fourteenth Amendment . . . to bodily integrity." *Id.* ¶¶ 357–64. They contend that "Defendants deliberately and knowingly breached" that right by "creating and perpetuating the ongoing exposure

6

to contaminated water, with deliberate indifference to the known risks of harm which said exposure would, and did, cause to Plaintiffs." *Id.* ¶ 360. In Count II, Plaintiffs allege that Defendants—by "deliberately and affirmatively den[ying], l[ying], cover[ing] up, deceiv[ing], discredit[ing] and ignor[ing] . . . known dangers and risks of harm"—violated their due process rights under a state-created-danger theory. *Id.* ¶ 368.

Now before the Court are Motions for Judgment on the Pleadings filed by the City and each Individual Defendant, and Motions for Qualified Immunity filed by the Individual Defendants. *See* [66]; [68]; [70]; [72]; [74]; [75].

## II.    Standard

"The standard for Rule 12(c) motions for judgment on the pleadings is identical to the standard for Rule 12(b)(6) motions to dismiss for failure to state a claim." *Waller v. Hanlon*, 922 F.3d 590, 599 (5th Cir. 2019) (citation omitted). Thus, to overcome a Rule 12(c) motion, a complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The facial plausibility standard requires "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* And "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

7

The Court "accept[s] as true the allegations in the complaint and construe[s] them in the light most favorable to the plaintiff." *R2 Invs. LDC v. Phillips*, 401 F.3d 638, 642 (5th Cir. 2005) (citation omitted). But the Court "will not strain to find inferences favorable to the plaintiffs" or "accept 'conclusory allegations, unwarranted deductions, or legal conclusions.'" *Id.* (quotation omitted). Generally, the inquiry involves an examination of the pleadings alone. *See Cinel v. Connick*, 15 F.3d 1338, 1341 (5th Cir. 1994). The Court may, however, refer to matters of public record and documents attached to the complaint. *See id.* at 1343 n.6 (matters of public record); *Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015, 1017 (5th Cir. 1996) (exhibits attached to the complaint). "If an attached exhibit contradicts a factual allegation in the complaint, 'then indeed the exhibit and not the allegation controls.'" *Quadvest, L.P. v. San Jacinto River Auth.*, 7 F.4th 337, 345 (5th Cir. 2021) (quoting *United States ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 377 (5th Cir. 2004)).

III.   Analysis

Plaintiffs bring two Section 1983 claims under the Fourteenth Amendment's Due Process Clause. *See* [57] ¶¶ 356–75. Count I alleges a violation of the right to bodily integrity. *Id.* ¶¶ 356–64. Count II advances a "State Created Danger" claim. *Id.* ¶¶ 365–74. The City and Individual Defendants argue that Plaintiffs have failed to state either claim. *See* Defs.' Supp. Mem. [71] at 4–19.[4] The Individual

---

[4] The City and Individual Defendants make nearly identical arguments on the viability of Plaintiffs' constitutional claims.

Defendants also assert that they are entitled to qualified immunity. *See* [68]; [72]; [74]; [75].

A.  Claims Against the City

A Section 1983 substantive due process claim against a municipality "requires proof of three elements: a policymaker; an official policy; and a violation of constitutional rights whose 'moving force' is the policy or custom." *Doe ex rel. Magee v. Covington Cnty. Sch. Dist. ex rel. Keys*, 675 F.3d 849, 866 (5th Cir. 2012) (en banc) (quoting *Piotrowski v. City of Hous.*, 237 F.3d 567, 578 (5th Cir. 2001)). "Without an underlying constitutional violation, an essential element of municipal liability is missing." *Becerra v. Asher*, 105 F.3d 1042, 1048 (5th Cir. 1997), *as supplemented on denial of reh'g* (Apr. 7, 1997). Accordingly, "proper analysis requires [this Court] to separate two different issues when a § 1983 claim is asserted against a municipality: (1) whether plaintiff's harm was caused by a constitutional violation, and (2) if so, whether the city is responsible for that violation." *Collins v. City of Harker Heights*, 503 U.S. 115, 120 (1992).

