# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF MISSISSIPPI
# NORTHERN DIVISION

| | |
|---|---|
| Priscilla Sterling, Raine Becker, Shawn Miller, and John Bennett, individually and on behalf of all others similarly situated, | Civil No. 3:22-cv-00531-KHJ-MTP |
| Plaintiffs, | |
| v. | |
| The City of Jackson, Mississippi; Chokwe A. Lumumba; Tony Yarber; Kishia Powell; Robert Miller; Jerriot Smash; and Trilogy Engineering Services LLC, | |
| Defendants. | |

## SECOND AMENDED CLASS ACTION COMPLAINT FOR INJUNCTIVE

## RELIEF AND MONEY DAMAGES WITH JURY TRIAL DEMAND

## TABLE OF CONTENTS

**Page**

JURISDICTION ................................................................................................. 2

PARTIES .......................................................................................................... 7

STATEMENT OF FACTS ................................................................................ 12

I.     The City of Jackson's Antiquated Public Water System. ........................... 12

II.    Contamination of Jackson's Water Supply ................................................ 14

       A.     The Origin of Lead in Jackson's PWS .............................................. 14

       B.     Alarming Jumps in Lead Contamination in Jackson's Drinking
              Water. ............................................................................................. 20

       C.     The City of Jackson Ignores the Urgent Warnings of Former
              Interim Director of Public Works Bell. ............................................. 21

       D.     Yarber and Powell Made the Situation Worse by Switching
              from High-pH well Water to Low-pH Surface Water for a
              Substantial Portion of Jackson Water Users, Causing a Shock to
              the Jackson PWS. ........................................................................... 28

       E.     High Concentrations of Lead Are Detected in Jackson's
              Drinking Water in June 2015. .......................................................... 31

       F.     The Jackson Defendants' False and Misleading Statements
              Suggesting Jackson's Water Was Safe to Drink When It in Fact
              Was Not. ......................................................................................... 33

       G.     Jackson Repeatedly Fails to Comply With State Ordered
              Compliance Plan. ............................................................................ 39

       H.     Low pH, Lead, and other Contamination Issues Continue
              Throughout 2016 and After. ............................................................ 42

       I.     Defendants' Misconduct Magnifies the Problem. ............................. 43

              1.     Boil-Water Notices .................................................................. 43

              2.     Defendant Powell Fires a Whistle-Blower Who Sought to
                     Warn Jackson's Citizens and Water Users of the
                     Presence of Lead Joints in Jackson's Water Distribution
                     Lines. ..................................................................................... 44

**TABLE OF CONTENTS**
**(continued)**

Page

3.    Jackson Hires Trilogy Engineering Services LLC, Who Makes the Situation Worse. .......................................................44

J.    The Devastating Health Effects of Lead and Other Exposure ..........50

III.    Lack of Water Access .................................................................53

A.    Jackson's Dilapidated PWS Collapses. ...............................................53

IV.    EPA Investigations Provided Ample Notice and Confirm Defendants' Failures to Act. ..........................................................59

A.    The March 2020 Emergency Administrative Order. ........................59

B.    Jackson's Water Is Still Not in Compliance with Federal Law, and the City Has Not Taken Any Serious Steps to Come into Compliance over Several Years. ........................................................64

V.    Named Plaintiffs' Allegations. ...................................................67

A.    Priscilla Sterling .................................................................67

B.    Raine Becker .................................................................69

C.    Shawn Miller .................................................................72

D.    John Bennett .................................................................74

CLASS ALLEGATIONS .................................................................76

A.    Class Definition .................................................................76

B.    Class Certification Requirements: Federal Rule of Civil Procedure 23 .................................................................77

CLAIMS FOR RELIEF .................................................................80

COUNT I: 42 U.S.C. § 1983 – FOURTEENTH AMENDMENT SUBSTANTIVE DUE PROCESS – BODILY INTEGRITY AGAINST DEFENDANTS THE CITY OF JACKSON, LUMUMBA, YARBER, POWELL, MILLER, AND SMASH ........................................80

# TABLE OF CONTENTS
## (continued)

Page

COUNT II: 42 U.S.C. § 1983 – FOURTEENTH AMENDMENT
    SUBSTANTIVE DUE PROCESS – STATE CREATED DANGER
    AGAINST DEFENDANTS THE CITY OF JACKSON, LUMUMBA,
    YARBER, POWELL, MILLER, AND SMASH ........................................82

COUNT III: PROFESSIONAL NEGLIGENCE AGAINST TRILOGY ..............85

COUNT IV: NEGLIGENCE AGAINST TRILOGY .............................................87

COUNT V: NEGLIGENCE AGAINST DEFENDANTS THE CITY OF
    JACKSON, LUMUMBA JR., YARBER, POWELL, MILLER,
    SMASH, AND JOHN DOES 1 THROUGH 20 ...........................................89

DEMAND FOR JURY TRIAL ..........................................................................96

RELIEF REQUESTED .....................................................................................96

## INTRODUCTORY STATEMENT

1.    Access to clean, poison-free water is a fundamental human right.

2.    The City of Jackson's water supply has been neglected for decades, culminating in its complete shutdown in August and December 2022, leaving over 150,000 residents, 82.5% of whom are Black and over 24% are living in poverty, without access to running water. During that time, Jackson's residents lacked more than just drinking water, or water for making powdered baby formula, cooking, showering, or laundry. For the long periods where the city pipes had no water pressure—and were unable to facilitate the flow of water—residents of Jackson could not flush their toilets for days at a time.

3.    Yet, even before the water supply failed, Jackson's water supply was not fit for human consumption due to the high levels of lead and other contaminants, in violation of Plaintiffs' right to bodily integrity protected by the Due Process Clause of the Fourteenth Amendment, the federal Safe Drinking Water Act, and the Environmental Protection Agency's Lead and Copper Rule, and other law. Children, comprising a quarter of Jackson's residents, are especially susceptible to the devastating and life-long damages of lead poisoning. This public health crisis, decades in the making, was wholly foreseeable by Defendants' actions and has left Jackson residents in an untenable position – without access to clean, safe water in 2023 in a major United States city.

4.     Plaintiffs reside in Jackson, Mississippi. They were poisoned by lead and other contaminants released into Jackson's drinking water as a result of Defendants' conscience-shocking conduct and deliberate indifference. Plaintiffs assert claims for personal injuries based on Defendants' deprivation of Plaintiffs' rights to bodily integrity protected by the Due Process Clause of the Fourteenth Amendment to the United States Constitution. Finally, Plaintiffs assert claims against Trilogy Engineering Services LLC for professional and simple negligence in exacerbating the catastrophic, preventable, and ongoing public health crisis.

## JURISDICTION

5.     This is a civil action with claims brought pursuant to 42 U.S.C. § 1983 against Defendants for violations of the Fourteenth Amendment of the United States Constitution. This Court has subject matter jurisdiction over Plaintiffs' § 1983 claims, pursuant to 28 U.S.C. § 1331, because Plaintiffs' claims arise under the Constitution and laws of the United States.

6.     The Court also has diversity jurisdiction under 28 U.S.C. § 1332(d). The matter in controversy in this suit exceeds $5,000,000, exclusive of interest and costs. This is a class action in which Plaintiffs are citizens of the State of Mississippi, and at least one Defendant is a citizen of a different state—in particular, Defendants Trilogy is understood to be a citizen of the State of Texas.

7.     This Court may exercise supplemental jurisdiction over Plaintiffs'

professional and simple negligence claims pursuant to 28 U.S.C. § 1367(a), because they are so related to claims in this action within the Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. This case does not present novel or complex issues of State law that predominate over claims for which this Court has original jurisdiction, and there are no compelling reasons for declining supplemental jurisdiction over those of Plaintiffs' claims that do not arise under 42 U.S.C. § 1983.

8.      This Court has personal jurisdiction over Defendant the City of Jackson because it is a Mississippi municipality and because the acts and omissions giving rise to Plaintiffs' claims took place in the State of Mississippi.

9.      This Court may exercise personal jurisdiction over Defendant Mayor Chokwe A. Lumumba ("Defendant Lumumba") because he is a citizen and resident of the State of Mississippi and the acts and omissions giving rise to Plaintiffs' claims took place in the State of Mississippi. Exercising personal jurisdiction over Defendant Lumumba comports with the Fifth and Fourteenth Amendments' Due Process Clauses because Plaintiffs' claims arise out of relate to Defendant Lumumba's substantial contacts with Mississippi.

10.     This Court may exercise personal jurisdiction over Defendant former Mayor Tony Yarber because he is a citizen and resident of the State of Mississippi

and the acts and omissions giving rise to Plaintiffs' claims took place in the State of Mississippi. Exercising personal jurisdiction over former Mayor Yarber ("Yarber") comports with the Fifth and Fourteenth Amendments' Due Process Clauses because Plaintiffs' claims arise out of and relate to former Mayor Yarber's substantial contacts with Mississippi.

11.    This Court may exercise personal jurisdiction over Defendant Kishia Powell ("Powell") because the acts and omissions giving rise to Plaintiffs' claims took place in the State of Mississippi. She is subject to personal jurisdiction under Mississippi's long-arm statute because her conduct as alleged in this Complaint constitutes the transaction of business in Mississippi as well as the commission of a tort in Mississippi. Additionally, exercising personal jurisdiction over former Public Works Director Powell comports with the Fifth and Fourteenth Amendments' Due Process Clauses because Plaintiffs' claims arise out of and relate to former Public Works Director Powell's substantial contacts with Mississippi.

12.    This Court may exercise personal jurisdiction over Defendant Jerriot Smash ("Smash") because the acts and omissions giving rise to Plaintiffs' claims took place in the State of Mississippi. He is subject to personal jurisdiction under Mississippi's long-arm statute because his conduct as alleged in this Complaint constitutes the transaction of business in Mississippi as well as the commission of a

tort in Mississippi. Additionally, exercising personal jurisdiction over former Public Works Director Smash comports with the Fifth and Fourteenth Amendments' Due Process Clauses because Plaintiffs' claims arise out of and relate to former Public Works Director Smash's substantial contacts with Mississippi.

13.    This Court may exercise personal jurisdiction over Defendant Robert Miller ("Miller") because the acts and omissions giving rise to Plaintiffs' claims took place in the State of Mississippi. He is subject to personal jurisdiction under Mississippi's long-arm statute because his conduct as alleged in this Complaint constitutes the transaction of business in Mississippi as well as the commission of a tort in Mississippi. Additionally, exercising personal jurisdiction over former Public Works Director Miller comports with the Fifth and Fourteenth Amendments' Due Process Clauses because Plaintiffs' claims arise out of and relate to former Public Works Director Miller's substantial contacts with Mississippi.

14.    This Court may exercise personal jurisdiction over Defendant Trilogy Engineering Services, LLC ("Trilogy") because the acts and omissions giving rise to Plaintiffs' claims took place in the State of Mississippi. As alleged below, Trilogy maintains an office in Jackson, Mississippi which is, upon information and belief, its principal place business for the purposes of exercising general personal

jurisdiction over it. Independently, Trilogy is subject to specific personal jurisdiction under Mississippi's long-arm statute because its conduct as alleged in this Complaint constitutes the transaction of business in Mississippi as well as the commission of a tort in Mississippi. Additionally, exercising personal jurisdiction over Trilogy comports with the Fourteenth Amendment's Due Process Clause because Plaintiffs' claims arise out of and relate to Trilogy's systematic and continuous contacts with Mississippi.

15.     This Court has personal jurisdiction over John Does 1 through 20 because they are, upon information and belief, citizens and residents of the State of Mississippi, which subjects them to general personal jurisdiction, and because the acts and omissions giving rise to Plaintiffs' claims took place in the State of Mississippi. The John Doe Defendants are thus subject to specific personal jurisdiction under Mississippi's long-arm statute because their conduct as alleged in this Complaint constitutes the transaction of business in Mississippi as well as the commission of a tort in Mississippi. Additionally, exercising personal jurisdiction over them comports with the Fifth and Fourteenth Amendments' Due Process Clauses because Plaintiffs' claims arise out of and relate to their substantial contacts with Mississippi.

16.     Venue is proper under 28 U.S.C. § 1391 because nearly all of the Defendants reside in Jackson, Mississippi and because a substantial part of the

events or omissions giving rise to the claim occurred in Jackson, Mississippi.

## **PARTIES** [1]

17.     Plaintiffs have at all relevant times been residents of Jackson, Mississippi and citizens of the State of Mississippi and/or regularly consumed drinking water provided by Jackson.

18.     Jackson was required to transmit drinking water to its residents under Jackson Code of Ord. § 2-336(4), which mandates that the city perform the functions of water engineering and maintenance for its residents. Additionally, Jackson residents are required to take and pay for the city's water, unless they have a private well or other water supply source that they can draw from. Jackson Code of Ord. §§ 122-268 (rates prescribed), 122-270 (delinquent bills; penalty). Jackson residents are, in effect, compelled to use water provided by the city and must rely on the city to provide water to them.

19.     Because the government, as well as its employees and contractors, were in control of the water system and in exclusive possession of information related to the safety of the water, Plaintiffs relied on them to provide safe water and to provide accurate and complete information about the safety of the water.

20.     Plaintiffs have suffered personal injuries as a result of exposure to and

---

[1] Pursuant to ECFs 35 and 49, Plaintiffs have removed Siemens Corporation and Siemens Industry Inc. and the allegations against them from their amended complaint.

consumption of Jackson's drinking water at a time when lead levels in the water made it unsafe to drink or be exposed to.

21.    As a result of Defendants' actions, Plaintiffs have suffered and will continue to suffer injuries including but not necessarily limited to: dehydration, malnutrition, lead poisoning, E. Coli exposure, exposure to other hazardous contaminants, various health problems (including without limitation hair loss, skin rashes, digestive and other organ problems), physical pain and suffering, mental anguish, fright and shock, disability, denial of social pleasures and enjoyments, embarrassment, humiliation and mortification, medical expenses, wage loss, income loss, business income loss, brain and/or developmental injuries (including without limitation cognitive deficits, lost earning capacity and aggravation of pre-existing conditions).

22.    Defendant the City of Jackson is the capital of the State of Mississippi and its most populous city. It is a municipality created under the laws of Mississippi. Jackson maintains a Department of Public Works, which is responsible for, *inter alia*, managing the City's Public Water System ("PWS") so that Jackson-area residents and PWS water users have access to clean, safe drinking water.

23.    Jackson is a Defendant because, despite the warnings and protests of City employees, including then-Interim Public Works Director Bell, Jackson—

through its policies, customs, and practices—deliberately created, increased, and prolonged the public health crisis at issue in this case and participated in the concealment of the harm it caused Plaintiffs.

24.    Defendant Lumumba is the current mayor of Jackson. The Mayor of Jackson is responsible for the management of city government, as well as for the health and welfare of its citizens and residents. Defendant Lumumba is sued in his individual capacity for the injuries he caused to Plaintiffs resulting from his deliberately indifferent deprivation of Plaintiffs' constitutional and civil rights. Defendant Lumumba is an official with final policymaking authority for the purposes of *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978).

