UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

| | |
|---|---|
| **Priscilla Sterling, Raine Becker, Shawn Miller, and John Bennett, individually and on behalf of all others similarly situated** | **Plaintiffs** |
| v. | Civil No. 3:22-cv-531-KHJ-MTP |
| **The City of Jackson, Mississippi; Chokwe A. Lumumba; Tony Yarber; Kishia Powell; Robert Miller; Jerriot Smash; Siemens Corporation; Siemens Industry, Inc.; and Trilogy Engineering Services LLC** | **Defendants** |

**CITY OF JACKSON'S MEMORANDUM IN SUPPORT OF
MOTION TO DISMISS THE SECOND AMENDED CLASS ACTION
COMPLAINT FOR INJUNCTIVE RELIEF AND MONEY DAMAGES**

The Second Amended Complaint fails to state a cognizable substantive-due-process, bodily integrity claim against the City of Jackson ("the City"). In dismissing the Amended Complaint, the Court allowed "Plaintiffs another opportunity to plead their bodily integrity claim, focusing solely on the misrepresentation allegations." Order [Doc. 97] at 21. The Court sought further briefing on "(1) what culpability standard applies for misleading statements issued to the general public; and (2) whether the City's statements, taken as a whole, meet that standard in this particular context." *Id.*

If a misleading public pronouncement made in response to an environmental crisis could ever give rise to a constitutional violation, then the culpability standard should be a knowing misstatement made with an intent to harm. But even if the Court applies the lower standard of deliberate indifference, the City's statements, taken as a whole, still do not shock the conscience. No historical basis and no binding precedent supports expanding the scope of substantive due process to include liability for statements made to the general public.

1

The Court has previously rejected the remaining allegations of the Second Amended Complaint as insufficient to state a constitutional claim. The Court should dismiss with prejudice all federal claims. Finally, the Court should decline to exercise supplemental jurisdiction over the remaining state law claims and dismiss those claims without prejudice.

## RELEVANT FACTUAL AVERMENTS[1]

On January 29, 2016, one day after the City received notice that thirteen samples tested in June 2015 detected lead levels above the federal action level, the City held a press conference at which Kishia Powell—then the public works director—announced the results. 2d Am. Compl. [Doc. 101] at 33 (¶152); Anna Wolfe & Sara Fowler, *Jackson, MSDH Report Lead Detection in City Water*, CLARION-LEDGER (Jan. 29, 2016), (cited in 2d Am. Compl. [Doc. 101] at 34 (¶ 152) n.42). During the press conference, she stated the results meant the "City is required to take additional compliance measures." *Id.* (cleaned up). She also stated, "[T]his is not a widespread issue, although we are treating it very seriously." R.L. Nave, *Jackson Has Long Been at High Risk for Lead Poisoning*, JACKSON FREE PRESS (Feb. 3, 2016), (cited in 2d Am. Compl. [Doc. 101] at 15 (¶ 48) n.10). Powell explained why she believed the problem was not widespread: "We had 58 samples taken, only 13 of them exceeded the actionable level, and there were homes on the same street that were sampled that did not exceed those levels." Wolfe & Fowler, *supra* (cleaned up). She stated, "This is not a situation where you have to stop drinking the water." 2d Am. Compl. [Doc. 101] at 33 (¶ 150) (quoting Nave, *supra*). She continued, "We want people to understand how they should be flushing their internal plumbing system before using water . . .

---

[1] Because the Court's February 5, 2024 Order directed the parties to "focus[] solely on the misrepresentation allegations," the City restates only the allegations about the City's public statements. Order [Doc. 97] at 21. Plaintiffs have not significantly revised those averments.

These are just measures you take." Wolfe & Fowler, *supra*. Powell stated that the findings do "not mean that the city has violated the Safe Drinking Water Act, and our water is safe." 2d Am. Compl. [Doc. 101] at 33-34 (¶ 152) (quoting Wolfe & Fowler, *supra*).

