## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF MISSISSIPPI
## NORTHERN DIVISION

| | |
|---|---|
| Priscilla Sterling, Raine Becker, Shawn Miller, and John Bennett, individually and on behalf of all others similarly situated, | Civil No. 3:22-cv-00531-KHJ-MTP |
| Plaintiffs, | |
| v. | |
| The City of Jackson, Mississippi; Chokwe A. Lumumba; Tony Yarber; Kishia Powell; Robert Miller; Jerriot Smash; and Trilogy Engineering Services LLC, | |
| Defendants. | |

## PLAINTIFFS' MEMORANDUM IN OPPOSITION TO THE CITY OF JACKSON'S MOTION TO DISMISS THE SECOND AMENDED COMPLAINT

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................ 1

FACTUAL BACKGROUND ............................................................................... 1

LEGAL STANDARD ......................................................................................... 5

ARGUMENT ...................................................................................................... 5

I.     Plaintiffs Have Pleaded a Violation of Their Due Process Right to Bodily Integrity. ................................................................................................. 5

     A.     Precedent and Historical Examples Support Plaintiffs' Due Process Right to be Free From the Compelled Intrusion of a Harmful Substance into Their Bodies. ................................................................................. 5

     B.     Courts do Not Impose a Heightened Culpability Standard in Situations Where Government Officials Have Time to Reflect. ........................... 9

          1.     Deliberate Indifference is the Appropriate Standard in This Case. ......... 10

          2.     The City's Conduct was Deliberately Indifferent. .................................. 12

               a.     The City knew the inadequacy of its response to the water crisis was likely to result in the violation of a constitutional right. ............................................................................. 12

               b.     The City had months to deliberate about its response and implemented its inadequate policy for years. ............................. 14

               c.     As the sole provider of municipal water services, Plaintiffs had an involuntary relationship with the City for the purposes of obtaining tap water. .................................................. 15

               d.     The City had no governmental interest sufficient to justify poisoning its residents. ................................................. 16

     C.     Plaintiffs Adequately Pleaded That the City was "the Moving Force" Behind the Deprivation of Plaintiffs' Due Process Rights. ................................. 18

II.     Plaintiffs State-Created Danger Claim was Not "Re-Plead," and Therefore Need Not be Dismissed a Second Time. .................................................. 19

III.     Supplemental Jurisdiction Over Plaintiffs' State Law Claims is Warranted. .................. 20

CONCLUSION .................................................................................................. 21

## TABLE OF AUTHORITIES

**Page**

**Cases**

*Alton v. Tex. A&M Univ.*,
  168 F.3d 196 (5th Cir. 1999) ..................................................6

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)..................................................5

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 553 (2007)..................................................5

*City of Canton v. Harris*,
  489 U.S. 378 (1989)..................................................13, 18, 19

*County of Sacramento v. Lewis*,
  523 U.S. 833 (1998)..................................................10, 11, 14

*Cruzan ex rel. Cruzan v. Dir., Mo. Dep't of Health*,
  497 U.S. 261 (1990)..................................................7, 8, 9, 17

*Doe ex rel. Magee v. Covington Cnty. Sch. Dist. ex rel. Keys*,
  675 F.3d 849 (5th Cir. 2012) ..................................................18

*Doe v. Taylor Indep. Sch. Dist.*,
  15 F.3d 443 (5th Cir.1994) (en banc) ..................................................6, 12, 14, 15

*Guertin v. State*,
  912 F.3d 907 (6th Cir. 2019) ..................................................8, 16

*Hope v. Pelzer*,
  536 U.S. 730 (2002)..................................................13

*In re Cincinnati Radiation Litig.*,
  874 F. Supp. 796 (S.D. Ohio 1995) ..................................................7, 9, 16

*Ingraham v. Wright*,
  430 U.S. 651 (1977)..................................................8

*Johnson v. Johnson*,
  385 F.3d 503 (5th Cir. 2004) ..................................................5

*Missouri v. McNeely*,
  569 U.S. 141 (2013)..................................................8, 17

*Missouri v. McNeely*,
  596 U.S. 141 (2013)..................................................5

*Monell v. Dep't of Soc. Servs. of City of N.Y.*,
  436 U.S. 658 (1978)..................................................18, 19

# TABLE OF AUTHORITIES
## (continued)

Page

*Morris v. Dearborne*,
  181 F.3d 657 (5th Cir. 1999) ...................................................18

*Piotrowski v. City of Houston*,
  237 F.3d 567 (5th Cir. 2001) ...................................................18

*Rochin v. California*,
  342 U.S. 165 (1952)....................................................8, 10, 14, 15

*Skinner v. State of Okla. ex rel. Williamson*,
  316 U.S. 535 (1942)............................................................8

*M. D. ex rel. Stukenberg v. Abbott*,
  907 F.3d 237 (5th Cir. 2018) ...................................... *passim*

*Union Pac. Ry. Co. v. Botsford*,
  141 U.S. 250 (1891)..........................................................6, 8

*Washington v. Glucksberg*,
  521 U.S. 702 (1997)....................................................6, 7, 9, 17

*Washington v. Harper*,
  494 U.S. 210 (1990)....................................................7, 8, 16

*Whitley v. Albers*,
  475 U.S. 312 (1986)..........................................................10

*Wilson v. Cook County*,
  742 F.3d 775 (7th Cir. 2014) ...................................................10

*Winston v. Lee*,
  470 U.S. 753 (1985)..........................................................7, 8

