UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

PRISCILLA STERLING, et al.                                    PLAINTIFFS

V.                                        CIVIL ACTION NO. 3:22-CV-531-KHJ-MTP

THE CITY OF JACKSON, MISSISSIPPI, et al.                        DEFENDANTS

ORDER

Before the Court are Motions to Dismiss by Defendants Chokwe A.

Lumumba, Tony Yarber, Kishia Powell, Robert Miller, Jerriot Smash,[1] and the City

of Jackson ("City"). [104]; [106]. As explained below, the Court grants the Individual

Defendants' [104] Motion to Dismiss and grants in part and denies in part the City's

[106] Motion to Dismiss. The Court dismisses with prejudice all claims against the

Individual Defendants. The Court dismisses with prejudice the bodily-integrity and

state-created-danger claims against the City. The Court will allow Plaintiffs seven

days to submit supplemental briefing as to why the remaining state-law claims

belong in this Court.

I.      Background

This class action arises from the City of Jackson's water crisis. Named

Plaintiffs Priscilla Sterling, Raine Becker, Shawn Miller, and John Bennett—all

---

[1] The Court refers to this cohort, comprised of current and former City officials, as
the "Individual Defendants." *See* Order [97] at 1–2 n.2 ("Lumumba is the current Mayor of
Jackson and has served in that role since July 2017. His predecessor, Yarber, served as
mayor from April 2014 to June 2017. Powell (August 2014–May 2016), Smash (May 2016–
October 2017), and Miller (October 2017–July 2020) are former Public Works Directors for
the City.") (cleaned up).

citizens of Jackson—bring this Second Amended Complaint on behalf of the Jackson-Area Resident Class. [101] ¶¶ 292–360. The Second Amended Complaint contains the same claims as the Amended Complaint: (1) bodily integrity against the City and Individual Defendants, (2) state-created danger against the City and Individual Defendants, (3) state-law negligence against the City and Individual Defendants, (4) state-law professional negligence against Trilogy Engineering Services LLC ("Trilogy") and (5) state-law negligence against Trilogy. *Compare id.* ¶¶ 370–435, *with* First Am. Compl. [57] ¶¶ 356–420.

Upon motion under Rule 12(c), the Court dismissed all claims against the Individual Defendants with prejudice. Order [97] at 26–27. As for the City, it dismissed the state-created-danger claim with prejudice, *id.* at 22–24, and the bodily-integrity claim without prejudice, *id.* at 21.² In doing so, the Court thoroughly summarized the factual allegations underlying this litigation. *See id.* at 1–6. The Court reproduces the relevant portions of that summary below, updating citations to the operative complaint.

Jackson's public water system faces multifaceted issues that trace back over 100 years. *See, e.g.*, [101] ¶¶ 38–44, 62–69. The alleged conduct underlying this litigation, however, began in late 2013 or early 2014. Plaintiffs allege that,

---

² Plaintiffs acknowledge that the Court's prior [97] Order governs the claims dismissed with prejudice and that their Second Amended Complaint does not revive them. Pls.' Resp. [113]; Pls.' Mem. [115] at 24–25. The Court thus grants the Individual Defendants' [104] Motion to Dismiss without further explanation.

For good measure, the Court again dismisses Plaintiffs' state-created-danger claim against all Defendants, incorporating the analysis in its prior Order by reference. *See* [97] at 22–24.

somewhere around that time, the City learned that low-pH surface water contributed to an uptick in lead levels. *See id.* ¶ 82.[3] Federally mandated testing for the 2010–2012 period showed an uptick in lead in the City's surface water supply compared to the previous triennial testing period ending in 2009. *Id.* ¶ 49; *see also id.* ¶¶ 75–81.[4] Plaintiffs concede these results "were not high enough to . . . trigger any mandatory action," but they allege they "should have raised concerns about the potential health risks to system customers." *Id.* ¶ 78.

And they allege they did raise concerns. Around that time, then-Interim Public Works Director Willie Bell presented the issue to then-Mayor Chokwe Lumumba (Defendant Chokwe Antar Lumumba's father) and other City Council members (including Tony Yarber, who became Mayor). *See id.* ¶¶ 82–102. Bell explained that pH control problems at the City's water treatment plants caused the lead uptick, and he suggested the City spend $400,000 to repair a defective lime injection pump at the O.B. Curtis water treatment plant. *Id.* ¶¶ 83–92. Before his death in February 2014, Mayor Chokwe Lumumba incorporated the purchase into the budget. *Id.* ¶¶ 95–96. Former Mayor Yarber took over in April 2014. *Id.* ¶ 97. In August 2014, he appointed Kishia Powell to replace Bell as the Public Works

---

[3] As pH decreases, water becomes more corrosive, causing lead to leach out of pipes and into the water traveling through them. [101] ¶ 54. Plaintiffs allege that this is a major problem in Jackson: there is a "solid band of lead every 20 feet in the older cast-iron piping" running underneath the City's streets. *Id.* ¶ 46.