1.  Count I—Bodily Integrity

In Count I, Plaintiffs allege a deprivation of their "clearly established fundamental right under the substantive due process clause of the Fourteenth Amendment . . . to bodily integrity." [57] ¶ 357. They contend that "Defendants deliberately and knowingly breached" that right by "creating and perpetuating the ongoing exposure to contaminated water, with deliberate indifference to the known risks of harm which said exposure would, and did, cause to Plaintiffs." *Id.* ¶ 360.

The City moves to dismiss this claim. [70] at 1. It advances three main arguments. First, it argues that the Constitution does not guarantee access to clean water or a contaminant-free environment. *See* [71] at 4–9. Therefore, without well-pleaded allegations that the City compelled, forced, or coerced Plaintiffs to consume lead, Plaintiffs' claim is inextricably tied to a right to receive clean water and thus necessarily must fail. *See id.*

Second, the City asserts that the only allegations that "may give rise to a constitutional claim relate to public pronouncements the City made that Plaintiffs allege may have coerced them to consume the water." *Id.* at 10. But the City argues that Plaintiffs' averments about the City's public statements do not establish the requisite level of culpability for a bodily integrity claim. *See id.* at 10–12. Specifically, the City distinguishes knowingly false statements intentionally made to compel the consumption of contaminated water and exaggerated statements made to reassure the public following events affecting public health. *See id.* Because "Plaintiffs' pleadings and the incorporated exhibits show the City provided guidance as to how to use the water safely," the City argues its pronouncements fall into the latter category. *Id.*

Finally, the City argues that Plaintiffs fail to plead causation—a necessary element of a Section 1983 claim. *Id.* at 13.

> Putting aside the warnings the City gave, Plaintiffs do *not* allege that they even read, or heard, any of those statements, let alone that they relied upon the statements in drinking the water without taking any precautions. In other words, Plaintiffs do not allege that City officials' statements coerced them to ingest lead. And without an element of

coercion, Plaintiffs' claim is indistinguishable from a meritless claim
that the City owed Plaintiffs a constitutional right to clean water.

*Id.* at 13.

      i.     Shocks the Conscience

"[I]n a due process challenge to executive action, the threshold question is whether the behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998). If the Court finds Plaintiffs' allegations meet this culpability standard, it must "next determine whether there exist historical examples of recognition of the claimed liberty protection at some appropriate level of specificity." *Morris v. Dearborne*, 181 F.3d 657, 668 (5th Cir. 1999) (citing *Lewis*, 523 U.S. at 847 n.8).

The Supreme Court has "made it clear that the due process guarantee does not entail a body of constitutional law imposing liability whenever someone cloaked with state authority causes harm." *Lewis*, 523 U.S. at 848. Instead, substantive due process only protects against "'arbitrary action of government,' and . . . under the 'shocks the conscience' standard, 'only the most egregious official conduct can be said to be arbitrary in the constitutional sense.'" *M.D. by Stukenberg v. Abbott*, 907 F.3d 237, 251 (5th Cir. 2018) (quoting *Lewis*, 523 U.S. at 845–46).

Conduct that shocks the conscience has been described in several ways:

It has been described as conduct that "violates the decencies of civilized conduct"; conduct that is "so brutal and offensive that it [does] not comport with traditional ideas of fair play and decency"; conduct that "interferes with rights implicit in the concept of ordered liberty";

> and conduct that "is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience."

*Doe ex rel. Magee*, 675 F.3d at 867 (quoting *Lewis,* 523 U.S. at 846–47 & n.8). The "constitutional concept of conscience shocking . . . points clearly away from liability, or clearly toward it, only at the ends of the tort law's spectrum of culpability." *Lewis*, 523 U.S. at 848.

On one end of the spectrum, "[c]onduct [that is] *intended* to injure" and that is "unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level." *Tyson v. Sabine*, 42 F.4th 508, 518 (5th Cir. 2022) (citation omitted). On the other end of the spectrum, "liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process." *Lewis*, 523 U.S. at 849.