25.    Defendant Yarber is the former mayor of Jackson, Mississippi. Former Mayor Yarber is sued in his individual capacity for damages because he intentionally made decisions about Jackson's water source that created the current public health crisis, and because he was deliberately indifferent to the suffering and injuries of Jackson's citizens and water users, including Plaintiffs, when he made further decisions that concealed, prolonged, and exacerbated the current public health crisis. Former Mayor Yarber was an official with final policymaking authority for the purposes of *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978).

26.    Defendant Powell is the former Public Works Director for Jackson. She was in this role from early 2014 to May 2016. Defendant Powell is sued in her individual capacity for money damages because she was deliberately indifferent to the suffering and injury of Jackson's citizens and water users when she made decisions and statements that concealed and prolonged the current public health crisis. Former Director of Public Works Powell was an official with final policymaking authority (or delegated final policymaking authority) for the purposes of *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978).

27.    Defendant Jerriot Smash was the Interim Public Works Director for Jackson from approximately May 2016 to October 2017. Defendant Smash is sued in his individual capacity. Former Interim Public Works Director Smash was an official with final policymaking authority (or delegated final policymaking authority) for the purposes of *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978).

28.    Defendant Robert Miller was the Public Works Director for Jackson from at least October 2017 to July 2020. Defendant Miller is sued in his individual capacity. Former Public Works Director Miller was an official with final policymaking authority (or delegated final policymaking authority) for the purposes of *Monell v. New York City Department of Social Services*, 436 U.S. 658

(1978)

29.    The actions of lower-level City employees, not named as defendants herein, in delivering residents unsafe water were constrained by policies not of their own making. Jackson's water treatment employees were inadequately trained. In light of the duties assigned to them, the need for more training was obvious, and the inadequacy was so likely to result in the violation of constitutional rights that Jackson's policy makers can reasonably said to have been deliberately indifferent to the need for additional training.

30.    Jackson is liable because, through its policy makers, it violated the constitutional rights of Plaintiffs, including but not limited to their rights to bodily integrity and to be free from state-created danger.

31.    Defendant Trilogy is a Texas limited liability company. Trilogy was previously organized under the laws of the State of Mississippi but dissolved effective May 20, 2015. Thereafter, it reorganized in Texas and registered as a Foreign LLC in Mississippi.

32.    Trilogy maintains a current business address at 210 East Capitol St. # 1050, Jackson, Mississippi 39201. Trilogy's website indicates that it intends "to provide engineering and professional services to municipal, private, and industrial

clients in Mississippi."[2]

33.    Trilogy holds itself out as having "experience in design, managing, and overseeing construction of drinking water and wastewater (reuse water) projects."[3] Indeed, Trilogy lists "drinking water design" as the top service it provides, and specifies that Trilogy's services in this area include "[w]ater treatment plant operations," "[d]istribution waterline," and "Lead and Copper Corrosion Control study."[4]

## STATEMENT OF FACTS

### I.    The City of Jackson's Antiquated Public Water System.

34.    Jackson owns and/or operates a public water system (numbered PWS ID No. MS0250008, "PWS") which serves the vast majority of water users in the City and in surrounding communities.[5]

35.    Jackson's PWS provides water for human consumption to a population of approximately 173,514 persons in and around Jackson.

36.    Jackson's population is approximately 82% Black and nearly a quarter

---

[2] *About*, Trilogy Engineering Services LLC, https://trilogyengineers.com/about/ (last accessed May 17, 2021).
[3] *Id.*
[4] *Services*, Trilogy Engineering Services LLC, https://trilogyengineers.com/ services/ (last accessed May 17, 2021).
[5] United States Environmental Protection Agency Region 4, Emergency Administrative Order, Docket No. SDWA-04-2020-2300 (Mar. 27, 2020), attached as Exhibit 1 and incorporated as if fully stated herein.

of the City's residents live below the poverty line. Children, more at risk from lead

poisoning, comprise almost 25% of Jackson's population.

37.     Jackson's PWS No. MS0250008 consists of two water treatment

plants, known as the O.B. Curtis Water Treatment Plant ("Curtis WTP") and J.H.

Fewell Water Treatment Plant ("Fewell WTP"), as well as a number of

groundwater wells and appurtenant collection, treatment, storage, and distribution

facilities.

38.     The Curtis WTP was initially constructed in or around 1992.

39.     The Fewell WTP was initially constructed in or around 1909.

40.     The Curtis WTP and the Fewell FTP have consistently drawn water

from the Reservoir and the Pearl River to provide water to the City's residents and

water users.

41.     The Curtis WTP has a surface water intake that takes water from the

Ross Barnett Reservoir.[6]

42.     The Fewell WTP has a surface water intake that takes water from the

Pearl River.[7]

43.     Jackson has an aging network of pipes to deliver drinking water and

---

[6] The City of Jackson, Mississippi, 2019 Annual Drinking Water Quality Report,
(May 2020).
[7] *Id*.

remove wastewater. This includes approximately 1,500 miles of water mains, some of which are over 100 years old.[8]

44.     Due to antiquated and inadequate equipment, lack of repairs and maintenance, understaffing, and other failures to operate a proper PWS, Jackson has not provided adequate and safe water to its citizens. Although the 2022 total shutdown of the PWS is a crisis, it is not the first time in recent history that the system was unable to provide adequate supply of safe water. And even when the system delivers water, it contains unacceptably high levels of lead, E. Coli, and other contaminants.

## II.    Contamination of Jackson's Water Supply

### A.     The Origin of Lead in Jackson's PWS

45.     Jackson's PWS and its pipes contain significant amounts of lead.

46.     There is a solid band of lead every 20 feet in the older cast-iron piping under Jackson's city streets.[9]

47.     In 2016, then-Public Works Director Powell confirmed that even Jackson's cast-iron pipes contain lead joints every twenty feet.

---

[8] Jason Breslow, *The Water Crisis in Jackson Follows Years of Failure to Fix an Aging System*, NPR, Aug. 31, 2022, https://www.npr.org/2022/08/31/1120166328/jackson-mississippi-water-crisis.

[9] Anna Wolfe, *Jackson Water System Contains Lead Joints*, CLARION LEDGER, Mar. 15, 2016, https://www.clarionledger.com/story/news/local/2016/03/15/city-water-system-has-some-lead-joints/81780766/.

48.    In 2011, the Mississippi State Department of Health ("MSDH") tagged Hinds County as "high-risk for lead poisoning" and recognized that "children are especially at risk since their bodies absorb lead more easily than adults."[10]

49.    "[F]or the 2010 – 2012 monitoring period, [Jackson] reported results of 13.7 ppb. These results were not high enough to exceed the lead [maximum contaminant level ("MCL")[11]] and trigger any mandatory action, but should have raised concerns about the potential health risks to system customers."[12]

50.    "Typically, lead does not come from a water body or a drinking water treatment plant. Lead gets into drinking water because older pipes could be made of lead or are connected to each other with lead solder. The lead enters the drinking

---

[10] R.L. Nave, *Jackson Has Long Been at High Risk for Lead Poisoning*, JACKSON FREE PRESS, Feb. 3, 2016, https://www.jacksonfreepress.com/news/2016/feb/03/jackson-has-long-been-high-risk-lead-poisoning/; *see* MSDH News Release, Sixteen Counties Identified as High Risk Areas for Lead Poisoning, Oct. 10, 2011.

[11] A maximum contaminant level is a required limit of the amount of a toxin (here, lead) in drinking water, established by the U.S. Environmental Protection Agency under the Safe Drinking Water Act ("SDWA"). *See* 40 C.F. 141.2 ("Maximum contaminant level means the maximum permissible level of a contaminant in water which is delivered to any user of a public water system."). For lead, the MCL is 15 parts per billion ("ppb").

[12] Stephanie Otts & Catherine Janasie, Nat'l Sea Grant Law Center, Univ. of Mississippi School of Law, *How Safe is the Water?: An Analysis of the Lead Contamination Risks of Public Water Supplies in the Mississippi Delta*, University of Mississippi School of Law, at 13 (Dec. 2017), https://nsglc.olemiss.edu/projects/lead-contamination/files/howsafeiswater.pdf.

water when these pipes or fixtures begin to corrode or when the water is acidic (low pH)."[13]

51.    pH is a scale of acidity and alkalinity ranging from 0 (the most acidic) to 14 (the most alkaline).

52.    pH is measured on a logarithmic scale, meaning that a pH of one whole number, such as 7.0, is ten times more corrosive than a pH of another whole number, such as 8.0.

53.    "In a high pH value environment, lead and copper pipes build up an oxide layer over time that protect water from lead or copper contamination."[14]

54.    However, when the pH level is not maintained, water becomes more corrosive and causes lead to leach out of pipes.[15]

55.    The MSDH, Water Supply Division, therefore "prefers a pH of 8.5 for public water supplies."[16]

---

[13] The University of Mississippi, *Water Quality Challenges in Jackson, Mississippi*, https://olemiss.maps.arcgis.com/apps/MapJournal/index.html?appid=816b40d4f0e74c6c819dc543fdf3e2cf.

[14] David T. Dockery & David E. Thompson, Mississippi Dep't of Envtl. Quality, office of Geology, *Mississippi Environmental Geology*, at 59 (2019), https://www.mdeq.ms.gov/wp-content/uploads/2019/03/EnvironmentalGeologyOfMississippi.pdf.

[15] *See id.*

[16] *Id.*; *see also, e.g.*, *e.g.*, Y.S. Tam & P. Elefsiniotis, *Corrosion Control in Water Supply Systems: Effect of pH, Alkalinity, and Orthophosphate on Lead and Copper Leaching from Brass Plumbing*. 44 J. OF ENVT'L SCI. & HEALTH, 1251–60; Eun Jung Kim et. al., *Effect of pH on the Concentrations of Lead and Trace*

56.    "A water supply with a lower than recommended pH can strip the oxide lining and associated scale in service lines and increase lead levels in the water."[17]

57.    When the pH of a water supply drops, the solubility of lead minerals on the surfaces of pipes increases, leading to higher concentrations of lead in the water supply.[18]

58.    Jackson has previously struggled with low pH in its water, which makes the water corrosive and therefore more likely to leach lead and other contaminants from pipes into drinking water.

59.    Testing of Jackson's water and water sources has consistently exhibited low pH levels over time.

60.    Mississippi has previously listed certain segments of the Pearl River as impaired due to low pH, which it defines as falling below 6.5 pH. This means that the Pearl River (used as source water for Jackson's drinking water) has been

---

*Contaminants in Drinking Water: A Combined Batch, Pipe Loop and Sentinel Home Study*, 45 WATER RESEARCH, 2763-74 (Mar. 2011), https://www.researchgate.net/publication/50987815_Effect_of_pH_on_the_concen trations_of_lead_and_trace_contaminants_in_drinking_water_A_combined_batch _pipe_loop_and_sentinel_home_study.

[17] *Id.*

[18] Colin White, Matthew Tancos, and Darren A. Lytle, *Microbial Community Profile of a Lead Service Line Removed from a Drinking Water Distribution System*, 77 APPLIED AND ENVIRONMENTAL MICROBIOLOGY, 5557–5561 (Aug. 2011), http://ncbi.nlm.nih.gov/pmc/articles/PMC3147460/.

found to be at least 20 times more acidic than the level MSDH prefers for drinking water sources.

61.     Similarly, "[s]urface water from the Ross Barnett Reservoir has a pH of just above 6."[19]

62.     One potential cause of Jackson's bad pH levels in the City's source water is runoff from the surface mining industry—which is prevalent in Mississippi.[20]

63.     Surface mining creates the opportunity for "acid mine drainage" ("AMD") to react with public water supplies across the state.

64.     AMD, a direct result of surface mining, creates a highly acidic chemical reaction in mine-impacted waters associated with metals like iron and aluminum.

65.     This reaction causes disastrous outcomes including pollution of drinking water and destruction of infrastructure for hundreds of years.

66.     There are currently 591 mines in Mississippi—412 of these are iron mines, 182 are aluminum.[21]

---

[19] Dockery, *supra* n.14 at 59.
[20] Otts et al., *supra* n.12, at 13.
[21] *See* Mining in Mississippi, The Diggings, https://thediggings.com/usa/Mississippi (citing Bureau of Land Management data).

67.    "The pH of AMD is usually in the range of 2-6."[22]

68.    The acidity of this drainage into the public water supply causes low, hazardous pH levels in surface water.

69.    Over the last decade, "a failing lime-feed system at the city's OB Curtis Water Treatment Plant" compounded the City's problems with low pH source water by effectively not treating water drawn from the Reservoir.[23]

70.    "Lime is added to regulate the pH of the system's water and reduce the risk of lead leaching from the pipes."

71.    "The lime-feed system may have been malfunctioning for years due a clogged valve. Insufficient lime was entering the system, resulting in water with a lower pH."

72.    The problem was complicated by the fact that the system was designed for liquid lime, but sometimes used solid lime powder.

73.    Indeed, public officials have long known that a key "issue with

---

[22] Jerry M. Bigham and Charles A. Cravotta, *Acid Mine Drainage*, Encyclopedia of Soil Science (3d ed. 2016), https://pubs.er.usgs.gov/publication/70182719#:~:text=The%20pH%20of%20AM D%20is,%E2%80%938)%20are%20also%20common.

[23] As will be explained further below, MSDH required the City to conduct a corrosion control study in 2015–in the aftermath of Jackson's violations under the Lead and Copper Rule ("LCR"), which "identified a failing lime-feed system at the city's OB Curtis Water Treatment Plant as the likely culprit of the elevated levels of lead." Otts et al., *supra* n.12, at 13.

[Jackson's] water is the pH holding consistency all the way through the system."[24]

74.    Jackson's citizens and water users were not warned or informed of the drastic escalation in lead levels (and associated health risks) for the City's PWS at that time.[25]

**B.    Alarming Jumps in Lead Contamination in Jackson's Drinking Water.**

75.    Between 2010 and 2013, triennial testing showed an alarming increase of lead Jackson's drinking water.

76.    For the triennial testing period ending December 31, 2009, the lead levels for the surface PWS drawn from the Pearl River and the Reservoir (MS0250008) were 4.8 ppb for the 90th percentile and 8.8 ppb for the 95th percentile.[26]

77.    In the triennial testing period ending December 31, 2013, and immediately prior to unitizing the surface water system (MS0250008) with the well water system (MS0250012), the lead level escalated for the surface water system to 13.7 ppb for the 90th percentile and as high as 33.5 for the 95th

---

[24] Anna Wolfe, *Jackson Hit with Technical Violation for Water Treatment*, CLARION-LEDGER, June 9, 2016, https://www.clarionledger.com/story/news/local/2016/06/09/jackson-issued-technical-violation-water-treatment/85618558/.

[25] Indeed, there would be no relevant public information provided at all to Jackson's citizens and water users until January 2016.

[26] Drinking Water Watch Database, https://apps.msdh.ms.gov/DWW/.

percentile.[27]

78.    Although the 2013 testing results for the 90th percentile of the surface water system "were not high enough to exceed the lead MCL and trigger any mandatory action," they "should have raised concerns about the potential health risks to system customers."[28]

79.    In contrast, the lead levels for the Maddox Road Well Water System were consistently low, owing to the higher pH of the well water.