The City issued specific recommendations and precautions for small children and pregnant women. *See* Tim Summers, Jr., *As the Water Turns, City Wrestles Over Corrosion Study*, JACKSON FREE PRESS (Mar. 16, 2016) (cited in 2d Am. Compl. [Doc. 101] at 27 (¶ 116)). The recommendations and measures included, among others, running tap water on cold for one to two minutes before consumption; never using hot water for consumption; children under 5 and pregnant women not consuming tap water; using filtered or bottled water when mixing formula; and screening children under six for lead. *See, e.g.*, Anna Wolfe, *6 Things to Know About the Lead Water in Jackson*, CLARION-LEDGER (Mar. 25, 2016) (cited in 2d Am. Compl. [Doc. 101] at 42 (¶ 190) n.55).[2]

City officials continued to make public statements over the next few weeks. Then-Mayor Tony Yarber said, "I don't want to sound the wrong alarm and have folks saying, 'We're Flint.' We're not Flint." *Id.* at 35 (¶ 156) (quoting Anna Wolfe, *Jackson City Council Talks Lead Water*, CLARION-LEDGER (Feb. 17, 2016) (cited in 2nd Am. Comp. [Doc. 101] at 34 (¶153)). Powell added, "a major difference between Flint, Michigan, and Jackson, Mississippi . . . is that the crisis in Flint began because the city did not have corrosion control measures in place, whereas Jackson does." *Id.* 34 (¶ 153) (quoting Wolfe, *supra*). She acknowledged those

---

[2] Since that press conference, the City has consistently advised residents (1) to run the cold tap for one to two minutes before using tap water; (2) not to use hot water for cooking or drinking; (3) pregnant women and small children should refrain from using tap water; (4) to refrain from mixing baby formula with tap water; and (5) to screen small children for lead. See Anna Wolfe, *Jackson Hit with Technical Violation for Water Treatment*, CLARION-LEDGER (June 9, 2016) (cited in 2d Am. Compl. [Doc. 101] at 20 (¶73) n.24 (noting that precautions for pregnant women and children would stay in place)).

3

corrosion control "systems need to be improved and upgraded . . . ." Wolfe, *supra*. She also stated, "[T]here is no lead in the drinking water as it leaves the water treatment plant." 2d Am. Compl. [Doc. 101] at 35 (¶ 159) (quoting Wolfe, *supra*).

## LEGAL STANDARD

The Court has set forth the standard of review for a motion to dismiss, *see Sterling v. City of Jackson*, 2024 U.S. Dist. LEXIS 19462 at *9-*11, which the City incorporates by reference.

## ARGUMENT

**I.     The City's alleged misrepresentations do not shock the conscience.**

   A.   <u>The culpability standard for misleading statements made in response to a crisis should be intent to harm.</u>

As the Court noted in its February 5, 2024 Order, the culpability standard for a substantive-due-process claim is "whether the behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Sterling*, 2024 U.S. Dist. LEXIS 19462, at *14. "The 'shocks the conscience' standard is satisfied where the conduct was intended to injure in some way unjustifiable by any government interest, or *in some circumstances* if it resulted from deliberate indifference." *M.D. by Stuckenberg v. Abbott*, 907 F.3d 237, 251 (5th Cir. 2018) (emphasis added) (applying deliberate indifference standard to substantive due process claim by foster children in State's custodial care).

The Supreme Court has held in other contexts that the deliberate indifference standard does not necessarily apply to every substantive due process claim. For instance, the Court has recognized that a "much higher standard of fault than deliberate indifference has to be shown for officer liability in a prison riot." *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 852-53 (1998) (citing *Whitley v. Abers*, 475 U.S. 312 (1985)). And in *Lewis*, the Court refused to apply a

4

culpability deliberate indifference standard to high-speed automobile chases. *Id.* at 836. The Court reasoned, "Deliberate indifference that shocks in one environment may not be so patently egregious in another, and our concern with preserving the constitutional proportions of substantive due process demands an exact analysis of circumstances before any abuse of power is condemned as conscience-shocking." *Id.* at 850.

To date, no Supreme Court or Fifth Circuit case has applied a "deliberate indifference" standard to allegations that a governmental officer made misleading statements in response to an environmental crisis for determining whether the governmental officer's conduct "shocked the conscience" in a constitutional sense.[3] The Court should not do so here.