**Statutes**

28 U.S.C. § 1331..........................................................20, 21

28 U.S.C. § 1367..............................................................20

28 U.S.C. § 1367(a) .......................................................20, 21

28 U.S.C. § 1367(c) ...........................................................21

Safe Drinking Water Act, 42 U.S.C § 300f *et seq.* ..............................2, 3

**Constitutions**

U.S. Const. amend XIV § 1 .....................................................5

## INTRODUCTION

Plaintiffs have plausibly pleaded a claim for the violation of their bodily integrity against the City of Jackson.[1] A bodily integrity claim requires a plaintiff to establish that (i) their protected liberty interest was violated, (ii) the government took action that caused that violation, and (iii) the government acted with deliberate indifference. The Second Amended Complaint ("SAC") (Dkt. 101) includes additional and clarified facts supporting Plaintiffs' bodily integrity claim, detailing that Plaintiffs heard the City's statements and misrepresentations about the water crisis in Jackson, and relied on those statements in deciding to continue drinking the City's tap water. Plaintiffs also added facts demonstrating that this reliance was reasonable given the City's complete control over the public water system.

The SAC makes clear that the City's actions inducing Plaintiffs to drink lead-contaminated water were not limited to mere negligence. Instead, the allegations make clear that the City knew that there was lead in the water, knew it was harmful to human health, continued providing it to the community, and lied about it. The City's conduct directly caused Plaintiffs to ingest lead over a prolonged period of time. Plaintiffs' allegations plausibly state a claim for violation of their bodily integrity.

## FACTUAL BACKGROUND

As detailed in the SAC, the City of Jackson deliberately disregarded residents' health. For years, the City knowingly fed lead-contaminated water to its residents' taps and encouraged them to drink and use that water. Perhaps to avoid public criticism and negative media reports—

---

[1] Plaintiffs filed their Second Amended Complaint pursuant to this Court's Order on Defendants' Motion for Judgment on the Pleadings.  Dkt. 97 at 21. Plaintiffs attach hereto a redline showing the additional allegations included in the SAC as Exhibit 1. While the redline comparison identifies text that shifted to another page as a result of Plaintiffs' amendments (*see generally* green and red text throughout), the only substantive facts that Plaintiffs added were paragraphs 18, 19, 301–03, 316–18, 334–36, and 373.

especially in light of the influx of media attention on the Flint water crisis, which began in April 2014—the City opted to cover up and downplay the severity of the Jackson water crisis and publicly deny the City's worsening water quality. By encouraging Plaintiffs to continue consuming the City's water, it subjected Plaintiffs' bodies to toxic contaminants.

The City knew that lead has devastating health effects on humans, especially on children's development. SAC ¶¶ 230–36. Increased lead levels in childhood are associated with an increased likelihood of ADHD behaviors, delinquent behaviors, and arrests. *Id.* ¶ 233. Lead is also harmful to adults as it can cause cardiovascular effects, increased blood pressure, hypertension, decreased kidney function, and reproductive problems in both men and women. *Id.* ¶ 236. Under the Safe Drinking Water Act, 42 U.S.C § 300f *et seq.*, the EPA sets the maximum permissible concentration of lead in public drinking water at 15 parts per billion ("ppb"). *Id.* ¶ 49, n.11.

As early as 2011, the Mississippi Department of Health ("MSDH") identified Jackson to be at "high-risk for lead poisoning," and triennial testing from 2010 through 2013 showed that the concentration of lead in Jackson's drinking water was increasing at an alarming rate. *Id.* ¶¶ 48, 75–78. By late 2013 or early 2014, Jackson officials knew lead was leaching from pipes and fixtures into the City's drinking water, and understood the cause, the risks, and the cost to repair the system. *Id.* ¶¶ 82, 106–08, 113.

Rather than take the needed steps to stop lead from leaching further into the water, the City ignored warnings, switching a section of the City's water source from a safe groundwater system to the corrosive surface water system that was already poisoning other residents. *Id.* ¶¶ 120–28. Following these decisions, in June 2015, MSDH's triennial testing showed that lead levels in Jackson had jumped again. *Id.* ¶¶ 134, 141, 146. This time, Jackson's lead levels

exceeded the 15 ppb regulatory limit at 28 ppb. *Id.* ¶ 144. Yet the City did not notified residents whose lead levels exceeded the regulatory limit, nor did it notify the public until *at least seven months later*. *Id.* ¶¶ 146–47. Because lead in drinking water cannot be seen or tasted, Plaintiffs could not know that the City was providing them with lead-contaminated water.

Instead, the City of Jackson and its policy-making officials affirmatively mislead the public into thinking the water was safe to drink when in fact, it was not. *Id.* § II.F. For example, Defendant Powell stated to the Jackson Free Press that, "This is not a situation where you have to stop drinking the water. This is not a widespread issue, although we are treating it very seriously." *Id.* ¶¶ 150 n.10, 153 ("A major difference between Flint, Mich. and Jackson, Miss., Powell said, is that the crisis in Flint began because the city did not have corrosion control measures in place, whereas Jackson does."), 154 ("We are nowhere near the levels seen in Flint."), 164–67. At the same conference, she stated, the June 2015 finding of lead above the Lead and Copper Rule's action level "does not mean that the City has violated the Safe Drinking Water Act, and our water is safe." *Id.* ¶ 152 n.42. With these misrepresentations, Defendant Powell encouraged the public to continue drinking the water, despite knowing lead's severe health risks. Defendant Powell also downplayed the severity and extent of how widespread the contamination was, blaming plumbing at individual homes rather than pipes in the system. *Id.* ¶¶ 159, 160 ("[T]he problem with the lead was happening at specific homes with lead pipes, and that the water leaving the treatment plant was not contaminated."). Additionally, Defendant Powell actively covered up the crisis by immediately firing one of her employees for alerting the public that in fact, the City's pipes contained bands of lead every 20 feet. *Id.* ¶¶ 197–200.