[4] For the period ending in 2009, the lead levels for the surface water system were 4.8 parts per billion (ppb) for the 90th percentile and 8.8 ppb for the 95th percentile. [101] ¶ 76. For the 2010–2012 period, those values were 13.7 ppb and 33.5 ppb. *Id.* ¶ 77. The action level under the United States Environmental Protection Agency's Lead and Copper Rule is 15.0 ppb for the 90th percentile. *Id.* ¶ 115. For those same periods, the well water system showed relatively low lead levels—1.7 ppb. *Id.* ¶¶ 80–81.

3

Director. *Id.* ¶ 105. The City removed the $400,000 purchase from the budget sometime later. *See id.* ¶ 103.

In June 2015, the Mississippi State Department of Health (MSDH) recorded the first lead action level exceedance in the City's drinking water. *Id.* ¶¶ 141–42. Of the 58 homes sampled, 13 showed lead levels above the action level. *See id.* ¶¶ 141–47.

On January 29, 2016, the day after the MSDH formally reported the action level exceedance to the City, the City held a press conference where Powell announced the results. Anna Wolfe & Sarah Fowler, *Jackson, MSDH Report Lead Detection in City Water*, Clarion Ledger (Jan. 29, 2016), https://www.clarionledger.com/story/news/local/2016/01/29/small-amount-lead-some-jackson-residents-water/79510298/ [https://perma.cc/F4NQ-LX9J] (cited at [101] ¶ 152 n.42). She stated that the results meant the "[C]ity is required to take additional compliance measures." *Id.* She claimed that "[t]his is not a widespread issue, although we are treating it very seriously." R.L. Nave, *Jackson Has Long Been at High Risk for Lead Poisoning*, Jackson Free Press (Feb. 3, 2016), https://www.jacksonfreepress.com/news/2016/feb/03/jackson-has-long-been-high-risk-lead-poisoning/ [https://perma.cc/4YKS-NTC8] (cited at [101] ¶ 46 n.10). Powell explained why she believed the problem was not widespread: "[w]e had 58 samples taken, only 13 of them exceeded the actionable level[,] and there were homes on the same street that were sampled that did not exceed those levels." Wolfe & Fowler, *supra*. She stated, "[t]his is not a situation where you have to stop drinking the

water." [101] ¶ 150 (quoting Nave, *supra*). She continued, "[w]e want people to understand how they should be flushing their internal plumbing system before using water . . . . These are just measures you take." Wolfe & Fowler, *supra*. Powell stated that the findings do "not mean that the city has violated the Safe Drinking Water Act, and our water is safe." [101] ¶ 152 (quoting Wolfe & Fowler, *supra*).

Statements continued over the next few weeks. Then-Mayor Yarber said, "I don't want to sound the wrong alarm [and have] folks saying, 'We're Flint.' We're not Flint." *Id.* ¶ 156 (quoting Anna Wolfe, *Jackson City Council Talks Lead Water*, Clarion Ledger (Feb. 17, 2016), https://www.clarionledger.com/story/news/local/2016/02/17/jackson-city-council-talks-lead-water/80538910/ [https://perma.cc/82FC-5UP3])). Powell chimed in, "[a] major difference between Flint, Mich., and Jackson, Miss. . . . is that the crisis in Flint began because the city did not have corrosion control measures in place, whereas Jackson does." *Id.* ¶ 153 (quoting Wolfe, *supra*). She acknowledged that these corrosion control "systems need to be improved and upgraded . . . ." Wolfe, *supra*. She added that "[t]here is no lead in the drinking water as it leaves the [water treatment] plant." [101] ¶ 159 (quoting Wolfe, *supra*).[5]

Also in February 2016, the City entered into a Compliance Plan with the MSDH. *Id.* ¶ 174; [101-3]. The Plan required the City to, among other things, raise the pH in its water system to a level that would prevent lead from leaching out of

---

[5] Plaintiffs acknowledge that this statement may be true, but urge that it is deliberately misleading, as it creates an "overall impression that there is no lead in the water at all, when testing in fact confirmed that there was." [101] ¶ 160.

the decades-old pipes that feed many Jackson homes. *See* [101-3] at 2–3. The City failed to fulfill this obligation consistently and was cited with a violation of the Plan in July 2018. [101] ¶¶ 180–82, 185–86. Despite that fact, which the City publicly admitted, Powell's successor, Robert Miller, stated that the "water is still safe to drink." *Id.* ¶¶ 173, 186.

Plaintiffs allege that these statements and others made about the water's potability were knowingly false, intentionally misleading, and "induced Jackson's citizens and water users to take actions that were dangerous to their health . . . and to avoid taking actions that might mitigate that harm." *Id.* ¶ 155; *see also id.* ¶¶ 149–73. They argue that the City's alleged misrepresentations about the water, combined with other factors, compelled them to ingest lead-contaminated water in violation of their Fourteenth Amendment right to bodily integrity. *See* [115] at 10–13. The City moves to dismiss that claim under Federal Rule of Civil Procedure 12(b)(6), arguing that Plaintiffs fail to state a claim. [106] at 1.