"[I]n some circumstances," the shocks the conscience standard can be satisfied by showing conduct that falls within the middle range of this spectrum— conduct resulting "from deliberate indifference." *M.D. by Stukenberg*, 907 F.3d at 251 (quoting *Rosales-Mireles v. United States*, 138 S. Ct. 1897, 1906 (2018)). Demonstrating deliberate indifference is a "significantly high burden . . . to overcome." *Hernandez v. Tex. Dep't of Protective & Regul. Servs.*, 380 F.3d 872, 882 (5th Cir. 2004) (quotation omitted). Deliberate indifference requires culpability beyond gross negligence; it "must amount to an intentional choice"— one that "consciously disregard[s] a known and excessive risk to the victim's health and safety." *M.D. by Stukenberg*, 907 F.3d at 251 (quotations omitted).

Here, Plaintiffs do not allege that Defendants acted with intent to injure;

they allege they acted with "deliberate indifference to the known risks of harm" that

exposure to contaminated water "would, and did, cause to Plaintiffs." [57] ¶ 360.

Importantly, "[d]eliberate indifference that shocks in one environment may not be

so patently egregious in another." *Lewis*, 523 U.S. at 850. Therefore, the Court's

"concern with preserving the constitutional proportions of substantive due process

demands an exact analysis of circumstances before any abuse of power is

condemned as conscience shocking." *Id.*

The Court separates the factual allegations underlying Plaintiffs' bodily

integrity claim into two categories: (1) failures to act and (2) actions that

exacerbated and extended the water crisis.

### a.   Failures to Act

As to the first category, Plaintiffs allege:

- Defendants knew that portions of the public water system were failing due to inadequate treatment of low-pH water from surface water sources. Defendants knew that this failure posed health risks to residents. Defendants failed to take adequate measures to remedy the issue. *See* [57] ¶¶ 32–117, 139–46, 172–92.
- Defendants failed to maintain equipment and to staff the City water department with qualified employees. These failures contributed to water contamination and the eventual loss of access to water. *See id.* ¶¶ 245–61.
- The City failed to comply with the Compliance Plan issued by the MSDH in February 2016. *See id.* ¶¶ 172–86.

The Court begins by recognizing that the Due Process Clause has historically

applied to "*deliberate* decisions of government officials to deprive a person of life,

liberty, or property." *Collins*, 503 U.S. at 127 n.10 (collecting cases). The Clause "is

phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security." *DeShaney v. Winnebago Cnty. Dep't. of Soc. Servs.*, 489 U.S. 189, 195 (1989). Due process thus confers "no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests . . . ." *Id.* at 196. In *DeShaney*, the Supreme Court noted what the Fifth Circuit has coined the "special relationship exception" to this categorical rule: "Under this exception, a state may create a 'special relationship' with a particular citizen , . . . [and i]n such instances, 'the Constitution imposes upon [the State] a corresponding duty to assume some responsibility for his safety and general well-being.'" *Doe ex rel. Magee*, 675 F.3d at 855–56 (quoting *DeShaney*, 489 U.S. at 199–200). In the Fifth Circuit, the "special relationship exception" applies to prisoners, pretrial detainees, people involuntarily committed to an institution, and children placed in foster care. *Id.*

In "special relationship" cases, it is not deliberate indifference alone that creates the constitutional deprivation. *See id.* at 862 ("An allegation of deliberate indifference may be sufficient to *violate* a constitutional duty, but it is not sufficient to *create* the constitutional duty."). Rather, deliberately indifferent conduct combines with "the State's affirmative act of restraining the individual's freedom to act on his own behalf" to create a constitutional violation. *DeShaney*, 489 U.S. at 200.