80.    For the triennial testing period ending December 31, 2009, the lead level was 1.7 ppb for 90th percentile of the Maddox Road Well Water System results.

81.    For the following triennial testing period ending December 31, 2013, the lead level was again 1.7 ppb for the 90th percentile.

**C.    The City of Jackson Ignores the Urgent Warnings of Former Interim Director of Public Works Bell.**

82.    By late 2013 or early 2014, Jackson was aware that its low-pH water (which was not being treated due to the malfunctioning lime pump) was causing lead to leach from pipes into the City's drinking water.

83.    At that time, then-Interim Director of Public Works Willie Bell ("Bell") told the then-mayor, Chokwe Lumumba ("Lumumba"), that there were

---

[27] *Id.*

[28] Otts et al., *supra* n.12, at 13.

"issues with the water's pH," stressed Jackson's need to alter its corrosion control treatment method, and brought a proposal to Jackson officials.

84.    Bell's presentation to Lumumba directly connected Jackson's pH issues with its increasing lead levels, and explained that low pH environments were causing lead to leach out of pipes into the water supply.

85.    Bell explained that the MSDH had previously identified Jackson as being at high risk for lead poisoning in children, because it was extremely likely that Jackson had lead service lines for distributing drinking water, and that the vast majority of Jackson's homes had pipes that were partially or completely made of lead.

86.    Bell explained the potential risks associated with lead in drinking water, particularly as they relate to children.

87.    Prior to his presentation to Lumumba, Bell asked Cynthia Hill ("Hill"), who ran Jackson's water treatment plants, to estimate the cost of the repairs, including the cost to switch to a liquid lime treatment system to improve corrosion control.

88.    Hill estimated necessary repairs would cost approximately $400,000.

89.    Bell shared the $400,000 figure with Lumumba.

90.    The repair Bell identified was to a defective lime injection pump in the O.B. Curtis Water Treatment Plan that had been malfunctioning.

91.    Bell cautioned Lumumba against taking actions that might shock Jackson's PWS.

92.    Bell informed Lumumba that some of Jackson's erstwhile sources of drinking water (including the Pearl River and the Reservoir) had very low pH levels.

93.    Lumumba understood all of this and decided to take action to protect Jackson's citizens and water users.

94.    As current Mayor Defendant Lumumba stated in a July 18, 2018 Press Release: The City of Jackson "learned that there were troubles or issues with the water treatment facility being able to maintain a proper pH through what we had as a liquid lime system at that time."[29]

95.    At that time, Mayor Lumumba "took action to incorporate that in the budget to purchase a new system."[30]

96.    Mayor Lumumba passed away on or about February 25, 2014.

97.    In April 2014, Yarber was elected to finish Lumumba's term.

98.    Former Mayor Yarber served as a member of Jackson's City Council prior to becoming Mayor.

99.    Indeed, former Mayor Yarber had previously served as a member of

---

[29] Press Release, City of Jackson (July 18, 2018), attached as Exhibit 2 and incorporated as if fully stated herein.
[30] *Id.*

the City Council's budget committee in the spring of 2014.

100.   Then-Council Member Yarber was present for and aware of Bell's presentation to Lumumba regarding the City's corrosion control system and the urgent need for upgrades and the health risks to residents if the upgrades were not implemented.

101.   Former Mayor Yarber (as a then-member of the Jackson City Council and member of the Jackson City Council's Budget Committee) was present for and understood Bell's presentation to Lumumba.

102.   In other words, Yarber was aware (both when he was a Council Member and later as Mayor) that Jackson's water treatment plants were incapable of adequately treating the water to ensure that it had a pH level necessary to prevent corrosion of Jackson's water pipes, including its lead water pipes, and therefore necessary to prevent lead from leaching into Jackson's drinking water.

103.   Although he was aware of Jackson's serious need for a corrosion control system and other upgrades—and understood the reasoning of why former Mayor Lumumba had put them in the budget (based on Bell's urgent warnings)—Former Mayor Yarber removed those projects from the City's budget.[31]

104.   All the while, the City continued to ignore alarms regarding malfunctioning and nonfunctioning corrosion control treatment methods.

---

[31] *Id.*

105.    Additionally, shortly after former Mayor Yarber was elected, he replaced Bell—who had sounded the alarm about the low pH levels, high corrosivity, and lack of corrosion control at Jackson's water treatment plants—and installed Powell as Jackson's Public Works Director.

106.    Several high-ranking figures in Jackson's government—including but not limited to Mayor Lumumba, former Interim Public Works Director Bell, then-current Mayor Yarber, and then-current Public Works Director Powell—were thus aware of the decreasing pH of the water and the increasing lead levels in the previous year's testing.

107.    Powell and Yarber were also aware that the surface water drawn from the Pearl River and the Reservoir had a very low pH level.

108.    Yet, despite these urgent concerns and the obvious risk of harm they carried, Jackson did not take any action to address rising lead levels in Jackson's water.

109.    Despite the fact that the then-existing corrosion control methods in place at the O.B. Curtis Water Treatment Plant were inadequate, not performing, and, in fact, not functioning for years, no corrosion control improvements were made to Jackson's water treatment plants at that time.

110.    As a public water system professional, Defendant Powell knew that several segments of the Pearl River had been identified as impaired due to low pH

levels and shared this information with former Mayor Yarber.

111.   Both Powell and Yarber – in their capacity as public servants – chose to direct their staff to carry out the most harmful and neglectful options for the corrosion control methods.

112.   To this day, Jackson has not identified any materials, studies, reports, documents, treatises, or other information that was relied upon in good faith by former Mayor Yarber, former Public Works Director Powell, or Jackson in deciding to ignore the pH levels of the source water or the lack of corrosion control methods at the O.B. Curtis Water Treatment Plant.

113.   Indeed, despite the fact that room was already made in the budget for such improvements, the budget items were cut, and no improvements were made at this time.

114.   Ultimately, former Mayor Yarber's, former Public Works Director Powell's, and Jackson's decision proved catastrophic. As described below, it caused a serious increase in lead levels that would not be detected until June 2015 and would not be reported until January 2016. Jackson would not even begin to address those levels until later in the spring of 2016.

115.   Two years later, after the discovery of dangerous lead levels exceeding the LCR's 15 ppb action level, former Interim Public Works Administrator Bell told the City Council in 2016 that "had that [the project to

update the water treatment plant's corrosion control system] been done [years earlier as Bell had suggested], we would not have that inconsistency [in lead levels]."[32]

116.   Bell stated, "With this water system, the real issue with our water is the pH holding consistency all the way through the system."[33]

117.   Likewise, an anonymous employee of the Public Works Department stated that the corrosion could be attributed to the outdated lime injection system used to regulate the pH of the water.[34]

118.   Then-Public Works Director Powell essentially agreed and admitted that Jackson's issue with lead "stems from the fact that our corrosion control system at the plan needs to be upgraded, optimized."[35]

119.   In addition to the fact that no action was taken to combat the rapidly rising lead levels, former Mayor Yarber, former Public Works Director Powell,

---

[32] Anna Wolfe, *Ex-official: Jackson Has Water Solution, Hasn't Acted*, CLARION-LEDGER, Mar. 23, 2016, https://www.clarionledger.com/story/news/local/2016/03/22/offering-jackson-water-solutions-new-treatment-needed/82120680/.
[33] Wolfe, *supra* n.24.
[34] Tim Summers, Jr., *As the Water Turns, City Wrestles Over Corrosion Study*, JACKSON FREE PRESS, Mar. 16, 2016, https://www.jacksonfreepress.com/news/2016/mar/16/water-turns-city-wrestles-over-corrosion-study/.
[35] Kate Galbraith, *High Levels of Lead Found in Mississippi Capital's Water Likened to Flint Crisis*, THE GUARDIAN, Mar. 17, 2016, https://www.theguardian.com/us-news/2016/mar/17/high-levels-lead-mississippi-water-flint-michigan.

and the City of Jackson did not warn Jackson's citizens and water users of rising

lead levels, the corrosive state of Jackson's water, or the associated health risks.

**D.    Yarber and Powell Made the Situation Worse by Switching from High-pH well Water to Low-pH Surface Water for a Substantial Portion of Jackson Water Users, Causing a Shock to the Jackson PWS.**

120.    Simultaneously with rising lead levels, Jackson switched a section of

the city's water source from well water to surface water—which significantly

impacted drinking water quality and safety for the entirety of water users.

121.    The City of Jackson unitized the surface water system and the well

water system and switched the well water users to surface water drawn from the

Pearl River and the Reservoir.

122.    Specifically, "the City of Jackson, Mississippi, took the city's Maddox

Road Well system (serving much of south Jackson, with 6 groundwater wells along

the Highway 18 corridor, and the City of Byram) off the well system and onto

surface water."[36]

123.    Jackson, as authorized and directed by Powell and Yarber, switched

water sources for a portion of its water users from the high-pH well water to the

low-pH surface water drawn from the Pearl River and the Reservoir.

124.    The decision was a catastrophic one for thousands of Jackson water

---

[36] Dockery et al., *supra* n.14, at 58.

customers given the fragile balance of pH then in place in Jackson's PWS.

125.    The well water used by the Maddox Road Well Water System in a portion of the Jackson metro area had a high pH (over 8), which "protected service lines connected to the Maddox Road Well system from corrosion and exposure to lead contamination from lead pipes."[37]

126.    The O.B. Curtis and J.H. Fewell Water Treatment Plants were not prepared to handle the increased flow associated with a sudden addition of 16,000 new connections.

127.    The surface water "had a pH of just over 6" and this portion of the City's PWS was not prepared for the drastic change in acidic water due to malfunctioning and nonfunctioning corrosion control methods and water treatment.

128.    These increased stresses also contributed to the problems at the Curtis and Fewell WTPs and the failure of the PWS.

129.    As a public water system professional, Defendant Powell knew that several segments of the Pearl River had been identified as impaired due to low pH levels and shared this information with former Mayor Yarber.

130.    Indeed, as a public water system professional, Director of Public Works Powell in fact knew of the seriously low pH of the surface waters Jackson was switching to, as well as the fact that certain segments had previously been

---

[37] Dockery et al., *supra* n.14, at 59.

designated impaired for low pH pursuant to section 303(d) of the Clean Water Act, 33 U.S.C. § 1313(d).

131.    Further, in her capacity as a public water system professional, Powell knew of the seriously impaired, malfunctioning and nonfunctioning corrosion control methods within the City's water treatment plants.

132.    Powell shared this information with former Mayor Yarber.

133.    Both of these public servants chose to direct their staff to carry out the most harmful and neglectful options for the well-water switch as well as the corrosion control methods.

134.    Ultimately, former Mayor Yarber's, former Public Works Director Powell's, and Jackson's decision proved catastrophic. As described below, it caused a serious increase in lead levels that would not be detected until June 2015 and would not be reported until January 2016. Jackson would not even begin to address those levels until later in the spring of 2016. Even to this day, in the late spring of 2021, Jackson is not fully in compliance with federal law.

135.    To this day, Jackson has not identified any materials, studies, reports, documents, treatises, or other information that was relied upon in good faith by former Mayor Yarber, former Public Works Director Powell, or Jackson in making the decision to switch water sources for nearly a quarter of its water users.

136.    There was no information or studies that supported the advisability of

the switch or suggested that it would be safe under the circumstances.

137.   No studies regarding the cost of a switch were conducted and no information or analysis supported later claims that the switch was taken as a cost-saving measure.

138.   No internal materials were created or reviewed by former Mayor Yarber's office, the Jackson City Council, or the Department of Public Works that supported the switch, suggested it would be safe, indicated it would be a valid cost-saving measure, or showed that it was advisable in any way.

139.   No other actions were taken to ensure that a switch in Jackson's drinking water source would be safe and would not result in the injury and poisoning of Jackson's citizens and water users.

140.   Jackson's citizens and water users were not warned or informed of the associated risks from rising lead levels in drinking water while the City continued to ignore alarms regarding malfunctioning and nonfunctioning corrosion control treatment methods.

**E.    High Concentrations of Lead Are Detected in Jackson's Drinking Water in June 2015.**

141.   On or about June 23 and 24, 2015, officials from the MSDH performed water testing in Jackson as required by the Safe Drinking Water Act

("SDWA").[38]

142.   The MSDH found that levels of lead in Jackson's drinking water exceeded the LCR's 15 ppb action threshold in 22% of Jackson homes, according to the sampling.[39]

143.   This was a larger proportion of homes with lead in excess of the LCR's 15 ppb threshold than found in Flint, Michigan at about the same time (16.7%).[40]

144.   The 90% percentile of testing in June 2015 was 28 ppb, nearly twice the EPA's action level of 15 ppb.

145.   The lead levels the MSDH detected in June 2015 were likely higher and more widespread, and therefore more dangerous.

146.   Although MSDH officials did not inform the City of Jackson's residents and water users at that time, upon information and belief, Defendants and their employees were made aware of these test results.

147.   On or about January 29, 2016, the MSDH formally notified Jackson that it found lead in 22.4 percent of the 58 Jackson homes it sampled in June 2015.

148.   Despite knowing of the high levels of lead in Jackson's water, Jackson

---

[38] Lead Testing Results, June 2015, https://jacksonfreepress.media.clients. ellingtoncms.com/news/documents/2016/02/04/0250008_PB_2015_with_ReSample_Results_1.pdf.
[39] Galbraith, *supra* n.35.
[40] *Id.*

did not take action to protect Jackson's citizens and water users.

**F.    The Jackson Defendants' False and Misleading Statements Suggesting Jackson's Water Was Safe to Drink When It in Fact Was Not.**

149.   The Jackson Defendants—most prominently Yarber, Powell, and

official statements made on behalf of Jackson—made numerous false statements,

either explicitly asserting or otherwise strongly implying, that Jackson's water was

safe to drink when, in fact, it was not.

150.   Even though she acknowledged there were issues with lead in

Jackson's drinking water, Interim Jackson Public Works Director Powell

nevertheless stated to the Jackson Free Press that "This is not a situation where you

have to stop drinking the water."[41]

151.   Indeed, she made repeated statements reassuring the City of Jackson's

citizens and water users that Jackson's water was safe to drink even though it was

not.

152.   On January 29, 2016, Powell immediately told the public that the June

2015 findings of lead above the LCR's action level for lead in Jackson's drinking

water "[do] not mean that the city has violated the Safe Drinking Water Act, and

---

[41] Nave, *supra* n.10.

our water is safe."[42]

153.    Powell also sought to persuade Jackson's citizens and water users that

Jackson's water crisis was unlike Flint's drinking water crisis. "A major difference

between Flint, Mich., and Jackson, Miss., Powell said, is that the crisis in Flint

began because the city did not have corrosion control measures in place, whereas

Jackson does."[43]

154.    Powell also falsely claimed that "We are nowhere near the levels seen

in Flint."[44] This statement was false; if anything, there were a larger proportion of

homes that had shown elevated lead levels above 15 ppb. Powell made the

statement to assuage any concerns by Jackson's citizens and water users and

---

[42] Anna Wolfe & Sara Fowler, *Jackson, MSDH Report Lead Detection in City Water*, CLARION-LEDGER, Jan. 29, 2016, https://www.clarionledger.com/story/news/local/2016/01/29/small-amount-lead-some-jackson-residents-water/79510298/.