Instead, the Court should find that where Plaintiffs alleged the City made misleading statements in the face of an immediate environmental crisis, only the City's intent to cause harm by making false statements could shock the conscience. First, that is the less expansive concept of substantive due process in this unchartered area. Second, this is the standard that has been recognized by the Second Circuit in *Benzman v. Whitman*, 523 F.3d 119 (2d Cir. 2008), and *Lombardi v. Whitman*, 485 F.3d 73 (2d Cir. 2007).[4] Read together, those cases stand for the

---

[3] No Supreme Court or Fifth Circuit case has found a substantive-due-process claim arising from public misstatements. The Court should practice "judicial self-restraint" before "expand[ing] the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended." *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992)).

[4] In addition to *Benzman* and *Lombardi*, in *Las Lomas Land Co., LLC v. City of L.A.*, 177 Cal. App. 4th 837, 857, 99 Cal. Rptr. 3d 503, 520 (2009), a California Court of Appeals summarily rejected a substantive due process claim based upon a public official's making "misleading public statements," finding that "[t]hese allegations, if true, do not amount to an outrageous or egregious abuse of power of constitutional dimension." The case, however, dealt with an alleged deprivation of a property interest, not a bodily integrity interest. *See also Prucker v. Town of Wales*, No. 3:20-cv-11917-KAR, 2023 U.S. Dist. LEXIS 41483, at *29-30 (D. Mass. 2023) (holding "dishonest and misleading" statements insufficient to shock the conscience in property interest case); *Srinivas v. Picard*, 648 F. Supp. 2d 277, 288 (D. Conn. 2009) (holding, in property interest case, that

proposition that—where the factual averments in the plaintiff's complaint show a government official made misstatements in response to an environmental crisis, having "to reconcile competing government obligations"—only an intent to harm by making those false statements can shock the conscience in a way that justifies constitutional liability. *See Benzman*, 523 F.3d at 128 (noting "it is far from clear that a complaint adequately alleging knowing falsity would have survived dismissal in the absence of an allegation of intent to injure, and we are not ruling that such a complaint would have stated a valid *Bivens* claim"). Absent an intent to harm—which Plaintiffs have conceded does not exist in this civil action, *see Sterling*, 2024 U.S. Dist. LEXIS 19462, at *25—Plaintiffs have failed to state a substantive-due-process, bodily-integrity claim against the City. *Cf. Guertin v. State*, 912 F.3d 907, 929 (6th Cir. 2019) (readily distinguishable because, as shown below, the allegations in the plaintiffs' complaint demonstrated the governmental agent in *Guertin* knowingly lied). The Court should, therefore, find that the City's alleged misstatements do not shock the conscience in a constitutional sense.

*Benzman* and *Lombardi* dealt with the environmental crisis of the air quality in New York following the attacks of September 11, 2001. Although the State of Mississippi's finding of actionable lead levels in the City's water supply was not a crisis of the same dimension, it was nonetheless an immediate crisis that required the City to quickly reconcile competing policy considerations—e.g., balancing warning citizens about the lead exceedance without inciting unjustified panic—in choosing how to respond. And, in responding to that crisis, the allegations

---

"intentionally and maliciously fabricated and disseminating falsehoods to get someone fired" would be actionable, making "simply misleading" statements was constitutionally insufficient.).

in Plaintiffs' Second Amended Complaint do not demonstrate the City made knowingly false statements.

For example, the City's representation that "this is not a widespread issue, although we are treating it very seriously" was supported by the fact that, of the 58 homes from which lead-testing samples were taken, only 13 of them exceeded the actionable level. Wolfe & Fowler, *supra.* The City also reassured the public the water was safe to drink subject to the user taking certain measures and precautions. Nowhere in Plaintiffs' Second Amended Complaint do Plaintiffs dispute the City's water is safe to drink subject to those precautions (the Second Amended Complaint ignores the fact the City issued precautions along with its assurances the water was safe to drink). Moreover, the statements the Jackson water crisis was not like Flint were not false, because the City did have corrosion-control measures in place, unlike Flint, even though those measures needed to be improved and upgraded. Wolfe, *supra*.

The allegations in Plaintiffs' Second Amended Complaint, taken as a whole, do not state a cognizable substantive-due-process, bodily-integrity claim. To hold otherwise could have a chilling effect on a governmental entity's willingness to share information with the public in the face of a crisis for fear of constitutional liability later. *Collins* instructed courts to operate from a "presumption that the administration of government programs is based on a rational decisionmaking process that takes account of competing social, political, and economic forces." 503 U.S. at 128. The Supreme Court's instruction has force here: substantive due process liability should not be used to impede or dictate government agencies' policy decisions on whether to share information with the public in the face of a crisis, even if some of those decisions could seem gravely erroneous in retrospect.