Like Powell, Defendant Yarber also chose to mislead the public and chose to deny and feign ignorance of the crisis in Jackson. *Id.* ¶¶ 156 ("I don't want to sound the wrong alarm [and have] folks saying, 'We're Flint.' We're not Flint."), 164.

Throughout 2018, City officials continued to make false and misleading statements. Defendant Robert Miller stated that "there's been no detecting of lead or copper in the water supply." *Id.* ¶ 170. Even when Jackson had just been cited for failure to comport with the MSDH compliance plan, he assured residents that the "water is still safe to drink." *Id.* ¶ 173. In fact, the only recommendations that the City made to residents regarding water safety exacerbated the lead problem. From January to March 2016, Jackson issued boil water notices, but boiling water causes lead concentrations to *increase* because it causes the water to evaporate, leading to a higher concentration of lead. *Id.* ¶¶ 195–96.

These statements caused Plaintiffs to consume lead-contaminated water for years. Plaintiffs regularly watched, read, and listened to local news, where they closely followed City advisories. *Id.* ¶¶ 301, 316, 334, 350. Plaintiffs relied on the City's public misrepresentations that the PWS was safe for consumption, and given the City's complete control over the PWS, that reliance was reasonable. *Id.* ¶¶ 18–19, 302, 317, 335, 351. Had Plaintiffs known that Jackson's municipal water contained lead, they would have immediately stopped consuming the water and switched to bottled water. *Id.* ¶¶ 303, 318, 336, 352.

Throughout 2018 to 2021, the City remained in violation of both the MSDH Compliance Plan and the SDWA. *See id.* ¶ 280. On March 27, 2020, the EPA issued an Administrative Order which cited multiple SDWA violations and noted that the water system "present[s] an imminent and substantial endangerment to the persons served by the system." *Id.* ¶¶ 267–69.

The City's conscience-shocking conduct and deliberate indifference, including misrepresentations, caused Plaintiffs to consume lead-contaminated water, resulting in personal injuries and in violation of Plaintiffs' Due Process rights protected by the Fourteenth Amendment. *Id.* ¶¶ 4, 20–30; *see* U.S. Const. amend XIV § 1.

## LEGAL STANDARD

Plaintiffs are required to plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 553, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).

The Court must accept the well-pleaded facts as true and views them in the light most favorable the plaintiff. *Johnson v. Johnson*, 385 F.3d 503, 529 (5th Cir. 2004). "The motion to dismiss should not be granted unless the plaintiff would not be entitled to relief under any set of facts that he could prove consistent with the complaint." *Id.* In other words, the focus at the motion to dismiss stage is on the availability of the cause of action, not whether the plaintiffs have proven that their constitutional rights were violated.

## ARGUMENT

**I.** **Plaintiffs Have Pleaded a Violation of Their Due Process Right to Bodily Integrity.**

 **A.** **Precedent and Historical Examples Support Plaintiffs' Due Process Right to be Free From the Compelled Intrusion of a Harmful Substance into Their Bodies.**

As the City has conceded, there is no question that "any compelled intrusion into the human body implicates a significant, constitutionally protected privacy interest." Dkt. 94 (City's Reply Br.) at 4 (emphasis omitted) (quoting *Missouri v. McNeely*, 596 U.S. 141, 159 (2013)); Dkt. 71 at 10 ("[P]ublic pronouncements the City made that Plaintiffs allege may have coerced

them to consume the water" "may give rise to a constitutional claim."); *see also Alton v. Tex. A&M Univ.*, 168 F.3d 196, 199 (5th Cir. 1999) ("Of course, '[t]he right to be free of state-occasioned damage to a person's bodily integrity is protected by the fourteenth amendment guarantee of due process.'" (quoting *Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d 443, 450–51 (5th Cir.1994) (en banc))). Since at least 1891, the Supreme Court has recognized that "[n]o right is held more sacred . . . than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law." *Union Pac. Ry. Co. v. Botsford*, 141 U.S. 250, 251 (1891).

But the City conflates the exercise of looking to "concrete examples involving fundamental rights found to be deeply rooted in our legal tradition," *Washington v. Glucksberg*, 521 U.S. 702, 722 (1997), with identifying factually identical precedent. *See* Dkt. 107 ("Mot.") at 13 (misconstruing "the right at issue" to be "protection from exposure to lead-contaminated water allegedly caused by public pronouncements"). The liberty interest is not and cannot be defined so narrowly. *See, e.g.*, *Glucksberg*, 521 U.S. at 724 (defining the scope of the issue as "whether the protections of the Due Process Clause include a right to commit suicide with another's assistance"). In other words, the liberty interest is concerned with the harm experienced by the individual, not the means by which the state carried out that harm.

The right to bodily integrity includes the liberty interest to refuse the government's issuance of chemicals into a person's body without that person's informed consent. The Supreme Court has unequivocally recognized that the Due Process Clause safeguards the constitutionally protected liberty interest in refusing unwanted medical treatment, even when such treatment is considered to be life-saving. *Id.* at 725 ("Given the common-law rule that forced medication was a battery, and the long legal tradition protecting the decision to refuse unwanted medical

- 6 -

treatment, our assumption was entirely consistent with this Nation's history and constitutional traditions."); *Washington v. Harper*, 494 U.S. 210, 229 (1990) ("The forcible injection of medication into a nonconsenting person's body represents a substantial interference with that person's liberty."); *Cruzan ex rel. Cruzan v. Dir., Mo. Dep't of Health*, 497 U.S. 261, 278 (1990) ("[A] competent person has a constitutionally protected liberty interest in refusing unwanted medical treatment . . . ."). By the same token, compelling individuals without their informed consent to ingest substances known to be harmful undoubtedly gives rise to a constitutional violation under the Fourteenth Amendment.