II.    Standard

To overcome a motion under Rule 12(b)(6), a complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The facial plausibility standard requires "more than an unadorned, the-defendant-unlawfully-

6

harmed-me accusation." *Id.* "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

The Court "accept[s] as true the allegations in the complaint and construe[s] them in the light most favorable to the plaintiff." *R2 Invs. LDC v. Phillips*, 401 F.3d 638, 642 (5th Cir. 2005) (citation omitted). But the Court should neither "strain to find inferences favorable to the plaintiff[]" nor "accept 'conclusory allegations, unwarranted deductions, or legal conclusions.'" *Id.* (quotation omitted). The Court can consider "the complaint, its proper attachments, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Innova Hosp. San Antonio, L.P. v. Blue Cross & Blue Shield of Ga., Inc.*, 892 F.3d 719, 726 (5th Cir. 2018) (cleaned up).

III.    Analysis

First, the Court recaps its prior Order, details the new allegations in Plaintiffs' Second Amended Complaint, and analyzes the viability of Plaintiffs' bodily-integrity claim as amended. As explained below, the Court concludes that the Second Amended Complaint does not state a violation of the right to bodily integrity. Second, the Court considers its potential jurisdiction over the remaining state-law claims and grants Plaintiffs seven days to submit additional briefing as to why these claims belong in this Court. If Plaintiffs decline to do so, the Court will decline to exercise supplemental jurisdiction and sua sponte dismiss those claims without prejudice. *See* Fed. R. Civ. P. 12(h)(3).

In its prior Order, the Court analyzed Plaintiffs' bodily-integrity claim by separating the underlying factual allegations into two categories: (1) failures to act and (2) actions that exacerbated the water crisis. *See* [97] at 13, 17–18. The Court ruled that, under the circumstances here, the former could not rise to the level of conscience-shocking conduct sufficient to establish a substantive due process violation. *See id.* at 13–17. As for the latter category—actions taken—the Court found that, in light of a concession by the City, the only allegations that might be constitutionally viable are those that relate to public misrepresentations by City officials. *See id.* at 17–21.[6]

Still, the Court dismissed the misrepresentation-based claim because Plaintiffs failed to plead causation; they did not plead that they heard or relied on any of the alleged false or misleading statements about the water. *Id.* at 21. The Court allowed Plaintiffs another opportunity to plead their claim and instructed them to focus solely on the misrepresentation allegations. *Id.* It explained that if Plaintiffs re-pleaded their claim, any subsequent motion to dismiss briefing should address: "(1) what culpability standard applies for misleading statements issued to the general public; and (2) whether the City's statements, taken as a whole, meet that standard in this particular context." *Id.* Additionally, the Court sought briefing on "whether there exist historical examples of recognition of the claimed liberty protection at some appropriate level of specificity to sustain a due process violation." *Id.* at 22 (quotation omitted).

---

[6] The Court incorporates by reference its [97] Order rejecting every argument but the one centered on the City's alleged misrepresentations.

Plaintiffs' Second Amended Complaint tries to remedy the causation defect. For example, Sterling alleges that she followed local news reporting on the water crisis and that her family continued to use City water because of the public representations made by City officials that the water was safe. [101] ¶¶ 301–02. She alleges that had officials advised her not to drink or use the water, she would have immediately switched to bottled water. *Id.* ¶ 303. Her named co-plaintiffs allege the same. *See id.* ¶¶ 316–18, 334–36, 350–52. "Taking the allegations of the complaint as true, . . . [the Court] assume[s] that a sufficient causal connection exists between [City officials]' optimistic statements and the [P]laintiffs' exposure to toxic substances." *Lombardi v. Whitman*, 485 F.3d 73, 81 (2d Cir. 2007).[7]

Plaintiffs base their claim on the "control that the City had over the Jackson[] public water system; the misrepresentations that the City made related to the safety of the water; and Plaintiffs' reasonable reliance on those misrepresentations, which induced them to consume contaminated water at the City's direction." [115] at 20. They argue these factors combined to compel them to ingest harmful substances without their informed consent, and they equate this consumption of tainted drinking water without informed consent to other forcible intrusions of the body that violate the Fourteenth Amendment right to bodily integrity. *See id.* at 9–13.

---

[7] That "point is fairly debatable," and the causation issues are "vexed." *Lombardi*, 485 F.3d at 81 (citing *Martinez v. California*, 444 U.S. 277, 281 (1980)).

A. Substantive Due Process

The substantive component of the Fourteenth Amendment's Due Process Clause protects individual liberties, such as the right to bodily integrity, from unreasonable governmental intrusion. *Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d 443, 450–51 (5th Cir. 1994) (en banc). A § 1983 substantive due process claim against a municipality "requires proof of three elements: a policymaker; an official policy; and a violation of constitutional rights whose 'moving force' is the policy or custom." *Doe ex rel. Magee v. Covington Cnty. Sch. Dist. ex rel. Keys*, 675 F.3d 849, 866 (5th Cir. 2012) (en banc) (quoting *Piotrowski v. City of Hous.*, 237 F.3d 567, 578 (5th Cir. 2001)). "Without an underlying constitutional violation, an essential element of municipal liability is missing." *Becerra v. Asher*, 105 F.3d 1042, 1048 (5th Cir. 1997), *as supplemented on denial of reh'g* (Apr. 7, 1997). "[P]roper analysis requires [this Court] to separate two different issues when a § 1983 claim is asserted against a municipality: (1) whether plaintiff's harm was caused by a constitutional violation, and (2) if so, whether the city is responsible for that violation." *Collins v. City of Harker Heights*, 503 U.S. 115, 120 (1992).