Plaintiffs are non-custodial citizens. They do not allege a "special relationship" between themselves and the City. An "exact analysis of

14

circumstances," *Lewis*, 523 U.S. at 850, shows that this first category of allegations amounts to a failure to protect plaintiffs who are not in a special relationship with the state from a foreseeable risk of harm; they are of the same ilk as the allegations in *Collins v. City of Harker Heights*, 503 U.S. 115 (1992).[5]

The plaintiff in *Collins* was the widow of a city sanitation worker (Mr. Collins) who died of asphyxia from sewer gas after he entered a manhole to work on a clogged sewer line. *Id.* at 117, 129. The defendant city had long known about the hazard; Mr. Collins' own supervisor had been rendered unconscious in a manhole several months before the town employed Mr. Collins. *Id.* at 118 n.1. According to Mrs. Collins' complaint filed under Section 1983, the city—implementing a policy of "deliberate indifference toward the safety of its employees"—never bothered to warn its employees of the "known hazards" of working in sewer lines and manholes, and it deliberately failed to teach them how to deal with these known hazards. *Id.* at 117. The complaint further alleged that the city acted "systematically and intentionally" in failing to provide safety equipment and training required by a

---

[5] "[T]he need to preserve the constitutional proportions of substantive due process demands an exact analysis of context and circumstances before deliberate indifference is condemned as conscience shocking." *Lewis*, 523 U.S. at 834. Plaintiffs rely on *M.D. by Stukenberg* and *Hernandez ex rel. Hernandez* for the proposition that deliberate indifference can shock the conscience. *See* [89] at 21. Each of these cases occurred in the context of a special relationship between the State and children in the foster care system. Therefore, the defendants' alleged "deliberate indifference" in each case was measured against a *DeShaney* affirmative duty to protect the plaintiffs and provide them with "personal security and reasonably safe living conditions." *M.D. by Stukenberg*, 907 F.3d at 250 (quoting *Hernandez ex rel. Hernandez*, 380 F.3d at 880). Plaintiffs' allegations that Defendants "consciously disregarded a known and excessive risk to the victim's health and safety," [89] at 17, should thus be considered alongside the fact the City had no constitutional duty to provide a minimal level of safety to Plaintiffs. *See Collins*, 503 U.S. at 126–28.

state statute. *Id.* at 117−18. The Supreme Court explained that the claim

"advance[d] two theories: that the Federal Constitution imposes a duty on the city

to provide its employees with minimal levels of safety and security in the workplace,

or that the city's deliberate indifference to Collins' safety was arbitrary government

action that must shock the conscience of federal judges." *Id.* at 126 (internal

quotation marks and citation omitted).

The Court dismissed the first theory under the due process principles from

*DeShaney*: the city owed no constitutional duty to its employees or citizens to

provide a minimal level of safety and security. *Id.* at 119, 126–28. Here, in that

same vein, the Constitution does not guarantee a fundamental right to live in a

contaminant-free environment, a right to water services, or a right to clean water.

*See id.* at 125–26; *Guertin v. State*, 912 F.3d 907, 921–22 (6th Cir. 2019).

As for the second theory, despite the complaint's allegation of deliberate

indifference, the Court held it could not properly characterize the city's conduct as

"arbitrary, or conscience shocking, in a constitutional sense." *Collins*, 503 U.S. at

128. The Court characterized the claim as a "fairly typical state-law tort claim." *Id.*

The Court emphasized that it had "previously rejected claims that the Due Process

Clause should be interpreted to impose federal duties that are analogous to those

traditionally imposed by state tort law." *Id.* (collecting cases).

At bottom, the first category of allegations describes a failure to take

adequate remedial action to prevent a foreseeable harm to citizens of a municipality

from the contamination of an environmental resource. As a result, the alleged

16

conduct does not rise to the level of conscience-shocking conduct sufficient to establish a substantive due process violation. *See Greene v. Plano, I.S.D.*, 227 F. Supp. 2d 615, 618–19 (E.D. Tex. 2002), *aff'd sub nom. Greene v. Plano Indep. Sch. Dist.*, 103 F. App'x 542 (5th Cir. 2004); *Kaucher v. Cnty. of Bucks*, 455 F.3d 418, 420, 428–30 (3d Cir. 2006); *White v. Lemacks*, 183 F.3d 1253, 1258 (11th Cir. 1999) ("[W]hen someone not in custody is harmed because too few resources were devoted to their safety and protection, that harm will seldom, if ever, be cognizable under the Due Process Clause."); *Santucci v. Newark Valley Sch. Dist.*, No. 3:05-CV-971, 2005 WL 2739104, at *5 (N.D.N.Y. Oct. 24, 2005) ("Indefensible passivity and nonfeasance do not rise to the level of a constitutional violation.") (citation omitted).