[43] Anna Wolfe, *Jackson City Council Talks Lead Water*, CLARION-LEDGER, Feb. 19, 2016, https://www.clarionledger.com/story/news/local/2016/02/17/jackson-city-council-talks-lead-water/80538910/. As above, this claim was false: the City of Jackson did not have properly operating corrosion control measures. Furthermore, Powell's false statement ironically mirrored a false statement regarding the existence of corrosion control in Flint, Michigan by a Michigan Department of Environmental Quality supervisor, Steven Busch, which the Sixth Circuit concluded was a conscience-shocking misrepresentation that prolonged and exacerbated the effects of the water crisis there. *See Waid v. Earley (In re Flint Water Cases)*, 960 F.3d 303, 317, 328 (6th Cir. 2020).

[44] Lisa Riordan Seville, Hannah Rappleye, Tracy Connor and Stephanie Gosk, *'People are Scared': Jackson, Mississippi Copes With Lead Alarm*, NBC NEWS, Feb. 25, 2016, https://www.nbcnews.com/news/us-news/people-are-scared-jackson-mississippi-copes-lead-alarm-n525961.

persuade them that the water was safe to drink.

155.   In making this knowingly false statement, Powell induced Jackson's citizens and water users to take actions that were dangerous to their health and the health of their children and to avoid taking actions that might mitigate that harm.

156.   Former Mayor Yarber echoed Powell, emphatically saying: "I don't want to sound the wrong alarm [and have] folks saying, 'We're Flint.' We're not Flint."[45]

157.   Yet, by January and February 2016, appropriate warnings to Jackson's citizens and water users were actually already long and tragically overdue, and the public alarm should have been ringing loudly.

158.   Moreover, by that time, the comparison to the tragic water crisis was unmistakable, and Powell's and Yarber's emphatic and repeated comments were clearly intended to downplay the water crisis in Jackson and persuade PWS water users that Jackson's water was safe to drink.

159.   Powell also claimed that "There is no lead in the drinking water as it leaves the plant."[46]

160.   Although this statement may be true in one sense, since lead is rarely in source water and therefore unlikely to be in the drinking water as it leaves the

---

[45] Anna Wolfe, *Jackson City Council Talks Lead Water*, *supra* n. 43.
[46] *Id.*

plant, the statement is deliberately misleading since it conveys the overall

impression that there is no lead in the water at all, when testing in fact confirmed

that there was.

161.    There is no question that Defendant Powell understood the basic fact

of water chemistry that low pH water can be corrosive and therefore cause lead to

leach out of drinking water pipes long after it leaves a municipal water treatment

plant.

162.    Nevertheless, Powell repeatedly attempted to cast doubt on the

possibility that Jackson's water crisis was a widespread problem, claiming that

"the problem with the lead was happening at specific homes with lead pipes, and

that the water leaving the treatment plant was not contaminated."[47]

163.    That statement was false; within months, a Jackson Public Works

Department employee would confirm that even the City's cast-iron water lines had

solid bands of lead every twenty feet.[48] At the time Powell made the false

statement, it was (at best) made in reckless disregard of the truth; days earlier,

Powell herself had claimed that "there are no records showing whether there are

---

[47] David Kenney, *Jackson City Council Tables Water Emergency*, WLBT3, Mar. 1, 2016, https://www.wlbt.com/story/31360020/council-tables-water-emergency/.
[48] The employee blew the whistle and warned the Jackson community of the widespread potential for Jackson's corrosive, low pH water to leach lead broadly and poison children throughout the City and the larger PWS. Powell immediately fired the employee for reporting the threat to the public.

any lead lines underground."

164.    Beyond Powell and Yarber, other Jackson officials also told the press and public that Jackson's drinking water is "not unsafe" to drink.

165.    Those other Jackson officials spoke with the permission of, and at the direction of, Defendants Yarber and Powell.

166.    These statements were false.

167.    For instance, at the time Powell said Jackson's citizens could drink the water, 11% of Jackson homes were still testing above the LCR's 15 ppb threshold for lead. Indeed, testing in January 2016 showed that additional residences served by Jackson's PWS were testing at dangerously elevated lead levels, signaling that the problem was not contained or limited to certain residences.

168.    Moreover, the lead levels at that time showed that the corrosion of lead piping caused by Jackson's water was grave and serious. In January and February 2016, one Jackson home at that time tested positive for lead with 476 ppb, more than 30 times the EPA's action level of 15 ppb.

169.    Other homes tested at 106 ppb, 62 ppb, 58 ppb and 50 ppb. These levels, found consistently throughout different homes in Jackson, showed that Jackson's water crisis was if anything more dangerous and more widespread than the water crisis in Flint.

170.    False statements of essentially the same character would continue

over time. For example, Defendant Miller echoed Defendant Powell in a deliberately misleading statement from July 2018, saying "there's been no detecting of lead or copper in the water supply."[49]

171.   This statement is deliberately misleading since it conveys the overall impression that there is no lead in the water at all, when testing in fact confirmed that there was.

172.   Indeed, it is beyond a doubt that Defendant Miller (like Defendant Powell before him) understood the basic fact of water chemistry that low pH water can be corrosive and therefore leach lead out of drinking water pipes long after it leaves a municipal water treatment plant.

173.   Also in July 2018, despite the fact that Jackson had just been cited with yet another technical violation for its failure to comply with the Compliance Plan the MSDH put in place for it in 2016, Defendant Miller assured Jackson's citizens water users that "[t]he water is still safe to drink."[50]

---

[49] Justin Vicory, *Department of Health Says Jackson Is in Violation of Safe Drinking Water Requirements*, CLARION-LEDGER, July 18, 2018, http://www.clarionledger.com/story/news/local/2018/07/18/Jackson-violating-safe-drinking-water-requirements-health-dept/798010002/.
[50] Marie Weidmayer, *City Violated Water Treatment Procedure, Still Safe to Drink*, JACKSON FREE PRESS, July 19, 2018, http://www.jacksonfreepress.com/news/2018/jul/19/city-violated-water-treatment-procedure-still-safe/.

G.    **Jackson Repeatedly Fails to Comply With State Ordered Compliance Plan.**

174.    In February of 2016, the MSDH issued a compliance plan for the City.[51]

175.    One item required by the compliance plan was an "engineer-designed corrosion control study and plan for optimization of water treatment."[52]

176.    Jackson was also required to submit "an engineer-designed corrosion control study and plan for optimization of water treatment for the City of Jackson Water System." The compliance plan contemplated that once the corrosion control plan was deemed sufficient by MSDH, the corrosion control plan "will be monitored by the City of Jackson assigned engineer(s)" as well as the MSDH.

177.    Until the plan was approved by MSDH, however, Jackson "must ensure functional treatment of water in the current system to maintain a constant pH of at least 8.5 and alkalinity of between 50 mg/l and 70 mg/l. Repairs or modifications to the City of Jackson Water System to establish these values must be completed as soon as possible but no later than October 1, 2016."

178.    Additionally, Jackson was required to "update the City of Jackson Water System Lead/Copper Site Plan. The plan must be designed and monitored

---

[51] *See* Otts, et. al., *supra* n.12.
[52] Compliance Plan for City of Jackson (MS0250008), attached hereto as Exhibit 3 and incorporated as if fully stated herein.

by an engineer and provided to the MSDH Bureau of Public Water Supply. The

plan must include a map with all sampling locations, intakes, wells, treatment

plants, storage tanks, and booster stations. The plan and map must be submitted to

the Director of the MSDH Bureau of Public Water Supply or before March 15,

2016."

179.   Jackson was also required to "submit a written summary of activities

related to all areas identified in this Compliance Plan to the Director of the MSDH

Bureau of Public Water Supply by the 15th of each month, beginning March 15,

2016."

180.   Jackson immediately and repeatedly failed to comply with the

Compliance Plan.

181.   A follow-up letter dated March 22, 2016 noted in several places that

the City had requested (and was granted) extensions. The follow-up letter also

noted that Jackson had failed to comply (or had insufficiently complied) with the

Compliance Plan's other dictates.

182.   The Corrosion Control Plan called for the installation of certain

equipment that would help raise pH and reduce corrosion from Jackson's

distribution lines.

183.   An estimate of the cost to fix the problem had already been

completed. Mayor Defendant Lumumba office estimated that fixing the crisis

would cost $1,000,000 to $1,200,000.

184.    The City of Jackson did not begin installing necessary components for optimized corrosion control until at least October 2017.

185.    Furthermore, the City was cited with a technical violation in July 2018.

186.    The City revealed the technical violation, in a statement by Director of Communications Candice Cole: "In an effort to maintain trust and transparency with those we serve, we must inform you that it has come to our attention that for six months, our water system has failed to consistently meet the minimum pH required by our optimized control plan for the City of Jackson."[53]

187.    In other words, more than two years after the MSDH reported finding serious lead levels that exceeded the action level of 15 ppb under the LCR, the Jackson had "consistently" failed to maintain the pH level necessary to prevent further leaching of lead.

188.    A recent information request revealed numerous emails documenting a multi-year failure by Jackson to take the necessary actions to come into compliance with the February 2016 compliance plan, even to present day.[54]

---

[53] Weidmayer, *supra* n.50.

[54] *See* Steve Wilson, *EPA Emails Reveal City's Continued Violations*, THE NORTHSIDE SUN, Sept. 8, 2021, https://www.northsidesun.com/local-news-top-stories/epa-emails-reveal-citys-continued-violations#sthash.zt33DM8L.JWEPdmmP.dpbs.

### H.    Low pH, Lead, and other Contamination Issues Continue Throughout 2016 and After.

189.    The corrosive and dangerously low pH of Jackson's drinking water continued throughout 2016.

190.    As of 2016, "Jackson's water ha[d] a low pH that fluctuates often," ranging "from 6.5 to 7.5" as it leaves the water treatment plant."[55]

191.    "One relatively new downtown building in Jackson had tap water with a consistent pH of 6.3 for 2016."[56]

192.    In follow-up testing taken in August 2016, several Jackson homes again reported very high lead levels—123 ppb, 90 ppb, and 86 ppb.[57]

193.    In the August 2016 testing, 13 out of 120 homes (nearly 11%) had elevated lead levels.[58]

194.    Jackson's PWS has and continues to be exposed to other contaminants

---

[55] Anna Wolfe, *6 Things to Know About the Lead Water in Jackson*, CLARION-LEDGER, Mar. 17, 2016, https://www.clarionledger.com/story/news/local/2016/03/17/5-things-know-lead-water-jackson/81830278/.

[56] *See* Dockery et al., *supra* n.14, at 58.

[57] Anna Wolfe, *A Year Later, Jackson's Lead-Water Issue Not Solved*, HATTIESBURG AMERICAN, Dec. 13, 2016, https://www.hattiesburgamerican.com/story/news/local/2016/12/13/year-later-jackson-lead-water-issue-solved/95401880/.

[58] Anna Wolfe, *Jackson Is Still Experiencing Elevated Lead Levels in Water*, CLARION-LEDGER, Sept. 13, 2016, https://www.clarionledger.com/story/news/local/2016/09/13/jackson-still-experiencing-elevated-lead-levels-water/90302838/ .

as well. As an example, for many years, citizens, watchdogs, and regulators have significant concerns about the Jackson's PWS' exposure to E. Coli.[59] As with lead, this contamination is a result of similar failures to maintain Jackson's aging infrastructure, and keep the system in a safe and working condition.[60] As recently as 2020, the Environmental Protection Agency ("EPA")'s emergency order confirmed that E. Coli was a component of the "imminent and substantial endangerment" risk that residents of Jackson were being exposed to by their PWS.[61] The EPA identified this risk of E. Coli "based on evidence of turbidity exceedances, disinfection treatment concerns, and/or the condition of the distribution system" and noted that, for similar reasons, the system could contain Cryptosporidium and Giardia.[62]

## I.    Defendants' Misconduct Magnifies the Problem

### 1.    Boil-Water Notices

195.    Jackson issued several boil water notices from the spring of 2016 to present.

196.    This advice was dangerously ignorant. Boiling water exacerbates lead

---

[59] Breslow, *supra* n.8.

[60] *Id.*

[61] U.S. Environmental Protection Agency, Civil Enforcement Case Report, Case Number: 04-2020-2300 (March 27, 2020), https://echo.epa.gov/enforcement-case-report?id=04-2020-2300, at 1, attached as Exhibit 6 and incorporated as if fully stated herein.

[62] *Id.*

toxicity because the water boils off and evaporates but the lead does not, leading to a higher concentration of toxic lead in the resulting drinking water.

**2.    Defendant Powell Fires a Whistle-Blower Who Sought to Warn Jackson's Citizens and Water Users of the Presence of Lead Joints in Jackson's Water Distribution Lines.**

197.    In February 2016, Jonathan Yaeger, an engineer-in-training with the Jackson Public Works Department, found lead materials during a water main replacement job.

198.    Yaeger took his concerns to officials in his department, even offering to address the City Council, but they discouraged him from doing so.

199.    Yaeger spoke to a local reporter about having found lead during the water main replacement job.

200.    Defendant Powell fired Yaeger from the Public Works Department for "possibly creating unwarranted public fear."[63]

**3.    Jackson Hires Trilogy Engineering Services LLC, Who Makes the Situation Worse.**

201.    In February 2016, MSDH required Jackson to enter into a compliance plan to achieve compliance with the LCR.

202.    The compliance plan required Jackson to, *inter alia*, "identify an

---

[63] KARE Staff, *Water Worker Fired After Talking About Lead to Media*, KARE 11, Mar. 29, 2016, https://www.kare11.com/article/news/nation-now/water-worker-fired-after-talking-about-lead-to-media/108980682.

individual or firm providing professional engineering service to the City of Jackson for drinking water matters and provide the name or firm by written notice to the Director of the MSDH Bureau of Public Water Supply on or before February 22, 2016."[64]

203.    In April 2016, Jackson approved a contract with Trilogy Engineering Services to conduct a corrosion control optimization study.[65]

204.    Although the City Council initially rejected Trilogy in a vote on March 10, 2016, the City Council approved the contractor for the project on April 5, 2016 and used an emergency loan from the state to pay for the project.[66]

205.    Trilogy Engineering Services is owned and managed in part by Thessalonian LeBlanc.[67]

206.    LeBlanc held an unreported campaign fundraiser for Yarber in 2014.[68]

207.    Trilogy knew that the services they were to provide for the City were

---

[64] Exhibit 3.

[65] Anna Wolfe, *Jackson Is Still Experiencing Elevated Lead Levels in Water*, *supra* n. 58.

[66] Tim Summers, Jr., *UPDATE: Council Approves Trilogy for Water Corrosion Study; Emergency Loan to Fund It*, JACKSON FREE PRESS, Apr. 5, 2016, https://www.jacksonfreepress.com/news/2016/apr/05/council-rethinking-trilogy-water-corrosion-study-e/.