B.     The City's alleged misstatements were also not made with deliberate indifference.

Even under the lower deliberate-indifference standard of culpability, the City's alleged misstatements do not shock the conscience. Proving deliberate indifference is "a significantly high burden for plaintiffs to overcome." *M.D. by Stukenberg*, 907 F.3d at 251-52. "To act with deliberate indifference, a state actor must consciously disregard a known and excessive risk to the victim's health and safety." *Id.* at 252. "Stated differently, the State must be both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and it must also draw that inference." *Id.* at 252 (internal quotations omitted). This is "a degree of culpability beyond mere negligence or even gross negligence; it 'must amount to an intentional choice, not merely an unintentionally negligent oversight.'" *Id*. A government actor "is not deliberately indifferent to a substantial risk of serious harm if, aware of the risk, it responds reasonably even if the harm ultimately was not averted." *Id.* (citing *Farmer v. Brennan*, 511 U.S. 825, 844 (1994)) (cleaned up).

In *Pierce v. Hearne Independent School District*, the Court emphasized the intent necessary for a deliberate-indifference finding:

> A due process violation results from "*deliberate* decisions of government officials to deprive a person of life, liberty, or property." *Daniels v. Williams*, 474 U.S. 327, 331 (1986). "Actions and decisions by officials that are merely inept, erroneous, ineffective, or negligent do not amount to deliberate indifference . . . ." *Alton v. Texas A&M Univ.*, 168 F.3d 196, 201 (5th Cir. 1999) (citation omitted). As the Seventh Circuit has explained, deliberate indifference entails "conduct that reflects complete indifference to risk—*when the actor does not care whether the other person lives or dies, despite knowing that there is a significant risk of death*." *Salazar v. City of Chicago*, 940 F.2d 233, 238 (7th Cir. 1991) (citations and internal quotations omitted).

600 F. App'x 194, 198 (5th Cir. 2015) (emphasis added).

Plaintiffs cannot demonstrate that, taken as a whole, the City's public pronouncement regarding its water system were made with deliberate indifference. First, as shown above, none of the City's statements were knowingly false. Second, Plaintiffs' pleadings and the incorporated exhibits show the City provided guidance as to how to use the water safely, discouraging the use of the water under certain circumstances. The pleadings also show that after the City received notice of a lead exceedance, it informed the public, providing specific recommendations and precautions as to how the water may be consumed safely. *See* Summers, *supra*. The recommendations and measures included, among others, running tap water on cold for one to two minutes before consumption; never using hot water for consumption; children under five and pregnant women not consuming tap water; using filtered or bottled water when mixing formula; and screening children under six for lead. *See, e.g.*, Anna Wolfe, *6 Things to Know About the Lead Water in Jackson*, CLARION-LEDGER (Mar. 25, 2016) (cited in 2d Am. Compl. [Doc. 101] at 42 (¶ 190) n.55). The City has been consistent in providing those precautions.

Whether the City should have said more (or nothing at all) does not give rise to a substantive-due-process claim. *See Sterling*, 2024 U.S. Dist. LEXIS 19462, *23 ("[I]nept, erroneous, ineffective, and negligent," actions "do not amount to deliberate indifference."). Finding otherwise would, without guidance, greatly expand the scope of substantive-due-process. The Supreme Court has cautioned Courts not to do so, and the City asks the Court to follow that guidance here.

9

> C. <u>There are no concrete examples arising from the established bodily integrity jurisprudence or from our Nation's history or traditions that support the right asserted here—protection from public statements.</u>

Even if Plaintiffs could establish the City's public pronouncements shocked the conscience, which they cannot, the Court's analysis does not end there. *Sterling*, 2024 U.S. Dist. LEXIS 19462, *27. "The Court must next determine whether there exist historical examples of recognition of the claimed liberty protection at some appropriate level of specificity to sustain a due process violation." *Id.* (citing *Morris v. Dearborne*, 181 F.3d 657, 668 (5th Cir. 1999)). That determination analysis must be based on the state of the law as it existed "at the time of the incident at issue." *Morris*, 181 F.3d at 668. In performing that analysis, the Supreme Court directs Courts to use a "restrained methodology" that "looks to concrete examples involving fundamental rights found to be deeply rooted in our legal tradition." *Sterling*, 2024 U.S. Dist. LEXIS 19462, *27 (quoting *Washington v. Glucksberg*, 521 U.S. 702, 721-22 (1997)). The concrete examples set forth the "outlines of the 'liberty' specially protected by the Fourteenth Amendment". *Washington*, 521 U.S. at 721.