Like forced medication, the constitutional right to be free from forced ingestion of harmful substances is "entirely consistent with this Nation's history and constitutional traditions." *Glucksberg*, 521 U.S. at 725. This right is particularly coveted when those substances have no therapeutic benefit. *See Winston v. Lee*, 470 U.S. 753, 765 (1985) (while surgery is not demeaning when conducted with the consent of the patient, surgery absent consent amounts to drugging a citizen "into a state of unconsciousness" and then "searching beneath his skin," which is "a virtually total divestment of [an individual's] ordinary control"); *In re Cincinnati Radiation Litig.*, 874 F. Supp. 796, 810–11 (S.D. Ohio 1995) (finding nonconsensual experiments involving high doses of radiation violated plaintiffs' due process "right to be free of state-sponsored invasion of a person's bodily integrity").

Given that the Due Process Clause specially protects the fundamental liberty interest to be free from forced ingestion of harmful substances, the Court may next determine whether the "challenged state action" alleged here "implicate[s] [this] fundamental right." *Glucksberg*, 521 U.S. at 722. "[A] careful description" of Plaintiffs' "asserted fundamental liberty interest," *id.* at 721, demonstrates that courts have historically protected the sacred right to bodily integrity from

forced intrusions into the body similar to the intrusion Plaintiffs experienced. Historical examples of Plaintiffs' claimed liberty interest include compelled surgery, induced vomiting, forcible injection of medication, corporal punishment, mandatory blood draws, and forced sterilization. *See Winston*, 470 U.S. at 765 (issuance of anesthesia and surgery against a person's will ); *Union Pac.*, 141 U.S. at 257 ("subjecting the plaintiff's person to examination by a surgeon, without her consent" was not permitted); *Rochin v. California,* 342 U.S. 165, 174 (1952) (forcibly inducing vomiting to obtain evidence from a detainee's stomach was "offensive to human dignity"); *Harper*, 494 U.S. at 229 ("The forcible injection of medication into a nonconsenting person's body represents a substantial interference with that person's liberty."); *Cruzan*, 497 U.S. at 279 (recognizing a competent person's "constitutionally protected right to refuse lifesaving hydration and nutrition"); *Ingraham v. Wright*, 430 U.S. 651, 672–73 (1977) (agreeing that corporal punishment evokes a "constitutionally protected liberty interest," because "[a]mong the historic liberties so protected was a right to be free from and to obtain judicial relief, for unjustified intrusions on personal security"); *Missouri v. McNeely*, 569 U.S. 141, 148 (2013) (a compelled blood test may constitute "an invasion of bodily integrity" as it "implicates an individual's 'most personal and deep-rooted expectations of privacy'" (citation omitted)); *Skinner v. State of Okla. ex rel. Williamson*, 316 U.S. 535, 541 (1942) (while the Court analyzed Oklahoma's forced sterilization statute under the equal protection framework, it recognized that sterilization performed without consent "forever deprived [the individual] of a basic liberty"). Moreover, the most directly applicable persuasive authority provides that forcibly administering harmful substances through drinking water violates residents' fundamental liberty interest. *Guertin v. State*, 912 F.3d 907, 920–21 (6th Cir. 2019) ("Involuntarily subjecting nonconsenting individuals to foreign substances with no known therapeutic value—often under false pretenses

and with deceptive practices hiding the nature of the interference—is a classic example of invading the core of the bodily integrity protection.").

Regardless of the manner in which the government seeks to intrude into an individual's body, it is the lack of informed consent that is fundamental to the violation of a person's liberty interest. *See Cruzan*, 497 U.S. at 269 ("This notion of bodily integrity has been embodied in the requirement that informed consent is generally required for medical treatment."); *Glucksberg*, 521 U.S. at 721 ("[T]he Fourteenth Amendment forbids the government to infringe 'fundamental' liberty interests *at all*, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest." (citation omitted)). Thus, so long as the government has knowledge that it is likely invading a person's body, and that person has not provided consent, the invasion may constitute a violation of the individual's bodily integrity. As such, the government may violate a nonconsenting person's bodily integrity "through canard and deception," as much as through seizing a person and forcing them to submit. *Cincinnati Radiation*, 874 F. Supp. at 812.

Accordingly, binding and persuasive authority and historical examples support Plaintiffs' due process liberty interest protecting them from compelled administration of lead into their bodies.

## B.  <u>Courts Do Not Impose a Heightened Culpability Standard in Situations Where Government Officials Have Time to Reflect.</u>

To help determine whether Plaintiffs plausibly pleaded that their constitutional rights were violated, the Court's February 5, 2024 order, requested that the parties brief "what culpability standard applies for misleading statements issued to the general public." Dkt. 97 at 21. As explained below, the applicable culpability standard is deliberate indifference. The culpability standard is not determined solely by an official's type of action (*i.e.*, misleading

- 9 -

statements), but rather is determined with consideration to the amount of time the official had to reflect on their selected course of action.