1. Failures to Act

Nothing in Plaintiffs' Second Amended Complaint changes this Court's conclusion that the City owed no affirmative duty to protect them from the foreseeable dangers of rising lead levels in the water. *See* [97] at 13–17. The Due Process Clause has historically applied to "*deliberate* decisions of government officials to deprive a person of life, liberty, or property." *Collins*, 503 U.S. at 127

10

n.10 (collecting cases). The Clause "is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security." *DeShaney v. Winnebago Cnty. Dep't. of Soc. Servs.*, 489 U.S. 189, 195 (1989). Due process thus confers "no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests . . . ." *Id.* at 196; *see also* [97] at 15–16 (discussing *Collins*, 503 U.S. 115).

One exception to this categorical rule applies in the Fifth Circuit: the "special relationship" exception. "Under this exception, a state may create a 'special relationship' with a particular citizen, . . . [and i]n such instances, 'the Constitution imposes upon [the State] a corresponding duty to assume some responsibility for his safety and general well-being.'" *Doe ex rel. Magee*, 675 F.3d at 855–56 (quoting *DeShaney*, 489 U.S. at 199–200). The "special relationship exception" applies to prisoners, pretrial detainees, people involuntarily committed to an institution, and children placed in foster care. *Id.*

Plaintiffs' Second Amended Complaint alleges that City ordinances required the City to provide and compelled Plaintiffs to accept water from the public water system. [101] ¶¶ 18–19 (citing Jackson, Miss., Code of Ordinances §§ 2-336(4), 122-268, 122-270).[8] To the extent that Plaintiffs argue these new allegations impose on the City a constitutional duty to protect them from or warn them about foreseeable

---

[8] Section 2-336(4) creates the City's public works department and spells out its general functions; one function is "water . . . engineering and maintenance." Jackson, Miss., Code of Ordinances § 2-336(4). Section 122-268 prescribes the applicable rates for users of the City's water system. *Id.* § 122-268. Section 122-270 describes the penalties for delinquent water bills. *Id.* § 122-270.

danger resulting from rising lead levels, that is not the case. *See id.* ¶¶ 18–19, 373–78.[9]

Nothing in the ordinances Plaintiffs cite prohibits getting water from other sources. If compulsory school attendance laws do not create a special relationship between elementary students and public schools, *see Doe ex rel. Magee*, 675 F.3d at 861, then laws requiring municipal residents to pay for water they elect to receive from the City do not either. As the Fifth Circuit explained,

> It may well be true that, for the vast majority of parents in Mississippi, the only way for them to fulfill their obligation [to enroll their children in school until age 17] is to enroll their children in public school. But that practicality does not alter the fact that [the child's] parents voluntarily sent her to the school as a means of fulfilling their obligation to educate her. [The child]'s parents were free at any time to remove [her] from the school if they felt that her safety was being compromised. This reality is a far cry from the situation of incarcerated prisoners, institutionalized mental health patients, or children placed in foster care.

*Id.* The same principles apply here. It may have been inconvenient (and costly) for Plaintiffs to buy water from other sources for all their needs, but that "practicality does not alter the fact that" Plaintiffs voluntarily elected to receive and use Jackson water. *Id.* Plaintiffs acknowledge that reality by alleging that they would have switched to bottled water had the City's messaging about the water been different. *See* [101] ¶¶ 301–03, 316–18, 334–36, 350–52.

Furthermore, the City's mere knowledge of the foreseeable danger "lurking in [the] tap water," *id.* ¶ 300, does not create a constitutional duty to protect non-

---

[9] "[T]he Due Process Clause should [not] be interpreted to impose federal duties that are analogous to those traditionally imposed by state tort law." *Collins*, 503 U.S. at 128 (collecting cases).

custodial citizens from, or warn them about, that danger. *See Collins*, 503 U.S. at 125–29 (holding that a government's failure to warn of a known danger, without more, does not violate substantive due process); *Doe ex rel. Magee*, 675 F.3d at 862 ("[F]oreseeability cannot create an affirmative duty to protect when plaintiff remains unable to allege a custodial relationship.") (quoting *Graham v. Indep. Sch. Dist. No. I-89*, 22 F.3d 991, 995 (10th Cir. 1994)); *J.R. v. Gloria*, 593 F.3d 73, 79 (1st Cir. 2010) ("That affirmative duty to protect does not arise from the state's knowledge of the individual's predicament or from its expression of intent to help him.").

True, the City's mismanagement of the public water system exacerbated the Plaintiffs' risk of danger. And in circuits that recognize the state-created-danger theory, similar allegations that the state played some part in creating or increasing a foreseeable danger may create a corresponding constitutional duty to protect a plaintiff from that danger. *See Fisher v. Moore*, 73 F.4th 367, 373–74 & n.32 (5th Cir. 2023); *see also, e.g.*, *Est. of B.I.C. v. Gillen*, 710 F.3d 1168, 1173 (10th Cir. 2013) (articulating six-part test). But the Fifth Circuit has never adopted that theory. *See Fisher*, 367 F.4th at 372 & n.13 (collecting cases and noting that the Fifth Circuit has "repeatedly declined to recognize" the state-created-danger theory).