The *Collins* Court's refusal to characterize the city's conduct as arbitrary rested on other grounds, too—"the presumption that the administration of government programs is based on a rational decisionmaking process that takes account of competing social, political, and economic forces." 503 U.S. at 128 (citation omitted). The Court reasoned that "decisions concerning the allocation of resources to individual programs, . . . and to particular aspects of those programs, . . . involve a host of policy choices that must be made by locally elected representatives, rather than by federal judges interpreting the [Constitution]." *Id.* at 128–29. This rationale applies with equal force to the case here.

  b.  Actions Taken

Turning to the second category of allegations, Plaintiffs allege that Defendants took actions that exacerbated and extended the water problems:

- Defendants switched portions of the public water system from well water to surface water without a study or other evidence supporting the switch. [57] ¶¶ 118–36.

- Defendants relied on Trilogy's recommendation that the City use soda ash, rather than a liquid lime system, which led to clumping in the system and made problems worse. *Id.* ¶¶ 199–227.

- Defendants issued boil water notices, which exacerbated lead toxicity. *Id.* ¶¶ 193–94.

- Defendants issued misleading public statements. *Id.* ¶¶ 147–71.

Plaintiffs allege that the City knew in late 2013 or early 2014 that it had an issue treating low-pH surface water. *Id.* ¶ 80. The change in test results from December 2009 to December 2013 supports that allegation. Over that time, lead levels in surface water increased but did not exceed the action level under the Lead and Copper Rule. *See id.* ¶¶ 73–79. During that same time, lead levels in the well water remained consistently low. *Id.* ¶ 79. Yet in October 2014, the City switched some well water connections to surface water connections after completing a new five-million-gallon booster station. [57-7] at 14. The City made the switch "to provide treated surface water to the southern portion of Jackson," *id.* at 8, but did so without evidence of a corrosion control treatment study or water quality evaluation, *id.* at 14. Ostensibly, then, with costs sunk into a new booster station, the City made the switch with financial considerations in mind. But the October 2014 switch failed. *See id.* at 8, 14. Not only did the surface-water-exclusive period (October 2014–July 2015) correlate with lead levels rising to new heights, but the new booster station also failed to meet the volumetric requirements necessary to service the area previously serviced by the well-water system. *See* [57] ¶ 142; [57-7] at 14.

In hindsight, the decision to switch in October 2014 was "inept, erroneous, ineffective, [and] negligent[,]" but such actions "do not amount to deliberate indifference." *Alton v. Tex. A&M Univ.*, 168 F.3d 196, 201 (5th Cir. 1999); *see also Domino v. Tex. Dep't of Crim. Just.*, 239 F.3d 752, 756 (5th Cir. 2001) ("Deliberate indifference is an extremely high standard to meet."). While it may be true that the City never should have taken the well-water system offline, it "is in the very nature of deliberative bodies to choose between and among competing policy options, and yet a substantive due process violation does not arise whenever the government's choice prompts a known risk to come to pass." *Schroder v. City of Fort Thomas*, 412 F.3d 724, 729 (6th Cir. 2005); *see also Collins*, 503 U.S. at 128 (explaining courts must presume "that the administration of government programs is based on a rational decisionmaking process that takes account of competing social, political, and economic forces").

Allegations relating to the City's reliance on Trilogy's recommended switch to soda ash fail for similar reasons. To hold otherwise "suggests that the Due Process Clause may obligate managers of a municipal budget or other government officials to reject the advice of industry and regulatory experts based on the risk that those experts are wrong." *Guertin*, 912 F.3d at 949 (McKeague, J., dissenting). Such a conclusion cuts against the necessary presumption related to the administration of government programs. *See Collins*, 503 U.S. at 128.[6]

---

[6] That the City Council at first rejected Trilogy's bid does not change this conclusion. *See* [57] ¶ 202. Nor do allegations that Trilogy's part owner, Thessalonian LeBlanc, held an unreported campaign fundraiser for former Mayor Yarber in 2014. *Id.* ¶ 204. Trilogy's other part owner and chief engineer, Phillip Gibson, has a history with working on the City's

As to the boil-water notices, Plaintiffs allege that they exacerbated the lead problem. [57] ¶¶ 193–94. Plaintiffs, however, recognize lead is not the only contaminant in the water. *See id.* ¶¶ 239–40. Because boiling water helps eliminate other bacterial contaminants, issuing boil-water notices cannot be seen as arbitrary government action that shocks the conscience.