[67] LeBlanc is not an engineer, but another high-ranking individual at the time, Phillip Gibson, was.

[68] Tim Summers, Jr., *As the Water Turns, City Wrestles Over Corrosion Study*, Jackson Free Press, Mar. 16, 2016, https://www.jacksonfreepress.com/news/2016/mar/16/water-turns-city-wrestles-over-corrosion-study/.

necessary for the continued functioning of its PWS, on which they knew that residents of Jackson depend on. They knew that their work was for the benefit of residents of Jackson and that if their project failed, residents of Jackson would suffer. As a result, and because it is obvious to contractors performing work for a government entity related to its services that this work being requested for the benefit of that government's people, Trilogy's duties of care to the City of Jackson (and related entities) also extended to Plaintiffs (as residents of Jackson).

208.   Trilogy was hired to, among other things, conduct a corrosion control study regarding how to come into compliance with the SDWA.

209.   Trilogy determined in a 2017 report that Jackson must have an 8.6 pH at the point of the distribution system and recommends a calibrated hydraulic model.

210.   At that time, there were reports that public officials suspected that there were technical issues with a pump at the Curtis WTP that "automatically delivers lime feed," which was "used to balance the acidity and alkalinity of the water."[69]

211.   In 2016, it was reported that Jackson had been using solid "lime

---

[69] Anna Wolfe, *Jackson Water Issues Persist, Lead Levels Down*, CLARION-LEDGER, Jun. 2, 2017,
https://www.clarionledger.com/story/news/local/2017/07/03/
jackson-water-issues-persist-lead-levels-down/437239001/.

powder" to treat the water, which had caused "persistent clogging of the underground transportation pipes with the OB Curtis Water Treatment Plant." For that reason, Jackson had shifted away from using the underground pipes and was using above-ground hoses to transport water.[70]

212.    The staff and engineers at Trilogy—particularly Trilogy's chief engineer at that time, Phillip Gibson—were aware of these assessments in 2016.

213.    Indeed, Gibson was previously "discussing possible solutions" with Jackson officials before Trilogy authored the Corrosion Control Plan in 2017, and Gibson in fact mentioned that "a switch to liquid lime treatment might alleviate the clogging issue."

214.    Trilogy completed a "desktop" study of the OB Curtis and JH Fewell Water Treatment Plants.

215.    Trilogy recommended that Jackson use soda ash to control corrosion by raising the pH of the water as it left the City's two water treatment plants.

216.    Trilogy recommended the "[c]onversion of both existing lime silos to feed soda ash" at the OB Curtis Water Treatment Plant.

217.    The City followed this recommendation and "retrofit[ted] the liquid lime system into a system which uses soda ash."[71]

---

[70] Wolfe, *supra* n.32.
[71] Exhibit 2.

218.   As Mayor Defendant Lumumba summarized in 2018: "What we have recently discovered is that the retrofitted system is not an adequate solution to the process. Because we are dealing with a machine that was not intended for the use of soda ash, there has been trouble in terms of soda ash clumping as it leads into the distribution system."[72]

219.   Former Public Works Director Miller would later tell reporters that "the specific challenge faced by the city is that the soda ash being used to control the pH has been particularly difficult to dose in the current system," particularly in light of soda ash's reaction with "high levels of humidity in the air" in Mississippi to "form rock-like clumps that are very difficult to process in the system."

220.   In other words, Trilogy had not accounted for the "clumping" of soda ash because of "the Mississippi humidity," which "jams the feed."[73]

221.   Any reasonable water systems engineer would have understood the unique aspects of Mississippi's environment, including the impact of its humidity on different chemicals.

222.   Any reasonable water systems engineer would have understood the challenges and hazards of attempting to retrofit a liquid lime-based corrosion

---

[72] *Id.*

[73] *Jackson, Miss., Issues Drinking Water Advisory*, WQP MAGAZINE, July 19, 2018, https://www.wqpmag.com/contaminant-removal/jackson-miss-issues-drinking-water-advisory.

control system to a solid soda ash-based corrosion control system—particularly in light of previous internal assessments that the liquid lime system had not been functioning properly.

223.   Trilogy should have understood that these considerations militated in favor of using a liquid lime agent, even if improvements would have been more expensive or improvements to other aspects of the Water Treatment Plant would have been required.

224.   Any reasonable public works director should have understood that these considerations militated in favor of using a liquid lime agent, even if improvements would have been more expensive or improvements to other aspects of the Water Treatment Plant would have been required.

225.   Trilogy knew or should have known that soda ash would likely clump and clog the pipes and pumps, thereby jamming the feed and rendering the corrosion control method essentially inoperative and non-functional.

226.   Trilogy either knew or should have known that if the corrosion control method was inoperative, it would facilitate the flow of water with a lower pH than necessary to prevent corrosion, thereby increasing the amount of lead that can leach from Jackson's water distribution pipes to leach into Jackson's drinking water.

227.   Trilogy nevertheless recommended a switch.

228.    The City of Jackson, which either knew or should have known of the

dangers of this plan, agreed to implement the change to soda ash.

229.    In June 2017, "the average pH of the city's water leaving the treatment

plant was 7.4—lower than it was in February 2016 when the city began examining

the issue."[74]

### J.    The Devastating Health Effects of Lead and Other Exposure

230.    Lead is a toxic metal that causes severe health consequences.

231.    Lead's catastrophic effects are indisputable. According to the EPA,

> "[y]oung children, infants, and fetuses are particularly vulnerable
> to lead because the physical and behavioral effects of lead occur
> at lower exposure levels in children than in adults. A dose of lead
> that would have little effect on an adult can have a significant
> effect on a child. In children, low levels of exposure have been
> linked to damage to the central and peripheral nervous system,
> learning disabilities, shorter stature, impaired hearing, and
> impaired formation and function of blood cells."

232.    According to the World Health Organization,

> "lead affects children's brain development resulting in reduced
> intelligence quotient (IQ), behavioral changes such as
> shortening of attention span and increased antisocial behavior,
> and reduced educational attainment. Lead exposure also causes
> anemia, hypertension, renal impairment, immunotoxicity and
> toxicity to the reproductive organs. The neurological and
> behavioral effects of lead are believed to be irreversible."

233.    The behavioral effects of lead poisoning in children cannot be

overstated. According to many of the leading researchers on lead, increased lead

---

[74] Wolfe, *Jackson Water Issues Persist, Lead Levels Down*, *supra* n.69.

levels in childhood are associated with an increased likelihood of ADHD

behaviors, delinquent behaviors, and arrests, including arrests involving violent

offenses.

234.    Lead is so harmful that, according to the EPA, "ingestion of lead can

cause seizures, coma and even death."

235.    The effects of lead exposure are long lasting. The EPA has explained:

> "Lead can accumulate in our bodies over time, where it is
> stored in bones along with calcium. During pregnancy, lead is
> released from bones as maternal calcium and is used to help
> from the bones of the fetus. This is particularly true if a woman
> does not have enough dietary calcium. Lead can also cross the
> placental barrier exposing the fetus to lead. This can result in
> serious effects to the mother and her developing fetus,
> including: reduced growth of the fetus [and] premature birth."

236.    Lead is also harmful to adults. The EPA warns that "[a]dults exposed

to lead can suffer from: Cardiovascular effects, increased blood pressure and

incidence of hypertension, [d]ecreased kidney function, [and] [r]eproductive

problems (in both men and women)."

237.    The costs of lead poisoning are real and substantial. It has been

estimated that each case of childhood lead poisoning leads to $5.9 million in

medical care costs over the course of appropriate treatment.[75]

---

[75] Leonardo Trasande & Yinghua Liu, *Reducing The Staggering Costs Of Environmental Disease In Children, Estimated At $76.6 Billion In 2008*, 30 HEALTH AFFAIRS, 863-70 (2011).

238.    The World Health Organization explains that the direct medical costs of lead exposure include treatment for acute lead poisoning (typically chelation therapy), as well as the treatment of cardiovascular disease in adults who develop hypertension following lead exposure.

239.    Given the long-lasting risks of lead exposure and the potential for lead sediment to be disturbed and re-mobilized into the PWS, Plaintiffs will require regular medical and tap water testing and evaluation, at bare minimum, in accordance with government standards.

240.    As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered extreme emotional distress.

241.    Like lead, E. Coli, Cryptosporidium, and Giardia are hazardous to children, with risks of significant health complications, expensive screenings and treatments, and emotional distress.

242.    Jackson's most vulnerable, its children, have suffered the most disastrous consequences from lead, E. Coli, and other contaminant exposure— diminished potential over the entire course of their lives.

243.    The World Health Organization states that "[t]hese costs are sometimes referred to as lost opportunity costs . . . When exposure to lead is widespread in a society, the aggregate loss of intelligence (and thus economic productivity) can be substantial."

244.  Notably, this estimate is conservative because it relates solely to lost earning potential and does not include costs related to special educational, medical, sociological, disability and occupational services, or long-term monitoring and treatment costs.

245.  Other researchers have estimated the economic impact of childhood lead poisoning to be as high as $50.9 billion per year in lost economic productivity resulting from reduced cognitive potential from preventable childhood lead exposure.[76]

246.  As a direct and proximate result of Defendants' conduct, Jackson's children, including Plaintiffs, have suffered specific, measurable damages in the form of lost earning potential. They have also incurred damages in the form of required special educational, medical, sociological, occupational and disability services and related education assistance programs.

## III.  Lack of Water Access

### A.  Jackson's Dilapidated PWS Collapses.

247.  Jackson's PWS has been on the brink of total failure for years. Indeed, the recent crises are not the first occasion in which the system shutdown completely. For example, in the winter of 2021, numerous of Jackson's pipes and water mains burst. Although they burst during winter storms, the system would not

---

[76] *Id.*

have failed if had been properly maintained, staffed, and updated to meet the needs of Jackson's residents.[77] When the mains and pipes burst, tens of thousands of Jackson residents lost access to water in their homes for several weeks.

248.    After this crisis, Defendants were acutely aware of problems that would later contribute to the 2022 failures and potential solutions to them. But they did not fix the system.

249.    Key component of Jackson's PWS that play crucial roles in delivering water to its residents are inadequate, poorly maintained, and understaffed. This includes Jackson's water treatment facilities, water pumps, water mains, water pipes, and other equipment and infrastructure.

250.    Defendants have not made repairs necessary to the continued functioning of the PWS, or maintained it properly, leaving it dependent on decayed equipment and structurally fragile.[78] For example, as confirmed recently by state officials, the motors and water screens in the systems pumps are in dire need of repair.[79] And, as highlighted repeatedly by the EPA, the system has faulty

---

[77] Breslow, *supra*; Benji Jones, How Jackson, Mississippi, Ran Out of Water, VOX. Sept. 1, 2022, https://www.vox.com/2022/8/31/23329604/jackson-mississippi-water-crisis.

[78] Anisha Kohli, Jackson, Mississippi Has No Safe Tap Water for the Foreseeable Future. It's a Crisis Decades in the Making, TIME MAGAZINE, Aug. 30, 2022, https://time.com/6209710/jackson-mississippi-water-crisis/

[79] Jones, *supra*.

monitoring equipment, key components of which have been "nonfunctional for several years."[80]

251.    Jackson's PWS has also not been adapted to current needs and is not staffed by sufficient employees who are actually qualified and properly trained to operate all of the components of the system.[81] Because staff are not qualified to operate all of the equipment, some components and devices that are managed by unqualified staff have been configured improperly for long periods of time, degrading the equipment, stressing other parts of the network, and reducing the resilience and functionality of the entire PWS. For example, the EPA has cited Jackson for monitoring equipment that has not been repaired or calibrated in three years because a necessary technician position working with that equipment has gone unfilled during that time.[82]

252.    Jackson's antiquated PWS has also consistently failed to treat water properly, resulting in recurring "boil-water advisories," instructing citizens to boil for 1-3 minutes any water that they plan to drink, brush their teeth with, or use in

---

[80] Kohli, *supra*; United States Environmental Protection Agency Region 4, *Safe Drinking Water Act Compliance Investigatio*n, Letter to Mayor Lumumba (March 30, 2020), https://www.epa.gov/system/files/documents/2021-07/neic-civil-investigation-report_city_of_jackson-public-water-system.pdf.
[81] Kohli, *supra*.
[82] Exhibit 1 at 6.

cooking.[83]

253.    Residents in Jackson have become "tragically numb" to the repeated issuances of such advisories, which have been issued with increasing frequency.[84] Dozens of such notices were issued in 2021 alone.[85] Shortly before one recent shutdown, the State of Mississippi had issued a boil-water advisory in July 2022.[86] The City of Jackson made multiple attempts to lift the advisory, which requires testing samples from 120 different sites throughout the city and obtaining clear results for two days.[87] But each time the City began running tests it encountered too many "cloudy" samples that were likely to contain disease-causing pathogens.[88]

254.    In July 2022, the main water pumps at Curtis WTP failed. Upon information and belief, this occurred because they were inadequate, not properly repaired and maintained, and not staffed adequately.

255.    This forced the Curtis WTP to shift to a backup pump. After working for several weeks to fix the main pump, Curtis WTP employees claimed in mid-August that one of the main pumps was a few days from returning to regular

---

[83] Breslow, *supra*.
[84] Kohli, *supra*.
[85] Kohli, *supra*.
[86] Kohli, *supra*.
[87] Kohli, *supra*.
[88] Kohli, *supra*.

operations. But they were ultimately not able to return it to regular operations during that period, or in the two weeks that followed.

256.   Defendants knew or should have known that Curtis WTP's backup pump had many of the same problems as the main pump, and could not maintain the water supply for a long period of time.

257.   During this period, Jackson's secondary water treatment plant, Fewell WTP, was also experiencing problems with its pumps that result from similarly inadequate equipment, lack of repair and maintenance, and understaffing.[89] For similar reasons, it was also unable to increase its output to fill gaps in the system.[90]

258.   By August 29, 2022, that pump was no longer able to function, and, upon information and belief, may have malfunctioned.[91] When the backup pump went offline, water pressure thorough the system plummeted, effectively shutting down access to running water in Jackson.

259.   For an extended period of time after that, residents of Jackson lacked access to running water, creating a humanitarian crisis.

260.   Commenting on all of the warning signs, Governor Reeves stated that

---

[89] Jones, *supra*.
[90] Jones, *supra*.
[91] Jones, *supra*; State Health Officer Issues Emergency Order Regarding City of Jackson Water, MSDH News Release, Aug. 30, 2022, https://msdh.ms.gov/msdhsite/_static/23,24664,341.html.

"[i]t was a near certainty that Jackson would begin to fail to produce running water sometime in the next several weeks or months if something didn't materially improve[.]"[92]

261.   By the end of 2022, federal authorities stepped in to take over management of the system.

262.   In December 2022, poorly maintained water lines were unable to withstand winter temperatures leading to bursts, plant slowdowns, a boil water notice, and another shutdown of the water supply.