No concrete examples arising from the established bodily integrity jurisprudence or from our Nation's history or traditions support the right asserted, i.e., a right to protection from public statements that, somewhere down the line, result in exposure to an environmental contaminant.

In the few cases in which a plaintiff claimed a bodily-integrity violation due to exposure to environmental contaminants, courts have declined to expand the scope of substantive due process to encompass environmental control. For instance, in *Gasper v. Louisiana Stadium & Exposition District*, 418 F. Supp. 716 (E.D. La. 1976), a group of nonsmokers brought constitutional claims to ban smoking in the Louisiana Superdome. The plaintiffs alleged that "allowing patrons to smoke in the Louisiana Superdome, [the Louisiana Stadium and Exposition

District] is causing other nonsmokers involuntarily to consume hazardous tobacco smoke, thereby causing physical harm and discomfort to those nonsmokers…." *Id.* at 717. The district court found there is "no constitutional right to a clean environment." *Id.* at 720-21. The Fifth Circuit agreed. *See Gasper v. La. Stadium & Exposition Dist.*, 577 F.2d 897 (5th Cir. 1978).

The *Gasper* district court relied on *Tanner*, 340 F. Supp. 532. In *Tanner*, the plaintiffs brought substantive due process claims for petroleum refineries' emissions of pollutants into the air, which the plaintiffs alleged caused pulmonary damage. *Id.* at 534. The district court found that, assuming plaintiffs could plead sufficient state action, they still failed to state a constitutional claim. The court noted,

> [F]rom an institutional viewpoint, the judicial process, through constitutional litigation, is peculiarly ill-suited to solving problems of environmental control. Because such problems frequently call for the delicate balancing of competing social interests, as well as the application of specialized expertise, it would appear that their resolution is best consigned initially to the legislative and administrative processes.

*Id.* at 536. This Court should not expand the scope of substantive due process into the environmental-control arena, either.

In the key Fifth Circuit cases finding a violation of the right to bodily integrity, the plaintiff was in the government's custody or care—a student at school, a child in foster care, a patient at a state hospital, a prisoner, or an arrestee. And in these cases, the government has generally either directly violated the plaintiff's body or has exercised its power to coerce an intrusion.[5] This is why one court observed that in the Fifth Circuit, the right to bodily integrity

---

[5] *M.D.*, 907 F.3d at 250, dealt with more than just the right to bodily integrity. The case considered the heightened substantive due process of right of "personal security and reasonably safe living conditions" because the plaintiffs, children in foster care, were in a "special relationship" with the State. No such special relationship exists here. *Sterling*, 2024 U.S. Dist.

11

"appears to arise almost exclusively in the context of sexual abuse" cases. *Bickford v. Boerne Indep. Sch. Dist.*, 5:15-CV-1146-DAE, 2016 U.S. Dist. LEXIS 69101, *11 n.4 (W.D. Tex. May 26, 2016); *see also Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d 443, 50-51 (5th Cir. 1994); *Doe v. Rains Cnty. Indep. Sch. Dist.*, 66 F.3d 1402, 1407 (5th Cir. 1995); *Doe v. Edgewood Indep. Sch. Dist.*, 964 F.3d 351, 365 (5th Cir. 2020). For example, in the *Doe* cases cited above, a teacher sexually abused a student. In *Jefferson v. Ysleta Independent School District*, 817 F.2d 303, 305 (5th Cir. 1987), a teacher tied a second grader to a chair. And, in *United States v. Guidry*, 456 F.3d 493, 506 (5th Cir. 2006), a police officer sexually assaulted female arrestees. In short, those cases all involve the government forcing an intrusion upon the plaintiff's body.