### 1.    Deliberate Indifference is the Appropriate Standard in This Case.

The deliberate indifference standard is applied where an official has time to make "unhurried judgments, upon the chance for repeated reflection, largely uncomplicated by the pulls of competing obligations." *County of Sacramento v. Lewis*, 523 U.S. 833, 853 (1998); *see also Rochin*, 342 U.S. at 172 (formulating and applying the shocks-the-conscience test for the first time where government actors acted with full appreciation of the brutality of their acts); *M. D. ex rel. Stukenberg v. Abbott*, 907 F.3d 237, 251 n.22 (5th Cir. 2018) (resolving debate about which standard of culpability to apply in favor of deliberate indifference); *Wilson v. Cook County*, 742 F.3d 775, 783 (7th Cir. 2014) (applying a culpability standard of deliberate indifference to a bodily integrity claim brought against a municipality for an employee's sexual misconduct). As the City appears to concede (Mot. at 3–4), a heightened culpability standard is only applicable when an official does not have time for deliberation, such as when responding to a prison riot[2] or engaging in high-speed police chases.[3] In all other circumstances, the standard is that of deliberate indifference. As there is no indication from the Second Amended Complaint or the City's opposition brief that the City was obligated to make a split-second decision,[4] it would

---

[2] In the context of a prison riot, "a deliberate indifference standard does not adequately capture the importance of such competing obligations, or convey the appropriate hesitancy to critique in hindsight decisions *necessarily made in haste, under pressure, and frequently without the luxury of a second chance*." *Whitley v. Albers*, 475 U.S. 312, 320 (1986) (emphasis added).

[3] "[W]hen unforeseen circumstances *demand an officer's instant judgment*, even precipitate recklessness fails to inch close enough to harmful purpose to spark the shock that implicates the large concerns of the governors and the governed." *Lewis*, 523 U.S. at 853 (citation omitted).

[4] The City attempts to suggest that it "was an immediate crisis that required the City to quickly reconcile competing policy considerations." However, this unsupported attempt to impose post-hoc urgency on the government's response does not amount to the need for instantaneous

be inappropriate to apply a heightened standard of fault (*e.g.*, intent to harm) to the facts and circumstances of this case.

The facts alleged in the SAC sufficiently allege that the City had months, if not years, to deliberate before deciding to mislead the community about the dangers of the contaminated water it was providing. *See generally* supra at 1–9 (describing conduct that took place over at least seven years). Not only did the City have ample time to reflect on its conduct, but its conduct consisted of multiple instances where it provided false or misleading statements about the safety of the water as well as actions taken to cover up the severity of the crisis. *See, e.g.*, SAC ¶¶ 148, 150, 151, 152, 157, 160, 162, 165, 195–98 (describing multiple false statements, misrepresentations, and cover up of lead in the water by Defendant Powell); *id.* ¶¶ 154, 162, 168, 171, 193–94 (misrepresentations by Defendant Yarber). Given that the City had more than sufficient time for repeated reflection and unhurried judgment, it is sufficient for Plaintiffs to show that the City was deliberately indifferent, *i.e.*, had "extended opportunities to do better . . . teamed with protracted failure even to care." *Lewis*, 523 U.S. at 853.

In *M. D. ex rel. Stukenberg*, the Fifth Circuit considered whether a lower culpability standard (the "professional judgment" standard) should apply in the foster care context. Similar to the case at hand, *Stukenberg* also involved a policy implemented and continued, subject to ample and repeated reflection, where warnings of its inadequacy dated back nearly two decades. 907 F.3d at 247 (describing reports and reviews of the state's foster care system dating back to 1996). The court recognized that "[t]he compelling appeal of the argument for the professional judgment standard is that foster children, like involuntarily committed patients, are entitled to

---

decision-making as is necessary during a prison riot or high-speed chase. At the least, it is a trial defense rather than a basis for dismissing a complaint at the threshold.

more considerate treatment and conditions than criminals." *Id.* at 251 n.22 (citations omitted). Of course, this reasoning applies equally to Jackson residents who, by no fault of their own, resided in dwellings that received municipal tap water. In *Stukenberg*, the Fifth Circuit determined that any difference between the two standards would be minimal, and so required the plaintiffs demonstrate the higher standard of deliberate indifference. *Id.* at 252. Thus, while it would not be unheard of to entertain a lower culpability standard in this case, imposing a higher standard of "intent to harm" would be plainly mistaken.

### 2.    The City's Conduct was Deliberately Indifferent.

Once a plaintiff establishes the deprivation of a liberty interest—here, bodily integrity—the Court must analyze whether the alleged conduct amounts to deliberate indifference. Deliberate indifference occurs when "the [government] acted or failed to act despite [its] knowledge of a substantial risk of serious harm." *Stukenberg*, 907 F.3d at 252 (citation omitted). Of course, determining the egregiousness of the alleged conduct depends on the factual circumstances under which the conduct occurred. *Taylor*, 15 F.3d at 456 n.12 ("Deliberate indifference will often be a fact-laden question . . . ."). To assess the arbitrariness of the government's actions at the motion to dismiss stage, courts often look to the following factors: (1) the city's knowledge that its policy was likely to result in the violation of constitutional rights; (2) the amount of time the city had to deliberate, (3) whether there was an involuntary relationship between the city and the plaintiffs, and (4) whether the city's conduct was undertaken pursuant to a legitimate government purpose.

### a.    The City knew the inadequacy of its response to the water crisis was likely to result in the violation of a constitutional right.

"The Supreme Court has . . . explained that the deliberately indifferent state of mind can be inferred 'from the fact that the risk of harm is obvious.'" *Stukenberg*, 907 F.3d at 253 (quoting

*Hope v. Pelzer*, 536 U.S. 730, 737 (2002)). For example, "the need to train officers in the constitutional limitations on the use of deadly force can be said to be 'so obvious,' that failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights." *City of Canton v. Harris*, 489 U.S. 378, 390 n.10 (1989) (citation omitted).