As before, the Court concludes that the City owed no affirmative duty to protect Plaintiffs from the foreseeable dangers of rising lead levels in the water. *See* [97] at 13–17.

13

2.  Actions Taken

The Court thus turns to the central issue before it: whether the misrepresentation allegations state a bodily-integrity claim.

The Court starts (and ends) with the "threshold question": whether, under these circumstances, the public pronouncements made by Jackson officials constituted conduct that "is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998).

The Supreme Court has "made it clear that the due process guarantee does not entail a body of constitutional law imposing liability whenever someone cloaked with state authority causes harm." *Id.* at 848. Instead, substantive due process only protects against "'arbitrary action of government,' and . . . under the 'shocks the conscience' standard, 'only the most egregious official conduct can be said to be arbitrary in the constitutional sense.'" *M.D. by Stukenberg v. Abbott*, 907 F.3d 237, 251 (5th Cir. 2018) (quoting *Lewis*, 523 U.S. at 845–46).

Conduct that shocks the conscience has been described in several ways:

> It has been described as conduct that "violates the decencies of civilized conduct"; conduct that is "so brutal and offensive that it [does] not comport with traditional ideas of fair play and decency"; conduct that "interferes with rights implicit in the concept of ordered liberty"; and conduct that "is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience."

*Doe ex rel. Magee*, 675 F.3d at 867 (quoting *Lewis*, 523 U.S. at 846–47 & n.8). The "constitutional concept of conscience shocking . . . points clearly away from liability,

or clearly toward it, only at the ends of the tort law's spectrum of culpability."
*Lewis*, 523 U.S. at 848.

On one end of the spectrum, "[c]onduct [that is] *intended* to injure" and that
is "unjustifiable by any government interest is the sort of official action most likely
to rise to the conscience-shocking level." *Tyson v. Cnty. of Sabine*, 42 F.4th 508, 518
(5th Cir. 2022) (citation omitted). On the other end of the spectrum, "liability for
negligently inflicted harm is categorically beneath the threshold of constitutional
due process." *Lewis*, 523 U.S. at 849.

"[I]n some circumstances," the shocks the conscience standard can be
satisfied by showing conduct that falls within the middle range of this spectrum—
conduct resulting "from deliberate indifference." *M.D. by Stukenberg*, 907 F.3d at
251 (quoting *Rosales-Mireles v. United States*, 585 U.S. 129, 138 (2018)).
Demonstrating deliberate indifference is a "significantly high burden . . . to
overcome." *Hernandez ex rel. Hernandez v. Tex. Dep't of Protective & Regul. Servs.*,
380 F.3d 872, 882 (5th Cir. 2004) (quotation omitted). Deliberate indifference
requires culpability beyond gross negligence; it "must amount to an intentional
choice"—one that "consciously disregard[s] a known and excessive risk to the
victim's health and safety." *M.D. by Stukenberg*, 907 F.3d at 251 (quotations
omitted). "Deliberate indifference that shocks in one environment may not be so
patently egregious in another, and [the Court's] concern with preserving the
constitutional proportions of substantive due process demands an exact analysis of

15

circumstances before any abuse of power is condemned as conscience shocking." *Lewis*, 523 U.S. at 850.

Thus, the Court must first address whether deliberately indifferent conduct can shock the conscience under the circumstances here. Viewing the facts in the light most favorable to Plaintiffs, in a non-custodial case—absent allegations of an intent to harm—can a complaint that adequately alleges that City officials made knowingly false public statements about the safety of the City's water during an ongoing crisis shock the conscience? Even under the state-created-danger theory, the answer is "far from clear." *Benzman v. Whitman*, 523 F.3d 119, 128 (2d Cir. 2008). Under the law binding this Court, the "mere novelty of [Plaintiffs'] claim is reason enough to doubt that substantive due process sustains it." *Reno v. Flores*, 507 U.S. 292, 303 (1993) (internal quotation marks and citations omitted).

Indeed, neither party presents, nor can the Court find, any binding precedent in which a court found an underlying bodily integrity violation involving a non-custodial plaintiff and purely deliberately indifferent conduct by a state actor. Plaintiffs' most persuasive authority is the Sixth Circuit's holding that the response to the Flint Water Crisis by government officials shocked the conscience. *See Guertin v. State*, 912 F.3d 907 (6th Cir. 2019). Even there, the court said that non-custodial deliberate indifference claims require "something more"—an additional element like "callous disregard or intent to injure—[to] ensure[] that only the most egregious official conduct can be said to be arbitrary in the constitutional sense." *Id.*