Next, the Court turns specifically to Plaintiffs' allegations about the City's public statements on the water's potability. Plaintiffs allege that Defendants knew about the action level exceedance when the MSDH first recorded it in June 2015. *See id.* ¶ 144. Yet Powell and other city officials issued statements during and after the January 2016 press conference that Plaintiffs allege were knowingly false, intentionally misleading, and "induced Jackson's citizens and water users to take actions that were dangerous to their health . . . and to avoid taking actions that might mitigate that harm." *Id.* ¶ 153; *see also id.* ¶¶ 147–71.

The City concedes that these allegations are the only allegations that "may give rise to a constitutional claim," and it states that the "question is whether the City *intentionally* made statements that compelled Plaintiffs to consume water it knew was contaminated." [71] at 10 (emphasis added); *see also Benzman v. Whitman*, 523 F.3d 119, 127–29 (2d Cir. 2008); *Lombardi v. Whitman*, 485 F.3d 73, 83–84 (2d Cir. 2007). Plaintiffs counter that they "have not pleaded that Defendants literally forced citizens to drink poisoned water or made false statements about the

water systems. *See* Tim Summers Jr., *As the Water Turns, City Wrestles Over Corrosion Study*, Jackson Free Press (Mar. 16, 2016), https://www.jacksonfreepress.com/news/2016/mar/16/water-turns-city-wrestles-over-corrosion-study/ [https://perma.cc/3X7Q-PK9Q] (cited at [57] ¶ 204 n.68).

lack of lead in the water with the specific intent of poisoning citizens." Pls.' Resp. [89] at 14. Instead, Plaintiffs allege deliberate indifference—that Defendants violated their bodily integrity by knowing the water was unsafe yet consciously making false and misleading statements to the contrary. According to Plaintiffs, these false and misleading statements "induced" them to consume the water. *See id.* at 14–15; [57] at 153; *see also M.D. by Stukenberg*, 907 F.3d at 251 (quotations omitted) (explaining that deliberate indifference "must amount to an intentional choice" that "consciously disregard[s] a known and excessive risk to the victim's health and safety").

The parties' briefing, however, does not provide the necessary information for the Court to decide: (1) what culpability standard applies for misleading statements issued to the general public; and (2) whether the City's statements, taken as a whole, meet that standard in this particular context. *See supra* note 5. Regardless, Plaintiffs have not pleaded that these statements were the "direct cause of the[ir] constitutional harm." *M.D. by Stukenberg*, 907 F.3d at 268. Indeed, Plaintiffs do not allege that they heard or relied on any of the alleged false or misleading statements about the water. Given the City's concession that these statements *could* give rise to a constitutional violation, the Court will allow Plaintiffs another opportunity to plead their bodily integrity claim, focusing solely on the misrepresentation allegations.[7] The Court therefore dismisses Plaintiffs' bodily integrity claim against the City without prejudice.

---

[7] The Court is not bound by the City's concession as to the scope of constitutional rights. *See, e.g.*, *United States v. Valencia*, 66 F.4th 1032, 1032–33 & n.1 (5th Cir. 2023)