263.   Although these mechanical failures highlight additional ways in which Defendants failed the residents of Jackson, this crisis is intertwined with its water contamination problems. At the most basic level, both sets of problems are at least in part caused by inadequate equipment, repair and maintenance, and staffing. But water contamination also contributes to the failure of a PWS by exacerbating structural fragilities in failing equipment.[93] When a system has more contaminated water, its water processing facilities and pumps have to do more work, which strains key points of failure in the network as well as the system as a whole.

---

[92] Breslow, *supra*.
[93] Kohli, *supra*.

**IV.    EPA Investigations Provided Ample Notice and Confirm Defendants' Failures to Act.**

   **A.    The March 2020 Emergency Administrative Order.**

264.    The EPA has been closely monitoring Jackson's failing PWS for years. It has identified contamination, faulty equipment, dilapidated infrastructure, operations and maintenance problems, and inadequate processes on numerous occasions at the Curtis and Fewell WTP, the groundwater portion of the system, and throughout the PWS.

265.    On or around February 3–7, 2020, the EPA National Enforcement Investigations Center (NEIC) conducted a SDWA compliance inspection of the Jackson's PWS.[94] This inspection was two-pronged, consisting of an extensive review of the city's historical compliance data and an on-site inspection of the PWS.[95]

266.    During this process, NEIC inspectors held at least two meeting with Defendant Miller, including at the beginning and end of the investigation.[96] They sent a report of the inspections to Defendants, including Defendants Miller and

---

[94] U.S. Environmental Protection Agency Region 4, NEIC Civil Investigation Report, Case Number: EICVP1369E01 (March 30, 2020), at 1, attached as Exhibit 7 and incorporated as if fully stated herein.
[95] *Id.* at 5
[96] *Id.* at 8.

Lumumba.[97]

267.  On March 27, 2020, the EPA Region 4 issued an Emergency

Administrative Order.[98]

268.  The Emergency Administrative Order indicates that EPA Region 4

determined that Jackson's PWS has "numerous SDWA violations," including

violations of the National Primary Drinking Water Regulations.[99]

269.  The Cover Letter accompanying the Emergency Administrative Order

notes that the Order is "[b]ased on observations made by the EPA during its

inspection conducted the week of February 3, 2020 and review of the documents

provided by [Jackson] in response to the EPA's request for information . . . ."[100]

According to the emergency order, that information indicated that "conditions exist

at the system that present an imminent and substantial endangerment to the persons

served by the system."[101]

270.  The EPA identified numerous violations that contributed to these

conditions, such as monitoring equipment had not been repaired or calibrated in

three years because a necessary technician position had gone unfilled during that

---

[97] *Id.* at 1.
[98] Exhibit 1.
[99] *Id.* at 4.
[100] *Id.* at 2.
[101] *Id.*

time.[102] Other components of the PWS were also not staffed by operators or other employees with adequate qualifications and training, resulting in significant problems with the equipment and its operation.

271.    The unrepaired and/or un-calibrated monitoring machines were pH meters. As a result, "readouts from the continuous pH meters are off by up to 2 units in some instances."[103]

272.    The EPA also found that Jackson "conducts membrane cleaning cycles without the use of automatic monitoring equipment for pH and chlorine levels. . . . [Membrane cleaning is partially dependent on pH, requiring either higher or lower pH cleaning regimes based on the foulants present. The automatic monitoring equipment has been nonfunctional for several years."[104]

273.    The EPA also found that Jackson failed to:[105]

    a.    implement lead and copper tap water monitoring requirements, including materials evaluation conditions and sample collection procedures;

    b.    provide documentation regarding the change in source from groundwater to surface water, and associated disinfection differences;

---

[102] *Id.* at 6.

[103] *Id.*

[104] *Id.*

[105] *Id.* at 6–8.

c.      conduct required public education tasks or provide required

consumer notifications related to lead action level exceedances;

d.      implement a lead service line replacement program or even

complete a materials evaluation to identify potential lead service lines;

e.      provide lead and copper results for both monitoring periods in

its consumer confidence reports for the years 2016 or 2018;

f.      properly operate, or even calibrate—for approximately three

years—continuous turbidity monitoring equipment and report

individual filter turbidity exceedances for January 2020 from the

Curtis WTP;

g.      keep UV disinfection devices online and operating properly;

h.      maintain residual disinfectant levels (MRDLs) for chloramines

at the Curtis and Fewell WTPs within prescribed limits;

i.      maintain the infrastructure supporting the distribution system

and storage tanks;

j.      maintain the continuous monitoring equipment at the Curtis

WTP in operable condition, and properly calibrated, such that it could

provide reliable readings.

274.   As a result of these findings, the EPA ordered Jackson to take action

to ensure the safety of its drinking water.[106] This included:

      a.     Developing and implementing a plan to address al monitoring equipment and appurtenant treatment equipment repairs and/or replacements;

      b.     Addressing dosing processes for disinfection and pH control;

      c.     Developing and implementing a plan to provide alternative drinking water when specific triggers are met;

      d.     Take additional total coliform bacteria samples under prescribed conditions.

275.   Notwithstanding the severity of findings, and longstanding nature of these problems, Jackson did not reveal the Emergency Administrative Order to Jackson's citizens and water users for a year.

276.   Even when the Emergency Administrative Order and related emails and communications were sought pursuant to the Mississippi Open Records Act in the spring of 2021, Jackson resisted disclosing the materials.

277.   Jackson City Council member Ashby Foote observed that "the unwillingness of the city to share with citizens information related to safe drinking water is very troubling."[107]

---

[106] *Id.* at 9–14.

[107] *Jackson Won't Release Email About 2020 Water System Problems,* AP, Apr. 19, 2021, https://apnews.com/article/technology-mississippi-jackson-email-environment-360cd6c5d51adec308a635728fb31ae3.

278.    Foote also said: "An emergency administrative order was issued by the EPA, which is a formal document with a long list of things that needs to do, and we were not informed that it had been issued. And we had those responsibilities dictated by the EPA. So I was very disappointed when I found out a week ago that this was this has been around for a year, and we had not been notified of it."[108]

### B.    Jackson's Water Is Still Not in Compliance with Federal Law, and the City Has Not Taken Any Serious Steps to Come into Compliance over Several Years.

279.    Even when it flows, Jackson's water remains unsafe to this day.

280.    In a May 12, 2021 notice, the City of Jackson admitted to its water users that "[d]uring the monitoring periods of 2018, 2019, 2020, and 2021, we failed to consistently meet treatment technique requirements for our system which is a violation of the Lead and Copper Rule and a requirement of the City's Optimized Corrosion Control Plan."[109]

281.    From June 21, 2015, to May 28, 2021, Jackson sampled its water for lead 1,352 times. According to records examined by the Clarion Ledger, of those

---

[108] Kayla Thompson, *Jackson City Council Reacts to EPA Report on City's Water System*, WJTV News, Apr. 14, 2021, https://www.wjtv.com/news/jackson-city-council-reacts-to-epa-report-on-citys-water-system/.

[109] City of Jackson, *Consumer Notice Regarding Your Drinking Water*, attached hereto as Exhibit 4 and incorporated as if fully stated herein.

samples 66% contained lead.[110]

282.    On or about April 27, 2021, the EPA issued a Notice of Violation to

Jackson.[111]

283.    In the April 27, 2021 Notice of Violation, the EPA stresses that in

numerous ways Jackson's PWS is currently deficient and not in compliance with

federal law.

284.    In particular, the April 27, 2021 Notice of Violation noted that:

"As a result of the June 2015 lead [action level exceedance], the City
conducted an optimal corrosion control treatment (OCCT) study
between October 2016 and April 2017 and provided the recommended
treatment to MSDH on June 13, 2017. MSDH concurred with the
recommended treatment and provided a deadline of May 31, 2019 to
complete source water treatment installation. Although MSDH later
extended the completion date to December 2019, this deadline has
remained unmet throughout 2020 and into 2021, and the City has
failed to install OCCT at the Fewell WTP as of the date of this
Notice."

285.    Jackson is currently under an EPA emergency order, meant to prevent

"an impending dangerous condition from materializing or reduce or eliminate a

---

[110] Joyce Orlando, What to Know Jackson, MS Water Crisis: State of Emergency,
Biden Addresses, Boil Advisory, CLARION-LEDGER, August 31 2022,
https://www.clarionledger.com/story/news/local/2022/08/31/whats-happening-
jackson-ms-water-crisis-state-of-emergency/65466166007/
[111] Letter from Carol Kemker, Director, EPA Region 4 Enforcement and
Compliance Assurance Div., to the Hon. Chokwe A. Lumumba, Mayor of the City
of Jackson re Notice of Noncompliance (Apr. 27, 2021), attached hereto as Exhibit
5 and incorporated as if fully stated herein.

dangerous situation."

286.   Jackson has persistently failed to employ sufficient trained staff at its water treatment facilities is partially responsible for the City of Jackson's failure to provide safe drinking water.[112]

287.   For example, as of June 29, 2021, "there [were] only two full-time operators and one part-time operator at O.B. Curtis and five at J.H., compared to about 12 total in past years."[113]

288.   Mayor Defendant Lumumba is aware of the staffing shortfalls and has the power to ensure that sufficient staff are available.

289.   However, Mayor Defendant Lumumba has consistently not taken appropriate actions to ensure that sufficient staff are available to provide Jackson's citizens with clean and safe drinking water.

290.   Ultimately, "[s]ince the 2015 and 2016 lead exceedances, EPA identified 1,476 days during which the city failed to comply with 'proper treatment

---

[112] Wilson, *supra* n.54; Nick Judin, *EPA Tours Jackson Water Treatment Plants As City Faces Long Road To Rehab*, MISSISSIPPI FREE PRESS, July 26, 2021, https://www.mississippifreepress.org/14050/epa-tours-jackson-water-treatment-plants-as-city-faces-long-road-to-rehab/.

[113] Justin Vicory, *EPA and Jackson Mayor's Office Have a Plan for Fixing City's Long-Running Water Woes*, CLARION-LEDGER, June 30, 2021, https://www.clarionledger.com/story/news/2021/06/30/councilmembers-study-epa-mayors-plan-fix-jacksons-water-system/7794448002/.

technique requirements.'"[114]

291.   "Put another way, over the last five-and-a-half years, the city's drinking water hasn't met the minimum quality requirements for four of those years."[115]

## V.   Named Plaintiffs' Allegations.

### A.   Priscilla Sterling

292.   Ms. Sterling has lived in Jackson, Mississippi for almost 30 years.

293.   She works as a school teacher at Murrah High School in Jackson, Mississippi.

294.   She and her family own property in Jackson, Mississippi.

295.   That property is connected to the Jackson PWS and receives water from the Jackson PWS.

296.   Her household includes her mother, step-father, disabled daughter, grandson (6), and on some occasions her son.

297.   She pays the water bill for her family's property in Jackson, Mississippi.

298.   For many years, the family regularly consumed drinking water from

---

[114] Judin, *supra* n.112.

[115] Lee O. Sanderlin, *'We See the Threat:' EPA Gives Jackson Timeline to Begin Addressing City's Water Issues*, CLARION-LEDGER, July 22, 2021, https://www.clarionledger.com/story/news/2021/07/22/environmental-protection-agency-jackson-miss-water-issues/8056918002/.

the Jackson PWS.

299.    They also regularly cooked, bathed, and brushed their teeth with PWS water.

300.    They were not aware of the severe latent lead hazards lurking in her tap water that are described in this complaint.

301.    Plaintiff regularly watched, read, and listened to local news, including on networks such as WLBT News, WAPT News, WJTV News, MSNBC, as well as web and print news sources such as the Jackson Advocate, the Clarion Ledger, and the Associated Press. For example, she was aware of and complied with the City's boil water notices.

302.    Plaintiff and her family continued to use PWS water due to public representations made by City officials that PWS water was safe to use and was not harmful to human health.

303.    Had Plaintiff been advised by the City to not drink or use the municipal water, she would have immediately stopped consuming the water and switched her and her family to using bottled water for drinking, cooking, bathing, washing dishes, and brushing their teeth.

304.    Plaintiff and her family are exhibiting effects of lead-poisoning or other water contamination. Several of her children have been diagnosed with lead poisoning. She suffers from headaches. Her 24-year old daughter has a learning

disability and reoccurring yeast infections. The entire household has experienced frequent episodes of unexplained itching. They attempted to have their water tested for lead and other contaminants but have not been able to obtain assistance in setting up a test.

305.   Each of these issues was caused by exposure to lead or other contaminants from Jackson's tap water during the relevant time period.

306.   Plaintiff will continue to manifest new and worsening symptoms in the future and will face a lifetime of hardship, decreased earning capacity, and emotional distress.

307.   Plaintiff and her family depend on Jackson's PWS for access to water. When the PWS cannot deliver water, Plaintiff cannot readily go about normal daily activities like using the bathroom, brushing her teeth, and cooking. This causes Plaintiff significant hardship, loss of income, and emotional distress.

### B.   **Raine Becker**

308.   Ms. Becker has lived in Jackson, Mississippi for two years.

309.   As a single mother, she works three jobs. Her income has decreased in each of her jobs as a direct result of water crisis.

310.   She rents property in Jackson, Mississippi.

311.   That property is connected to the Jackson PWS and receives water from the Jackson PWS.

312.   Her household includes her and her 7-year old son, who is terminally ill and has a feeding tube that requires clean sanitary water to flush.

313.   She pays the water bill for her family's property in Jackson, Mississippi.

314.   For two years, the family regularly consumed drinking water from the Jackson PWS.

315.   They also regularly cooked, bathed, and brushed their teeth with PWS water. They stopped using the water at the end of August when news spread about the water being unsafe for human use. Until then, they were not aware of the severe latent lead hazards and other contaminants lurking in the tap water that are described in this complaint.

316.   Plaintiff regularly watched, read, and listened to local news. For example, she was aware of and complied with the City's boil water notices.

317.   Plaintiff and her family continued to use PWS water due to public representations made by City officials that PWS water was safe to use and was not harmful to human health. Specifically, Plaintiff relied on statements made by Mayors Lumumba and Yarber on the television network WLBT, in articles that she read online, and during town hall meetings, which she watched on Facebook. Plaintiff also recalls hearing City officials state that the situation in Jackson was not comparable to the water crisis that occurred in Flint, Michigan.

318.    Had Plaintiff been advised by the City to not drink or use the municipal water, she would have immediately stopped consuming the water and switched her and her son to using bottled water for drinking, cooking, bathing, washing dishes, and brushing their teeth.

319.    Plaintiff and her son depend on Jackson's PWS for access to water. When the PWS cannot deliver water, Plaintiff cannot readily go about normal daily activities like using the bathroom, brushing her teeth, and cooking. This causes Plaintiff significant hardship, loss of income, and emotional distress.

320.    Plaintiff's income has been directly impacted by the water crisis.

321.    Plaintiff's main source of income is working for Hampr, a business that offers laundry pick-up and delivery services. Without clean water with which to wash customers' clothes, Plaintiffs' livelihood has been harmed.