Absent an intrusion upon the plaintiff's body (e.g., assault, rape, sexual assault or harassment, or nonconsensual stripping, prolonged nudity and manual manipulation of the privates for a state actor's sexual gratification[6]), the Fifth Circuit has declined to find a substantive-due-process violation. For example, in *Pierce*, the court found no violation of the substantive due process right to bodily integrity when a student was killed while driving his teacher's ATV. 600 F. App'x at 194. In its opinion, the Fifth Circuit distinguished sexual abuse and corporeal punishment cases from a traditional claim of negligence, finding that the teacher did not "deliberately abuse, restrain, threaten or touch [the deceased]." *Id.* at 199. The court noted Supreme Court precedent, warning courts against expanding substantive due process rights by turning a negligence claim into a constitutional matter. *Id.* (citing *Collins*, 503 U.S. at 125). Likewise, in *Bickford*, the Court declined to find plaintiff pleaded a bodily-integrity violation

---

LEXIS 19462, *18 ("Plaintiffs are non-custodial citizens. They do not allege a 'special relationship' between themselves and the City.").

[6] *See generally Tyson v. Cnty of Sabine*, 42 F.4th 508, 519 (5th Cir. 2022).

12

arising out of a stage-production accident, in which the plaintiff's spine was crushed, lungs were punctured, and legs were shattered. 2016 U.S. Dist. LEXIS 69101, *1, *11-*13.

The Supreme Court cases addressing bodily-integrity claims confirm that the right is violated when the state forces or compels intrusion into the claimant's body. *See, e.g.*, *Union Pacific Railway Co. v. Botsford*, 41 U.S. 250 (1891) (determining the state could not force an individual to submit to a surgical examination); *Rochin v. Cal.*, 342 U.S. 164, 166, 172 (1952) (finding the state could not force an "an emetic solution through a tube into [a claimant's] stomach"); *Wash. v. Harper*, 494 U.S. 210 (1990) (finding that the state could forcibly inject antipsychotic drug into an unwilling claimant given compelling state interest); *Missouri v. McNeely*, 569 U.S. 141, 148 (2013) (finding that the state could not compel a blood sample via a venipuncture); and *Winston v. Lee*, 470 U.S. 753, 767 (1985) (finding the state could not compel a nonconsensual surgery).

None of those Fifth Circuit or Supreme Court cases are compatible with the "careful description" of the right at issue here: protection from exposure to lead-contaminated water allegedly caused by public pronouncements. Expansion of substantive due process into this area would radically change constitutional law. Public officials must respond quickly to all manner of public health crises with limited or imperfect information. In this case, the City could have merely issued the notices required by the Safe Water Drinking Act with every water bill and avoided any potential claim, but it chose to hold press conferences and make statements to the media to better spread the message of what precautions were necessary. At the same time, the City did not want to incite what it perceived at the time to be unnecessary panic. These are critical executive policy decisions that should not be policed with constitutional liability.

Otherwise, every public official responding to a public health crisis—such as an epidemic, a hurricane, or an oil spill—will face potential constitutional claims.

## II.   Plaintiffs' new allegations are insufficient to state a claim for substantive due process.

In its February 5, 2024, Order, the Court noted Plaintiffs' Amended Complaint did not show the City's public pronouncements were the "direct cause of their constitutional harm." *Sterling*, 2024 U.S. Dist. LEXIS 19462 at *26. In their Second Amended Complaint, Plaintiffs attempt to cure that defect by generally claiming the City's failure to warn them not to use or drink the water caused them to continue to use the municipal water. *See, e.g.*, 2d Am. Compl. [Doc. 101] at 68 (¶303). Those new averments are unavailing. Supreme Court precedent is clear that a government official's failure to warn does not give rise to a substantive-due-process claim. *Collins*, U.S. at 125-29.

Moreover, the new averments do not prove causation in a constitutional sense. As set forth above, in *every* case in which the Fifth Circuit has found a violation of bodily integrity, a state actor has coerced the plaintiff to act in a manner that violated his or her bodily integrity. Absent coercion, the Fifth Circuit has declined to find a substantive-due-process violation.