Here, Plaintiffs plausibly alleged that the City was (1) aware that the water it delivered to Plaintiffs' homes was contaminated with lead; (2) knew that lead is harmful to human health; and (3) knew that Plaintiffs were drinking their tap water as required for survival and also consuming it for hygienic purposes (*e.g.*, brushing their teeth, bathing, and washing dishes).[5] When questions about the safety of the City's water surfaced, City officials such as Defendants Powell and Yarber reassured Plaintiffs and the community that the water was safe to drink, and even provided advice they said would ensure the water would be safe (*e.g.*, issuing boil notices). SAC ¶¶ 149–51, 195–96. (Plaintiffs allege that these statements were untrue.) Yet, it was "obvious" to the City that Plaintiffs would rely on the City officials' statements about the safety of the water. And, it was "obvious" to the City that if Plaintiffs consumed their tap water, they would be likely to consume toxic amounts of lead with it—especially if consumed over time.

As such, covering up the lead crisis and representing to Jackson residents that the water was safe for consumption was "so obvious" to result in Plaintiffs' consuming lead, that it readily amounts deliberate indifference. And while "this court has never required [government] officials to be warned of a *specific* danger," *Stukenberg*, 907 F.3d at 252 (citation omitted), here Plaintiffs allege that Jackson officials were aware that their cover up of the lead crisis and repeated assurances of the safety of the water could ultimately cause Jackson residents to be poisoned by

---

[5] While the City contends that "none of the City's statements were knowingly false," Mot. at 9, Plaintiffs allege that they were. SAC ¶ 155. As the non-moving party, Plaintiffs' plausible allegations must be taken as true.

lead. Thus, the City's knowledge that its actions and misrepresentations were likely to lead to community members consuming lead-contaminated water indicates that the City acted with deliberate indifference.

> **b.      The City had months to deliberate about its response and implemented its inadequate policy for years.**

As discussed above, the City had "extended opportunities to do better." *Lewis*, 523 U.S. at 853; *see also Rochin*, 342 U.S. at 172 (describing conscience-shocking that occurred during the course of just one night). As Plaintiffs allege, the City had days, months, and even years to deliberate about its response to the water crisis. SAC ¶¶ 247–50, 280. It had time to reflect and reassess its decision to cover up the lead in the water. Its decision to advise residents that the water was safe to drink was not made under rushed circumstances, but rather such statements were made and reinforced on multiple occasions and by various City officials. *Id.* ¶¶ 158, 162, 164–66. Despite its many opportunities, the City failed to "take the obvious steps," *Taylor*, 15 F.3d at 457, to advise residents that the water was not safe to drink.

In *Doe v. Taylor Independent School District*, the Fifth Circuit found at summary judgment that a school principal "demonstrated deliberate indifference to the offensive [sexual] acts [of a teacher] by failing to take action that was obviously necessary to prevent or stop [the teacher's] abuse." *Id.* For two years, the principal received various complaints about the teacher's inappropriate behavior with female students, and yet dismissed these concerns and failed to respond to them. *Id.* at 456–57. Here, while the City similarly had years upon which to deliberate, it went even further than the principal in *Taylor*. Not only did the City dismiss concerns related to Jackson's water quality, but, it actively covered up these issues (SAC ¶¶ 140, 146, 149, 162), moved residents' water supply from clean wells to the contaminated public water system (*id.* ¶¶ 120–28), fired employees who spoke up about lead contamination (*id.* ¶¶ 163,

197–200), and publicly encouraged residents that the water was safe to use (*id.* ¶¶ 167–73). In doing so, the City had sufficient time to consider its policy choices, and yet chose to ignore residents' bodily integrity rights. However, deliberation need not occur over the course of years or even months.

In *Rochin*, the first case to formulate and apply the shocks the conscious standard, the Supreme Court found that police officers violated plaintiff's bodily integrity in an incident that lasted only one night. There, police officers saw plaintiff swallow two capsules. 342 U.S. at 166. The officer brought the plaintiff to the hospital and directed a doctor to force an emetic solution through a tube into plaintiff's stomach against his will. *Id.* Even though this conduct took place over just one night, the Supreme Court implied that the officers were aware of and thereby had time to appreciate their "brutal conduct." *Id.* at 173. Thus, while the amount of time for deliberation may vary from case to case, here, the City had ample time to consider that its policies coerced residents' to ingest lead, yet consciously ignored that concern. As such, this factor indicates the City was deliberately indifferent to Plaintiffs' right to bodily integrity.

c.   **As the sole provider of municipal water services, Plaintiffs had an involuntary relationship with the City for the purposes of obtaining tap water.**

When deciding whether plaintiffs' constitutional rights have been violated, Courts may also take into account the existence of an involuntary plaintiff-defendant relationship. Such a relationship indicates that the defendant's decisions were unwillingly imposed on the plaintiff. *See, e.g.*, *Stukenberg*, 907 F.3d at 244 (finding, inter alia, that the state was deliberately indifferent to the risks to foster care children posed by its policies and practices toward caseworkers' caseload management); *Cincinnati Radiation*, 874 F. Supp. at 811 (recognizing that "[m]any of the cases recognizing constitutional causes of action for nonconsensual medical

- 15 -

treatment involve plaintiffs who were either prisoners or were involuntarily committed to psychiatric institutions").