16

at 924 (quotation omitted).[10] This makes sense; one of the goals of the "shocks the conscience" test is to remove claims from the constitutional arena and prevent the Fourteenth Amendment from becoming a font of tort law. *See Lewis*, 523 U.S. at 846–49. That is why the "burden to show state conduct that shocks the conscience . . . requir[es] stunning evidence of arbitrariness and caprice that extends beyond mere violations of state law, even [beyond] violations resulting from bad faith." *Doe ex rel. Magee*, 675 F.3d at 868 (quoting *J.R.*, 593 F.3d at 80). It requires "something more egregious and more extreme," *id.* (quoting same)—something "willful and targeted toward [a] specific harm," *Saenz v. Heldenfels Bros., Inc.*, 183 F.3d 389, 392 (5th Cir. 1999). Accordingly, the Court concludes that without a constitutional duty to protect, a bodily-integrity claim requires "something more" than deliberate indifference to a foreseeable risk of harm. *See id.*; *Doe ex rel. Magee*, 675 F.3d at 862, 868 ("An allegation of deliberate indifference may be sufficient to *violate* a constitutional duty, but it is not sufficient to *create* the constitutional duty.").[11]

---

[10] Plaintiffs misconstrue *M.D. by Stukenberg* to "resolv[e the] debate about which standard of culpability to apply in favor of deliberate indifference." [115] at 14 (citing 907 F.3d at 251 n.22). That case occurred in the context of a special relationship between the State and children in the foster care system. Therefore, the defendants' alleged "deliberate indifference" was measured against a *DeShaney* affirmative duty to protect the plaintiffs and provide them with "personal security and reasonably safe living conditions." *M.D. by Stukenberg*, 907 F.3d at 250 (quotation omitted). As explained, Plaintiffs' allegations must be considered in light of the fact that the City owed no constitutional duty to provide a minimal level of safety to Plaintiffs. *See Collins*, 503 U.S. at 126–28.

[11] The facts in *Saenz* support that conclusion. In *Saenz*, an officer and his subordinate were on patrol and came across a truck stopped at a stop sign for a suspiciously long time. 183 F.3d at 390. The subordinate wanted to investigate the driver for drunk driving, but the officer ordered him not to, explaining that this driver, who the officer knew, was "always drunk." *Id.* The subordinate insisted on stopping the truck, but the officer ordered him to "just leave [the driver] alone." *Id.* Minutes later, the drunk driver crashed into an oncoming vehicle, killing two and injuring three more. *Id.* The estate and surviving

The City argues that Plaintiffs can only establish that "additional element" by alleging that the City made false statements about the water with an "intent to cause harm." Supp. Mem. [107] at 5. It cites two Second Circuit cases to support that conclusion. *See id.* In *Lombardi*, workers who performed critical services at the World Trade Center site in the aftermath of 9/11 brought a *Bivens* claim against federal officials alleging that they issued "reassuring—and knowingly false—announcements" that the air on-site presented "no significant health risks to the public." 485 F.3d at 74–75. The workers alleged they relied on those false assurances and were injured because of them. *Id.* at 75. The Second Circuit rejected the workers' due process claim, as they were owed no "special relationship" duty and did not allege that the officials acted with an "intent to harm." *Id.* at 75, 79, 85. Without such an allegation, officials obliged to make operational decisions—decisions subject to competing considerations and complicated by an unprecedented environmental crisis—did not violate the plaintiffs' substantive due process rights

family members of the deceased sued the officer and the county, alleging a substantive due process violation. *Id.* The officer—by ordering his subordinate not to stop a known drunk driver who was driving erratically—made an "intentional choice" that "consciously disregard[ed] a known and excessive risk to the victim[s'] health and safety." *M.D. by Stukenberg*, 907 F.3d at 252 (quotations omitted) (defining deliberate indifference). This Court struggles to see what competing governmental interest could justify stopping a fellow law enforcement officer from preventing a drunk driver from remaining on the road. But the Fifth Circuit rejected the claim: "If a state officer has no duty to protect an identified person from a known danger . . . he cannot offend due process by permitting an intoxicated driver to remain on the highway, thereby increasing the risk of harm to unidentified and unidentifiable members of the public." *Saenz*, 183 F.3d at 392. Plaintiffs tried to frame the claim as an arbitrary "abuse of governmental authority," but the Court held that this "semantic dodge" of the lack of a constitutional duty to protect would "not do." *Id.*

by making false or misleading statements about the health hazards posed to the worker-plaintiffs. *See id.* at 82–85.

A year later, the Second Circuit decided *Benzman*, which arose from many of the same false and reassuring statements in *Lombardi* about the lower Manhattan air after 9/11. *See Benzman*, 523 F.3d 119. The *Benzman* court recognized that the "considerations favoring prompt appearance at ground zero by first responders and other workers in order to minimize loss of life and injury and to clear debris f[ou]nd no analogue in the decision . . . to assure area residents that it was safe to return" to their homes, jobs, and schools. *Id.* at 128. Still, it rejected the plaintiffs' "novel" claim, heeding the "Supreme Court's cautionary words that 'the Court has always been reluctant to expand the concept of substantive due process.'" *Id.* at 127, 129 (quoting *Collins*, 503 U.S. at 125). Those cautionary words apply here, too.[12]

Against that backdrop, the Court draws several conclusions. First, the City had no constitutional duty to protect Plaintiffs from or warn them about the foreseeable danger of contaminated water because there was no special relationship and the state-created-danger theory is foreclosed in this circuit. Second, considering conclusion one, Plaintiffs must allege "something more" than pure deliberate indifference to their foreseeable plight. *Guertin*, 912 F.3d at 924; *see also Doe ex rel.*

---

[12] Notably, the Second Circuit analyzed both *Lombardi* and *Benzman* under the state-created-danger theory, yet it still rejected the plaintiffs' claims. *See Lombardi*, 485 F.3d at 80; *Benzman*, 523 F.3d at 127. In the Fifth Circuit's most recent rejection of that theory, it noted that the Supreme Court has "recently—and forcefully—underscored that substantive due process is a disfavored doctrine prone to judicial improvisation." *Fisher*, 73 F.4th at 373 (citing *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 240 (2022)); *see also id.* at 374 (noting the Supreme Court's "unsubtle admonition against enlarging substantive due process").