In doing so, the Court reiterates that "[t]he [substantive due process] inquiry does not necessarily end" with culpability. *Kinzie v. Dall. Cnty. Hosp. Dist.*, 239 F. Supp. 2d 618, 628 (N.D. Tex. 2003). Even if Plaintiffs establish the culpability prong, the Court "must next determine whether there exist historical examples of recognition of the claimed liberty protection at some appropriate level of specificity" to sustain a due process violation. *Morris*, 181 F.3d at 668 (citing *Lewis*, 523 U.S. at 847 n.8). That analysis requires the Court to "focus on the allegations in the complaint to determine how [Plaintiffs] describe[] the constitutional right at stake . . . ." *Collins*, 503 U.S. at 125; *see also Washington v. Glucksberg*, 521 U.S. 702, 703 (1997) (explaining that the Court "require[s] a 'careful description' of the asserted fundamental liberty interest") (citation omitted). The Court must apply a "restrained methodology" that looks to "concrete examples involving fundamental rights found to be deeply rooted in our legal tradition." *Glucksberg*, 521 U.S. at 721–22; *see also id.* at 725 (noting that right to bodily integrity is not "simply deduced from abstract concepts of personal autonomy"). If Plaintiffs decide to replead their bodily integrity claim, Plaintiffs and the City should undertake that analysis.

### 2. Count II—State Created Danger

In Count II, Plaintiffs allege that Defendants—by "deliberately and affirmatively den[ying], l[ying], cover[ing] up, deceiv[ing], discredit[ing] and

---

(per curiam). That is especially so here, where the City said only that the allegations "may" give rise to a claim. [71] at 10. Upon repleading, the City may specifically address whether or not Plaintiffs state a bodily integrity claim.

ignor[ing] . . . known dangers and risks of harm"—violated their due process rights under a state-created-danger theory. [57] ¶ 368.

Defendants argue that the state-created-danger theory of substantive due process liability is not legally cognizable in the Fifth Circuit. They are correct. First, the state-created-danger theory has never been adopted by this circuit. *See Fisher v. Moore*, 73 F.4th 367, 372 & n.13 (5th Cir. 2023) (collecting cases and noting that the Fifth Circuit has "repeatedly declined to recognize" that theory).

Second, when faced with similar facts, the Fifth Circuit has affirmed the district court's dismissal of the complaint. *See Greene*, 103 F. App'x at 545 ("Even if we were to recognize the state created danger theory, we could not fashion the theory so broadly as to permit recovery under the facts Appellant alleges.").

Finally, as recognized by the Fifth Circuit, the Supreme Court has recently demonstrated an "unsubtle admonition against enlarging substantive due process . . . ." *Fisher*, 73 F.4th at 374. "We are particularly hesitant to expand the reach of substantive due process . . . because the Supreme Court has recently—and forcefully—underscored that substantive due process is a disfavored doctrine prone to judicial improvisation." *Id.* at 373. "We must . . . exercise the utmost care whenever we are asked to break new ground in this field, lest the liberty protected by the Due Process Clause be subtly transformed into the policy preferences of [judges]." *Id.* at 373 n.27 (quoting *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 240 (2022)). "The Court has always been reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this

unchart[ed] area are scarce and open-ended." *Id.* (quoting *Collins*, 503 U.S. at 125). These principles, along with the case law that binds this Court, buttress this Court's decision. The Court dismisses the state-created-danger claim with prejudice.

B.  Claims Against the Individual Defendants

"When a defendant invokes qualified immunity, the burden shifts to the plaintiff to demonstrate the inapplicability of the defense." *Club Retro, L.L.C. v. Hilton*, 568 F.3d 181, 194 (5th Cir. 2009) (citation omitted). "To meet this burden, a plaintiff must plead specific allegations demonstrating: '(1) the violation of a constitutional right that (2) was clearly established at the time of the alleged misconduct.'" *Garcia v. City of Lubbock*, No. 21-11134, 2023 WL 4636896, at *3 (5th Cir. July 20, 2023) (quoting *Linicomn v. Hill*, 902 F.3d 529, 533 (5th Cir. 2018)). Qualified immunity may be granted without deciding the first prong. *See Kovacic v. Villarreal*, 628 F.3d 209, 213 (5th Cir. 2010) (citing *Pearson v. Callahan*, 555 U.S. 223, 242 (2009)).