322.    Plaintiffs other two jobs are delivering food on demand through two different food delivery apps. Without clean water with which to cook and wash dishes, restaurants in Jackson have suffered. As a result, Plaintiff must drive outside of Jackson in order to find food delivery gigs. Driving outside of Jackson to find work takes more time and requires more gasoline.

323.    Without access to clean water, Plaintiff will continue to face hardship, decreased earning capacity, and emotional distress.

C.    **Shawn Miller**

324.    Mr. Miller has lived in Jackson, Mississippi his entire life.

325.    He is employed as an engineer and is also a student at Jackson State University.

326.    He and his family own their property in Jackson, Mississippi and have lived in their home for over four years. Before their current home, he and his family lived in other homes in Jackson, Mississippi.

327.    His property was built in 1979 and the pipes were replaced in 2018 during a remodel.

328.    His property is connected to the Jackson PWS and receives water from the Jackson PWS.

329.    His household includes his wife and two minor children. They have all lived their entire lives in Jackson, Mississippi.

330.    He pays the water bill for his family's home in Jackson, Mississippi.

331.    For many years, the family regularly consumed drinking water from the Jackson PWS.

332.    They also regularly cooked, bathed, and brushed their teeth with PWS water.

333.    They were not aware of the severe latent lead hazards lurking in his tap water that are described in this complaint.

334.    Plaintiff regularly watched, read, and listened to local news. For example, he was aware of and complied with the City's boil water notices.

335.    Plaintiff and his family continued to use PWS water due to public representations made by City officials that PWS water was safe to use and was not harmful to human health. Specifically, Plaintiff relied on statements made by Mayors Lumumba and Yarber on the television network WLBT, on Facebook through the City's posts and articles that his friends and family posted, and during town hall meetings, which he attended in person. Plaintiff also recalls hearing Defendant Lumumba emphasize that the situation in Jackson was not comparable to the water crisis that occurred in Flint, Michigan.

336.    Had Plaintiff been advised by the City to not drink or use the municipal water, he would have immediately stopped consuming the water and switched him and his family to using bottled water for drinking, cooking, bathing, washing dishes, and brushing their teeth.

337.    Plaintiff and his family are exhibiting effects of lead-poisoning or other water contamination. Mr. Miller has suffered from headaches since August 2022.

338.    Each of these issues was caused by exposure to lead or other contaminants from Jackson's tap water during the relevant time period.

339.    Plaintiff will continue to manifest new and worsening symptoms in

the future and will face a lifetime of hardship, decreased earning capacity, and emotional distress.

340.   Plaintiff and his family depend on Jackson's PWS for access to water. When the PWS cannot deliver water, Plaintiff cannot readily go about normal daily activities like using the bathroom, brushing his teeth, and cooking. This causes Plaintiff significant hardship, loss of income, and emotional distress.

### D.   **John Bennett**

341.   Mr. Bennett has lived in Jackson, Mississippi for over three years.

342.   He is self-employed doing yard maintenance work.

343.   He and his household rent their home in Jackson, Mississippi.

344.   His home is connected to the Jackson PWS and receives water from the Jackson PWS.

345.   His household includes his girlfriend and her father, who have lived their entire lives in Jackson, Mississippi.

346.   He contributes to the water bill for his home in Jackson, Mississippi.

347.   For many years, his household regularly consumed drinking water from the Jackson PWS.

348.   They also regularly cooked, bathed, and brushed their teeth with PWS water.

349.   They were not aware of the severe latent lead hazards lurking in his

tap water that are described in this complaint.

350.   Plaintiff regularly watched, read, and listened to local news. For example, he was aware of and complied with the City's boil water notices.

351.   Plaintiff and his household continued to use PWS water due to public representations made by City officials that PWS water was safe to use and was not harmful to human health. Specifically, Plaintiff relied on statements made by Mayors Lumumba and Yarber on the television network WLBT, in articles that he read online, and on Facebook through the City's posts. Plaintiff also recalls hearing City officials state that the situation in Jackson was not comparable to the water crisis that occurred in Flint, Michigan.

352.   Had Plaintiff been advised by the City to not drink or use the municipal water, he would have immediately stopped consuming the water and switched him and his household to using bottled water for drinking, cooking, bathing, washing dishes, and brushing their teeth.

353.   Plaintiff and his household are exhibiting effects of lead-poisoning or other water contamination.

354.   These issues were caused by exposure to lead or other contaminants from Jackson's tap water during the relevant time period.

355.   Plaintiff will continue to manifest new and worsening symptoms in the future and will face a lifetime of hardship, decreased earning capacity, and

emotional distress.

356.   Plaintiff and his household depend on Jackson's PWS for access to water. When the PWS cannot deliver water, Plaintiff cannot readily go about normal daily activities like using the bathroom, brushing his teeth, and cooking. During the August 2020 water shutdown in Jackson, Plaintiff and his household had to move out of their home for over a week as they did not have access to water. This causes Plaintiff significant hardship, loss of income, and emotional distress.

## CLASS ALLEGATIONS

### A.   Class Definition

357.   Pursuant to the provisions of the Federal Rule of Civil Procedure 23, Plaintiffs bring this action on behalf of themselves and a Jackson Resident Class (collectively, "the Class"), defined as:

**Jackson-Area Resident Class**

358.   All persons who resided in Hinds County and have been exposed to water from Jackson's Public Water System anytime from January 1, 2009 to present.

359.   Excluded from the Class are (1) the Defendants in this action (and their officers, directors, agents, employees, and members of their immediate families), and any entity in which the defendants have a controlling interest, and the legal representatives, heirs, successors and assigns of defendants, and

(2) the judicial officers to whom this case is assigned, their staff, and the members of their immediate families.

360.    Plaintiffs reserve the right to revise the Class definition, including proposing subclasses of Plaintiffs, based upon information learned through discovery, and as determined by the Court in its discretion.

**B.    Class Certification Requirements: Federal Rule of Civil Procedure 23**

361.    This action has been brought and may be properly maintained on behalf of the Class proposed herein under Federal Rule of Civil Procedure 23.

362.    ***Numerosity: Rule 23(a)(1).*** Jackson is a city with approximately 153,000 residents. The number of individuals who have been exposed to lead and other contaminants in the Jackson water supply is in the thousands. The number of class members is sufficiently numerous to make class action status the most practical method for Plaintiffs to secure redress for violations of their constitutional rights, statutory rights and common law violations, for injuries sustained, including to their bodily integrity and property interest, and class wide equitable relief.

363.    ***Commonality and Predominance: Rules 23(a)(2) and 23(b)(3).*** There are questions of law and fact raised by Plaintiffs' claims common to, and typical of, those raised by the Class they seek to represent against all the Defendants. These questions predominate over any questions affecting individual Class members, including, without limitation:

a.      Whether Defendants engaged in the conduct alleged herein;

b.      Whether Defendants maintained, prolonged, misrepresented or covered up lead, bacteria, and other contaminants in the Jackson public water supply;

c.      Whether Defendants provided sufficient public education and notice about lead, toxic and dangerous bacteria, and other contaminants in the Jackson public water supply;

d.      Whether Defendants violated their obligations under the federal Safe Drinking Water Act and the EPA's Lead and Copper Rule;

e.      Whether Defendants violated Plaintiffs and class members liberty interest to bodily integrity and property interest that is guaranteed by the Due Process clause of the Fourteenth Amendment to the United States Constitution

f.      Whether government Defendants acted pursuant to a policy or practice;

g.      Whether Defendants' conduct violated the Class's civil rights;

h.      Whether private Defendants' conduct constituted professional and/or simple negligence;

i.      Whether Plaintiffs and other Class members are entitled to equitable relief, including but not limited to, declaratory and injunctive relief;

j.      Whether Plaintiffs and the other Class members are entitled to

damages and other monetary relief, and, if so, in what amount.

364. ***Typicality: Rule 23(a)(3).*** The violations of law including constitutional violations and resulting harm stated by the Named Plaintiffs are typical of the legal violations and harm suffered by all Class members, including but not limited to, non-economic injury and economic injury.

365. ***Adequacy: Rule 23(a)(4).*** Plaintiffs will fairly and adequately protect the interests of the Class Members. Plaintiffs' counsel are not aware of any conflicts of interest between Plaintiffs and absent class members with respect to the matters at issue in this litigation; Plaintiffs will vigorously prosecute the suit on behalf of the Class; and Plaintiffs are represented by counsel with experience in class actions and experience in cases with environmental contamination, including lead. Plaintiffs are represented by attorneys with substantial experience and expertise in complex and class action litigation, including matters involving constitutional violations of bodily integrity and property interests. Class counsel has identified and thoroughly investigated all claims in this action and has committed sufficient resources to represent the Plaintiffs and Class Members.

366. ***Superiority: Rule 23(b)(3).*** The maintenance of the action as a class action will be superior to other available methods of adjudication and will promote the convenient administration of justice. Moreover, the prosecution of separate actions by individual members of the Class could result in

inconsistent, or varying adjudications, with respect to individual members of the Class and/or one or more of the Defendants.

367.   Even if Class Members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and it increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

368.   ***Declaratory and Injunctive Relief: Rule 23(b)(2).*** Defendants have acted or failed to act on grounds generally applicable to all Plaintiffs, necessitating a remedy which is overarching in its scope for declaratory, equitable and injunctive relief for the Plaintiffs and Class Members.

369.   ***Issue Classes: Rule 23(c)(4)*** The claims of Class Members include common issues whose efficient adjudication in a class proceeding would materially advance the litigation and aid in achieving judicial economy and efficiency.

## CLAIMS FOR RELIEF

### COUNT I: 42 U.S.C. § 1983 – FOURTEENTH AMENDMENT SUBSTANTIVE DUE PROCESS – BODILY INTEGRITY AGAINST DEFENDANTS THE CITY OF JACKSON, LUMUMBA, YARBER, POWELL, MILLER, AND SMASH

370.   Plaintiffs incorporate by reference all allegations between paragraph one and the beginning of the claims for relief section as if fully stated herein.

371.   Plaintiffs have a clearly established fundamental right under the substantive due process clause of the Fourteenth Amendment to the United States Constitution to bodily integrity.

372.   The conduct of Defendants, all while acting under color of law, endangered and/or threatened Plaintiffs' fundamental liberty interest to bodily integrity as guaranteed by the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

373.   Jackson assumed a duty to deliver a basic human need to Plaintiffs as the primary provider of potable water in the City. Despite that duty, Defendants knew that they were delivering contaminated water to Plaintiffs' taps.

374.   Defendants were aware that their conduct could result in the deprivation of Plaintiffs' fundamental due process rights to bodily integrity.

375.   Defendants deliberately and knowingly breached the constitutionally protected bodily integrity of Plaintiffs by creating and perpetuating the ongoing exposure to contaminated water, with deliberate indifference to the known risks of harm which said exposure would, and did, cause to Plaintiffs.

376.   Defendants deliberately and knowingly breached the constitutionally protected bodily integrity of Plaintiffs by denying and obstructing Plaintiffs' access to safe drinking water.

377.   Defendants had the opportunity to reflect and deliberate before they

acted and/or failed to act.

378.    As a direct and proximate result of the unconstitutional acts of Defendants as alleged in this Complaint, Plaintiffs have suffered violations of Plaintiffs' fundamental right to bodily integrity, property and liberty interests, including, but not limited to:

    a.    Serious and in some cases life-threatening and irreversible bodily injury;

    b.    Substantial economic losses from medical expenses, lost wages, lost income, lost business profits, reduced property values, among others;

    c.    Pain and suffering;

    d.    Embarrassment, outrage, mental anguish, fear and mortification, and stress related physical symptoms.

379.    The conduct of Defendants was both reckless and outrageous, entitling Plaintiffs to an award of punitive damages, as well as costs and reasonable attorney fees, pursuant to 42 U.S.C. §1988.

## COUNT II: 42 U.S.C. § 1983 – FOURTEENTH AMENDMENT SUBSTANTIVE DUE PROCESS – STATE CREATED DANGER AGAINST DEFENDANTS THE CITY OF JACKSON, LUMUMBA, YARBER, POWELL, MILLER, AND SMASH

380.    Plaintiffs incorporate by reference all allegations between paragraph one and the beginning of the claims for relief section as if fully stated herein.

381.    Plaintiffs have a clearly established right under the substantive due

process clause of the Fourteenth Amendment to the United States Constitution to be protected from risks, dangers, dangerous situations, or being made more vulnerable to increased risk of harms, affirmatively created and/or caused by persons acting under color of state law.

382.    Defendants, while acting under color of state law, affirmatively created or exacerbated the dangers and dangerous situations to which Plaintiffs were exposed, making Plaintiffs more vulnerable to said dangers, and these Defendants did so with an extreme degree of culpability.

383.    Defendants, while acting under color of state law, affirmatively continued, increased and perpetuated the dangers, risks of harm and dangerous situations creating the public health crisis, when they deliberately and affirmatively denied, lied about, covered up, deceived, discredited and ignored said known dangers and risks of harm to which they exposed Plaintiffs making Plaintiffs more vulnerable to said dangers.

384.    Defendants were aware that their conduct could result in the deprivation of Plaintiffs' due process rights to be protected from the dangers, dangerous situations, or being made more vulnerable to the dangers affirmatively created and perpetuated by them.

385.    This conduct was reckless, deliberately indifferent and/or so outrageous as to shock the conscience, such that it was culpable in the extreme,

insofar as these Defendants knew of and disregarded the substantial risk of serious harm to Plaintiffs.

386.    The dangers and risks of harm were discreet and special to Plaintiffs, as a Jackson water users, and not risks affecting the public at large.

387.    The dangers and risks of harm to Plaintiffs from lack of access to water and ongoing exposure to water toxins and contaminants which were created and perpetuated by Defendants, were so extreme as to be equivalent to private acts of violence visited upon them.

388.    These actions of Defendants constituted affirmative acts that caused and/or substantially increased the risks of physical, emotional and economic harm to Plaintiffs.

389.    As a direct and proximate result of the unconstitutional acts of Defendants as alleged herein, Plaintiffs have suffered violations of Plaintiffs' fundamental rights to bodily integrity, property and liberty interests, including, but not limited to:

    a.    Serious and in some cases life-threatening and irreversible bodily injury;

    b.    Substantial economic losses from medical expenses, lost wages, lost income, lost business profits, reduced property values, among others;

    c.    Pain and suffering;

d.      Embarrassment, outrage, mental anguish, fear and

mortification, and stress related physical symptoms.

390.   The conduct of Defendants was reckless and outrageous, entitling

Plaintiffs to an award of punitive damages, as well as costs and reasonable attorney

fees, pursuant to 42 U.S.C. §1988.

## COUNT III: PROFESSIONAL NEGLIGENCE AGAINST TRILOGY

391.   Plaintiffs incorporate by reference all allegations between paragraph

one and the beginning of the claims for relief section as if fully stated herein.

392.   Trilogy undertook, for consideration, to render services for the City of

Jackson, which they should have recognized as necessary for the protection of

Plaintiffs.

393.   Trilogy undertook, for consideration, to perform a duty owed to

Plaintiffs.