## III.   Plaintiffs may not re-plead those matters that were dismissed with prejudice.

The Court dismissed Plaintiffs' state-created-danger claim with prejudice. *Sterling*, 2024 U.S. Dist. LEXIS 19462 at *28-*29. Nevertheless, Plaintiffs again assert a state-created-danger claim against the City in the Second Amended Complaint. *Compare* 2d Am. Compl. [Doc. 101], at 82-85, *with* Am. Compl. [Doc. 57], at 79-81. Plaintiffs may not do so. *See, e.g., Blakely v. Golabs, Inc.*, No. 3:21-cv-2422-L, 2023 U.S. Dist. LEXIS 169825, *32 (N.D. Tex. Aug. 17, 2023) (stating the plaintiff could not proceed on claims that "were already dismissed with prejudice"); *Prosper v. Alvarez*, No. H-20-0583, 2023 U.S. Dist. LEXIS 39106, *20 (S.D. Tex.

14

March 8, 2023) (finding plaintiffs cannot replead claims that were dismissed with prejudice). Therefore, the Court should dismiss Plaintiffs' state-created-danger from the Second Amended Complaint with prejudice.

The Court's Order also held that Plaintiffs' factual allegations about the quality or quantity of water were an insufficient factual predicate for a constitutional claim. *See, e.g.*, *Sterling*, 2024 U.S. Dist. LEXIS 19462, *16-*25 (finding the City's alleged "failures to act" and alleged "actions taken"—except the City's public pronouncements—failed to support a constitutional claim). For that reason, the Court limited the scope of Plaintiffs' amended pleading to "focusing solely on the misrepresentation allegations." *Id.* at *26-*27. Plaintiffs ignore the Court's directive. In addition to reasserting their state-created-danger claim, Plaintiffs do not focus their amended pleading solely on the misrepresentation allegations. Instead, they re-allege all the averments from the Amended Complaint and make two new allegations that have nothing to do with the City's alleged misrepresentations. *See* 2d Am. Compl. [Doc. 101] at 7 (¶¶ 18-19). For the reasons the Court held in its February 5, 2024 Order, these reiterated allegations of "failures to act" or "actions taken" still do not state a claim.

**IV.    The Court should decline to exercise supplemental jurisdiction over Plaintiffs' state law claims under Section 1367.**

Under 28 U.S.C. § 1367(c)(3), a district court may decline to exercise if it "dismissed all claims over which it has original jurisdiction." In the Fifth Circuit, courts determine whether dismissal is appropriate under (c)(3) "by assessing the common-law factors of judicial economy, convenience, fairness, and comity." *Manyweather v. Woodlawn Manor, Inc.*, 40 F.4th 237, 246 (5th Cir. 2022) (affirming remand after dismissal of federal claims). Applying those factors, the Fifth Circuit has generally held courts "should decline to exercise jurisdiction over remaining state-law claims when all federal-law claims are eliminated before trial." *Id.* That is especially

15

true should the court dismiss the matter during the pleading stage. *See id.* Should the Court dismiss all Plaintiffs' claims over which it has original jurisdiction at the pleading stage, the Court may exercise its wide discretion, follow the Fifth Circuit's general rule, and dismiss Plaintiffs' state law claims without prejudice.

## CONCLUSION

Because the City's alleged conduct does not rise to the level of conscience-shocking, and the conduct does not demonstrate the deprivation of a recognized fundamental right, Plaintiffs have failed to state a substantive-due-process, bodily-integrity claim.

RESPECTFULLY SUBMITTED, this the 14th day of March, 2024.

*/s/ Clarence Webster, III*
CLARENCE WEBSTER, III

Clarence Webster, III (MSB #102111)
Kaytie M. Pickett (MSB #103202)
Adam Stone (MSB #10412)
Abbey Reeves (MSB #105720)
JONES WALKER LLP
3100 North State Street, Suite 300
Jackson, MS 39216
Telephone: (601) 949-4900
Facsimile: (601) 949-4804
cwebster@joneswalker.com
kpickett@joneswalker.com
astone@joneswalker.com
areeves@joneswalker.com
*Counsel for the City of Jackson*

## **CERTIFICATE OF SERVICE**

I hereby certify that on March 14, 2024, I electronically filed the foregoing pleading with the Clerk of the Court using the CM/ECF system which served a copy of the foregoing on all counsel of record.

                                                */s/ Clarence Webster, III*
                                                CLARENCE WEBSTER, III