While Plaintiffs were not incarcerated or held against their will by the City, Plaintiffs have pleaded sufficient facts to show that their relationship with the City, for the purposes of obtaining tap water, was involuntarily. This involuntary relationship is perhaps most evident by the City's decision to switch Jackson's "well water users to surface water drawn from the Pearl River and the Reservoir," a decision that was "catastrophic" for "thousands of Jackson water customers given the fragile balance of pH then in place in Jackson's [public water system]." SAC ¶¶ 120–40. This was a decision that residents had no say in. Plaintiffs also had no say as to which water provider to select, how the City maintained its water system, or the ability to gain independent knowledge about the safety of the water. *See id.* ¶¶ 18–19 (demonstrating that the City was in exclusive control of the provision and maintenance of Jackson's water system). Instead, Plaintiffs were stuck with both the water and the information that the City provided, "turning residents' voluntary consumption of a substance vital to subsistence into an involuntary and unknowing act of self-contamination." *Guertin*, 912 F.3d at 925–26. This is precisely the conduct the Sixth Circuit found to violate Plaintiffs' constitutional rights in *Guertin*.

        **d.**    **The City had no governmental interest sufficient to justify poisoning its residents.**

Only strong countervailing government interests may outweigh an individual's constitutional right to bodily integrity. *See, e.g.*, *Harper*, 494 U.S. at 227 (holding that "given the . . . prison environment, the Due Process Clause permits the State to treat a prison inmate who has a serious mental illness with antipsychotic drugs against his will, if the inmate is dangerous to himself or others and the treatment is in the inmate's medical interest"); *McNeely*, 569 U.S. at 160 (the government's interest in preventing and prosecuting drunk-driving offenses

did not justify a warrantless blood draw to determine plaintiff's blood alcohol content, especially where the state had "a broad range of legal tools to enforce their drunk-driving laws"). However, the City points to no credible countervailing government interests that would be sufficiently compelling to override Plaintiffs' liberty interest.

The City strains to suggest a single countervailing governmental interest: preventing the incitement of "unjustified panic." Mot. at 6. The City merely postulates that preventing panic may have been a relevant interest, without providing any evidence to demonstrate this was a genuine concern or, even if it was, that the City's policies were sufficiently tailored to its purported goal of maintaining public order. Nor has the City cited any caselaw to support its assumption that a generalized concern of inciting panic outside of the prison context outweighs Plaintiffs' right to bodily integrity. Rather, especially when balanced with the City's decision to poison Plaintiffs, the government's interest in preventing panic is relatively minimal, especially given the other mechanisms at its disposal for maintaining public order.

More likely, the City's interests were in line with those of Plaintiffs. The City "has an 'unqualified interest in the preservation of human life,'" *Glucksberg*, 521 U.S. at 728 (quoting *Cruzan*, 497 U.S. at 282), not its destruction. Thus, contrary to the City's argument, it did not have legitimate, countervailing government interests that warranted poisoning its residents, and to suggest as much is unconscionable.

In sum, Plaintiffs allege that the City's response to and public statements about the water crisis were a conscious choice to disregard, prolong, exacerbate, and conceal the known risk to their right to bodily integrity. These allegations constitute deliberate indifference.

**C.**    **Plaintiffs Adequately Pleaded That the City was "the Moving Force" Behind the Deprivation of Plaintiffs' Due Process Rights.**

"Causation is . . . an 'intensely' fact-bound inquiry." *Stukenberg*, 907 F.3d at 253 (quoting *Morris v. Dearborne*, 181 F.3d 657, 673 (5th Cir. 1999)). This inquiry helps determine whether municipal liability may attach under § 1983. Specifically, "[a] claim of municipal liability under Section 1983 'requires proof of three elements: a policymaker; an official policy; and a violation of constitutional rights whose  "moving force" is the policy or custom.'" *Doe ex rel. Magee v. Covington Cnty. Sch. Dist. ex rel. Keys*, 675 F.3d 849, 866 (5th Cir. 2012) (quoting *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001)).

At this stage, Plaintiffs sufficiently allege that the City was responsible for the violation they suffered to their bodily integrity because the City's policy and practices were "the moving force" that coerced them to unknowingly ingest lead. *See City of Canton,* 489 U.S. at 389 ("[A] municipality can be liable under § 1983 only where its policies are the moving force behind the constitutional violation."); *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 659 (1978) (Municipalities "may be sued for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the government's official decision-making channels.").

First, the City's conduct was carried out by official policymakers, including the mayors of Jackson. SAC ¶¶ 103–12. Second, the City's conduct amounted to an official policy or practice, even if not formally ratified, because it endured for months (*id.* ¶ 186) and later years (*id.* ¶¶ 187–88); was implemented by high-level officials, including the mayor (*id.* ¶¶ 24, 288–89); and resulted in the firing of an employee who violated the policy (*id.* ¶¶ 197–200). Third, the City's policy or practice inflicted Plaintiffs' constitutional harm. As alleged, the City's conduct, providing contaminated water, covering up its contamination, and assuring Plaintiffs

that the water was safe to drink caused Plaintiffs to unknowingly ingest lead and prolonged the amount of time that they ingested it. *Id.* ¶¶ 149–73. The City's conduct and statements directly misled Plaintiffs to believe that the water was safe for human consumption when it was not. Id. Plaintiffs followed guidance from City officials' assuring them that the tap water was safe. "Had Plaintiff[s] been advised by the City to not drink or use the municipal water, [they] would have immediately stopped consuming the water" and switched to bottled water. *Id.* ¶¶ 303, 318, 336, 352. However, absent the City's recommendation to stop drinking the water and due to the City's assurances that the water was safe to use, Plaintiffs continued to use it. *Id.* ¶¶ 302, 317, 335, 351. Thus, the City's creation of and response to Jackson's water crisis are not only "closely related to the ultimate injury," *City of Canton*, 489 U.S. at 391, that Plaintiffs suffered, but are the actual cause of the violation of Plaintiffs' right to bodily integrity.