*Magee*, 675 F.3d at 862. Third, all the above—plus the fact that no binding precedent has found a substantive due process claim resulting from exposure to environmental contaminants—makes Plaintiffs' claim a novel one in this circuit.[13] And fourth, this Court must be reluctant to expand the concept of substantive due process. With those conclusions in mind, the Court compares the factual allegations here to other binding bodily-integrity precedent. That comparison reveals a yawning gap.

Take *Rochin v. California*, 342 U.S. 165 (1952). There, the Supreme Court held that forcibly administering a vomit-inducing solution through a tube into a suspect's stomach to extract evidence violated the right to bodily integrity. *Id.* at 166, 172–74. Similarly, other types of direct, physically intrusive conduct have been held to implicate the right to bodily integrity. *See Missouri v. McNeely*, 569 U.S. 141, 148, 162–63 (2013) (compelled physical intrusion beneath a suspect's skin and into his veins to obtain a blood sample); *Winston v. Lee*, 470 U.S. 753, 766–77 (1985) (nonconsensual surgery to retrieve a bullet from a suspect's chest); *Washington v. Harper*, 494 U.S. 210, 229 (1990) (explaining that forcibly injecting antipsychotic drugs into a nonconsenting inmate's body "represent[ed] a substantial

---

[13] In fact, the Fifth Circuit has rejected substantive due process claims arising from exposure to environmental contaminants. *See, e.g.*, *Greene v. Plano, I.S.D.*, 227 F. Supp. 2d 615, 618–19 (E.D. Tex. 2002), *aff'd sub nom.*, *Greene v. Plano Indep. Sch. Dist.*, 103 F. App'x 542 (5th Cir. 2004) (unpublished) (per curiam); *Gasper v. La. Stadium & Exposition Dist.*, 418 F. Supp. 716, 720–21 (E.D. La. 1976), *aff'd*, 577 F.2d 897 (5th Cir. 1978) (per curiam) (rejecting substantive due process claim brought by non-smokers to ban smoking in the Louisiana Superdome and stating that there is no constitutional right to a "clean environment").

20

interference with that person's liberty"); *Riggins v. Nevada*, 504 U.S. 127, 135–38 (1992) (same as to pretrial detainee). To describe these cases is to question their applicability here. All relate to some direct, forced, and intentional invasion of an individual's body.

Likewise, Fifth Circuit cases in which the court has found a violation of bodily integrity all contain some element of direct, intentional invasion. The deputy in *Tyson* intended to violate the plaintiff's bodily integrity when he "commanded her to expose" her genitals and engaged in sex acts in front of her. *See* 42 F.4th at 514, 518. The teacher in *Taylor* intended to molest the 15-year-old student. *See* 15 F.3d at 450–51. Other cases reflect a similar intent to harm or invade the plaintiff's bodily integrity. *See, e.g.*, *Jefferson v. Ysleta Indep. Sch. Dist.*, 817 F.2d 303, 305 (5th Cir. 1987) (teacher tying student to a chair violated student's right to bodily integrity); *Shillingford v. Holmes*, 634 F.2d 263, 264–66 (5th Cir. 1981) (police officer violated tourist's right to bodily integrity by intentionally striking tourist with his baton), *abrogated on unrelated grounds by Valencia v. Wiggins*, 981 F.2d 1440 (5th Cir. 1993).

Comparing the allegations in those cases with those here, the Court finds that the City's statements about the water do not shock the conscience. After learning of the action level exceedance, Jackson officials downplayed the scope of the potential crisis, told the public that the water was safe, and attempted to distinguish the situation from Flint. *See supra* Part I. But the Court cannot ignore that the City told the public that test results revealed lead in the tap water of some

Jackson homes, acknowledged the need to upgrade its corrosion control systems, and issued precautions about best practices when using the water. *See id.*

In short, the City's narrative choice does not reflect that "additional element," *see Guertin*, 912 F.3d at 924, required in a non-custodial deliberate indifference case, especially considering the unavailability of the state-created-danger cause of action. The allegations here are simply inapposite from cases when officials cloaked with state authority forcibly pumped someone's stomach, *Rochin*, 342 U.S. 165, or sexually assaulted a schoolgirl, *Taylor*, 15 F.3d 443. The allegations are more like those in *Saenz*, 183 F.3d 389—tragic but ultimately not conscience-shocking within the rigid boundaries of substantive due process. *See supra* n.11.