"A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (citation omitted). The law is only clearly established if the Court can "point to controlling authority—or a 'robust consensus of persuasive authority'—that defines the contours of the right in question with a high degree of particularity." *Morgan v. Swanson*, 659 F.3d 359, 371–72 (5th Cir. 2011) (en banc) (quoting *Ashcroft*, 563 U.S. at 742). "Broad general propositions are not enough to overcome qualified immunity." *Cope v. Cogdill*, 3 F.4th 198, 205 (5th

Cir. 2021), *cert. denied*, 142 S. Ct. 2573 (2022). Typically, plaintiffs must identify a factually analogous case. *Id.* But in "extreme circumstances" where the constitutional violation is "obvious," plaintiffs may be excused of that obligation. *Id.* at 206 (quoting *Taylor v. Riojas*, 592 U.S. 7, 8–9 (2020) (per curiam)).

This is not a case involving an obvious constitutional violation. *See Taylor*, 592 U.S. at 8–9 (explaining that constitutional violation was obvious where officers allegedly placed inmate in a cell covered in "massive amount of feces" for days then transferred him to a "frigidly cold cell" where he was "left to sleep naked in sewage"); *Cope*, 3 F.4th at 206 (noting *Taylor* was "based upon the Supreme Court's conclusion of how 'particularly egregious' and over the top the misconduct at issue was . . . ."). But the "situation [here] is nothing like cases involving violations so blatant that officers need no on-point precedent to know their conduct is illegal." *Laviage v. Fite*, 47 F.4th 402, 408 (5th Cir. 2022); *see also Henderson v. Harris Cnty.*, 51 F.4th 125, 135 (5th Cir. 2022) ("[O]bvious cases are exceedingly rare.").

Plaintiffs rely on *Guertin* and the "robust consensus" of Supreme Court precedent the Sixth Circuit relied on. [89] at 30. But Plaintiffs note that *Guertin* "was decided after most of the conduct alleged here." *Id.* at 29. And the Supreme Court cases *Guertin* relied on provide little clarity or practical guidance to officials in a case like the one at bar. Cases about forced stomach-pumping, forced surgery, forced anti-psychotic medication, and the burden of proof required to withdraw life support provide little guidance on the constitutionality of the decisions government officials must make in maintaining a public water system and responding to related

disasters when they arise. *See Rochin v. California*, 342 U.S. 165, 172–74 (1952); *Missouri v. McNeely*, 569 U.S. 141, 148 (2013); *Winston v. Lee*, 470 U.S. 753, 767 (1985); *Washington v. Harper*, 494 U.S. 210, 221–22 (1990); *Riggins v. Nevada*, 504 U.S. 127, 135–38 (1992); *Cruzan v. Dir., Mo. Dep't of Health*, 497 U.S. 261, 265–69 (1990).

In sum, "the Plaintiffs have not offered (and the Court cannot find) any controlling authority establishing with particularity the bodily integrity right that they press." *J.W. by and through Williams v. City of Jackson*, 663 F. Supp. 3d 624, 642 (S.D. Miss. 2023). As for the state-created-danger claim, "a *never*-established right cannot be a *clearly* established one." *Fisher*, 73 F.4th at 369. Further, Plaintiffs concede their negligence claim against the Individual Defendants. [89] at 2 n.1. The Court dismisses all claims against the Individual Defendants with prejudice.

IV.    Conclusion

The Court has considered all arguments. Those not addressed would not have changed the outcome. For the stated reasons, the Court GRANTS the City's [70] Motion for Judgment on the Pleadings. The Court also GRANTS each of the Individual Defendants'—Lumumba and Miller [66, 68]; Smash [72]; Powell [74]; and Yarber [75]—Motions for Judgment on the Pleadings and Motions for Qualified Immunity. The Court DISMISSES without prejudice the bodily integrity claim against the City of Jackson and DISMISSES with prejudice the state-created-danger claim against the City of Jackson. The Court DISMISSES with prejudice all

26

claims against Lumumba, Miller, Smash, Powell, and Yarber. The Court will allow Plaintiffs 14 days to replead their bodily integrity claim against the City of Jackson.

SO ORDERED, this 5th day of February, 2024.

s/ *Kristi H. Johnson*
UNITED STATES DISTRICT JUDGE