394.   Based on its undertaking, Trilogy had a duty to Plaintiffs, as residents

and water users in the City of Jackson, to exercise that degree of care consistent

with the greater degree of knowledge and skill possessed by professionals, as well

as an ethical duty to report to public authorities the dangers posed to public health

and property that would result from the failure to install and/or operate a proper

anti-corrosive treatment for treating Jackson's source of drinking water.

395.   Trilogy also owed a duty to Plaintiffs to notify the proper authorities

of unethical illegal practices of others whose actions or decisions posed threats to public health and property that would result from the failure to install and/or operate a proper anti-corrosive treatment when treating Jackson's drinking water.

396.   Plaintiffs relied on Trilogy to perform the duty to inspect the City's water treatment system, as well as its sources and corrosion control methods, to make sure that it was safe.

397.   Trilogy failed to exercise that degree of care consistent with the greater degree of knowledge and skill possessed by professionals.

398.   Indeed, Trilogy failed to use even reasonable care.

399.   Plaintiffs suffered harm resulting from Trilogy's failures to exercise reasonable care to protect Plaintiffs in its undertaking.

400.   Trilogy's failures to exercise reasonable care to protect Plaintiffs directly and proximately caused the Plaintiffs' injuries and were entirely foreseeable.

401.   As a direct and proximate result of Trilogy's actions and/or omissions, Plaintiffs have been lead poisoned and/or suffered from life threatening Legionella pneumonia, infections, dementia, and have suffered past, present and future personal injuries, including but not limited to: various health problems (including, without limitation, hair loss, skin rashes, digestive and other organ problems), physical pain and suffering, mental anguish, fright and shock, disability, denial of

social pleasures and enjoyments, embarrassment, humiliation, and mortification, medical expenses, wage loss, brain and/or developmental injuries including (without limitation) cognitive deficits and lost earning capacity.

402.   Trilogy's conduct and/or failure(s) to act constitute gross negligence because it was so reckless that they demonstrated a substantial lack of concern for whether an injury would result.

403.   Trilogy's conduct evinces actual malice and/or gross negligence which evidences a willful, wanton or reckless disregard for the safety of others, and so Plaintiffs are entitled to an award of punitive damages.

## COUNT IV: NEGLIGENCE AGAINST TRILOGY

404.   Plaintiffs incorporate by reference all allegations between paragraph one and the beginning of the claims for relief section as if fully stated herein.

405.   Trilogy undertook, for consideration, to render services for the City of Jackson, which they should have recognized as necessary for the protection of Plaintiffs.

406.   Trilogy undertook, for consideration, to perform a duty owed to Plaintiffs.

407.   Based on its undertaking, Trilogy had a duty to Plaintiffs, as residents and water users in the City of Jackson, to exercise a reasonable degree of care, as well as an ethical duty to report to public authorities the dangers posed to public

health and property that would result from the failure to install and/or operate a

proper anti-corrosive treatment for treating Jackson's source of drinking water.

408.    Trilogy also owed a duty to Plaintiffs to notify the proper authorities

of unethical illegal practices of others whose actions or decisions posed threats to

public health and property that would result from the failure to install and/or

operate a proper anti-corrosive treatment when treating Jackson's drinking water.

409.    Plaintiffs relied on Trilogy to perform the duty to inspect the City's

water treatment system, as well as its sources and corrosion control methods, to

make sure that it was safe.

410.    Trilogy failed to exercise that degree of reasonable care.

411.    Plaintiffs suffered harm resulting from Trilogy's failures to exercise

reasonable care to protect Plaintiffs in its undertaking.

412.    Trilogy's failures to exercise reasonable care to protect Plaintiffs

directly and proximately caused the Plaintiffs' injuries and were entirely

foreseeable.

413.    As a direct and proximate result of Trilogy's actions and/or omissions,

Plaintiffs have been lead poisoned and/or suffered from life threatening Legionella

pneumonia, infections, dementia, and have suffered past, present and future

personal injuries, including but not limited to: various health problems (including,

without limitation, hair loss, skin rashes, digestive and other organ problems),

physical pain and suffering, mental anguish, fright and shock, disability, denial of social pleasures and enjoyments, embarrassment, humiliation, and mortification, medical expenses, wage loss, brain and/or developmental injuries including (without limitation) cognitive deficits and lost earning capacity.

414.   Trilogy's conduct and/or failure(s) to act constitute gross negligence because it was so reckless that they demonstrated a substantial lack of concern for whether an injury would result.

415.   Trilogy's conduct evinces actual malice and/or gross negligence which evidences a willful, wanton or reckless disregard for the safety of others, and so Plaintiffs are entitled to an award of punitive damages.

## COUNT V: NEGLIGENCE AGAINST DEFENDANTS THE CITY OF JACKSON, LUMUMBA JR., YARBER, POWELL, MILLER, SMASH, AND JOHN DOES 1 THROUGH 20

416.   Plaintiffs incorporate by reference all allegations between paragraph one and the beginning of the claims for relief section as if fully stated herein.

417.   Defendants the City of Jackson, Mayor Lumumba Jr., former Mayor Yarber, former Public Works Director Powell, former Public Works Director Miller, former Interim Public Works Director Smash, and John Does 1 through 20 all owed a duty to exercise reasonable care on behalf of Jackson's residents and water users.

418.    Defendants the City of Jackson, Mayor Lumumba Jr., former Mayor Yarber, former Public Works Director Powell, former Public Works Director Miller, former Interim Public Works Director Smash, and John Does 1 through 20 all undertook, for consideration to perform a duty owed to Plaintiffs by the City of Jackson.

419.    Based on their undertakings, Defendants the City of Jackson, Mayor Lumumba Jr., former Mayor Yarber, former Public Works Director Powell, former Public Works Director Miller, former Interim Public Works Director Smash, and John Does 1 through 20 had a duty to Plaintiffs to exercise reasonable care to protect that undertaking.

420.    Defendants the City of Jackson, Mayor Lumumba Jr., former Mayor Yarber, former Public Works Director Powell, former Public Works Director Miller, former Interim Public Works Director Smash, and John Does 1 through 20 had a duty to Plaintiffs to exercise reasonable care to ensure the provision of, and proper treatment for, safe drinking water drawn from the Jackson public water system's various water sources.

421.    Plaintiffs relied on the Defendants the City of Jackson, Mayor Lumumba Jr., former Mayor Yarber, former Public Works Director Powell, former Public Works Director Miller, former Interim Public Works Director Smash, and John Does 1 through 20 to exercise reasonable care to ensure the provision of, and

proper treatment for, safe drinking water drawn from the Jackson public water system's various water sources.

422.    Plaintiffs relied on Defendants the City of Jackson, Mayor Lumumba Jr., former Mayor Yarber, former Public Works Director Powell, former Public Works Director Miller, former Interim Public Works Director Smash, and John Does 1 through 20 to exercise reasonable care to disclose known hazards in their drinking water.

423.    Defendants the City of Jackson, Mayor Lumumba Jr., former Mayor Yarber, former Public Works Director Powell, former Public Works Director Miller, former Interim Public Works Director Smash, and John Does 1 through 20 failed to exercise reasonable care.

424.    Defendants the City of Jackson, Mayor Lumumba Jr., former Mayor Yarber, former Public Works Director Powell, former Public Works Director Miller, former Interim Public Works Director Smash, and John Does 1 through 20 breached their duties to Plaintiffs in ways including but not limited to the following:

a.    Failure to repair and maintain Jackson's water system;

b.    Failure to obtain adequate equipment for Jackson's water system;

c.    Failure to adequately staff Jackson's water system;

d.     Failure to supply water to Jackson;

e.     Failure to respond to known risks to Jackson's water supply;

f.     Failure to require appropriate corrosion control treatment;

g.     Failing to install, have, maintain, and repair appropriate corrosion control equipment and methods;

h.     Switching the City of Jackson's water to a new source without performing appropriate studies to determine if it was safe under the circumstances;

i.     Failing to warn Jackson's citizens and water users that the City was switching water sources to a source with a much lower pH that would cause lead to leach into drinking water;

j.     Failing to require proper testing of Jackson's water at the Curtis and Fewell WTPs;

k.     Failing to conduct proper testing of Jackson's water at the Curtis and Fewell WTPs;

l.     Failing to require proper testing of Jackson's drinking water;

m.     Failing to conduct proper testing of Jackson's drinking water;

n.     Failing to have, maintain, and repair properly functioning equipment capable of monitoring appropriate pH levels;

o.     Stating that appropriate corrosion control equipment was in use;

p.    Representing that the water was safe to drink when it was really not safe to drink;

q.    Ignoring evidence that Jackson's water was unsafe to drink;

r.    Withholding information that showed that Jackson was not taking steps to ensure its water was safe to drink;

s.    Withholding information that showed that Jackson's water was unsafe to drink; and

t.    Failing to warn Plaintiffs that Jackson's water was not safe to drink.

425.    Plaintiffs suffered harm resulting from the failures to exercise reasonable care of Defendants the City of Jackson, Mayor Lumumba Jr., former Mayor Yarber, former Public Works Director Powell, former Public Works Director Miller, former Interim Public Works Director Smash, and John Does 1 through 20.

426.    Plaintiffs suffered harm from the failure to exercise reasonable care to protect their undertakings of Defendants the City of Jackson, Mayor Lumumba Jr., former Mayor Yarber, former Public Works Director Powell, former Public Works Director Miller, former Interim Public Works Director Smash, and John Does 1 through 20.

427.   Defendants the City of Jackson, Mayor Lumumba Jr., former Mayor Yarber, former Public Works Director Powell, former Public Works Director Miller, former Interim Public Works Director Smash, and John Does 1 through 20 failures to exercise reasonable care to protect their undertakings proximately caused the Plaintiffs' injuries and were entirely foreseeable.

428.   All of the Defendants' conduct and/or failures to act constitute gross negligence and recklessness because the conduct and/or failures to act demonstrate a deliberate disregard of a known risk and a substantial lack of concern for whether injury would result.

429.   Defendants' acts and/or omissions were the proximate cause of the Plaintiffs' injuries.

430.   As a direct and proximate result of the above Defendants' negligent and/or reckless conduct, Plaintiffs have suffered past and present personal injuries, and will with reasonable certainty suffer future personal injuries, including but not limited to: lead poisoning, chemical contamination, disease, malnutrition, brain and/or developmental injuries (including without limitation cognitive deficits, lost earning capacity and aggravation of pre-existing conditions), physical pain and suffering, mental anguish, fright and shock, disability, denial of social pleasures and enjoyments, embarrassment, humiliation, and mortification, medical expenses,

wage loss, and various health problems (including without limitation hair loss, skin rashes, digestive and other organ problems).

431.   Defendants the City of Jackson, Mayor Lumumba Jr., former Mayor Yarber, former Public Works Director Powell, former Public Works Director Miller, former Interim Public Works Director Smash, and John Does 1 through 20 are liable to Plaintiffs for all harms resulting from Defendants' failures to exercise reasonable care.

432.   Defendants the City of Jackson, Mayor Lumumba Jr., former Mayor Yarber, former Public Works Director Powell, former Public Works Director Miller, former Interim Public Works Director Smash, and John Does 1 through 20 acted in the course and scope of their employment.

433.   Defendants the City of Jackson, Mayor Lumumba Jr., former Mayor Yarber, former Public Works Director Powell, former Public Works Director Miller, former Interim Public Works Director Smash, and John Does 1 through 20 pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert and/or conspired with one another in committing and furtherance of the wrongful acts (and omissions) alleged throughout this Complaint.

434.   Defendants the City of Jackson, Mayor Lumumba Jr., former Mayor Yarber, former Public Works Director Powell, former Public Works Director Miller, former Interim Public Works Director Smash, and John Does 1 through 20

are not immune from suit under Miss. Code Ann. § 11-46-5(1), and no exception in

Miss. Code Ann. § 11-46-9 applies.

435.   Plaintiffs have served a notice of Plaintiffs' negligence claim pursuant

to Miss. Code Ann. § 11-46-11(3) on or about October 31, 2022.

## **DEMAND FOR JURY TRIAL**

436.   Plaintiffs demand trial by jury in this action of all issues so triable.

## **RELIEF REQUESTED**

Plaintiffs demand judgment against Defendants with an order providing

equitable and/or injunctive relief to remediate the harm caused by lack of access to

safe water, requiring Defendants to:

a.    Abate Defendants' contamination of water, pipes, and water

delivery systems, and repair or remediate any damage to property;

b.    Remove or otherwise remediate pipes, fixtures, PWS

equipment, or water delivery equipment connected to the PWS that is

contaminated with lead and other dangerous contaminants;

c.    Provide direct access to safe, uncontaminated water to all users

of Jackson's PWS who lack safe access to water;

d.    Cancel or refuse to collect any bills charged to or debts held by

users of Jackson's PWS for unsafe water or water that was not delivered;

e.    Create a system to regularly test PWS water for lead and other

water contaminants;

      f.    Establish a medical monitoring process, including periodic medical testing, and diagnostic tools which can evaluate the presence of lead or other water contaminants in a person's body, organs, or bones, for residents exposed to unsafe water;

      g.    Establish community health centers for the care of persons suffering from physical or mental health problems resulting from contaminated PWS water;

      h.    Appoint a neutral monitor to oversee Jackson's PWS for a time period determined to be appropriate by the Court;

      i.    Suspend all efforts to privatize Jackson's PWS, or components of it, until this case is resolved and the PWS is operating properly and safety;

Plaintiffs also demand judgment against Defendants for damages including:

      j.    Compensatory, economic, and non-economic damages;

      k.    Punitive damages;

      l.    Exemplary damages;

      m.    Pre-judgment and post-judgment interest;

      n.    Attorneys' fees and litigation expenses; and

      o.    Any other relief the Court deems just and proper.

Dated: February 20, 2024           */s/ Mark P. Chalos*
                                     Mark P. Chalos (*Pro Hac Vice*)

*Lead Counsel*
Lieff Cabraser Heimann & Bernstein, LLP
222 2nd Avenue South, Suite 1640
Nashville, TN 37201-2379
Telephone: 615-313-9000
Facsimile: 615-313-9965
mchalos@lchb.com

Tiseme G. Zegeye (*Pro Hac Vice*)
Amelia A. Haselkorn (*Pro Hac Vice*)
Lieff Cabraser Heimann & Bernstein, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone: 415-956-1000
Facsimile: 415-956-1008
tzegeye@lchb.com
ahaselkorn@lchb.com

Robert L. Gibbs (Bar No. 4816)
Gibbs Travis PLLC
210 East Capitol Street, Suite 1801
Jackson, MS 39201
Telephone: 601-487-2640
Fax: 601-366-4295
rgibbs@gibbstravis.com

Stuart C. Talley (*Pro Hac Vice*)
Kershaw Talley Barlow, P.C.
401 Watt Avenue, Suite 1
Sacramento, CA 95864
Telephone: 916-779-7000
stuart@ktblegal.com

Larry Moffett (Bar No. 3401)
Law Office of Larry D. Moffett PLLC
P.O. Box 1418
39 CR 231
Oxford, MS 38655
Telephone: 662-298-4435
larry@larrymoffett.com

*Attorneys for Plaintiffs and the Proposed Class*