In sum, Plaintiffs adequately pleaded a constitutionally cognizable Due Process Claim. Plaintiffs have shown that (1) they hold a constitutionally protected interest in their right to bodily integrity not to be compelled to ingest harmful substances; (2) that the City acted with deliberate indifference to Plaintiffs' right, which shocked the conscious; and (3) that the City's deliberate indifference caused Plaintiffs' deprivation of their constitutional right to bodily integrity. Accordingly, this Court should deny the City's motion.

## II.     <u>Plaintiffs State-Created Danger Claim was Not "Re-Plead," and Therefore Need Not be Dismissed a Second Time.</u>

Contrary to the City's arguments, Plaintiffs did not "ignore the Court's directive" by "reasserting" claims that the Court dismissed with prejudice. Instead, Plaintiffs did not remove their state-created danger claim against the City to preserve it for potential appellate proceedings. In doing so, Plaintiffs recognize that the Court's February 5, 2024 Order dismissing Plaintiffs' state-created danger claim against the City with prejudice (Dkt. 97) governs.

The Court's February 5, 2024 Order, provided "Plaintiffs another opportunity to plead their bodily integrity claim, focusing solely on the misrepresentation allegations." Dkt. 97 at 21. The City complains that Plaintiffs added two paragraphs providing further detail about the City's control over Jackson's public water system, which help explain why Plaintiffs reasonably relied on the City for their information about the safety of the water. Mot. at 14–15.

Plaintiffs' bodily integrity claim is in part based on the control that the City had over the Jackson's public water system; the misrepresentations that the City made related to the safety of the water; and Plaintiffs' reasonable reliance on those misrepresentations, which induced them to consume contaminated water at the City's direction. Plaintiffs' allegations in the SAC are well-within the Court's order because the facts they added are pertinent to their bodily integrity claim based on the City's misrepresentations. The City's arguments about Plaintiffs' state-created danger claim are unnecessary as the Court has already dismissed that claim with prejudice, and it therefore would be unnecessary to do so again. Dkt. 97 at 26.

## III.    Supplemental Jurisdiction Over Plaintiffs' State Law Claims is Warranted.

The Court has supplemental jurisdiction over Plaintiffs' state law claims because they form part of the same case or controversy as Plaintiffs' federal claim. Under 28 U.S.C. § 1367, "district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a).  Here, this Court has original, federal question jurisdiction under 28 U.S.C. § 1331 over Plaintiffs' Fourteenth Amendment substantive due process claims against the City. 28 U.S.C. § 1331 ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.").

Plaintiffs' federal constitutional claim and Plaintiffs' state law claims for professional negligence and negligence against Trilogy (Counts III and IV) as well as negligence against the City officials (Count V), arise from the same case or controversy under § 1367(a): the contamination of Jackson's public water system with lead and other harmful contaminants. Moreover, none of the exceptions to the default of the exercise of supplemental jurisdiction are applicable here.

A district court, in its discretion, may decline to exercise supplemental jurisdiction in four narrow circumstances: (1) the claim raises a novel or complex issue of state law; (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction; (3) the district court has dismissed all claims over which it has original jurisdiction; or (4) in exceptional circumstances, there are compelling reasons for declining jurisdiction. 28 U.S.C. § 1367(c). The City only raises the third exception to supplemental jurisdiction. Mot. at 15–16. However, for the forgoing reasons, Plaintiffs' federal due process claim should proceed against the City, and therefore there is no basis for the Court should decline to exercise supplemental jurisdiction over Plaintiffs' state law claims.

## **CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that the Court deny the City's motion to dismiss Plaintiffs' Due Process Claim.


Dated: April 5, 2024                    _____/s/ Mark P. Chalos_____
                                         Mark P. Chalos (*Pro Hac Vice*)
                                         *Lead Counsel*
                                         Lieff Cabraser Heimann & Bernstein, LLP
                                         222 2nd Avenue South, Suite 1640
                                         Nashville, TN 37201-2379
                                         Telephone: 615-313-9000
                                         Facsimile: 615-313-9965
                                         mchalos@lchb.com

2970608.4

Robert L. Gibbs (Bar No. 4816)
Gibbs Travis PLLC
210 East Capitol Street, Suite 1801
Jackson, MS 39201
Telephone: 601-487-2640
Fax: 601-366-4295
rgibbs@gibbstravis.com

Tiseme G. Zegeye (*Pro Hac Vice*)
Amelia A. Haselkorn (*Pro Hac Vice*)
Lieff Cabraser Heimann & Bernstein, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone: 415-956-1000
Facsimile: 415-956-1008
tzegeye@lchb.com
ahaselkorn@lchb.com

Stuart C. Talley (*Pro Hac Vice*)
Kershaw Talley Barlow, P.C.
401 Watt Avenue, Suite 1
Sacramento, CA 95864
Telephone: 916-779-7000
stuart@ktblegal.com

Larry Moffett (Bar No. 3401)
Law Office of Larry D. Moffett PLLC
P.O. Box 1418
39 CR 231
Oxford, MS 38655
Telephone: 662-298-4435
larry@larrymoffett.com

*Attorneys for Plaintiffs and the Proposed Class*

- 22 -

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 5, 2024 I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which served a copy of the foregoing on all counsel of record.

*/s/ Amelia A. Haselkorn*

Amelia A. Haselkorn

2970608.4