To conclude otherwise would be to conclude that City officials would have been less culpable by "default[ing] to silence" throughout the crisis. *See Lombardi*, 485 F.3d at 84 (citing *Collins*, 503 U.S. at 125–29) (no duty to warn or protect non-custodial citizens from a foreseeable risk of harm). The Court cannot accept that conclusion. Acknowledging the action level exceedance and downplaying it at least put citizens on notice, even if inadequately. Maybe, considering that the City's years-long mismanagement of the public water system contributed to the dangers faced by the citizens of Jackson, the law should impose a constitutional duty on City officials to adequately warn and protect citizens from such a state-created danger. *See Fisher*, 73 F.4th at 375 (Wiener, J., concurring); *id.* at 375–76 (Higginson, J., dissenting). But for now it does not, and it is not for this Court to change that.[14]

---

[14] The Fifth Circuit has emphasized the need for "rigorous panel briefing that grapples painstakingly with how such a cause of action would work in terms of its practical

For all these reasons, the allegations in Plaintiffs' [101] Second Amended Complaint do not establish a facially plausible constitutional violation. Accordingly, "an essential element of municipal liability is missing." *Doe ex rel. Magee*, 675 F.3d at 869. The Court therefore must grant the City's [106] motion to dismiss Plaintiffs' bodily-integrity claim.

### B. State Law Claims

The only remaining claims here are professional negligence and negligence against Trilogy, *see* [101] ¶¶ 391–415, and negligence against the City, *see id.* ¶¶ 416–35. The parties quibble over whether the Court should exercise supplemental jurisdiction over these state-law claims. *See* [107] at 15–16; [115] at 20–21; Reply [116] at 9–10. Lost in that back and forth is any acknowledgment of the allegations in Plaintiffs' [101] Second Amended Complaint that the Court has original jurisdiction under the Class Action Fairness Act of 2005 ("CAFA"). *See* [101] ¶ 6; *see also id.* ¶¶ 357–69.

For class action lawsuits, "CAFA expanded diversity jurisdiction in two key ways." *Miss. ex rel. Hood v. AU Optronics Corp.*, 571 U.S. 161, 165 (2014). First, it replaced the complete diversity requirement with a minimal diversity requirement. *Id.* Now, "a federal court may exercise jurisdiction over a class action if 'any member of a class of plaintiffs is a citizen of a State different from any defendant.'" *Id.*

---

contours and application." *Fisher*, 73 F.4th at 369. It has likewise emphasized the need for "meticulous briefing on how state-created danger liability meets today's reinvigorated test," which provides that "rights protected by substantive due process must be deeply rooted in this Nation's history and tradition and implicit in the concept of ordered liberty." *Id.* at 374 (cleaned up).

(quoting 28 U.S.C. § 1332(d)(2)(A)). Second, "CAFA grants federal jurisdiction over

class . . . actions in which the aggregate amount in controversy exceeds $5 million."

*Id.* at 166 (citing 28 U.S.C. §§ 1332(d)(2), (d)(6)). Plaintiffs allege that the class is

composed of "thousands," that Trilogy is a "citizen of the State of Texas," and that

the "matter in controversy in this suit exceeds $5,000,000." [101] ¶¶ 6, 362; *see also*

Trilogy's Answer [111] ¶ 6; 28 U.S.C. §§ 1332(d)(5)(B), (d)(1)(D).

But other requirements apply that the Court doubts Plaintiffs can satisfy.

*See, e.g.*, 28 U.S.C. §§ 1332(d)(4), (d)(5)(A). If original jurisdiction does not lie under

CAFA, the Court declines to exercise supplemental jurisdiction over the remaining

state-law claims. *See id.* § 1367(c)(3); *Manyweather v. Woodlawn Manor, Inc.*, 40

F.4th 237, 246 (5th Cir. 2022). Given the Plaintiffs' class allegations and the City's

lack of a challenge to that jurisdictional theory, the Court will grant Plaintiffs seven

days to submit supplemental briefing as to why the remaining state-law claims

belong here. If Plaintiffs decline to do so, the Court will dismiss those claims

without prejudice. *Howery v. Allstate Ins. Co.*, 243 F.3d 912, 916 (5th Cir. 2001)

("[T]he burden of establishing federal jurisdiction rests on the party seeking the

federal forum."); *Trend Intermodal Chassis Leasing LLC v. Zariz Transp. Inc.*, No.

3:23-CV-1143, 2024 WL 117155, at *2 (N.D. Tex. Jan. 10, 2024) ("The Court will not

assume it has jurisdiction."); *see also* Fed. R. Civ. P. 12(h)(3).

IV.   Conclusion

The Court has considered all arguments. Those not addressed would not have

changed the outcome. For the stated reasons, the Court GRANTS the Individual

Defendants' [104] Motion to Dismiss; and GRANTS IN PART and DENIES IN PART the City's [106] Motion to Dismiss. The Court DISMISSES with prejudice all claims against the Individual Defendants. The Court DISMISSES with prejudice the bodily-integrity and state-created-danger claims against the City. The Court will allow Plaintiffs seven days to submit supplemental briefing as to why the remaining state-law claims should continue in this Court. Plaintiffs' supplemental briefing is due on or before June 18th, 2024.

SO ORDERED, this 11th day of June, 2024.

s/ *Kristi H. Johnson*
UNITED STATES DISTRICT JUDGE